No. 24-3259

In the United States Court of Appeals for the Ninth Circuit

WORLD VISION, INC.,
Defendant-Appellant,

v.

AUBRY MCMAHON,
Plaintiff-Appellee.

Appeal from the United States District Court
for the Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

**DEFENDANT-APPELLANT'S OPENING BRIEF**

NATHANIEL L. TAYLOR
ABIGAIL J. ST. HILAIRE
ELLIS, LI & MCKINSTRY PLLC
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
(202) 682-0565
ntaylor@elmlaw.com

SCOTT J. WARD
J. MATTHEW SZYMANSKI
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
(703) 761-5012
sjw@gg-law.com

DANIEL H. BLOMBERG
  *Counsel of Record*
LUKE W. GOODRICH
JORDAN T. VARBERG
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
dblomberg@becketlaw.org

*Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant World Vision, Inc. states that it does not have a parent corporation and does not issue any stock.

/s/ Daniel H. Blomberg
Daniel H. Blomberg

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES ................................................................ v

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES .................................................................. 1

INTRODUCTION .............................................................................. 1

STATEMENT OF THE CASE ............................................................. 5

    A. World Vision and its Religious Mission ..................................... 5

    B. World Vision's Religious Personnel Policies ............................... 6

    C. DCS Representatives: the "Voice, Face, and Heart"
       of World Vision ...................................................................... 8

    D. Plaintiff Aubry McMahon ...................................................... 12

    E. McMahon's Application, Job Offer, and Rescission ...................... 13

    F. Proceedings Below ................................................................ 15

STANDARD OF REVIEW ................................................................ 17

SUMMARY OF ARGUMENT ........................................................... 17

ARGUMENT ................................................................................. 19

I. McMahon's claims are barred by the law of church
   autonomy .................................................................................. 19

    A. McMahon's claims are barred by the Religion
      Clauses' protection for ministerial selection. .............................. 21

       1. The ministerial exception applies to employees
         who are important to an organization's
         religious mission. .............................................................. 21

2. McMahon's claims violate the Religion
   Clauses' protection for ministerial selection.............................24

3. The district court's contrary conclusion was in
   error. .................................................................................30

B. McMahon's claims are barred by the Religion
   Clauses' protection for religious membership
   decisions. ...........................................................................33

1. Church autonomy ensures religious groups
   can set religious standards for their members. ......................34

2. McMahon's claims violate the Religion
   Clauses' protection for religious membership
   standards. ...........................................................................37

3. The district court's contrary conclusion
   was in error .........................................................................39

II. McMahon's claims are barred by Title VII and
    the WLAD. ................................................................................43

A. The statutory religious exemptions apply.................................43

B. The bona fide occupational qualification
   defenses apply. ...........................................................................48

III. Mahon's claims are barred by the freedom of expressive
     association. ...........................................................................50

A. McMahon's claims infringe the freedom of
   association.................................................................................52

B. McMahon failed to provide adequate justification
   for this infringement.................................................................53

C. The district court erred in refusing to apply
   freedom of association.............................................................57

IV. McMahon's claims are barred by the Free
    Exercise Clause. .....................................................................59

CONCLUSION .................................................................. 62

CERTIFICATE OF COMPLIANCE ..................................... 63

CERTIFICATE OF SERVICE ............................................. 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) ............................................................... 50

*Alcazar v. Corp. of the Catholic Archbishop*,
   627 F.3d 1288 (9th Cir. 2010) ........................................ 21, 23, 32, 33

*Alicea-Hernandez v. Catholic Bishop*,
   320 F.3d 698 (7th Cir. 2003) .......................................... 23, 29

*Aparicio v. Christian Union*,
   No. 18-cv-592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) ............. 36

*Apilado v. N. Am. Gay Amateur Athletic All.*,
   792 F. Supp. 2d 1151 (W.D. Wash. 2011) ......................................... 53

*Apilado v. N. Am. Gay Amateur Athletic All.*,
   No. 2:10-cv-682, 2011 WL 5563206
   (W.D. Wash. Nov. 10, 2011) ......................................... 51, 54

*Askew v. Trs. of Gen. Assembly of Church of
   Lord Jesus Christ*,
   684 F.3d 413 (3d Cir. 2012) ......................................... 38, 41

*Bear Creek Bible Church v. EEOC*,
   571 F. Supp. 3d 571 (N.D. Tex. 2021), ............................. 45, 46, 59, 60

*Behrend v. S.F. Zen Ctr.*,
   108 F.4th 765 (9th Cir. 2024) .................................... 17, 22, 24, 30, 33

*Billard v. Charlotte Catholic High Sch.*,
   101 F.4th 316 (4th Cir. 2024) ......................................... 23, 29-30, 45

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ...................................................... 46, 47

*Bouldin v. Alexander*,
   82 U.S. (15 Wall.) 131 (1872) ............................................ 34

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ......................................... 18, 50, 52, 53-54, 57, 58

*Boy Scouts of Am. v. Wyman,*
    335 F.3d 80 (2d Cir. 2003) .................................................................. 59

*Brazauskas v. Fort Wayne-S. Bend Diocese,*
    796 N.E.2d 286 (Ind. 2003) ............................................................... 37

*Bryce v. Episcopal Church,*
    289 F.3d 648 (10th Cir. 2002) ....................................... 35, 36, 38, 40

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ........................................................................... 57

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) ..................................... 36, 38, 40

*Carson v. Makin,*
    596 U.S. 767 (2022) ........................................................................... 41

*Chambers v. Omaha Girls Club, Inc.,*
    834 F.2d 697 (8th Cir. 1987) ............................................................. 49

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ........................................................................... 54

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ........................................................................... 53

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ................................................. 38, 51, 53

*Corp. of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ....................................................................... 4, 35

*Curay-Cramer v. Ursuline Acad.,*
    450 F.3d 130 (3d Cir. 2006) ......................................................... 45-46

*Darren Patterson Christian Acad. v. Roy,*
    699 F. Supp. 3d 1163 (D. Colo. 2023) ......................................... 36, 59

*Democratic Party of U.S. v. Wisconsin,*
    450 U.S. 107, (1981)................................................................57

*Digit. Realty Tr., Inc. v. Somers,*
    583 U.S. 149 (2018) ............................................................. 44

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
    100 F.4th 1251 (10th Cir. 2024) ........................................ 38

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ............................................. 18

*EEOC v. Chi. Club,*
    86 F.3d 1423 (7th Cir. 1996)............................................. 56

*EEOC v. Fremont Christian Sch.,*
    781 F.2d 1362 (9th Cir. 1986)........................................46-47

*EEOC v. Kamehameha Schs.,*
    990 F.2d 458 (9th Cir. 1993)............................................. 49

*EEOC v. Miss. Coll.,*
    626 F.2d 477 (5th Cir. 1980) ............................................. 46

*EEOC v. Pac. Press Publ'g Ass'n,*
    676 F.2d 1272 (9th Cir. 1982)........................................ 46, 47

*EEOC v. Roman Catholic Diocese,*
    213 F.3d 795 (4th Cir. 2000)............................................. 23

*Emp. Div. v. Smith,*
    494 U.S. 872 (1990)........................................................18-19

*Everson v. Mich. Dep't of Corr.,*
    391 F.3d 737 (6th Cir. 2004)............................................. 61

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
    *Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) ...............................59, 60, 61

*Fitzgerald v. Roncalli High Sch.,*
    73 F.4th 529 (7th Cir. 2023) ............................................. 45

*Fratello v. Archdiocese of N.Y.*,
  863 F.3d 190 (2d Cir. 2017) .................................................. 29, 30, 31

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ............................................. 3, 4, 18, 54, 55, 59-60

*Garcia v. Salvation Army*,
  918 F.3d 997 (9th Cir. 2019) ....................................................... 44, 56

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) ........................................... 36, 39

*Green v. Miss United States of Am.*,
  52 F.4th 773 (9th Cir. 2022) ............................................ 51, 54, 56, 58

*Grussgott v. Milwaukee Jewish Day Sch.*,
  882 F.3d 655 (7th Cir. 2018) ................................................................ 31

*Headley v. Church of Scientology*,
  687 F.3d 1173 (9th Cir. 2012) ....................................................... 34-35

*Hegwine v. Longview Fibre Co.*,
  172 P.3d 688 (Wash. 2007) ................................................................. 49

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) .............................................................................. 59

*Hosanna-Tabor v. EEOC*,
  565 U.S. 171 (2012) ....................... 20, 21, 29, 30, 31, 40, 41, 42, 52, 58

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) ........................................................................... 51

*Int'l Union v. Johnson Controls*,
  499 U.S. 187 (1991) ........................................................................... 49

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952) ..................................................................... 4, 39-40

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) .............................................................. 43

*Little v. Wuerl,*
   929 F.2d 944 (3d Cir. 1991) .............................................................. 38

*Louisiana v. EEOC,*
   --- F. Supp. 3d ---, No. 2:24-cv-629,
   2024 WL 3034006 (W.D. La. June 17, 2024) ...................................... 48

*Maguire v. Marquette Univ.,*
   627 F. Supp. 1499 (E.D. Wis. 1986) .................................................... 46

*McCollum v. Cal. Dep't of Corr.,*
   647 F.3d 870 (9th Cir. 2011) .............................................................. 49

*Mendoza v. Zirkle Fruit,*
   301 F.3d 1163 (9th Cir. 2002) ............................................................ 47

*Moore v. Hadestown Broadway LLC,*
   --- F.Supp.3d ---, No. 23-cv-4837, 2024 WL 989843
   (S.D.N.Y. Mar. 7, 2024) ..................................................................... 59

*NLRB v. Catholic Bishop,*
   440 U.S. 490 (1979) ............................................................................ 42

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) .............................................................................. 4

*Orr v. Christian Bros. High Sch.,*
   No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021) ................. 23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020) .................. 17, 19, 20, 21, 22, 29, 30, 32, 33, 34, 43

*Our Lady's Inn v. City of St. Louis,*
   349 F. Supp. 3d 805 (E.D. Mo. 2018) ................................................. 59

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.,*
   819 F.2d 875 ............................................................................... 34, 43

*Petruska v. Gannon Univ.,*
   462 F.3d 294 (3d Cir. 2006) .............................................................. 29

*Priests for Life v. HHS,*
  7 F. Supp. 3d 88 (D.D.C. 2013) ........................................................... 59

*Puri v. Khalsa,*
  844 F.3d 1152 (9th Cir. 2017) ...................................... 17, 34, 35, 40-41

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ................................................................................. 50

*Serbian E. Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) ............................................... 17, 19, 20, 33, 34, 37

*Shaliehsabou v. Hebrew Home,*
  363 F.3d 299 (4th Cir. 2004) ............................................................. 23

*Slattery v. Hochul,*
  61 F.4th 278 (2d Cir. 2023) ................................... 51, 52-53, 54, 58, 59

*Spencer v. World Vision, Inc.,*
  633 F.3d 723 (9th Cir. 2011) ...................................................... 5, 44, 49

*Starkey v. Roman Catholic Archdiocese,*
  41 F.4th 931 (7th Cir. 2022) ................................................... 23, 32, 45

*Sterlinski v. Catholic Bishop,*
  934 F.3d 568 (7th Cir. 2019) ............................................................. 23

*Sutton v. Providence St. Joseph Med. Ctr.,*
  192 F.3d 826 (9th Cir. 1999) ............................................................. 19

*Tandon v. Newsom,*
  593 U.S. 61 (2021) ................................................................. 18, 60, 61

*Tandon v. Newsom,*
  992 F.3d 916 (9th Cir. 2021) ............................................................. 61

