No. 24-3259

# In the United States Court of Appeals for the Ninth Circuit

WORLD VISION, INC.
Defendant-Appellant

v.

AUBRY MCMAHON
Plaintiff-Appellee

Appeal from the United States District Court
For the Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

## BRIEF OF *AMICI CURIAE* BILLY GRAHAM EVANGELISTIC ASSOCIATION AND SAMARITAN'S PURSE IN SUPPORT OF DEFENDANT-APPELLANT WORLD VISION, INC.

Jeffrey C. Mateer
David J. Hacker
Stephanie N. Taub
Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 West Plano Pkwy., Suite 1600
Plano, Texas 75075
(972) 941-4444

Rebecca R. Dummermuth
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1400
Washington, D.C. 20004
(202) 921-4105

Randall W. Miller
Julie M. Christensen
Emily C. Means
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard St., Suite 4000
Dallas, Texas 75201
(214) 855-7500
rwmiller@munsch.com

COUNSEL FOR *AMICI CURIAE*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that *amici* do not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................i

TABLE OF CONTENTS...................................................... ii

INDEX OF AUTHORITIES..................................................iii

INTEREST OF THE *AMICI CURIAE* ........................................... 1

INTRODUCTION ............................................................ 4

ARGUMENT .................................................................. 6

    I.    THE SECTION 702 EXEMPTION BROADLY PROTECTS RELIGIOUSLY MOTIVATED EMPLOYMENT ACTIONS........... 6

        A.    A Plain-Text Reading of the Section 702 Exemption Renders Religious Employers Exempt from Title VII Discrimination Claims that Challenge the Employer's Ability to Make Religious Employment Decisions. ........................ 7

        B.    A Plain-Text Reading of Section 702 is Consistent with the First Amendment Protections Shared By Religious Organizations. .................................... 11

    II.    FORCING RELIGIOUS ORGANIZATIONS TO HIRE PEOPLE WHO OPENLY DISAGREE WITH THEIR RELIGIOUS BELIEFS AND MISSIONS WOULD UNDERCUT BOTH THEIR PURPOSE AND CONTRIBUTION TO SOCIETY. ................................... 20

CONCLUSION............................................................... 35

CERTIFICATE OF COMPLIANCE ........................................... 37

CERTIFICATE OF SERVICE ................................................. 38

# INDEX OF AUTHORITIES

**Cases**                                                                  **Page**

*Behrend v. San Francisco Zen Ctr. Inc.*,
     108 F.4th 765 (9th Cir. 2024)........................................14, 15, 16

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
     Saints v. Amos*, 483 U.S. 327 (1987) ..................................7, 9, 10

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
     450 F.3d 130 (3d Cir. 2006)......................................................... 19

*Digit. Realty Tr., Inc. v. Somers*,
     583 U.S. 149 (2018) .................................................................... 8

*EEOC v. Miss. Coll.*,
     626 F.2d 477 (5th Cir. 1980) ...................................................... 9

*Everson v. Bd. of Educ.*,
     330 U.S. 1 (1947) .................................................................11, 12

*Fulton v. City of Phila.*,
     593 U.S. 522 (2021) .................................................................. 33

*Garcia v. Salvation Army*,
     918 F.3d 997 (9th Cir. 2019) ...................................................... 8

*Groff v. DeJoy*,
     600 U.S. 447 (2023) .................................................................... 8

*Hall v. Baptist Mem'l Health Care Corp.*,
     215 F.3d 618 (6th Cir. 2000) ...................................................... 9

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
     565 U.S. 171 (2012) ...........................................................*passim*

*Kennedy v. St. Joseph's Ministries, Inc.*,
     657 F.3d 189 (4th Cir. 2011) ...................................................... 8

*Killinger v. Samford Univ.*,
     113 F.3d 196 (11th Cir. 1997) .................................................. 10

iii

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ................................................... 13

*Little v. Wuerl,*
    929 F.2d 944 (3d Cir. 1991).............................................7, 9, 10

*New York v. Cathedral Acad.,*
    434 U.S. 125 (1977) .............................................................. 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020) .........................................................*passim*

*Rayburn v. Gen. Conference of Seventh-Day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) .................................................. 32

*Seattle's Union Gospel Mission v. Woods,*
    142 S. Ct. 1094 (2022) .......................................................... 35

*Serbian E. Orthodox Diocese for U.S. of Am. & Canada v.*
    *Milivojevich,*
    426 U.S. 696 (1976) .............................................................. 17

## Statutes

42 U.S.C. § 2000e-1(a) ................................................... 6, 8

42 U.S.C. § 2000e(j)........................................................ 6, 8

## Other Authorities

*1 Corinthians* 12:12–27................................................... 17

*1 Corinthians* 12:6 ........................................................ 22

*1 Peter* 4:10............................................................... 30

*2 Corinthians* 6:14 ....................................................... 19

*About Us,* SAMARITAN'S PURSE, https://www.samaritanspurse.org/
    (last visited Aug. 19, 2024)..................................................... 25

*About Us*, SAMARITAN'S PURSE,
https://www.samaritanspurse.org/our-ministry/about-us/ (last
visited Aug. 19, 2024) .................................................................. 23

Billy Graham Evangelistic Association, *That Your Ways May Be
Known: 2023 Annual Report* at 2,
https://static.billygraham.org/sites/billygraham.org/uploads/pro
d/2024/05/18848_2023_Annual_Report_PDF.pdf (last visited
Aug. 19, 2024) .............................................................................. 31