*Teamsters Loc. Union v. Wash. Dep't of Corr.,*
  789 F.3d 979 (9th Cir. 2015) ............................................................. 60

*Watson v. Jones,*
  80 U.S. (13 Wall.) 679 (1872) ........................................................... 19

*Werft v. Desert Sw. Ann. Conf. of United Methodist Church,*
377 F.3d 1099 (9th Cir. 2004) .......................................................21-22

*Westenbroek v. Kappa Kappa Gamma Fraternity,*
No. 2:23-cv-51, 2023 WL 5533307 (D. Wyo. Aug. 25, 2023)..............51

*Youth 71Five Ministries v. Williams,*
No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ...................60

**Statutes**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C § 1331 ...............................................................................1

28 U.S.C § 1367 ...............................................................................1

42 U.S.C. § 2000e .............................................. 3, 18, 44, 55, 56

42 U.S.C. § 2000e-1 ......................................... 3, 18, 44, 47, 55

42 U.S.C. § 2000e-2 .............................................. 18, 48, 55, 56

42 U.S.C. § 2000e-5 ..........................................................................1

42 U.S.C. § 2000gg-5 ......................................................................47

Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat.
241, 255 (1964) ...........................................................................44

Wash. Rev. Code § 49.60.040 ....................................... 18, 48, 55

Wash. Rev. Code § 49.60.180 ....................................... 18, 48, 55

**Other Authorities**

29 C.F.R. § 1604.2 ..........................................................................56

Richard Carlson, *The Small Firm Exemption and the Single
Employer Doctrine in Employment Discrimination Law,*
80 St. John's L. Rev. 1197 (2006) .........................................55

*Facts & Data on Small Business and Entrepreneurship*,
Small Business & Entrepreneurship Council ................................... 55

*Section 2 Threshold Issues*, EEOC ....................................................... 56

*Small Business Size Standards*, Congressional Research
Service (June 15, 2022) ....................................................................... 60

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367, and 42 U.S.C. § 2000e-5(f)(3). The district court entered final judgment on May 14, 2024. 1-ER-2. The notice of appeal was timely filed on May 21, 2024. 5-ER-1076. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether McMahon's claims are barred by the Religion Clauses' protections for selecting ministers and for deciding religious standards of membership.

2. Whether McMahon's claims are barred by Title VII and the WLAD.

3. Whether McMahon's claims are barred by the First Amendment's expressive association protections.

4. Whether McMahon's claims are barred by the Free Exercise Clause.

## INTRODUCTION

The question in this case is simple but significant: May religious ministries ask their employees to comply with their core religious teachings? The answer is yes.

World Vision is a Christian ministry that asks its employees to uphold core Christian teachings in word and deed. This requirement is rooted in World Vision's belief that "faithfulness in biblical belief and conduct" are "indispensable elements of being a credible witness to Jesus Christ." And this requirement is clearly and regularly communicated to employees in job interviews, policies, and recurring training sessions.

Plaintiff Aubry McMahon applied to work at World Vision even though she disagrees with World Vision's core understanding of Christianity. During her interview process, she was expressly asked if she agreed with World Vision's religious beliefs and would comply with its religious standards of conduct, including its belief in traditional marriage—and McMahon said yes. But after receiving a job offer based on this agreement, she revealed she was in a same-sex marriage in direct violation of World Vision's religious beliefs and standards of conduct. Once World Vision rescinded her offer, she sued under Title VII and the Washington Law Against Discrimination.

McMahon's claims are barred by multiple constitutional and statutory protections for religious freedom.

***First***, they are barred by the Religion Clauses' doctrine of church autonomy, which protects the freedom of religious groups both to select those who hold an important religious role and to set religious qualifications for members of their ministries. Here, McMahon's claims violate both protections. She applied to serve in a position that plays a key public-facing role in carrying out World Vision's religious mission—including leading staff devotionals, praying with supporters, and helping supporters grow in their understanding of God's love for the poor. And she rejected World Vision's religious standards of conduct for members of its ministry. Either violation, standing alone, is sufficient to bar her claims; both together make this a straightforward case.

2

*Second*, McMahon's claims are barred by Title VII and the WLAD, which expressly protect religious ministries like World Vision. Specifically, Title VII provides that its prohibitions "shall not apply" when a religious organization makes an employment decision based on an employee's religious "belief," "observance," or "practice"—which is precisely what World Vision did here. 42 U.S.C. §§ 2000e-1(a), 2000e(j). Title VII also allows employers to establish bona fide occupational qualifications that are reasonably necessary to an employer's mission— which for World Vision includes asking employees who communicate its faith not to undermine that faith by their actions. The WLAD's parallel provisions likewise bar McMahon's claims.

*Third*, McMahon's claims are barred by the doctrine of expressive association, which requires strict scrutiny of laws that compel expressive groups to associate with individuals who undermine their expressive message. And the application of Title VII and the WLAD here cannot satisfy strict scrutiny—particularly when those laws categorically exempt small businesses constituting most employers nationwide, and when the Supreme Court has repeatedly (and unanimously) held that the government's interest in eliminating sexual-orientation discrimination does not justify penalizing religious groups for adhering to their religious views on marriage. *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

*Fourth*, McMahon's claims are barred by the Free Exercise Clause, which prevents discriminatory legal burdens from being unnecessarily placed on religious exercise. *Id.*

The district court's contrary ruling is not only wrong—it poses a serious threat to separation of church and state. Since our nation's founding, the Constitution has protected the freedom of religious organizations "to decide for themselves, free from state interference, matters of church government." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). This includes the freedom to decide "that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). That freedom extends to modern debates over sexual morality. As the Supreme Court said, "religious organizations" must be given "proper protection as they seek to teach" and "to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015).

Here, World Vision seeks to ensure that those who speak on its behalf faithfully reflect the view of marriage that Christianity has taught for millennia. If separation of church and state means anything, it means the government cannot force the Church to employ representatives who publicly reject its religious message.

4

## STATEMENT OF THE CASE

### A. World Vision and its Religious Mission

World Vision is a "Christian ministry dedicated to sharing the gospel of Jesus Christ" through "humanitarian outreach to children and families around the world who are poor and underserved." 1-ER-8 (quoting 3-ER-438 ¶18); 3-ER-537; *accord Spencer v. World Vision*, 633 F.3d 723, 725 (9th Cir. 2011) (O'Scannlain, J., concurring). It was founded in 1950 by Christian minister Bob Pierce after he "saw that the power of the gospel was demonstrated in the actions of those who fed, clothed, and cared for the hurting." 3-ER-537. Today, World Vision primarily serves "the world's most vulnerable"—"those living in extreme poverty or fragile contexts," who "disproportionately bear the brunt of evil" and of "broken relationships." 3-ER-566. It helps those of any faith or no faith. 3-ER-427–31.

World Vision works in and through partnership with donors, prayer supporters, and churches. 3-ER-438 ¶18. It annually trains more than 100,000 pastors and faith leaders from partner churches, working with them to serve millions of children worldwide. 3-ER-574.

World Vision, which is a nonprofit 501(c)(3) organization classified by the IRS as a church, 3-ER-442 ¶27(b), emphasizes its Christian identity and mission in every aspect of its ministry. Its Articles of Incorporation state that its purposes are exclusively religious, including to "perform the functions of the Christian church" in ways that "teach and preach

the Gospel," "spread … the Christian religion," and "render Christian service, both material and spiritual." 3-ER-509–10. World Vision holds itself out to the public as a Christian organization, with "its faith in Jesus … at the heart of all it does." 3-ER-442 ¶27(d) (cleaned up). Its logo, website, job applications, and public-facing materials reflect its Christian mission. *Id.* Its internal policies and practices do too. This includes weekly organization-wide chapel services, religious meetings for each department several times per week, and a "prayer-centered work environment" that incorporates prayer in daily operations and begins each fiscal year with a workday completely set aside for prayer. 3-ER-628. World Vision has even published a Bible that includes commentary highlighting scriptural teachings on serving the poor. *See* 3-ER-535–44; 5-ER-1075.

### B. World Vision's Religious Personnel Policies

World Vision's religious mission is reflected in its personnel policies— including that it hires only Christians for all positions. 3-ER-443 ¶27(d). All employees must agree with World Vision's religious beliefs as reflected in either its statement of faith or the Apostles' Creed. 3-ER-555; 3-ER-582. This includes affirming World Vision's belief in the resurrection and deity of Jesus Christ, the Trinity, and the forgiveness of sin through the Gospel. 3-ER-505.

All employees must also agree that they will abide by World Vision's religious Standards of Conduct, including outside the workplace. 3-ER-

6

582–83. Examples of prohibited conduct include "substance or alcohol over use or abuse," "greed and indifference to the needs of the poor," "malicious gossip," and, as relevant here, "sexual conduct outside the Biblical covenant of marriage between a man and a woman." 3-ER-583 (citing *Matthew* 19:4-5, *1 Corinthians* 6:9-19); 3-ER-586; 3-ER-554.

World Vision sees this "common commitment" to "faithfulness in biblical belief *and* conduct" as an "indispensable element[] of being a credible witness to Jesus Christ." 3-ER-549 (emphasis added); *see also* 1-ER-9–10; 3-ER-548. To World Vision, "[w]ords clarify the meaning of our deeds" and "deeds verify the integrity of our words about Jesus Christ." 3-ER-588. As an organization that conducts a significant part of its ministry through actions, World Vision believes that, to "work in a manner that draws people to Christ," "we cannot separate who we are from what we do." *Id.*

Because World Vision's religious expectations of employees are both substantial and important, they are discussed with all applicants as part of the interview process. 3-ER-582–86; 3-ER-484; 3-ER-594; 2-ER-150. An interviewer talks about World Vision's religious beliefs and standards of conduct "to clarify expectations and assist candidates … in deciding whether or not World Vision is the right place for them to serve the Lord." 1-ER-11 (cleaned up) (citing 3-ER-553, 3-ER-448 ¶40, 3-ER-582). If an applicant rejects those requirements, the interview process ends. 2-ER-333.

## C. DCS Representatives: the "Voice, Face, and Heart" of World Vision

Plaintiff Aubry McMahon sought to join World Vision's Donor Contact Services (DCS) department as a Customer Service Representative. 1-ER-12; 3-ER-435–36 ¶¶7-8. Representatives handle nearly all inbound and most outbound calls for World Vision, placing them on the front lines of its religious mission and ministry to donors, prayer supporters, and partner churches, inviting them to join World Vision "to serve the poor in Jesus' name." 4-ER-897; 4-ER-712; 5-ER-1044 ¶¶4-6. World Vision describes its representatives as "the *Voice, Face*, and *Heart* of World Vision." 4-ER-897.

### 1. Job Description and Qualifications

Representatives must affirm World Vision's religious beliefs and agree to abide by its standards of conduct. 3-ER-582–83; 3-ER-446 ¶34. As their job description explains, they are also expected to:

- "Help carry out our Christian organization's mission, vision, and strategies";
- "Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign";
- "[A]cquire and maintain donor relationships";
- "Serve as a liaison [with] donors and the general public";
- "Keep Christ Central in our individual and corporate lives";
- "Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer";

- "Learn and effectively communicate World Vision's involvement in ministries and projects around the world"; and

- "Be sensitive to Donor[s'] needs and pray with them when appropriate."

3-ER-530–31.

## 2. Training and Ministry Objectives

Upon joining World Vision, representatives receive "9-11 weeks of formal advance training," which "is more than any other advance training required of other World Vision employees." 59-ER-1044 ¶7. This training covers such religious topics as "who we are in Christ," "how to pray with donors," "attending chapel," and "leading and participating in devotions." 2-ER-312; *see also* 2-ER-314; 5-ER-1051–60; 3-ER-653–81.