BILLY GRAHAM PRAYER LINE, https://lp.billygraham.org/prayerline/
(last visited Aug. 19, 2024) .......................................................... 28

Brian Grim, *The Unseen Economic and Social Impacts of
American Faith,* DESERET NEWS, May 12, 2021 ......................... 34

Brian J. Grim and Melissa E. Grim, *The Socio-economic
Contribution of Religion to American Society*: *An Empirical
Analysis*, INTERDISC. J. OF RSCH. ON RELIGION (2016),
https://www.religjournal.com/pdf/ijrr12003.pdf ....................... 34

*Colossians* 3:23 ................................................................................... 2

*Facts,* SAMARITAN'S PURSE,
https://samaritanspurse.org/media/fact-sheet-samaritans-purse
(last visited Aug. 19, 2024) ................................................... 21, 24

Heist D., Cnaan R.A. *Faith-Based International Development
Work: A Review*. RELIGIONS. 2016; 7(3):19 ................................ 33

*Hurricane Beryl Response*, SAMARITAN'S PURSE,
https://www.samaritanspurse.org/our-ministry/hurricane-beryl-
response/ (last visited Aug. 19, 2024) .................................. 22, 25

*Luke* 10:30-37 ................................................................................. 25

*Matthew* 28:19 ............................................................................... 17

*Praising God for 30 Years of Operation Christmas Child*,
SAMARITAN'S PURSE, https://samaritanspurse.org/operation-
christmas-child/30-years-of-occ/ (last visited Aug. 19, 2024) ... 22

v

SEARCH FOR JESUS, https://searchforjesus.net/ (last visited Aug. 19, 2024) ...................................................................... 28

*Statement of Faith*, BILLY GRAHAM EVANGELISTIC ASSOC., https://billygraham.org/about/what-we-believe/ (last visited Aug. 19, 2024).................................................................16, 18, 30

*Statement of Faith*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/statement-of-faith/ (last visited Aug. 19, 2024)...................................16, 17, 18

Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 298–312 (2016) .................................................................................. 5

*Suffering Families Receive Critical Relief in Grenada*, SAMARITAN'S PURSE, https://samaritanspurse.org/article/suffering-families-receive-critical-relief-in-grenada/ (last visited Aug. 19, 2024).............. 26

*World Medical Mission*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/medical/world-medical-mission/ (last visited Aug. 19, 2024) ........................................ 22

## INTEREST OF THE *AMICI CURIAE*[1]

Reverend Billy Graham founded the Billy Graham Evangelistic Association ("BGEA") in 1950 and, continuing his lifelong work, BGEA exists today to support and extend the evangelistic calling and ministry of Franklin Graham by proclaiming the Gospel of the Lord Jesus Christ to all by every effective means available and by equipping the church and others to do the same. BGEA ministers to people around the world through a variety of activities including God Loves You Tour events, evangelistic festivals and celebrations, television and internet evangelism, the Billy Graham Rapid Response Team, the Billy Graham Training Center at the Cove, the Billy Graham Library, and the Billy Graham Archive & Research Center. Through its various ministries and in partnership with others, BGEA intends to represent Jesus Christ in the public square, to cultivate prayer, and to proclaim the Gospel. BGEA believes its mission to be primarily a spiritual endeavor and further believes that, to fulfill its mission, its employees must share its religious

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than *amici curiae*, their members, or counsel contributed money intended to fund preparation or submission of this brief.

1

beliefs and acknowledge that those beliefs are put into action through their employment with BGEA in pursuit of its religious mission and objectives.

In the same vein, Samaritan's Purse is a nondenominational, evangelical Christian organization formed in 1970 to provide spiritual and physical aid to hurting people around the world. The ministry operates in over 100 countries to meet the needs of people who are victims of war, poverty, natural disasters, disease, and famine, with the purpose of sharing God's love through His Son, Jesus Christ. The organization serves the Christian Church worldwide by promoting the Gospel of the Lord Jesus Christ. Samaritan's Purse employs staff of a shared Christian faith for a shared Biblical mission. All employees are responsible and accountable for living out their witness for Christ in all they do "as working for the Lord." *Colossians* 3:23. Samaritan's Purse is concerned when the government threatens the autonomy, effectiveness, and continued viability of the mission to take the Gospel of Jesus Christ to the ends of the earth.

Like Defendant-Appellant World Vision, both BGEA and Samaritan's Purse rely heavily on the work of outward-facing employee

2

representatives like those in donor relations and communications who tell the story, explain what motivates their eternal mission, share the inspiring impact on beneficiaries, all to the glory of God and His purposes. Employing only individuals who embrace and can authentically represent the beliefs of BGEA and Samaritan's Purse to donors and other constituents—both current and potential—as well as to the general public while communicating about the organizations' programs is not only desirable, it is essential. Therefore, employees in these roles and others are routinely required to acknowledge the organizations' religious beliefs, purpose, and mission. Employees must also acknowledge that the specific purpose for their employment with the organization is to further its religious purpose and mission pursuant to those beliefs, and that doing so depends not only on their sharing the organizations' beliefs, but also committing to demonstrate those beliefs and the convictions derived from them in a manner that is consistent with a code of conduct. This is a commonsense and yet very developed framework intended to ensure that both the shared religious beliefs and the organization are represented faithfully.