Extended training is necessary because World Vision entrusts its representatives with significant ministry responsibilities. For one, the "spiritual growth" of supporters, partners, and donors is a "primary concern" of representatives. 5-ER-1001. Representatives are expected to "engage with donors and supporters in a way that contributes to transformation of their values, beliefs, and behaviours so that they give, act and pray for the well-being of vulnerable children and help [to] overcome causes of poverty and injustice." 4-ER-712.

Indeed, "[t]ransformation of donors is just as vital to World Vision as that of the children they sponsor." 4-ER-815 ¶23. The representatives' "role is not just about the children (as vital as they are)"; rather,

representatives support the spiritual lives of World Vision's supporters "by inspiring those donors who share World Vision's faith and by sharing that faith with those who don't." 4-ER-825 ¶50; *see also* 3-ER-564; 5-ER-1020. World Vision's goal is that its "relationship with donors and sponsors" through its representatives causes "changes … that are consistent with Christ's concern for the poor as well as an enhanced relationship with God." 3-ER-621. Thus, to World Vision, "[e]ffective Christian fundraising is an act of worship," 5-ER-956, and "a form of ministry in itself." 4-ER-823 ¶43.

Finally, World Vision expects representatives to support colleagues' "spiritual development." 3-ER-637. As described below, this includes participating in and leading religious meetings with fellow representatives, attending weekly chapel services, and consistently praying with coworkers for each other and World Vision's mission.

### 3. Regular Duties

Representatives engage with World Vision's donors, supporters, and partners daily. 4-ER-813–15 ¶¶19, 23; 4-ER-897; *see* 1-ER-14. Representatives provide information and answer questions about World Vision's work, ministry, and beliefs. 4-ER-825 ¶¶50-51; 5-ER-1044 ¶¶4-6; 3-ER-530–32; 3-ER-594–96; 5-ER-1062; 3-ER-653; 3-ER-422–33. This can include handling questions about World Vision's beliefs on sexual morality and marriage. 3-ER-594–95. Representatives answer incoming inquiries and place outgoing calls to donors and partner organizations

10

and churches to teach and inform them about World Vision programs like collective fasts, religious programming for children and families, events and curriculum designed for church youth groups, and other religious initiatives. *See, e.g.*, 5-ER-1064.

Prayer is an "essential function[] of the role." 2-ER-312. Praying is included in the job description, is a subject of training, and is directed and encouraged by supervisors. 3-ER-530–32; 4-ER-936; 2-ER-312, 316, 320. In practice, representatives receive thousands of requests for prayer every year from supporters and partners, averaging about 150 to 200 prayer requests daily. 4-ER-820 ¶37; 4-ER-687–89. Representatives regularly and personally pray with these supporters and partners on "diverse needs ranging from a mother's biopsy to a recent widow's troubled daughter to a family dairy farm's fate." 1-ER-15 (cleaned up); 4-ER-817–19 ¶¶30-33; 5-ER-1064–69; 5-ER-1071–73.

Representatives also "enhance the spiritual development" of coworkers through "devotions"—religious meetings where teams come together "for reading of Scripture and prayer for the daily work." 3-ER-637; 4-ER-705. Devotions generally occur several days a week and are "Christ-centered" and "consistent with the teaching of Scripture." 4-ER-705; 3-ER-531; 4-ER-709. Each representative is expected to take turns leading devotions. 2-ER-319.

Finally, representatives participate in "worship every week" as part of a ministry-wide chapel service "focused on the work of Christ to the poor."

11

3-ER-639. "The entire donor contact center shuts down during chapel, and every representative attends chapel." 2-ER-319. From time to time, representatives also "participate in the leadership of … weekly Chapel services" and provide religious teaching and worship. 3-ER-531; 2-ER-247; 4-ER-816 ¶28; 5-ER-1074.

### D. Plaintiff Aubry McMahon

Plaintiff Aubry McMahon disagrees with World Vision's religious beliefs on Christianity and marriage. In her view, "the definition of Christianity is different for each person" because "Christianity, just like sexuality or religion, is fluid." 2-ER-105, 145. For instance, she does not believe that the resurrection and the deity of Jesus Christ are essential to Christianity. 2-ER-143–44.

McMahon also disagrees with Christians who believe that "marry[ing] someone of the same sex" is contrary to God's will. 2-ER-125. She sees those beliefs as selectively interpreting the Bible and akin to beliefs that parents should "stone [their] first-born daughter once she has her menstrual period" or for "wearing blended clothing." *Id.* For her, marriage is about "commitment to a person" "who you love," "whoever that person may be, as long as it's legal." 2-ER-106.

McMahon married her wife in September 2020. 1-ER-8. They are "huge advocates" for "the LGBTQ community." 2-ER-166. Among other things, they go to Pride events, display Pride symbols publicly, and

conduct their "day-to-day lives … to show that [they] are supportive of the LGBTQ community." 2-ER-115, 117.

McMahon designed and sold t-shirts online advancing her views on marriage, such as a t-shirt with rainbow colors and the statement "Love is a terrible thing to hate." 3-ER-403. She testified that this message "exemplifies" her "definition of marriage." 2-ER-120.

### E. McMahon's Application, Job Offer, and Rescission

In November 2020, McMahon applied to be a trainee Customer Service Representative at World Vision. 3-ER-497; 1-ER-17. The position would become a full-time role upon successful completion of training. 4-ER-810 ¶9.

World Vision's initial interview with McMahon raised questions designed to ensure she was a spiritual fit for its ministry. 3-ER-482–84; 2-ER-329–31, 333. McMahon was asked questions like "[h]ow is God involved in your life right now?" and "[w]hat are you learning and discovering about God?," and asked to describe "[w]ho you believe Jesus Christ is and what influence or impact he has had on your personal life[.]" 3-ER-482–83.

World Vision explained that it seeks "individuals who not only share our Christian faith and values, but also live them out both in and outside of work" and that "employees are expected to be in alignment with behaviors described in our standards of conduct, which are biblically based." 3-ER-483. World Vision then identified examples of behaviors

13

considered "not in alignment with [its] standards of conduct." *Id.* This list included "[a]ny sexual conduct outside of a marriage," with the explanation that World Vision "defines marriage as between a man and a woman." *Id.*; 2-ER-150. Yet after this list, when asked if she had questions about World Vision's beliefs and "standards of conduct," McMahon said, "No not at all." 3-ER-484; 2-ER-150.

World Vision emphasized that it was "important" for McMahon to understand its "expectations so that you can decide if we are the right organization for you," and asked if McMahon was "willing and able to comply with the Standards of Conduct." 3-ER-484. McMahon responded, "I'm aligned, yes!" *Id.*; 2-ER-150. At the end of the interview, McMahon was asked again if World Vision "seems like a good fit for you," and she said, "Yeah absolutely!" 3-ER-484; 2-ER-150.

But that was untrue. McMahon later testified that she sees World Vision's view on marriage as "hate," and its refusal to "hire somebody based off of who they love" as "very wrong." 2-ER-120, 147. She "wouldn't be comfortable" defending its beliefs on marriage. 2-ER-152. And she thinks the job's requirement that representatives "keep Christ central in [their] individual … lives" is, "to be blunt, none of [World Vision's] business." 2-ER-144–45. She understood that World Vision had a different view of Christianity than her own, and she rejected its views. 2-ER-142–43. McMahon never mentioned her same-sex marriage or her religious disagreements during the interview process. 2-ER-150.

14

Based on her professed "alignment," McMahon received a written offer on January 5, 2021. *See* 1-ER-17. McMahon immediately responded via email with a "quick question":

> My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee? I will be the one having the baby so I just wanted to check to see if any time would be allowed off.

3-ER-436 ¶9; 3-ER-477. After receiving this email, World Vision became concerned that McMahon was not aligned with World Vision's theological commitments. 2-ER-255. The situation was elevated to senior supervisors Melanie Freiberg and Christine Talbot, 2-ER-255, 260, who discussed how to "correctly and lovingly" respond consistent with "World Vision's Biblical marriage policy [and] the Scriptures and doctrines underlying it," 3-ER-451, 452 ¶¶50-51; *see* 1-ER-19, 20. After reaching out to speak with her, World Vision confirmed that McMahon was unable to comply with its religious standards of conduct and rescinded her offer. 2-ER-350.

### F. Proceedings Below

McMahon sued World Vision for sex, sexual-orientation, and marital-status discrimination under Title VII and the WLAD. Dkt.1. After discovery, the parties cross-moved for summary judgment. 5-ER-1046; Dkt.26.

The district court initially granted summary judgment to World Vision under the church autonomy doctrine. 1-ER-73. The court found

that both parties agreed World Vision had rescinded McMahon's job offer because of her inability to meet "one of the fundamental requirements of employment": complying with World Vision's religious standards of conduct. 1-ER-91. Under "numerous cases" cited by World Vision and unrebutted by McMahon, McMahon's claims thus violated church autonomy. 1-ER-94. The court noted that church autonomy might not bar a claim where there was no "religious justification" by the religious employer, or where there was "sufficient" evidence that the "justification was pretext," but that neither was true here. 1-ER-97.

McMahon moved for reconsideration, arguing that because World Vision had acted under a "facially discriminatory hiring policy" the court needn't analyze pretext and could resolve the case under "neutral principles of law," without becoming entangled in religion. 5-ER-1048, 1049. The district court agreed and reversed its decision. 1-ER-60.

The court later rejected World Vision's remaining defenses under the ministerial exception, the Title VII and WLAD exemptions, the freedom of expressive association, and the Free Exercise Clause, and granted summary judgment to McMahon. 1-ER-6. In lieu of a jury trial on damages, the parties stipulated to damages of $120,000, and the court entered final judgment for McMahon. 1-ER-2.

16

## STANDARD OF REVIEW

This Court reviews summary judgment "de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Behrend v. S.F. Zen Ctr.,* 108 F.4th 765, 768 (9th Cir. 2024). It also reviews de novo legal determinations and mixed questions of law and fact that implicate the Religion Clauses. *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017).

## SUMMARY OF ARGUMENT

McMahon's claims are barred by multiple protections for religious freedom, each independently requiring reversal.

**I.** McMahon's claims are barred by the First Amendment's protections for church autonomy, which guarantee religious "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). McMahon's claims violate two distinct "component[s]" of church autonomy. *Id.* at 746. First, they violate World Vision's right to freely select those who would, like McMahon, serve as a "messenger" of its faith, *id.* at 754, and have an important "role in carrying out [its] mission," *Behrend*, 108 F.4th at 769. Second, they violate World Vision's right to sincerely determine that McMahon did not meet "the standard of morals" required to be a member of its religious organization. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976).

17

**II.** McMahon's claims are barred by the very statutes she invokes. Title VII exempts religious employers when, as here, they make employment decisions based on an employee's religious beliefs or conduct. 42 U.S.C. §§ 2000e(j), 2000e-1(a). Title VII also protects them when they can show, as here, that sex is a bona fide occupational qualification ("BFOQ"). *Id.* § 2000e-2. The WLAD likewise provides an applicable religious exemption and BFOQ defense. Wash. Rev. Code §§ 49.60.040(11), 49.60.180(1).

**III.** McMahon's claims are barred by the First Amendment's protection for expressive association. McMahon's claims impair World Vision's ability to express its religious views, triggering strict scrutiny, and her claims cannot meet that high standard. *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).