# INTRODUCTION

Religious organizations play a vital role in shaping communities and promoting social good around the globe. The impact these organizations have in advancing their religious missions—whether through evangelistic programs or tangible forms of serving people in need or those affected by natural disasters—is only possible because these faith-based entities hire only individuals who share their faith and are prepared to live out those religious beliefs consistent with the organization's mission and the organization's recognition of the conduct that flows from holding these beliefs.

Recognizing the distinctive nature of religious organizations and the need for religious autonomy, Congress amended Section 702 of Title VII of the Civil Rights Act ("Title VII") to ensure that religious institutions and faith-based organizations are exempted from Title VII employment discrimination claims when they hire employees to carry out their religious missions ("Section 702 Exemption"). Consistent with the plain text of Section 702 and the constitutional freedoms enjoyed by religious organizations, this Court should apply Section 702 to exempt

faith-based organizations from Title VII discrimination claims based upon their religious employment decisions.

Courts and litigants disagree on the scope of the Section 702 Exemption for religious employers.[2] Some assert that Section 702 only applies as a defense to religious discrimination claims and cannot act as a defense to sex discrimination claims. *Amici* argue that the text of Section 702 allows religious employers to make employment decisions based upon religion, and therefore, it is also a defense to sex discrimination claims when the employee's adherence to the religious tenets of the organization is at issue.

Additionally, Section 702 must be read in light of the First Amendment, which prohibits the government from invading the autonomy of religious organizations. Both the Section 702 Exemption and the church autonomy doctrine of the First Amendment safeguard the right of religious organizations to make decisions about how they operate to fulfill their religious missions.

---

[2]  *See* Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 298–312 (2016) (explaining history and interpretation of Section 702 Exemption).

*Amici* will focus on the protections afforded by the Section 702 Exemption as well as related protections offered by the church autonomy doctrine and the ministerial exception.

## ARGUMENT

### I. The Section 702 Exemption Broadly Protects Religiously Motivated Employment Actions.

Section 702 provides broad protection to religious employers in choosing employees to participate in carrying out their religious mission. It states in part:

> This subchapter shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). Moreover, Title VII defines religion to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Therefore, under the plain language of Section 702, Title VII does not apply to religious organizations when they make employment decisions based on a particular religion—i.e., the religious beliefs, observance, or practice—of individual employees or job applicants. 42 U.S.C. § 2000e-1(a); *see also* Phillips, *supra*, at 301–03. "Against this background and with sensitivity to the constitutional concerns that

6

would be raised by a contrary interpretation, we read the exemption broadly." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991).

The Section 702 Exemption recognizes that when religious organizations hire and retain employees based on their commitment to faith and the religious mission of the organization, employees may be passed over for a job offer or terminated if they do not hold the religious beliefs and practices of the organization. This type of employment decision is exempt from all employment discrimination claims under Title VII. Both the plain text of Section 702 and its constitutional underpinnings in the First Amendment support this application of the Section 702 Exemption.

**A. A Plain-Text Reading of the Section 702 Exemption Renders Religious Employers Exempt from Title VII Discrimination Claims that Challenge the Employer's Ability to Make Religious Employment Decisions.**

The plain text of Title VII's Section 702 Exemption unequivocally exempts religious employers "with respect to the employment of individuals of a particular religion" from *all* of Title VII, not just parts of Title VII. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336 (1987) (broadly applying the Section 702 Exemption to the secular, nonprofit activities of religious

7

organizations). Indeed, rather than just exempting religious employers from allegations of religious discrimination, "Congress 'painted with a broader brush, exempting religious organizations from the *entire subchapter* of Title VII with respect to the *employment* of persons of a particular religion.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1004 (9th Cir. 2019) (quoting *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011)) (emphasis in original).

The Supreme Court has repeatedly emphasized that "statutory interpretation must begin with and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (cleaned up; collecting cases). Therefore, given the broad language of Section 702 combined with Title VII's broad definition of religion, when a religious organization bases an employment decision on its "belief," "observance," or "practice"—as World Vision did here—Title VII does not apply. 42 U.S.C. § 2000e-1(a), 2000e(j) ("This subchapter [Title VII] shall not apply to" a religious employer "with respect to the employment of individuals of a particular [religious belief, observance, or practice].");  *see Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) ("When a statute includes an explicit definition, we must follow that definition.").

8

The Supreme Court has upheld the constitutionality of Section 702, affirming that "Congress acted with a legitimate purpose in expanding the § 702 exemption to cover all activities of religious employers." *Amos*, 483 U.S. at 339. Thus, when the Section 702 Exemption applies, it renders the entirety of Title VII inapplicable to religious employers.

Through Section 702, Congress gives religious employers statutory "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951; *see Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 625 (6th Cir. 2000) ("The exemptions reflect a decision by Congress that religious organizations have a constitutional right to be free from government intervention."); *EEOC v. Miss. Coll.*, 626 F.2d 477, 487 (5th Cir. 1980) (finding Title VII did not apply to sex discrimination claim because "the exemption granted to religious institutions by § 702 of Title VII must be construed broadly to exclude from the scope of the act *any employment decision made by a religious institution on the basis of religious discrimination*" (emphasis added)). This allows religious employers to "create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct

9

role in the organization's 'religious activities.'" *Little,* 929 F.2d at 951; *Killinger v. Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997) ("The [Section 702] [E]xemption allows religious institutions to employ only persons whose beliefs are consistent with the employer's when the work is connected with carrying out the institution's activities.").

"Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals." *Amos*, 483 U.S. at 342 (Brennan & Marshall, JJ., concurring). Exempting religious employers from Title VII via Section 702 preserves the fundamental right of religious organizations to operate free from government interference consistent with the freedoms enumerated in the First Amendment. *Id.* at 337–39 (holding the Section 702 Exemption does not violate the Constitution as it "is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions.").

## B. A Plain-Text Reading of Section 702 is Consistent with the First Amendment Protections Shared By Religious Organizations.

A plain-text reading of Title VII's Section 702 Exemption is consistent with the First Amendment freedoms given to religious organizations, and such a reading ensures the First Amendment rights granted to religious employers are protected. The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. CONST. amend. I. Historically, courts have taken steps to broadly apply the protections granted under the First Amendment, and this Court should do the same when it comes to the Section 702 Exemption.

"No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause[s] of the First Amendment." *Everson v. Bd. of Educ.*, 330 U.S. 1, 33 (1947) (Rutledge, J., dissenting); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 565 U.S. 171, 200 (2012) (recognizing that the idea of religious practice and governance being free from governmental control dates back to at least 1215 A.D. when the concept "was addressed in the very first clause of Magna Carta."). The Framers drafted the First Amendment

against the backdrop of centuries "filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy." *Everson,* 330 U.S. at 8–9. "It was these feelings which found expression in the First Amendment." *Id.* at 11.

The church autonomy doctrine reflects the protection of both Religion Clauses of the First Amendment for "internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 746 (2020); *Hosanna-Tabor*, 565 U.S. at 199 (Alito & Kagan, JJ., concurring) (referencing the Religion Clauses' protections such that "religious bodies are free to govern themselves in accordance with their own beliefs."). As the Supreme Court explained: "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe*, 591 U.S. at 746.

The protections of the church autonomy doctrine are critically important for employment decisions because evaluating an employment

12

decision would require a "civil factfinder [to] sit[] in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Hosanna-Tabor*, 565 U.S. at 206 (Alito & Kagan, JJ., concurring). Indeed, courts have recognized the "religious-employer exemptions in Title VII and the ADA are legislative applications of the church autonomy doctrine." *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013). The reasoning for a broad application of the church autonomy doctrine parallels the approach this Court should take in applying the Section 702 Exemption.

The ministerial exception is one manifestation of the church autonomy doctrine. *See Our Lady of Guadalupe,* 591 U.S. at 746. Grounded in both the Establishment and Free Exercise Clauses, the ministerial exception protects a religious organization's autonomy to select those who will personify its beliefs as ministers. *Hosanna-Tabor*, 565 U.S. at 188–89. In fact, the ministerial exception requires courts "to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions" even if the employment decision was for non-religious reasons. *Our Lady of Guadalupe*, 591 U.S. at 746; *Hosanna-Tabor,* 565 U.S. at 194 ("The

purpose of the [ministerial] exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason.").

There is no "rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. Instead, "the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Id.* at 195 (citations and footnotes omitted). As articulated in *Our Lady of Guadalupe*, the definition of "minister" extends beyond formal titles or theological training to encompass individuals whose primary duties involve carrying out the organization's religious mission. 591 U.S. at 752–53. Rather, any definition of "minister" should ultimately be based on "what an employee does." *Id.* at 753.

This Court recently reaffirmed this principle in *Behrend v. San Francisco Zen Ctr. Inc.*, when it held that even tasks traditionally seen as menial can qualify under the ministerial exception if the performance of such tasks contributes to the organization's religious mission. 108 F.4th 765, 769 (9th Cir. 2024). What one may view as menial labor, another sees as sacred effort.

In *Behrend*, this Court was tasked with determining whether the ministerial exception applied to a Zen Buddhist Temple's Work Practice

Apprentice ("WPA") whose primary tasks involved cooking, dishwashing, cleaning, guest service tasks, and ceremonial jobs like ringing bells. *Id.* at 767. This Court rejected Behrend's contention that he did not qualify as a minister since his tasks involved "menial work" lacking a "key role in making internal church decisions and transmitting the faith to others." *Id.* at 768. Rather, the Court concluded that, though "Behrend may not have taught and was not a part of the hierarchical leadership structure, he [nonetheless] 'performed vital religious duties' as part of the Center's WPA program.'" *Id.* at 770 (citing *Our Lady of Guadalupe*, 591 U.S. at 756). Therefore, "because Behrend had a role in carrying out the Center's mission, he qualifies for the ministerial exception." *Id.* (cleaned up).

Federal courts have no business deciding "what does or does not have religious meaning." *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977). Just as the Court does not get to decide what tasks are "vital" or "menial" to determine whether or not someone qualifies as a minister, it should not get to draw the line on what employees are "menial enough" and second-guess, or disregard entirely, a religious organization's convictions about which employees must agree with its beliefs and practice to further its faith-based mission.