**IV.** Finally, McMahon's claims fail under the First Amendment's Free Exercise Clause. Her claims infringe World Vision's religious exercise in a way that is not neutral or generally applicable, which again triggers and fails strict scrutiny. *Fulton* 593 U.S. 522; *Tandon v. Newsom*, 593 U.S. 61 (2021).[1]

---

[1] The Free Exercise Clause also requires strict scrutiny here because McMahon's claims "impose[] a substantial burden on religious exercise." *Fulton*, 593 U.S. at 614 (Alito, J., concurring). The same is true under the Religious Freedom Restoration Act for McMahon's Title VII claims. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996). World Vision recognizes these arguments are currently barred by *Employment*

## ARGUMENT

## I. McMahon's claims are barred by the law of church autonomy.

The Religion Clauses of the First Amendment protect the "principle of church autonomy," which guarantees religious groups "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747. "State interference" to "dictate or even to influence such matters" would both "obviously violate the free exercise of religion" and "constitute one of the central attributes of an establishment of religion." *Id.* at 746.

Together, the Religion Clauses forbid civil courts from interfering in "essentially religious controversies" over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Milivojevich*, 426 U.S. at 709, 713-14. This rule has long reflected the proper "relations of church and state under our system of laws," protecting the church from dissident members using "secular courts" for leverage in religious disputes, and protecting the state from entanglement in matters beyond its jurisdiction or competence. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 729, 733 (1872).

---

*Division v. Smith*, 494 U.S. 872 (1990), and *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826 (9th Cir. 1999), but preserves them for future review.

One "component" of church autonomy is the ministerial exception, which bars government interference in religious organizations' personnel decisions concerning individuals expected to perform important religious duties, *Our Lady*, 591 U.S. at 746-47, even when a religious organization offers no "religious reason" for its decision. *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 192, 194 (2012). Another component bars civil interference where there *is* a sincere religious reason for a personnel decision— particularly where the decision was over failing to meet "the standard of morals" required of "members of the church." *Milivojevich*, 426 U.S. at 713-14.

Here, both components independently bar McMahon's claims. First, she was expected to perform important religious functions as a representative of World Vision. Second, she rejected the religious standards required to be a member of World Vision's faith group. Either way, her claims unconstitutionally interfere with World Vision's "independence" in "matters of faith and doctrine" and "internal government." *Our Lady*, 591 U.S. at 747.[2]

---

[2] Both "church autonomy" and "ministerial exception" are judicial shorthand. *Our Lady*, 591 U.S. at 746-47. "Church" autonomy applies to all faiths and encompasses entities that are not houses of worship, just as the "ministerial" exception extends beyond faiths that use the title "minister." *Id.*

20

### A. McMahon's claims are barred by the Religion Clauses' protection for ministerial selection.

The ministerial exception protects "a religious group's right to shape its own faith and mission," *Hosanna-Tabor*, 565 U.S. at 188-89, by respecting its independence "to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady*, 591 U.S. at 747.

The "purpose of the exception" is to ensure that the authority over "who will minister to the faithful" is "the church's alone." *Hosanna-Tabor*, 565 U.S. at 194-95. Such ministerial decisions are always "strictly ecclesiastical," *id.*, because they concern the "lifeblood" of a religious group. *Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1102-03 (9th Cir. 2004). Offering a "religious reason" isn't necessary to "safeguard a church's decision to fire a minister" from civil review, *Hosanna-Tabor*, 565 U.S. at 194-95; even to require one is impermissible church-state entanglement. *Alcazar v. Corp. of the Catholic Archbishop*, 627 F.3d 1288, 1291 (9th Cir. 2010) (en banc). Accordingly, McMahon's claims are barred because she sought to hold a ministerial role for World Vision.

### 1. The ministerial exception applies to employees who are important to an organization's religious mission.

To decide whether an individual holds a ministerial role, "[w]hat matters, at bottom, is what [she] does." *Our Lady*, 591 U.S. at 753. If she is entrusted with duties that are "important" to the organization's "spiritual and pastoral mission," the ministerial exception applies. *Werft*,

21

377 F.3d at 1101 n.4. This is true not just for "clergy" but for "any employee who … serves as a messenger" of the faith, *Our Lady*, 591 U.S. at 747, 754, or who otherwise plays a "role in carrying out [the organization's] mission," *Behrend*, 108 F.4th at 769. That is an intentionally "broad" standard, *id.* at 766, and necessarily so to account for the many religious roles within our nation's "rich diversity" of faith groups, *Our Lady*, 591 U.S. at 756.

In *Behrend v. San Francisco Zen Center*, for example, this Court applied the exception to a "work practice apprentice" at a Buddhist temple. 108 F.4th at 766, 769-71. The apprentice was not a priest, rabbi, imam, guru, or even someone who "transmit[ted] the faith" to others. *Id.* at 767-69. While he occasionally assisted with some explicitly religious activities, he "mostly" performed "menial work" such as "maintenance, kitchen, and guest services." *Id.* at 767, 769-70. But what mattered was that he "had a role in carrying out the Center's mission." *Id.* at 769 (cleaned up). In the Temple's sincere view, even his "menial work" was "an essential component of Zen training" and thus a religious act. *Id.* This Court held it must "defer to the Center's view that [the apprentice's] duties are, by nature, religious" to avoid religious entanglement. *Id.* at 770 n.3. Because "the purpose of the exception is to ensure a religious organization's independence in matters of faith, doctrine, and government," it "applies just as readily to those who perform vital, but not necessarily hierarchical, functions." *Id.* at 770.

Similarly, in *Billard v. Charlotte Catholic High School*, the Fourth Circuit found a substitute English and drama teacher was a minister. 101 F.4th 316, 331-33 (4th Cir. 2024). Billard had no religious training or title, and primarily performed secular duties. *Id.* But he was nonetheless a minister because the school "expected its teachers to model faith" and because he "beg[a]n each class with prayer," "attend[ed] Mass with his students," and "on rare occasions" had "fill[ed] in" for religion classes. *Id.* at 331-32. The court explained that "even if the tasks" in question did "not advertise their religious nature," what mattered was that they were "central to the[ school's] religious missions." *Id.*

*Behrend* and *Billard* are just two of many such cases. Courts have applied the ministerial exception to communications managers, *Alicea-Hernandez v. Catholic Bishop*, 320 F.3d 698, 702-04 (7th Cir. 2003), food inspectors, *Shaliehsabou v. Hebrew Home*, 363 F.3d 299, 301 (4th Cir. 2004), guidance directors, *Starkey v. Roman Catholic Archdiocese*, 41 F.4th 931, 941 (7th Cir. 2022), organists, *Sterlinski v. Catholic Bishop*, 934 F.3d 568, 569-72 (7th Cir. 2019), music directors, *EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 802-05 (4th Cir. 2000), and school principals, *Orr v. Christian Bros. High Sch.*, No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021), to name just a few. Throughout, the rule is that a religious institution can "choose its representatives" without civil interference. *Alcazar*, 627 F.3d at 1291.

23

### 2. McMahon's claims violate the Religion Clauses' protection for ministerial selection.

World Vision's representatives likewise fall within the ministerial exception. To advance its religious mission, World Vision entrusts its representatives to be the voice and face of its ministry to supporters and to minister to colleagues. 4-ER-826 ¶¶56-57. Taken together with their required religious qualifications and uniquely lengthy religious training, this is more than enough to show that the representatives have an important "role in carrying out [World Vision's] mission." *Behrend*, 108 F.4th at 769.

#### a. Ministry to supporters and partners

Representatives serve as the "voice, face, and heart" of World Vision to its supporters and partners. 4-ER-813 ¶17, 815 ¶23; 4-ER-897; 2-ER-246. Representatives "interact all day" with these audiences, serving as their main point of contact to the ministry. 4-ER-815 ¶23. In these daily conversations, representatives "shar[e]" World Vision's "mission, vision, and strategies" and "how World Vision witnesses to Christ in its work." 4-ER-823–26 ¶¶42, 51-52, 57. Per the job description, representatives speak for World Vision to "donors" and the "general public," and must "effectively communicate World Vision's involvement in ministries and projects around the world." 3-ER-530–31; *see also* 3-ER-424. These include Christian discipleship programs; biblical worldview programs; and training for pastors, faith leaders, and churches. 3-ER-453 ¶54; 3-ER-662–63; 3-ER-577–78.

24

Further, the message they convey is deeply religious. Representatives are entrusted with "inspiring those donors who share World Vision's faith" and "sharing that faith with those who don't." 4-ER-825 ¶¶50, 54. Their "goal" is "that every current and potential donor and partner will clearly understand [World Vision's] mission to bear witness to Jesus Christ," and they are to communicate "in ways that encourage people to respond to the gospel." 4-ER-825 ¶54 (cleaned up).

Indeed, World Vision's representatives play a "vital" role in "transform[ing]" the lives of its supporters by "increas[ing] their understanding of God's love for the poor" and thus "be[coming] … more like Christ." 4-ER-815 ¶23; 5-ER-1019. Representatives help "transform[]" supporters "so that they give, act and pray for the well-being of vulnerable children." 4-ER-712; 3-ER-662–63. Over time, the representatives' "relationship[s] with donors and sponsors" effect spiritual "changes in values, giving patterns, and lifestyles" and achieve "an enhanced relationship with God." 3-ER-621.

For this reason, World Vision considers representatives' fundraising as "an act of worship"—"as spiritual as giving a sermon, entering a time of prayer, visiting the sick, or feeding the hungry." 5-ER-947 (quoting theologian Henri Nouwen), 956; 4-ER-823 ¶¶43-44.

By raising support, representatives are "giving people an opportunity to partner with [World Vision] in stewarding God's resources according to God's will and ways." 5-ER-983. World Vision thus sees "giving" as

25

"integral" to "followers of Christ," "a mandatory act of obedience," and "a worshipful act of love." 5-ER-948; 5-ER-996; 3-ER-548; 5-ER-952; *see also* 5-ER-1075 (at pp.1613, 1716). And as supporters and partners "put their faith into action" in this way, "their own lives are transformed" as "the wonderful irony of Christ's words awes their hearts: 'It is more blessed to give than to receive.'" 3-ER-538.

Representatives also raise prayer support for children, encouraging World Vision's supporters to keep the children they serve in their prayers. 4-ER-820–21 ¶38; *see, e.g.*, 5-ER-1065, 1067. And the representatives themselves regularly pray for the children, both with supporters and with colleagues. 4-ER-820–21, 824 ¶¶38, 47.

Finally, representatives are expected to pray with and for supporters—which they do thousands of times per year. *See* 3-ER-531; 4-ER-816, 820–22 ¶¶29, 37-41; 2-ER-315; 4-ER-687, 689. This responsibility is "uniquely expected" of representatives. 4-ER-811–13 ¶¶12-17; 2-ER-353. When speaking with supporters and the public, representatives are trained to "[a]sk … how we can specifically be praying" and, as appropriate, "offer to pray" right then and there. 5-ER-1062–63; 5-ER-1007. Representatives are sometimes tasked with calling supporters specifically to offer prayer. 2-ER-314; 5-ER-1066–69. And

representatives routinely pray with colleagues for specific supporters. 2-ER-315; 4-ER-687, 689.[3]

### b. Ministry to colleagues

Representatives minister to their colleagues in several ways. One is by attending and "participat[ing] in the leadership of devotions," 3-ER-531, to "enhance the spiritual development" of the staff, 3-ER-637; *see also* 4-ER-705; 4-ER-903; 4-ER-814 ¶20; 2-ER-319. The representatives must ensure the devotional times they lead "spiritual[ly] nurture" their colleagues, are "Christ-centered," and follow "the teachings of Scripture." 4-ER-705; *see* 4-ER-707.