15

For organizations like BGEA and Samaritan's Purse, their beliefs are core to their mission and their very existence emanates from such sincerely held beliefs. *Statement of Faith*, BILLY GRAHAM EVANGELISTIC ASSOC., https://billygraham.org/about/what-we-believe/ (last visited Aug. 19, 2024); *Statement of Faith*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/statement-of-faith/ (last visited Aug. 19, 2024). And if the mission of the organization is to advance its religious beliefs, then it is critical that the religious organization—not the government—decides who will interact with the public and have a role in carrying out the religious mission. *See Behrend*, 108 F.4th at 770; *see also Hosanna-Tabor*, 565 U.S. at 200 (Alito & Kagan, JJ., concurring) (expressing concern about impairing a religious employer's ability "to express those views, and only those views, that it intends to express" because a religious group's "very existence is dedicated to the collective expression and propagation of shared religious ideals.").

The ministerial exception is just one aspect of the church autonomy doctrine. The church autonomy doctrine protects more than the relationship between a religious organization and its ministers. It also prevents the government from interfering with how a religious ministry

16

operates to fulfill its religious ministry. *See Our Lady of Guadalupe*, 591 U.S. at 746–47 (the First Amendment "protects [religious institutions'] internal management decisions that are essential to the institution's central mission."). This includes allowing ministries to hold themselves and their employees to standards of faith and faith-based codes of conduct. *See, e.g., Hosanna-Tabor*, 565 U.S. at 201 (Alito & Kagan, JJ., concurring) ("A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses."); *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 714 (1976) (expressing concern about a court's jurisdiction extending to the consideration of "the conformity of the members of the church to the standard of morals required of them").

At BGEA and Samaritan's Purse, proclaiming the Gospel of Jesus Christ is central to all endeavors, echoing Christ's mandate to "make disciples of all nations." *Matthew* 28:19; *Statement of Faith*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/statement-of-faith/ (last visited Aug. 19, 2024). This mission extends to every member of its staff because every employee is a member of the Body of Christ. *1*

17

*Corinthians* 12:12–27; *Statement of Faith*, BILLY GRAHAM EVANGELISTIC ASSOC., https://billygraham.org/ about/what-we-believe/ (last visited Aug. 19, 2024); *Statement of Faith*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/statement-of-faith/ (last visited Aug. 19, 2024).

Both the church autonomy doctrine and the Section 702 Exemption safeguard BGEA and Samaritan's Purse's right to align their mission with the belief that *every* Christian is part of the Body of Christ. These organizations recognize that there are many individual roles which must be fulfilled so that, collectively, they can represent Christ to the world. After all, every single job position in either religious organization exists because their respective leaders—dating to the Reverend Billy Graham himself—determined that creating those roles would serve to advance their religious missions—missions that are founded upon and motivated by shared religious beliefs.

Historically, religious organizations like BGEA and Samaritan's Purse have maintained the prerogative to require adherence to faith principles and conduct expectations as a condition of employment so that they have the greatest impact in advancing their faith-driven mission.

18

But this right to hire persons who share the same sincerely held beliefs, practices, and religious observances is threatened when courts refuse to apply the Section 702 Exemption to protect religious employers from claims of sex discrimination when an employment decision stems from the religious beliefs of the organization. Without this critical protection, Christian organizations may be required, for example, to hire individuals who do not share or even explicitly reject the beliefs they are trying to communicate to the world, thereby violating the Scriptural injunction found in *2 Corinthians* 6:14 ("Do not be unequally yoked with unbelievers…."); *see Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,* 450 F.3d 130, 141 (3d Cir. 2006) (rejecting the sex-discrimination claim of a Catholic school teacher dismissed for engaging in pro-choice advocacy because "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices"). Similar principles apply to any faith, of course.

Narrowing the scope of the Section 702 Exemption to apply only when an employee claims religious discrimination would jeopardize the religious organization's ability to hire individuals who align with its

religious tenets and conflict with the constitutional freedoms shared by religious organizations. Therefore, this Court should apply a plain text reading of Section 702 and exempt religious organizations from all Title VII discrimination claims when hiring decisions are made in furtherance of and based on the religious mission.

Like *Amici*, World Vision is a religious organization that relies on the protections afforded by Section 702 of Title VII. By requiring employees to wholeheartedly affirm World Vision's religious beliefs as reflected in either its statement of faith or the Apostles' Creed and abide by its religious Standards of Conduct, World Vision ensures that its employees share a common vision and dedication to its religious values. Applying the Section 702 Exemption in this context is essential for preserving the integrity of World Vision's mission.

## II. Forcing Religious Organizations to Hire People Who Openly Disagree With Their Religious Beliefs and Missions Would Undercut Both Their Purpose and Contribution to Society.

Reverend Billy Graham founded BGEA to support and extend the evangelistic calling and ministry of spreading the Gospel of Jesus Christ. Through its ministries and in partnership with other organizations, BGEA pursues this mission by representing Jesus Christ in the public

20

square, cultivating prayer, and proclaiming the Gospel through various means. BGEA believes its mission to be primarily a spiritual endeavor and further believes that, to fulfill its mission, its employees must share its religious beliefs and acknowledge that those beliefs are put into action through their employment with BGEA in pursuit of its religious mission and objectives.