Similarly, representatives are required to personally model World Vision's faith to colleagues. 4-ER-825–26 ¶¶52, 57. World Vision believes that "[e]ffective Christian witness" starts "in the lives of staff and how [they] … serve one another," such that the "workplace reflects [their] Christian unity," 3-ER-553, 3-ER-549, and protects the "integrity" of World Vision's ministry, 4-ER-826 ¶57.

---

[3] One representative prayed with a pastor for "God's direction" and "discernment" in the restarting of a ministry. 5-ER-1064. Another prayed for a caller's mother "who had to make the decision today to remove life support" from a family member dying from COVID. 5-ER-1066. A different caller received prayer when she shared with the representative that she "was feeling a little lost" because she was "worried she was going to lose her job." 5-ER-1071.

Further, representatives attend, and sometimes lead, weekly organization-wide chapel services. 3-ER-639; *see* 2-ER-247; 2-ER-312; 3-ER-531; 4-ER-815–20 ¶¶25-36. Representative-led chapels include prayer, Bible reading, testimonials, and worship. *See*, *e.g.*, 4-ER-816 ¶28.

Representatives also pray with their colleagues for the religious mission of World Vision. 4-ER-811–13 ¶¶12-17. "Prayer plays a central role in World Vision's ministry." 3-ER-639. Staff are "encourage[d] … to begin and end each work or project meeting in prayer," and World Vision "begin[s] each fiscal year with an entire day dedicated to" prayer. 3-ER-639; 4-ER-812, 824 ¶¶15, 46.

### c. Prerequisites for ministry

To ensure that representatives can carry out these important religious functions, World Vision carefully interviews applicants to ensure that they agree with its Christian faith and will abide by its standards of conduct. *See* 2-ER-149–51; 3-ER-446–47; 3-ER-582–83. World Vision believes that an "indispensable element[]" of being a "credible witness to Jesus Christ" is embodying "faithfulness in biblical belief and conduct." 3-ER-548–49; 4-ER-811, 822, 825–26 ¶¶12, 42, 48, 54, 57. Accordingly, the sensitive religious functions that representatives perform can be entrusted only to those who agree to follow World Vision's religious commitments. 4-ER-825–26 ¶¶48-57; *see also* 3-ER-565; 5-ER-1020.

Further, representatives receive more "formal advance training"—nine to eleven weeks—"than any other … World Vision employees." 5-ER-1044 ¶7. This includes training on World Vision's religious "mission, vision, core values, and standards of Christian witness." 3-ER-555 (cleaned up); 2-ER-312. It also includes instruction on praying with supporters, participating in chapels, and leading devotions. 2-ER-312. And it includes opportunities to "practic[e] prayer," refine "their judgment [about] how and when to ask the donors about prayer," and learn about prayer with supporters from experienced representatives. 2-ER-314, 319. If representatives struggle to meet expectations on matters such as prayer, they receive remedial training. 2-ER-316, 320.

\* \* \* \*

Representatives' duties, training, and religious expectations show that they are ministers—and more clearly than in many other cases that have applied the ministerial exception. They represent and are "responsible for conveying the message of [World Vision] to the public." *Alicea-Hernandez*, 320 F.3d at 702-04; *accord Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 208 (2d Cir. 2017) (representation to "community and the public"); *Petruska v. Gannon Univ.*, 462 F.3d 294, 306 (3d Cir. 2006) ("public representative," "voice to the faithful"). They are entrusted to grow the spiritual lives of those they serve. *Hosanna-Tabor*, 565 U.S. at 191-92; *Our Lady*, 591 U.S. at 756-57. They regularly lead prayer and participate in chapel services. *Our Lady*, 591 U.S. at 750, 757; *Billard*,

29

101 F.4th at 331. They lead devotional teaching. *Our Lady,* 591 U.S. at 757. And they are required to embody, model, and otherwise "live up to" the "religious precepts that [they] espouse[]." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring); *Our Lady*, 591 U.S. at 757; *Fratello*, 863 F.3d at 208; *Billard*, 101 F.4th at 330-31.

Indeed, this case is like *Behrend*, only easier. There, an employee was a minister although he performed "mostly menial" tasks in "maintenance, kitchen, and guest services," and neither taught nor led the faith. 108 F.4th at 769, 770 & n.3. What mattered was that his religious employer sincerely viewed his duties as "by nature, religious." *Id.* at 770 n.3. Here, as in *Behrend*, World Vision entrusts representatives to perform some tasks that may seem "menial" to some, but that it sincerely views as fundamentally religious. And unlike in *Behrend*, World Vision *also* entrusts representatives to lead indisputably religious endeavors, such as sharing the faith, praying with supporters, expressing World Vision's religious mission to the public, and guiding colleagues through religious devotions. Thus, even more than the apprentice in *Behrend*, representatives have "a 'role in carrying out [World Vision's] mission.'" 108 F.4th at 769.

**3**. **The district court's contrary conclusion was in error.**

The district court rejected the ministerial exception by repeating errors foreclosed by precedent.

*First*, the court discounted the significance of the requirements that McMahon be a member of World Vision's faith, follow World Vision's moral expectations, lead devotions, attend chapel, and help carry out World Vision's mission since those requirements applied to other employees too. 1-ER-34, 37–38. But *Hosanna-Tabor* unanimously rejected that same line of reasoning, explaining the lower court "gave too much weight to the fact that" non-ministers "performed the same religious duties" as ministers. 565 U.S. at 193. This, the Court said, was "error[]" and "cannot be dispositive" of ministerial status. *Id.* at 192-93.

A contrary rule would have perverse consequences. It would deprive devout religious communities of the protections of the Religion Clauses—because *all* a convent's nuns hold religious roles, *none* would be "ministers." Similarly, by grading on a spiritual curve, it would "in effect penalize religious groups" that entrust a broad range of personnel with "substantial" religious functions, while favoring those that confine religious functions to a select few. *Fratello*, 863 F.3d at 207.

*Second*, the court suggested that praying with supporters is unimportant because it supposedly isn't "strictly required." 1-ER-36. But, again, courts have rejected that view. *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 660 (7th Cir. 2018) ("voluntarily performed religious functions" that were not "*required*" still showed that role was "connected to the school's Jewish mission"). Even if representatives won't be immediately fired if they don't pray at every

31

opportunity, what matters is that World Vision undisputedly entrusts, expects, and trains representatives to perform this key religious function. *See Our Lady*, 591 U.S. at 736, 754, 757 (teacher was "entrusted" to perform religious duties); *Starkey*, 41 F.4th at 941 (focusing on "what an employee is entrusted to do"). And here, the record is clear that representatives pray often with supporters and would receive remedial training for failing to do so. *Supra* at 11; 2-ER-316, 320. Indeed, McMahon admitted that she knew prayer with supporters would be part of the role. 2-ER-151.[4]

*Third*, the court viewed the job title as insufficiently religious. 1-ER-32–33. But having a religious title is unnecessary, *Our Lady*, 591 U.S. at 751, which is why principals, communications directors, and a Work Practice Apprentice have been ministers. *Supra* at 23. And there is nothing inherently *non*-religious about the title here. This Court has long recognized the right of religious groups to "choose [their] *representatives*." *Alcazar*, 627 F.3d at 1292 (emphasis added).

---

[4] The court also said it wanted more "clarity" on whether representatives must "lead team devotions." 1-ER-16. That fails for the reasons explained, and for another one: the record is clear that leading devotions is a job requirement. 2-ER-319; 3-ER-531–32; 2-ER-354. The sole source of confusion was a witness's statement in an individual-capacity deposition that she was *unsure*, 2-ER-247—but then she researched the question and provided a definitive answer at her later Rule 30(b)(6) deposition. 3-ER-438 ¶16; 2-ER-310, 319.

*Fourth*, the court placed weight on the lack of a religious commissioning. 1-ER-33. But *Our Lady* rejected a virtually identical argument in concluding that religious groups, not civil courts, determine what adequate preparation for a minister entails. *Our Lady*, 591 U.S. at 759. And this Court has likewise long rejected attempts to require ordination for ministerial status. *Alcazar*, 627 F.3d at 1291. Courts can't second-guess World Vision's choice not to conclude the representatives' lengthy training process—the longest for any World Vision role—with a formal religious commissioning. *Behrend*, 108 F.4th at 770 n.3.

In sum, the district court erred by refusing to apply the ministerial exception.

## B. McMahon's claims are barred by the Religion Clauses' protection for religious membership decisions.

McMahon's claims also fail under another component of church autonomy: the freedom to set religious qualifications for being a member of a religious organization's ministry. Here, it is undisputed that McMahon rejected and violated religious beliefs that are essential to being a member of World Vision's religious community. And where a religious group makes a personnel decision grounded in its sincere religious beliefs—particularly a decision rooted in an individual's failure to follow "the standard of morals" required of its "members," *Milivojevich*, 426 U.S. at 713-14—then that decision is protected by the Religion Clauses.

33

### 1. Church autonomy ensures religious groups can set religious standards for their members.

As *Our Lady* explained, "the general principle of church autonomy" is not limited to the ministerial exception. 591 U.S. at 747. Instead, it is a "broad principle" that also protects "internal management decisions that are essential to [a religious] institution's central mission." *Id.* at 746, 747; *accord Puri*, 844 F.3d at 1157 (recognizing church autonomy protections distinct from ministerial exception).

That protection includes decisions about the religious qualifications for membership or employment in a religious community. The Supreme Court has long held that civil courts "have no power" to entertain lawsuits challenging "ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872). Religious groups thus have autonomy to decide whether a member failed to meet "the standard of morals required of them." *Milivojevich*, 426 U.S. at 714.

This Court has likewise explained that civil courts cannot second-guess whether a plaintiff has met "religious eligibility requirements" for a role within a religious body. *Puri*, 844 F.3d at 1167. Religious bodies must be "afforded great latitude" in making those determinations, and where they have "concluded that they no longer want to associate" with a member, "they are free to make that choice." *Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 883, 878 n.1 (9th Cir. 1987); *Headley*

*v. Church of Scientology*, 687 F.3d 1173, 1180 (9th Cir. 2012) ("A church is entitled to stop associating with someone who … do[es] not act in accordance with church doctrine.").

What is true of members generally is even more true of members who are employed to represent the church, its message, and its mission. Determining that "only those committed to [the church's] mission should conduct" its activities is a "means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). Where a religious employer has a sincere "religious justification" for finding an applicant fails to meet the "religious eligibility requirements" necessary to join its religious community, civil courts decline to replace that religious judgment with their own. *Puri*, 844 F.3d at 1167. Thus, "[w]hen a church makes a personnel decision based on religious doctrine," the "broader church autonomy doctrine" applies. *Bryce v. Episcopal Church*, 289 F.3d 648, 656-58, 568 n.2, 660 (10th Cir. 2002).

*Bryce* is illustrative. There, a church employee sued under Title VII, alleging that church officials' statements opposing homosexuality and her same-sex union constituted sex discrimination. *Id.* at 651-53. The Tenth Circuit declined to decide whether the plaintiff was a "minister." *Id.* at 658 n.2. Instead, it held that the "broader church autonomy doctrine" "extends beyond the specific ministerial exception" to include "personnel decision[s]" "rooted in religious belief." *Id.* at 656-58, 658 n.2.

35

Because the plaintiff challenged "a personnel decision based on religious doctrine," her suit was barred. *Id.* at 660.