Samaritan's Purse is a Christian, humanitarian aid organization operating in over 100 countries across the globe. *Facts,* SAMARITAN'S PURSE, https://samaritanspurse.org/media/fact-sheet-samaritans-purse (last visited Aug. 19, 2024). Samaritan's Purse provides spiritual and physical aid to victims of war, natural disasters, and famine, as well as community development, vocational programs, and resources for children, "with the purpose of sharing God's love through his son, Jesus Christ." *Id.* With an annual budget of nearly $1 billion, *id.*, Samaritan's Purse's projects include:

- Operation Christmas Child – Since 1993, Samaritan's Purse has delivered more than 220 million shoebox Christmas gifts in more than 170 countries and territories. These shoebox gifts are personalized for children by age group and can include toys, hygiene items, school supplies, and a personal note. They create opportunities to share the Gospel. Parents often want to know why someone would give their child such a special

21

present, giving Samaritan's Purse an opportunity to tell them about God's love.[3]

- Emergency natural disaster relief – Samaritan's Purse is often one of the first on the ground after a devastating natural disaster, like in the Caribbean after Hurricane Beryl.[4]

- Medical missions – Samaritan's Purse also endeavors to help develop medical care as a platform for evangelism that points people towards Jesus and demonstrates His love.[5]

Many religious organizations, like BGEA and Samaritan's Purse, have a sincere belief that their mission is best accomplished by hiring employees who are, in belief and conduct, faithful to the organization's religious doctrines and purpose. Whether custodian, landscaper, IT programmer, attorney, or accountant, each and every employee plays a critical role in carrying out the religious beliefs and mission of that organization. *1 Corinthians* 12:6 ("There are different kinds of working,

---

[3] *See Praising God for 30 Years of Operation Christmas Child*, SAMARITAN'S PURSE, https://samaritanspurse.org/operation-christmas-child/30-years-of-occ/ (last visited Aug. 19, 2024).

[4] *See Hurricane Beryl Response*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/hurricane-beryl-response/ (last visited Aug. 19, 2024).

[5] *See World Medical Mission*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/medical/world-medical-mission/ (last visited Aug. 19, 2024).

but in all of them and in everyone it is the same God at work."). For example, as stated on the website of Samaritan's Purse:

> As our teams work in crisis areas of the world, people often ask, "Why did you come?" The answer is always the same: "We have come to help you in the Name of the Lord Jesus Christ." Our ministry is all about Jesus—first, last, and always. As the Apostle Paul said, "*For we do not preach ourselves, but Jesus Christ as Lord, and ourselves as your servants for Jesus' sake*" (2 Corinthians 4:5, NIV).

*About Us*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/about-us/ (last visited Aug. 19, 2024). Each and every employee must understand and agree with the religious beliefs and purposes of the organization in order to be equipped to answer that common question: "Why did you come?" Additionally, every employee takes part in daily prayer and devotion and must agree to follow Biblical principles in every facet of their lives. Take the facilities manager who has daily opportunities to interact with outside vendors. He or she demonstrates the love of Christ by being kind, courteous, and relational, alongside ensuring that the facilities represent diligence and good stewardship, which are hallmarks of the Christian faith. When asked about pictures of the ministry's work that hang on the walls of the facility, he or she tells the story and shares the hope of Christ while sharing Samaritan's Purse's

mission of going into the most difficult wars, storms, famines, and sickness in the world.

For many religious employers, every employee is a de facto spokesperson of that organization and, consequently, of what that organization stands for. This happens in very public contexts but also happens in the everyday transactions of life, such as providing employment-related information to others, health insurance at a doctor's office, explaining the employer's identity and mission to friends, acquaintances, and those in the grocery store line, greeting guests who come on campus, or engaging with vendors (e.g., plumbers, delivery drivers, etc.).

For Christian organizations doing humanitarian work (i.e., where there is delivery of tangible resources or support intended to bring relief, etc.), the purpose for that work and the way it is done—indeed, the fact that it *is* done—is specifically and directly tied to the organization's religious beliefs. Samaritan's Purse, for example, has deployed aid and resources to crisis regions in Ukraine, Israel, and Turkey. *Facts,* SAMARITAN'S PURSE, https://samaritanspurse.org/media/fact-sheet-samaritans-purse (last visited Aug. 19, 2024). Samaritan's Purse also

24

deployed humanitarian aid to victims of Hurricane Beryl, which devastated some Caribbean countries earlier this year. *See Hurricane Beryl Response*, SAMARITAN'S PURSE, https://www.samaritanspurse.org/our-ministry/hurricane-beryl-response/ (last visited Aug. 19, 2024). Driven by its Christian concern, Samaritan's Purse is providing shelter, clean water, mobile medical care, and other relief in Carriacou (part of Grenada), Petite Martinique, Jamaica, and St. Vincent. *Id.* Samaritan's Purse, motivated by its religious mission, delivered more than 111 tons of lifesaving relief to the region, including an emergency field hospital, hundreds of rolls of shelter tarp, jerry cans, a desalination water treatment unit, solar lights, and hygiene kits. *Id.* All of the partners assisting with distributing these necessities pray over the items and for the recipients.

The very purpose for providing this aid is in response to the story in the Bible of the Samaritan who helped a hurting stranger. *About Us,* SAMARITAN'S PURSE, https://www.samaritanspurse.org/ (last visited Aug. 19, 2024). Jesus commanded His followers to "go and do likewise." *Luke* 10:30–37. As explained by partner Pastor Happy Akasie, while helping

Samaritan's Purse workers to distribute solar lights and tarps to Carriacou residents:

> We're bringing Christ to them. So we are really trusting God that people get hope and that they know God still loves them. We pray that this situation will draw them closer to God.