*Butler v. St. Stanislaus Kostka Catholic Academy* agreed. There, the court found that, "[e]ven if [plaintiff] did not qualify as a ministerial employee," the "long recognized" and "broader" "church autonomy doctrine" barred a Title VII sexual-orientation discrimination claim. 609 F. Supp. 3d 184, 198, 204 (E.D.N.Y. 2022). The court found that the religious employer had established a valid legal reason for the plaintiff's termination just days into his tenure: that he violated Catholic beliefs on same-sex marriage. *Id.* at 203. Thus, his claim could survive only if he submitted sufficient evidence to show that this religious reason was pretextual—which he didn't. *Id.*

Other courts have also applied church autonomy to bar employment claims even when the employee wasn't a minister. *See, e.g., Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1174, 1185 (D. Colo. 2023) (protecting religiously motivated employment decisions for non-ministers from imposition of non-discrimination standards); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (citing *Bryce*, applying "overarching principle of religious autonomy" to dismiss challenge to doctrinally rooted employment decision, regardless of whether plaintiff was a minister); *Aparicio v. Christian Union*, No. 18-cv-592, 2019 WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019) (Free Exercise Clause barred non-minister's Title VII sex discrimination claim);

*Brazauskas v. Fort Wayne-S. Bend Diocese*, 796 N.E.2d 286, 293-94, 296 (Ind. 2003) (citing *Bryce* to bar tortious-interference claim against Archdiocese, though plaintiff lacked "ministerial-type duties").

### 2. McMahon's claims violate the Religion Clauses' protection for religious membership standards.

That analysis applies here. World Vision's personnel decision is protected by the Religion Clauses because it is undisputedly grounded in its sincere religious belief that McMahon did not comply with "the standard of morals" required to be a member of its ministry. *Milivojevich*, 426 U.S. at 713-14.

McMahon concedes that she sought a role within World Vision's religious community where she was required to abide by its religious standards of conduct—and that she did not and would not do so. 2-ER-150; 5-ER-1047. Indeed, she publicly condemned World Vision's beliefs on marriage as "hate," and sees them as "very wrong," the product of "pick[ing] and choos[ing] parts of the Bible" to affirm. 2-ER-120, 125, 147. Instead of "wholeheartedly" affirming World Vision's understanding of Christianity, 3-ER-458, she believes that "Christianity is so fluid" that even World Vision's beliefs about the resurrection and deity of Jesus Christ are non-essential, 2-ER-143–45. And far from being "comfortable" defending World Vision's religious views on marriage, she felt it necessary to sue World Vision as an act of advocacy against its beliefs. 2-ER-152, 166.

37

McMahon accordingly admits that World Vision's decision to rescind her job offer was "based on religious doctrine," *Bryce*, 289 F.3d at 660—namely, her rejection and violation of religious standards that are essential to being a member of World Vision's religious community. 2-ER-161; 2-ER-268–69.

Where, as here, "the question of who is and is not a member depends … on religious practice," then it "falls squarely within the realm of matters insulated from civil court review." *Askew v. Trs. of Gen. Assembly of Church of Lord Jesus Christ*, 684 F.3d 413, 419 (3d Cir. 2012); *Does 1-11 v. Bd. of Regents*, 100 F.4th 1251, 1271 (10th Cir. 2024) (government cannot "impose its own ideas about which believers [a]re valid members of which religious sects"); *accord Butler*, 609 F. Supp. 3d at 204. Selecting faithful representatives is key to religious autonomy, which is why there is hardly a "clearer example of an intrusion into the internal structure or affairs" of a religious group than to "force[] the group to accept members it does not desire." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861-63 (7th Cir. 2006). That is also why courts have long protected religious employers' right "to employ only persons whose beliefs and conduct are consistent with the[ir] … religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991).

But here, McMahon rejects World Vision's religious precepts and seeks to enlist the government to penalize World Vision for a religious decision about who is religiously qualified to carry out World Vision's

38

religious mission. Thus, McMahon's claims "would impermissibly inject the auspices of government into religious doctrine and governance." *Garrick*, 412 F. Supp. 3d at 872.

### 3. The district court's contrary conclusion was in error.

The district court initially agreed, approvingly citing *Bryce* and *Butler* and noting that McMahon had failed to "rebut the numerous cases cited by World Vision" supporting its church autonomy rights. 1-ER-92–94. Because World Vision had a sincere religious reason for finding McMahon failed to meet its religious standards for ministry, and since McMahon agreed that reason wasn't pretextual, the court dismissed McMahon's claims. 1-ER-97.

The next month, the district court reversed itself. 1-ER-60. The court still agreed that World Vision's religious justification was "undisputed." 1-ER-64. But now it determined this meant church autonomy was irrelevant. Because World Vision's religious standards were "facially discriminatory," and McMahon supposedly wasn't asking for a pretext inquiry into "the reasonableness, validity, or truth" of World Vision's beliefs, the court saw no autonomy interest at stake. 1-ER-69–70. On this view, the Religion Clauses protect against pretext inquiries into the *reasons why* a religious organization chooses to disassociate with an employee—but they provide no protection for the *decision itself*.

That is wrong. The First Amendment ensures religious groups can "*decide* for themselves, free from state interference, matters of church

government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116 (emphasis added); *Bryce*, 289 F.3d at 655 ("churches have autonomy in *making decisions* regarding their own internal affairs" (emphasis added)); *Butler*, 609 F. Supp. 3d at 199 (protecting "*right to decide*" religious matters (emphasis added)). To be sure, restricting pretext inquiries reduces government entanglement in religious questions. But leaving the act of decision wholly unprotected and fixating instead on pretext "misses the point," *Hosanna-Tabor*, 565 U.S. at 194, and makes religious groups subject to unprecedented "secular control or manipulation," *Kedroff*, 344 U.S. at 116.

The district court identified zero cases reaching its startling conclusion. And it simply ignored the contrary holdings in *Bryce* and the "numerous" other cases it previously found to support World Vision—none of which treated "pretext" concerns as dispositive.

The district court suggested *Puri v. Khalsa* supported its ruling. 1-ER-69 (citing 844 F.3d at 1166). But *Puri* illustrates the ruling's error. There, plaintiffs sued over being denied positions on the board of a company that owned a Sikh religious group. *Puri*, 844 F.3d at 1157. This Court found that church autonomy wasn't implicated because the defendants didn't provide "a religious justification" for denying the board positions, and didn't claim that plaintiffs failed to meet the "religious eligibility requirements" for the positions. *Id.* at 1167. Thus, the dispute could be resolved by reference to "neutral principles of law" instead of

40

deference to defendants' religious judgments. *Id.* at 1167-68. The opposite is true here: World Vision *did* provide religious justifications and *did* determine that McMahon failed to meet its religious eligibility requirements. There is "no neutral principle of law" available to gainsay World Vision's determination that McMahon didn't conduct "her life in a manner consistent with church doctrine." *Askew*, 684 F.3d at 419.

For proof, this Court need look no further than the rulings in this case. Far from being religiously neutral, the rulings below squarely reject World Vision's sincere understanding of "how important" its religious standards are to its "overall mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito, J., joined by Kagan, J., concurring). World Vision emphasized that a "common commitment" to "faithfulness in biblical belief and conduct" is "indispensable" to "being a credible witness to Jesus Christ," and that employing representatives in a "same-sex marriage contradicts its Biblical … witness" in "several ways," including by having public-facing staff taking "an ongoing public stance" against its religious beliefs and standards. 3-ER-451 ¶49; 3-ER-549; 3-ER-588; 2-ER-267. Yet the district court determined that "nothing" in the record even suggested that rejecting World Vision's beliefs was relevant to "pray[ing] with donors," "participat[ing] in devotions and chapel," or World Vision's "very mission." 1-ER-40, 49. Such civil "scrutinizing" of "how a religious [group] pursues its [religious] mission" is unconstitutional "state entanglement with religion." *Carson v. Makin*, 596 U.S. 767, 787 (2022).

41

It also blinks reality: the "credibility" of a religion "depend[s] vitally" on the "conduct" of its representatives. *Hosanna-Tabor*, 565 U.S. at 201, 206 (Alito, J., joined by Kagan, J., concurring).

Moreover, the supposedly "neutral" litigation in this case is more entangling than in many pretext cases. Take *NLRB v. Catholic Bishop*, a leading case recognizing that the "very process" of pretext inquiry can "impinge on rights guaranteed by the Religion Clauses." 440 U.S. 490, 502 (1979). There, the Supreme Court found it concerning when the government probed "how many liturgies are required at Catholic parochial high schools[.]" *Id.* at 502 n.10, 507-08. But here, World Vision officials were deposed about "different prayers in the Christian faith," 2-ER-354; why "the belief in traditional marriage [is] so important to World Vision"; whether "being gay is prohibited in the Bible" in "Chapter 20, verse 13, in the Book of Leviticus"; and whether "homosexuality violated the covenants of the Bible," 2-ER-386–87, 389. Those theological inquiries—enforced by the power of a civil court—are far more entangling than adding up school liturgies.

The result here is also far more intrusive than in *Catholic Bishop*. There, the diocese had to bargain collectively over the terms of employment with qualified teachers it willingly employed. Here, World Vision must *employ individuals against its will* after it has sincerely found those individuals *religiously disqualified*—or else suffer massive penalties. Thus, under *Catholic Bishop*, this is an *a fortiori* case.

42

World Vision declined to make McMahon the voice and face of its ministry because she rejected its religious standards of conduct. That is a protected "internal management decision" closely tied to World Vision's "central mission." *Our Lady*, 595 U.S. at 746. The district court's contrary rule would subject World Vision and every other religious employer—including houses of worship—to the "risk [of] substantial damages every time" a religious dissenter isn't hired, and thus would "in the long run have the same effect as prohibiting" religious hiring practices and "compel[ling religious employers] to abandon part of [their] religious teachings." *Paul*, 819 F.2d at 881. This Court should reject that unprecedented intrusion into the formation of religious communities.

## II. McMahon's claims are barred by Title VII and the WLAD.

Title VII and the WLAD also protect World Vision's religious exercise. First, they contain exemptions that protect an employer's religious hiring practices. Second, they permit employers to enforce sex-based BFOQs to protect their religious mission. Both protections bar McMahon's claims.

### A. The statutory religious exemptions apply.

#### 1. Title VII

As a "legislative application[] of the church-autonomy doctrine," *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013), Congress exempted religious employers from the requirements of Title VII when they make employment decisions based on an individual's religious belief or conduct.

43

The statute's religious exemption provides as follows:

> This subchapter shall not apply to … a religious corporation … with respect to the employment of individuals of a particular religion[.]

42 U.S.C. § 2000e-1(a).

World Vision is a religious corporation under this exemption. *Spencer*, 633 F.3d at 724. So the only question is the exemption's scope.

The exemption's text is straightforward. As this Court has already recognized, the "subchapter" covered is *all* of Title VII. *See Garcia v. Salvation Army*, 918 F.3d 997, 1004 (9th Cir. 2019) (Congress "exempt[ed] religious organizations from the *entire subchapter* of Title VII"); Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241, 255 (1964). And Title VII expressly defines "religion": it includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). "When a statute includes an explicit definition, [courts] must follow" it. *Digit. Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018). Doing so here yields the following: "This subchapter [i.e., Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular" religious "belief," "observance," or "practice." 42 U.S.C. §§ 2000e-1(a), 2000e(j). Thus, the meaning is clear: When a religious employer engages in the relevant conduct—making an employment decision based on an individual's religious "belief," "observance," or "practice"—Title VII doesn't apply, no matter how the plaintiff styles her claims.

44

That plain-text reading forecloses McMahon's claims. World Vision rescinded McMahon's job offer because of her religious "belief" and "practice" contravening traditional marriage. Under the exemption, Title VII does not apply to that decision. *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("[W]hen the decision is founded on religious beliefs, then all of Title VII drops out."); *Fitzgerald v. Roncalli High Sch.*, 73 F.4th 529, 534 (7th Cir. 2023) (Brennan, J., concurring) (same; *Billard*, 101 F.4th at 335 (King, J., dissenting in part) (calling this the most "straightforward reading").