*Suffering Families Receive Critical Relief in Grenada*, SAMARITAN'S PURSE, https://samaritanspurse.org/article/suffering-families-receive-critical-relief-in-grenada/ (last visited Aug. 19, 2024). Because every Christian believer is part of the Body of Christ, Samaritan's Purse believes it is essential that its employees are Christians who, when present with people in need, fully embrace the fact that they are present on behalf of Jesus Christ, through Samaritan's Purse, and are prepared to steward that responsibility well. To be forced to employ individuals who do not share—or who even actively reject by words and/or conduct—these core religious beliefs would directly undercut and undermine the very purpose and existence of the organization.

For organizations that employ coreligionists (i.e., people who share beliefs and practices), employees delivering the resources and services and those directing that work are ambassadors of their shared faith. Charitable beneficiaries will associate those who cared for them and

delivered resources with the beliefs espoused by the organization. Being able to ensure that those doing the work share those beliefs is an essential part in delivering a positive witness and example of those beliefs—such as reflecting the love of Jesus Christ for Christian organizations. For those whose mission involves evangelism, training, discipleship, community involvement, communication, and the like— which may not necessarily be sacerdotal functions but are nevertheless religious services—there are innumerable ways in which a shared belief in every position within the organization is vital. For employees to faithfully walk in a manner worthy of their calling to advance the mission, reflecting the Christian ethos before ministry colleagues, beneficiaries, volunteers, donors, vendors, guests, and the community at large is essential.

For example, BGEA operates various ministries designed to present information about Jesus Christ to a wide public audience via various forms of media and invite connection with a BGEA representative. One is the Billy Graham Prayer Line, which uses TV, radio, internet, and other forms of advertising to invite people who want to know more about Jesus Christ, or who simply want someone to pray

with them, to call a number (855-255-7729). BILLY GRAHAM PRAYER LINE, https://lp.billygraham.org/prayerline/ (last visited Aug. 19, 2024). The Prayer Line is staffed 24/7 by trained Christian response team members (both staff and volunteers) who are ready to listen and offer prayer and encouragement, consistent with BGEA's beliefs. It would be impossible for someone who is not a Christian to represent the organization, perform these responsibilities satisfactorily, or further BGEA's mission in this capacity, because they would be incapable of articulating what it means to believe in Jesus Christ and how one may begin that spiritual journey. Another BGEA ministry designed to engage the public is its Internet Evangelism ministry called Search for Jesus ("SFJ"). SEARCH FOR JESUS, https://searchforjesus.net/ (last visited Aug. 19, 2024). Both of these BGEA ministries, among others, rely on an army of staff and volunteers; not only those trained to answer calls from the general public, as well as from supporters and partners, but also with responsibilities ranging from management to information technology, communications, advertising, public relations, and social media personnel to orchestrate evangelistic outreach and spread the Gospel.

Every employee in the organization understands that this is the reason they work for the ministry. They are required to acknowledge annually that the exclusive purpose of their position is to advance BGEA's mission and beliefs through their responsibilities. The organization cannot function as intended, faithfully representing the Body of Christ in every role, without each and every employee sharing in those beliefs and mission. Even in the finance department, for example, shared belief can lead to zeal for integrity and good stewardship, whereas the lack thereof and indifference to the religious mission would have a detrimental effect on the organization's reputation and effectiveness in its religious mission. The organization cannot function without protection of its "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746.

Another example is that of representatives charged with interacting with donors, supporters, and partner organizations. These representatives need to be able to effectively communicate the mission of the organization to everyone they encounter. For its part, BGEA believes "that the ministry of evangelism (sharing and proclaiming the message

of salvation only possible by grace through faith in Jesus Christ) and discipleship (helping followers of Christ grow up into maturity in Christ) is a responsibility of all followers of Jesus Christ," and thus all representatives of the organization must abide by these same beliefs. *Statement of Faith*, BILLY GRAHAM EVANGELISTIC ASSOC., https://billygraham.org/about/what-we-believe/ (Aug. 19, 2024). In the same vein, for a nonprofit that relies on donations to fund its work, the success of these individuals at building relationships and casting the vision for the work being done will be intimately connected with the resources the organization has to pursue its religious mission. In the case of BGEA, that is evangelism and discipleship, in large part. Donations are primarily made by individual donors who personally share the beliefs the organization stands for and want to advance its mission. Many Christian donors give financially in response to a Biblical calling to give and in recognition of the principle that they are mere stewards of the Lord's blessings on them. *1 Peter* 4:10 ("Each of you should use whatever gift you have received to serve others, as faithful stewards of God's grace in its various forms."). For instance, supporters expect that those who are employed by the organization both share those same beliefs and are doing

30

their part to steward donated funds well so as to advance the mission on their behalf. *See* Billy Graham Evangelistic Association, *That Your Ways May Be Known: 2023 Annual Report* at 2, https://static.billygraham.org/sites/billygraham.org/uploads/prod/2024/0 5/18848_2023_Annual_Report_PDF.pdf (letter to donors confirming "You made it possible to share the life-changing hope of the Gospel with countless people in 2023.") (last visited Aug. 19, 2024).