The point is further reinforced by the other half of § 2000e-1(a)—the "alien" exemption. Section 2000e-1(a) includes an exemption introduced with the same language: "This subchapter shall not apply to an employer *with respect to the employment of aliens outside any State* …." (emphasis added). If the religious exemption were somehow limited only to certain types of Title VII claims (religious discrimination), one would expect the alien exemption to have a parallel limitation (claims of race or national-origin discrimination). But courts have (rightly) imposed no such limitations. *See Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021), *rev'd in part on other grounds*, 70 F.4th 914 (5th Cir. 2023).

Caselaw, though divergent among lower courts, also confirms World Vision's reading. For example, in *Curay-Cramer v. Ursuline Academy*, the Third Circuit applied the religious exemption to a sex discrimination

45

claim brought by a teacher against a Catholic school that terminated her for her pro-choice advocacy. 450 F.3d 130, 132 (3d Cir. 2006). Because the school had "offer[ed] a religious justification" and Congress "intended … to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices," her claim was barred, even though she complained of sex (not religious) discrimination. *Id.* at 141-42; *see also EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980); *Bear Creek*, 571 F. Supp. 3d at 590-92; *Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1502-04 (E.D. Wis. 1986), *vacated in part on other grounds*, 814 F.2d 1213 (7th Cir. 1987).

Here, McMahon doesn't dispute that her religious belief and practice was the basis for World Vision's decision. Because her claim is "prohibited by [the statute's] plain terms," that is "the end of the [Title VII] analysis." *Bostock v. Clayton County*, 590 U.S. 644, 662 (2020).

The district court suggested that the exemption protects only against claims of religious discrimination—not sex discrimination—citing *EEOC v. Fremont Christian School*, 781 F.2d 1362, 1365-66 (9th Cir. 1986), and *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272, 1276 (9th Cir. 1982); *see* 1-ER-27–28. But these decisions do not go nearly as far as the district court tried to press them.

First, the sex discrimination claims in those cases arose from across-the-board policies based on *the employer's* belief that it should compensate women less than men. *Fremont*, 781 F.2d at 1364-65

46

(insurance benefits provided to married men but not married women); *Pac. Press*, 676 F.2d at 1275 (higher allowances paid to married men than female employees). But what triggers the religious exemption are employment decisions made because of *an employee's* particular religious beliefs or practices. *See* 42 U.S.C. § 2000e-1(a) (decision must be based on the need to employ "individuals of a particular religion"). The sex discrimination claims accordingly didn't fall within the text of the religious exemption and thus didn't require addressing whether the exemption bars sex discrimination claims.

Second, to the extent those cases included dicta (or holdings) to the contrary, they have "been undermined by intervening Supreme Court authority," and thus are "not binding." *Mendoza v. Zirkle Fruit*, 301 F.3d 1163, 1174 (9th Cir. 2002). As *Bostock* explained, Title VII's "express statutory exception for religious organizations" is one of the "doctrines protecting religious liberty" that may bar a claim of sex discrimination. 590 U.S. at 682. That statement would have made no sense if the exemption were limited to claims of religious discrimination. Moreover, *Bostock* made clear that Title VII must be interpreted according to its text, not legislative history, expectations, or purpose. *Id.* at 666, 670, 674, 676. *Fremont* and *Pacific Press* did the inverse.

Third, they have been undermined by Congress itself. When it recently passed the Pregnant Workers Fairness Act (PWFA), Congress expressly incorporated Title VII's religious exemption. 42 U.S.C. § 2000gg-5(b). In

47

so doing, Congress made clear that the exemption must apply to more than religious discrimination. Otherwise, its incorporation would have made no sense, given that the PWFA does not proscribe religious discrimination. *Louisiana v. EEOC*, --- F. Supp. 3d ---, No. 2:24-cv-629, 2024 WL 3034006, at *12 (W.D. La. June 17, 2024) (argument that exemption covers "only" "religious discrimination" "does not square with the PWFA").

In sum, the plain language of the exemption protects World Vision here; any contrary dicta in *Fremont* and *Pacific Press* have been superseded by both Supreme Court precedent and Congressional action.

### 2. The WLAD

The WLAD's religious exemption similarly bars McMahon's state-law claims. *See* Wash. Rev. Code § 49.60.040(11). This exemption applies to claims like McMahon's covered by the "ministerial exception." 1-ER-29 (citing *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067-70 (Wash. 2021)). Because the exception applies, the exemption does too.

### B. The bona fide occupational qualification defenses apply.

McMahon's claims also fail under Title VII's and WLAD's BFOQ defenses. These defenses allow employers to consider sex in hiring decisions when sex is a BFOQ "reasonably necessary to the normal operation" of the "enterprise." 42 U.S.C. § 2000e-2(e); *see also* Wash. Rev. Code § 49.60.180(1) (permitting BFOQ defense to sex, marital status, and sexual orientation discrimination).

The defense generally applies when two things are true. First, the qualification must "affect an employee's ability to do the job." *See Int'l Union v. Johnson Controls*, 499 U.S. 187, 201 (1991); *Hegwine v. Longview Fibre Co.*, 172 P.3d 688, 698 (Wash. 2007). Second, the qualification must be "related to" the organization's "central mission," *Int'l Union*, 499 U.S. at 202-03, or "essence," *Hegwine*, 172 P.3d at 698.

Both prongs are met. World Vision sincerely believes that a representative who refuses to comply with and defend its beliefs cannot effectively perform the role's religious duties. And requiring World Vision to employ representatives in same-sex relationships would undercut its mission, which is exactly the result caselaw seeks to avoid. *See McCollum v. Cal. Dep't of Corr.*, 647 F.3d 870, 881 (9th Cir. 2011) (it was "necessary" to consider religion in hiring for "the paid chaplaincy program," which "was adopted to accommodate the religious beliefs of inmates" (cleaned up)); *Chambers v. Omaha Girls Club*, 834 F.2d 697, 698-99, 704-05 (8th Cir. 1987) (upholding "role model rule" against single-parent pregnancies because employer's "purpose" included "model[ing]" "behavior" and teenage "pregnancy prevention"). That harm also distinguishes *EEOC v. Kamehameha Schools*, where the employer's mission was *not* religious and the discrimination at issue was *not* job-related or necessary to the school's mission. 990 F.2d 458, 465-67 (9th Cir. 1993). Thus, World Vision has a "strong argument that belief in [its] Statement of Faith … is a BFOQ." *Spencer*, 633 F.3d at 756 (Berzon, J., dissenting).

49

## III. McMahon's claims are barred by the freedom of expressive association.

McMahon's claims are also barred by the First Amendment's protection for "expressive association." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). This doctrine protects both the right "to associate with others" for expressive purposes and the right "not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-23 (1984). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is 'intrusion into the internal structure or affairs of an association.'" *Dale*, 530 U.S. at 648. And "[t]here can be no clearer example of [such] an intrusion … than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623.

The leading case is *Dale*. There, a former scoutmaster sued the Boy Scouts, claiming his dismissal for being a "gay rights activist" constituted sexual-orientation discrimination. 530 U.S. 643-45. But the Court held that the First Amendment foreclosed this claim because requiring the Boy Scouts to retain the plaintiff would impermissibly "force the [Boy Scouts] to send a message, both to the youth members and the world, that [it] accepts homosexual conduct as a legitimate form of behavior." *Id.* at 648, 653. Thus, "forcing the Scouts to include Mr. Dale would 'interfere with [its] choice not to propound a point of view contrary to its beliefs.'" *303 Creative*, 600 U.S. at 586 (quoting *Dale*, 530 U.S. at 654).

50

Similarly, in *Slattery v. Hochul*, a pro-life pregnancy center challenged a state law that prohibited employment discrimination based on "reproductive health decision[s]," claiming the law violated expressive association by "preventing [the center] from disassociating itself from employees who … seek abortions." 61 F.4th 278, 283 (2d Cir. 2023). Applying *Dale*, the Second Circuit held that the law violated expressive association. "The right to expressive association allows [the center] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Id.* at 288.

Many other cases have reached similar conclusions. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 574-75 (1995) (forcing parade to include LGBT group would violate associational rights); *Walker*, 453 F.3d at 861-64 (forcing student group to include practicing homosexuals would violate associational rights); *Green v. Miss United States of Am.*, 52 F.4th 773, 803-08 (9th Cir. 2022) (VanDyke, J., concurring) (forcing pageant to include transgender participant would violate associational rights). And courts have relied on the same principles to protect LGBTQ associational rights. *See Apilado v. N. Am. Gay Amateur Athletic All.*, No. 2:10-cv-682, 2011 WL 5563206, at *1-3 (W.D. Wash. Nov. 10, 2011) (protecting right of gay athletic organization to exclude straight persons); *Westenbroek v. Kappa Kappa Gamma Fraternity*, No. 2:23-cv-51, 2023 WL 5533307, at *13-15 (D. Wyo. Aug. 25, 2023) (protecting right of sorority to admit transgender member).

51

### A.  McMahon's claims infringe the freedom of association.

Under *Dale*, an expressive-association defense requires a court to address two questions: whether the organization "engage[s] in some form of expression," either "public or private"; and whether the forced association would "significantly affect [its] ability to advocate" for its viewpoints. 530 U.S. at 648, 650. The court must "give deference to [the] association's assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Id.* at 653. If the answer to both questions is yes, "the First Amendment prohibits" the forced association, absent satisfaction of strict scrutiny. *Id.* at 648, 659. World Vision meets both elements.

*First*, "[r]eligious groups" like World Vision are "the archetype of associations formed for expressive purposes," since their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). It is "indisputable that an association that seeks to transmit … a system of values engages in expressive activity." *Dale*, 530 U.S. at 650.

*Second,* World Vision's ability to express its faith would be severely impaired were it forced to employ persons who publicly contradict its faith. 3-ER-548; 3-ER-582–83. As *Slattery* recognized, "'[i]t would be difficult,' to say the least, for an organization 'to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same

52

time, it must accept members who engage in that conduct.'" 61 F.4th at 290; *accord Apilado v. N. Am. Gay Amateur Athletic All.*, 792 F. Supp. 2d 1151, 1162 (W.D. Wash. 2011) (gay softball league could not maintain "a gay identity" if it could not exclude heterosexual men). Forcing a religious group with traditional beliefs on marriage "to accept as members those who engage in … homosexual conduct would cause the group as it currently identifies itself to cease to exist." *Walker*, 453 F.3d at 863.

McMahon essentially agrees. Her self-stated goal in this lawsuit was to "advocate[]" against World Vision's religious standards and render its religious expression "illegal." 2-ER-166. Her claims thus "severely burden[]" World Vision's associational rights "by foreclosing" its "ability to reject employees whose actions suggest that they believe the opposite of the message it is trying to convey." *Slattery*, 61 F.4th at 288.

## B. McMahon failed to provide adequate justification for this infringement.

Because World Vision satisfies both prongs, McMahon's claims must pass strict scrutiny, meaning they must advance "compelling state interests … that cannot be achieved" through "less restrictive" means. *Dale*, 530 U.S. at 648. That standard—"the most demanding test known to constitutional law"—cannot be met here. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

***Compelling Interest***. To satisfy strict scrutiny, McMahon cannot rely on a general "interest in eliminating discrimination," *Dale*, 530 U.S. at

657, 659; rather, she must show a compelling interest *as applied to World Vision*. *Fulton*, 593 U.S. at 541; *Green*, 52 F.4th at 791. But here, there is no compelling interest in forcing World Vision to rely on vocal religious dissenters to serve as the "voice, face, and heart" of its religious message.