As a community of believers, the conduct and witness of employees to each other in their work breeds optimum effectiveness and efficiency in furthering the mission of Christ. Working from a shared faith for a shared mission brings unity and synergy. Forcing religious organizations to hire employees who may openly disagree with their religious beliefs would create a chilling effect and hinder the effectiveness of religious organizations. A rule that religious organizations cannot hire and fire based on their religious beliefs—a rule contrary to the text of Section 702 of Title VII—risks overt and increasing governmental and judicial interference with the internal governance and affairs of religious organizations. Some organizations will not wish to risk liability and may become distracted from their religious missions, spending valuable

resources to identify and respond to potential legal issues involving, for example, the extent to which a given role in an organization requires an individual to share the organization's religious beliefs. *See Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("There is the danger that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members.").

This is tantamount to governmental opposition to religious organizations, impeding their religious missions and faith-based programs. In any case, the liberty required for religious believers to join with others who share those beliefs and to express them publicly, through whatever means they see fit, will be severely compromised. Not only will the law likely create a barrier to entry for the creation of new religious organizations, intending to meet the many needs of society in new, privately-funded ways, it will also precipitate the decline of existing organizations.

The risk of faith-based organizations closing their doors because government will not let them remain faithful to their religious convictions is very real. For example,

> From 2006 to 2011, Catholic Charities in Boston, San Francisco, Washington, D.C., and Illinois ceased providing adoption or foster care services after the city or state government insisted that they serve same-sex couples. Although the precise legal grounds for these actions are not always clear, it appears that they were based on laws or regulations generally prohibiting discrimination on the basis of sexual orientation.

*Fulton v. City of Phila.*, 593 U.S. 522, 552 (2021) (Alito, J., concurring). Were organizations involved in international relief work and community betterment—such as World Vision, BGEA, and Samaritan's Purse—to face the same dilemma, forced to choose between faithfulness to their religious convictions or the good work they do, the impact here in the United States and around the globe could be devastating. *See, e.g.,* Heist D., Cnaan R.A. *Faith-Based International Development Work: A Review.* RELIGIONS. 2016; 7(3):19, at 9 (59% of international development organizations are faith-based).

A 2016 study conservatively estimated that religious congregations and organizations contribute quantifiable socioeconomic value to the United States economy between $378 billion to $1.2 trillion annually.

33

Brian J. Grim and Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society*: *An Empirical Analysis*, INTERDISC. J. OF RSCH. ON RELIGION (2016), https://www.religjournal.com/pdf/ijrr12003.pdf. This is more than the *global* annual revenues of tech giants Apple and Microsoft combined. *Id.* As one source put it, "[s]ome of this work runs counter to stereotypes some may have about religious groups. For instance, nearly 26,000 congregations are engaged in some form of active ministry to help people living with HIV/AIDS. That makes one HIV/AIDS ministry for every 46 people who are HIV-positive." Brian Grim, *The Unseen Economic and Social Impacts of American Faith,* DESERET NEWS, May 12, 2021, https://www.deseret.com/faith/2021/5/12/22429166/the-unseen-economic-social-impact-of-american-faith-brian-grim-religious-freedom-business-foundation/. Millions of faith-based organizations and congregations across the country better their communities by offering services to immigrants and the homeless, partner with organizations like Habitat for Humanity, offer programs aimed at alcohol and substance abuse, unemployment, and parenting and marriage counseling to name a few. Grim & Grim, *supra*, at 16–19.

34

## CONCLUSION

Justice Alito recently observed:

> To force religious organizations to hire messengers and other personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability. If States could compel religious organizations to hire employees who fundamentally disagree with them, many religious non-profits would be extinguished from participation in public life—perhaps by those who disagree with their theological views most vigorously. Driving such organizations from the public square would not just infringe on their rights to freely exercise religion but would greatly impoverish our Nation's civic and religious life.

*Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (statement of Alito, J., respecting the denial of certiorari).

The Section 702 Exemption and the church autonomy doctrine (including the ministerial exception) play a critical role in preserving the autonomy of religious organizations, allowing them to hire individuals who align with their faith mission. When employees are united in purpose, they amplify the organization's impact on society. By exempting religious employers from the contours of Title VII when they make employment decisions based on religion, this Court will protect the religious autonomy of faith-based organizations and allow them to

35

continue advancing their missions pursuant to their religious beliefs and meeting the needs of millions across the world.

Respectfully submitted,

*/s/ Randall W. Miller*

Randall W. Miller
Julie M. Christensen
Emily C. Means
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard St., Suite 4000
Dallas, Texas 75201
(214) 855-7500
rwmiller@munsch.com

Jeffrey C. Mateer
David J. Hacker
Stephanie N. Taub
Jeremiah G. Dys
FIRST LIBERTY INSTITUTE
2001 West Plano Pkwy., Suite 1600
Plano, Texas 75075
(972) 941-4444

Rebecca R. Dummermuth
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW
Suite 1400
Washington, D.C. 20004
(202) 921-4105

**COUNSEL FOR *AMICI CURIAE***

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  No. 24-3259

I am the attorney or self-represented party.

**This brief contains 6,713 words,** including _____0_____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **x** ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  */s/ Randall W. Miller*          **Date**  _____August 22, 2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

37

## CERTIFICATE OF SERVICE

I, Randall W. Miller, do hereby certify that I filed the foregoing Brief electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system on August 22, 2024. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Randall W. Miller*
Randall W. Miller