That's particularly true given the imbalance of harms between the parties. *Slattery*, 61 F.4th at 289. If the Court protects World Vision's "right to exclude" employees who reject its religious standards of conduct, McMahon's "right to be free of discrimination" is "impaired only to the limited extent" that she "cannot join the specific group" that "oppose[s]" her conduct. *Id.* But requiring World Vision "to accept members who engage in the conduct" it opposes "would *severely* burden" its "right of expressive association." *Id.* at 289-90 (emphasis added); *accord Green*, 52 F.4th at 792 (imbalance undermines interest); *Apilado*, 2011 WL 5563206, at *3 (Washington's interest in eradicating sexual-orientation discrimination did not outweigh LGBTQ group's interest in excluding heterosexual members).

Further, given that Title VII and the WLAD recognize broad exemptions covering numerous employers, the statutes do not even treat their own nondiscrimination interests as sufficiently compelling. A law cannot "be regarded as protecting an interest of the highest order" where "it leaves appreciable damage to [the] supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (cleaned up). But that is exactly what these laws do.

In addition to the religious, alien, and BFOQ exemptions discussed above, Title VII exempts:

- employers with fewer than fifteen employees, 42 U.S.C. § 2000e(b);
- employment decisions by a "bona fide private membership club," *id.*;
- employment decisions regarding employees in foreign countries if complying with Title VII would violate the law of that country, *id.* at § 2000e-1(b);
- termination of employees who are members of the Communist Party, *id.* § 2000e-2(f),
- race or national-origin discrimination in favor of Indians by employers on or near Indian reservations, *id.* § 2000e-2(i).

The WLAD also has religious and BFOQ exemptions, an exemption for small employers, and exemptions for employment of family members or domestic workers, Wash. Rev. Code. §§ 49.60.040(10), (11), 49.60.180(1).

The small employer exceptions alone belie any assertion that the government's interest can "brook no departures." *Fulton*, 593 U.S. at 542. Title VII's exemption covers about 80 percent of employers nationwide—and millions of private-sector employees.[5] There is no compelling interest in forcing a religious nonprofit to hire representatives who reject its core religious standards when most for-profits can fire for any reason. *Id.*

---

[5] *See Facts & Data on Small Business and Entrepreneurship*, Small Business & Entrepreneurship Council, https://perma.cc/MU32-NZ44; Richard Carlson, *The Small Firm Exemption and the Single Employer Doctrine in Employment Discrimination Law*, 80 St. John's L. Rev. 1197, 1198-99, 1199 n.14 (2006).

The private-club exemption proves the same thing. 42 U.S.C. § 2000e(b)(2). Tax-exempt private clubs are eligible for the exemption if, *inter alia*, they set "meaningful conditions of limited membership," such as "eligibility requirements." *EEOC v. Chi. Club*, 86 F.3d 1423, 1433 (7th Cir. 1996); *accord Section 2 Threshold Issues*, EEOC (§ 4(a)(II)(c)), https://perma.cc/ZH28-3GN8. There is no compelling reason to ban World Vision's *religious* "eligibility requirements" for "membership" while broadly protecting secular requirements for private clubs and exempting their employment decisions altogether.

The same is true with BFOQ exemptions, which allow discrimination where it is "reasonably necessary" to the "normal operation of a particular business or enterprise." 42 U.S.C § 2000e-2(e)(1). For example, the EEOC "consider[s] sex to be a" BFOQ justifying hiring "an actor or actress" where it enhances "authenticity or genuineness." 29 C.F.R. § 1604.2(a)(2). There isn't a compelling reason to allow *Hamilton* to cast based on race, *Green*, 52 F.4th at 781-82, but forbid World Vision from hiring based on religious standards.

Finally, Title VII's religious exemption makes the point clearer yet. Even under the district court's narrow view, the *exact same conduct* complained of here would be *completely exempted* if McMahon had styled her claim as "religious" discrimination instead of "sex" discrimination. The viability of her claim thus turns entirely on its label. *See Garcia*, 918 F.3d at 1005. That's not compelling.

56

*Least Restrictive Means*. Nor is any interest sufficiently tailored. *Dale*, 530 U.S. at 648. In fact, a less restrictive means has already been identified: the one recognized in Title VII's religious exemption, which protects a religious employer when the reason for its personnel decision is rooted in an employee's religious beliefs or practices. *See supra* at 43-44. The government's "establish[ment of] an accommodation for nonprofit organizations with religious objections" means the government "itself has demonstrated that it has at its disposal an approach that is less restrictive." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 730 (2014).

## C. The district court erred in refusing to apply freedom of association.

The district court didn't contest that World Vision is an expressive association. Instead, it rejected associational rights on the grounds that World Vision's "*very* mission is not to oppose or discourage same-sex marriage" but rather to "follow" Christ, "work[] with the poor," "seek justice," and "bear witness to the good news of the Kingdom of God." 1-ER-49 (emphasis added). But that is a false distinction—and one that fails to give the required "deference to [World Vision's] assertions regarding the nature of its expression" and its "view of what would impair [that] expression." *Dale*, 530 U.S. at 653; *see also Democratic Party of U.S. v. Wisconsin*, 450 U.S. 107, 123-24 (1981) (in such matters, "a [s]tate, or a court, may not constitutionally substitute its own judgment for that of" an expressive association).

It is also the same argument the Court rejected in *Dale*. There, opposition to homosexuality obviously wasn't the Boy Scout's "very mission," 1-ER-49; indeed, the Scouts' "central tenets" arguably did not "say[] the slightest thing about homosexuality," 530 U.S. at 665-68 (Stevens, J., dissenting). Yet the Court held that "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment." *Id.* at 655. The same analysis applies even more obviously here—not only because World Vision's teaching on marriage is far clearer than anything the Scouts ever said in *Dale*, but also because it is a religious group, whose "fundamental rights surely include the freedom to choose who is qualified as a voice for their faith." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring).

The district court also denied that "employment discrimination claims" "implicate … expressive associational rights" at all. 1-ER-48 (citing *Hishon v. King & Spalding*, 467 U.S. 69 (1984)). But that view is inconsistent with the law of this Circuit, *Green*, 52 F.4th at 781-82; would create a split with the Second Circuit, *see Slattery*, 61 F.4th at 286-91; was rejected by the Solicitor General on behalf of EEOC before the Supreme Court, *Hosanna-Tabor*, 565 U.S. at 189; and is wrong. As numerous cases prove, there is no employment-law exception to the First

Amendment.[6] Nor did *Hishon* hold otherwise. Rather, it decided that the corporate-law-firm defendant hadn't shown that the expression of its "ideas and beliefs" would be "inhibited" there. 467 U.S. at 78. But they would here, barring McMahon's claims.

## IV. McMahon's claims are barred by the Free Exercise Clause.

The Free Exercise Clause also bars McMahon's Title VII and WLAD claims because, as applied here, the statutes are not neutral and generally applicable. Under "bedrock" law, "a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions'" and "the government may not 'treat ... secular activity more favorably than religious exercise.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (quoting *Fulton*, 593 U.S.at 533, and *Tandon*, 593 U.S. at 62). Title VII and the WLAD do both.

First, a policy burdening religion that reserves discretion for the government "to decide which reasons for not complying with the policy are worthy of solicitude" is not generally applicable. *Fulton*, 593 U.S. at

---

[6] *See, e.g., Slattery*, 61 F.4th at 288-91; *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 89, 91 (2d Cir. 2003); *Moore v. Hadestown Broadway LLC*, --- F.Supp.3d ---, No. 23-cv-4837, 2024 WL 989843, at *19 (S.D.N.Y. Mar. 7, 2024); *Darren Patterson*, 699 F. Supp. 3d at 1184-85; *Bear Creek*, 571 F. Supp. 3d at 614-16; *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018); *Priests for Life v. HHS*, 7 F. Supp. 3d 88, 109 (D.D.C. 2013).

537; *FCA*, 82 F.4th at 687. BFOQ defenses create precisely this kind of discretion by excusing discrimination if it is deemed "reasonably necessary." *Supra* at 48-49. This requires an individualized case-by-case inquiry into what is "justified under the circumstances" of each situation. *See Teamsters Loc. Union v. Wash. Dep't of Corr.*, 789 F.3d 979, 987 (9th Cir. 2015). Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton,* 593 U.S. at 534.

Second, if a law "treat[s] *any* comparable secular activity more favorably than religious exercise," it must pass strict scrutiny. *Tandon*, 593 U.S. at 62. Both Title VII and the WLAD do exactly this, exempting employment decisions on myriad grounds. *Supra* at 55. The small-business exemption alone allows most for-profits to make the same decision World Vision did here simply due to their size. *Small Business Size Standards* at 5, Congressional Research Service (June 15, 2022), https://perma.cc/Y7ER-XLLU. These exemptions undermine general applicability and thus require strict scrutiny. *FCA*, 82 F.4th at 688 (citing *Tandon*, 593 U.S. at 62); *accord Bear Creek*, 571 F. Supp. 3d at 613; *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (protecting religious hiring policies against anti-discrimination rules when the rules allowed secular exceptions).

The district court rejected both conclusions. First, it found that *Fulton* does not apply because the numerous exemptions are "categorical" and do "not depend on individualized discretion." 1-ER-43. But the court

completely failed to account for the "case-by-case nature of the BFOQ analysis." *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 760 (6th Cir. 2004). And "a case-by-case analysis is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688.

Next, the district court concluded that the exemptions were not comparable under *Tandon* because there isn't an exact correspondence between the secular exemptions and the religious burdens. 1-ER-44. To the court, only "disparate treatment" between "small *religious* employers" and "small *secular* employers" counts. *Id.* But *Tandon* "summarily rejected" a rule like that, which compared only secular and religious in-home gatherings but refused to consider exempted "commercial activity in public buildings" that equally threatened the asserted interests for burdening religion. *Compare Tandon*, 593 U.S. at 64, *with Tandon v. Newsom*, 992 F.3d 916, 923 (9th Cir. 2021).

Rather, "[u]nder *Tandon*, 'whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue.'" *FCA*, 82 F.4th at 689. "And in making these comparisons, the Court 'is concerned with the risks various activities pose.'" *Id.* Here, the "object" of both "Title VII and WLAD" is to "eliminate discrimination in employment." 1-ER-42. Allowing millions of secular employers to discriminate with impunity, solely because of their size, location, mission, or membership requirements poses a far greater risk to that objective than allowing

61

World Vision to make religious hiring decisions. McMahon's claims thus again trigger, and again fail, strict scrutiny.

## CONCLUSION

This Court should reverse and direct entry of summary judgment for World Vision.

Respectfully submitted,

*/s/Daniel H. Blomberg*

NATHANIEL L. TAYLOR
ABIGAIL J. ST. HILAIRE
ELLIS, LI & MCKINSTRY PLLC
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
(202) 682-0565
*ntaylor@elmlaw.com*

SCOTT J. WARD
J. MATTHEW SZYMANSKI
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
(703) 761-5012
*sjw@gg-law.com*

DANIEL H. BLOMBERG
  *Counsel of Record*
LUKE W. GOODRICH
JORDAN T. VARBERG
AMANDA G. DIXON
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketlaw.org*

*Counsel for Defendant-Appellant*

August 21, 2024

62

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,848 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

/s/ Daniel H. Blomberg
Daniel H. Blomberg

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2024, the foregoing opening brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's AMCS system. I certify that all participants in the case who are registered AMCS users will be served by the appellate AMCS system.

/s/ Daniel H. Blomberg
Daniel H. Blomberg