**APPEAL NO. 24-3259**

**UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT**

---

WORLD VISION, INC.,
Defendant-Appellant,

v.

AUBRY MCMAHON,
Plaintiff-Appellee.

---

Appeal from the United States District Court for the
Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

---

**BRIEF OF *AMICI CURIAE* COLSON CENTER FOR CHRISTIAN
WORLDVIEW, MOODY BIBLE INSTITUTE, SUMMIT MINISTRIES,
AND CEDARVILLE UNIVERSITY IN SUPPORT OF APPELLANT**

---

Ian Speir
Covenant Law PLLC
13395 Voyager Pkwy. #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com

*Counsel for Amici Curiae*

## Corporate Disclosure Statement

The Colson Center for Christian Worldview, The Moody Bible Institute of Chicago, Summit Ministries, Inc., and Cedarville University are each a religious nonprofit, nonstock, or not-for-profit corporation recognized as tax-exempt under § 501(c)(3). No organization issues stock, and none has a parent corporation.

# Table of Contents

Corporate Disclosure Statement ................................................................. i

Table of Contents ....................................................................................... ii

Table of Authorities .................................................................................. iii

Identity and Interest of *Amici Curiae* ......................................................1

Argument.....................................................................................................4

   I.   Faith-based personnel policies are widespread among ministry organizations throughout the country. ..........................................................4

   II.  Shared faith commitments are crucial to successful ministry. ........................7

   III.   The First Amendment and Title VII protect the right of religious organizations to build communities of the faithful. .............................................10

   IV.   Judicial inquiries that fail to respect religious employment standards will foster personnel divisions, cripple the mission, and devastate ministry. .............13

Conclusion ................................................................................................17

Certificate of Compliance ........................................................................18

Certificate of Service ...............................................................................18

# Table of Authorities

**Cases**

*Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024)…………12

*Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002)…15

*Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987)………...4, 8, 10, 11, 12, 15

*Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968  (7th Cir. 2021)……..8, 16

*Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023)………………12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)……………………………………………………………7, 13, 15

*Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991)………………………………………12

*McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121 (W.D. Wash. 2023)……….13

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)…………………11, 12

*Obergefell v. Hodges*, 576 U.S. 644 (2015)…………………………………………..14

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020)……………………………………………………..4, 13, 16, 17

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976)………………13

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
41 F.4th 931 (7th Cir. 2022)……………………………………………………….8, 12

*Watson v. Jones*, 80 U.S. 679 (1871)……………………………………..10, 13

**Statutes and Rules**

42 U.S.C. § 2000e-1(a)……………………………………………………….11

FRAP 29(a)(4)(E)…………………………………………………………..1

**Other Authorities**

CASS SUNSTEIN, CONFORMITY: THE POWER OF SOCIAL INFLUENCES (2019)………..9

Helen Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad As It Needs to Be?*, 25 TEX. REV. L. & POLITICS 319 (2021)……...9

Laurence R. Iannaccone, *Why Strict Churches Are Strong*, 99 AM. J. SOCIOLOGY 1180 (Mar. 1994)………………………………………………..10

Matthew K. Richards et al., *Religious-Based Employment Practices of Churches: An International Comparison in the Wake of* Hosanna-Tabor, 26 Temp. Int'l & Comp. L.J. 263 (2012)………………………………………4

PETER GREER & CHRIS HORST, MISSION DRIFT: THE UNSPOKEN CRISIS FACING LEADERS, CHARITIES, AND CHURCHES (2014)……………………...9

Proverbs 27:17………………………………………………………...9

Thomas C. Berg, *Partly Acculturated Religious Activity: A Case for Accommodating Religious Nonprofits*, 91 NOTRE DAME L. REV. 1341 (2016)…..8, 9

## Identity and Interest of *Amici Curiae*[1]

*Amici* are evangelical Christian ministries that educate children, young people, and adults based on a Christian worldview, helping students, listeners, and learners of every age integrate biblical truth and the values and virtues of Christian faith into every area of their lives.

**The Colson Center for Christian Worldview** ("The Colson Center") is a nonprofit ministry founded by the late Charles W. ("Chuck") Colson, one of the most prominent evangelical Christian figures of the late twentieth century. The Colson Center exists to build and resource a national and global movement of Christians committed to cultural restoration and to living and defending a Christian worldview. Through its daily and weekly *BreakPoint* commentaries and its Colson Educators program, The Colson Center provides Christians with clarity, confidence, and courage in this unique cultural moment. Its Colson Fellows Program educates and equips believers with a robust Christian worldview so they can thoughtfully engage with the culture, inspire reflection in others, and work effectively toward reshaping the world in light of God's kingdom.

---

[1] The parties have provided blanket consent to the filing of all amicus briefs. No party's counsel authored this brief in whole or in part. No party or its counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amici,* their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *See* FRAP 29(a)(4)(E).

1

**The Moody Bible Institute of Chicago** ("Moody") is a non-profit ministry founded by evangelist D.L. Moody in 1886 to proclaim the Gospel and equip people to be biblically grounded and practically trained, and to engage the world through Gospel-centered living. Moody's mission is to equip men and women with a deep understanding of the Bible and prepare them for Christian service regardless of their profession. It does this through undergraduate and graduate education programs in theology, ministry, and related fields; through its publishing ministry serving nearly four million readers per year with 1,300+ titles in 85+ languages; and through its media ministry serving well over a million weekly listeners on broadcast and internet stations, in addition to streaming content.

**Summit Ministries** is a nonprofit ministry that equips and supports rising generations to embrace God's truth and champion a biblical worldview. Every year, it hosts a series of two-week summer conferences for over 1,700 high school and college students, bringing together prominent Christian speakers and intellectuals to help students navigate fundamental questions about life, Christian faith, and the common good. Its "Summit Gap Year" is a two-semester Christian gap-year program that has trained hundreds of students over the past ten years to worship God by seeking truth, building relationships, and living intentionally. The publishing division of Summit Ministries offers curriculum and other educational resources to

more than 60,000 students each year in Christian schools, homeschools, and churches. Its podcasts and online content reached an audience of 100 million in 2023.

**Cedarville University**, established in 1887, is a religious, non-profit institution of higher education. Cedarville transforms lives through excellent education and intentional discipleship in submission to biblical authority. It is chartered by the State of Ohio, certified by the Ohio Department of Higher Education, and accredited by the Higher Learning Commission, an institutional accreditation agency recognized by the U.S. Department of Education. The University has over 5,500 students including undergraduate, graduate, and dual-enrolled students, in more than 175 areas of study, from all 50 states and several other countries. The University employs approximately 610 full-time employees, comprised of faculty and staff, plus over 2,000 part-time employees, most of whom are students. The University Bylaws state, "Cedarville University is a Baptist university of arts, sciences, professional, and graduate programs, committed to the **WORD OF GOD** and the **TESTIMONY** of **JESUS CHRIST**."

Consistent with the First Amendment's guarantee of religious freedom, *amici* advocate for the right of religious institutions to operate free of government intrusion into matters of religious doctrine and self-governance. *Amici* argue that courts should respect a religious institution's freedom to select employees who uphold their religious standards of conduct.

3

## Argument

### I. Faith-based personnel policies are widespread among ministry organizations throughout the country.

As a Christian ministry, World Vision holds its employees to religious standards, requiring them to uphold Christian teachings and adhere to biblical standards of belief and conduct in order to be "credible witness[es]" to Jesus Christ and the gospel.

Faith-based personnel policies like World Vision's are not unusual. Across the country, "religious organizations routinely require their employees to affirm a personal conviction of the faith, to comply with the faith's teachings, and to adhere to religious-based standards of personal behavior." Matthew K. Richards et al., *Religious-Based Employment Practices of Churches: An International Comparison in the Wake of* Hosanna-Tabor, 26 TEMP. INT'L & COMP. L.J. 263, 269 (2012); *see, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2056 (2020) (school required teachers to "model and promote Catholic faith and morals" (cleaned up)); *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 330 n.4 (1987) (nonprofit gymnasium could require its janitor to "observe the Church's standards in such matters as regular church attendance, tithing, and abstinence").

*Amici* are evangelical Christian ministries that, like World Vision, maintain faith-based personnel policies and expect employees to abide by them. The Colson Center requires board members, officers, and employees to affirm its Statement of

Faith and adhere to biblical standards of conduct at work and in their personal lives. Its Statement of Faith is a morally orthodox articulation of historic Christian faith and teachings, including affirmation of the sanctity of life and traditional marriage. All employees—leaders and staff—are required annually to certify their agreement with and commitment to the Statement of Faith. The Colson Center's employee handbook establishes faith-based standards for employees, requiring them to reflect the values and vision of The Colson Center in the workplace and in their personal lives.

Moody requires board members, officers, and employees to annually affirm its Doctrinal Statement and adhere to its biblical standards of conduct. Both the Doctrinal Statement and the standards of conduct reflect Moody's unchanging belief that the Bible is the Word of God and that how Moody engages in ministry falls under the authority of the Bible. Moody maintains faith-based personnel policies and expects employees to abide by them and reflect Moody's biblical values and vision in the workplace and to the world.

Summit Ministries has adopted a Statement of Faith consisting of the historic Apostles Creed and a separate Statement of Convictions that affirms its beliefs about God, human dignity, salvation, traditional marriage, care of Creation, and service to others. All Summit Ministries board members, officers, and staff must affirm their agreement with the Statement of Faith and the Statement of Convictions. The

employee handbook affirms that faithfulness to God and family, and integrity in marriage, work, and finances, are part of the moral framework and behavior expected of all Summit Ministries employees.

Cedarville University requires all employees to adhere to its Doctrinal Statement, to obey its Statement of Standards, and to be a member of a church with doctrine substantially similar to the University's Doctrinal Statement. The University's Bylaws contain a Doctrinal Statement and Statement of Standards of Conduct. As stated in its Personnel Policy Handbook, the University requires "all full-time and part-time faculty and staff" to "sign initially, and annually thereafter, their agreement with and willingness to abide by the Doctrinal Statement as a condition of employment." In addition, all employees are required to comply with the Standards of Conduct, which prohibit conduct that violates, or is inconsistent with, the Doctrinal Statement. Moreover, "all faculty and staff members, regardless of position," are required "to maintain the discipline of weekly corporate worship at a local church" whose doctrinal positions are in substantial agreement with the University's Doctrinal Statement.

Like many religious organizations, *amici* expect their employees to exhibit Christian belief and conduct in every aspect of their lives. Summit Ministries' employee handbook puts it well, affirming that all of the organization's work is

Gospel-shaped ministry and that all engaged in it "are responsible for modeling Christ in their lives and in their work."

## II.  Shared faith commitments are crucial to successful ministry.

Religious organizations like World Vision and *amici* are not just employers of labor, nor are they simply enterprises providing a service. They are ministries with unique religious callings—communities of believers working together to accomplish a religious mission. For them, faith and mission are inseparable: what they believe shapes everything they do. But faith and mission are not self-sustaining. They depend on and are given expression through actual people—the leaders and staff who embody the organization's faith and live out its mission every day.

This is true of educational ministries like *amici*, which seek to teach biblical values, model Christian virtue, and inculcate a Christian worldview. But it is equally true of any ministry for whom faith is a matter of public expression. "Religious groups are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito & Kagan, JJ., concurring). The formation of faith inwardly shapes the profession of faith outwardly. For ministry organizations, *mission* and *message* go hand in hand.

Religious organizations define and carry out their missions principally "through [their] appointments," that is, through their selection of personnel. *Id.* at

188 (maj. op.). Like *amici*, many organizations insist that their employees profess and practice the same faith. These organizations are "entitled to limit … staff to people who will be role models by living the life prescribed by the faith." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). Shared faith is crucial to ministry because "religious beliefs are intertwined with the energy and commitment that make [religious] entities vigorous." Thomas C. Berg, *Partly Acculturated Religious Activity: A Case for Accommodating Religious Nonprofits*, 91 NOTRE DAME L. REV. 1341, 1354 (2016). A religious mission doesn't exist in a vacuum. It is bound up with and animated by distinct religious commitments, and it is embodied in the employees who faithfully carry the mission forward.

But shared faith commitments don't just advance the mission outwardly. They also form the community inwardly. As Justice Brennan observed in his concurrence in *Amos*, "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is ... a means by which a religious community defines itself." 483 U.S. at 342 (Brennan, J. concurring). For any organization, as the saying goes, "personnel is policy." *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 979 (7th Cir. 2021) (en banc). But for religious organizations, the stakes are higher. Those who

8

join hands in ministry define and give shape to what an organization believes and does. For them, personnel is *identity*. It's not just what they do—it's who they are.

Social science affirms these insights in two ways. First, "iron sharpens iron" (*Proverbs* 27:17). People learn through what sociologists call modeling, that is, by observing and imitating the conduct of those around them. "[M]uch of human behavior is a product of social influences" because "the actions and statements of other people provide information about what is true and what is right." CASS SUNSTEIN, CONFORMITY: THE POWER OF SOCIAL INFLUENCES 7, xxv (2019) (emphasis deleted). This is particularly important in religious settings. "Throughout history, religious traditions have emphasized the value of keeping good company and attending to the example of good or holy persons" because "people tend to become more like those with whom they associate." Helen Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad As It Needs to Be?*, 25 TEX. REV. L. & POLITICS 319, 363 (2021) (quotation omitted).

Second, organizations that actually demand something of their employees—requiring them to commit to standards of belief and conduct—are more likely to succeed. Shared commitment fosters a strong sense of community identity and inspires the energy and religious devotion on which mission success depends. *See* Berg, *supra*, at 1356–57; Peter Greer & Chris Horst, MISSION DRIFT: THE UNSPOKEN CRISIS FACING LEADERS, CHARITIES, AND CHURCHES 36–37 (2014). As one

economics-of-religion scholar put it, "[s]trictness works." Laurence R. Iannaccone, *Why Strict Churches Are Strong*, 99 AM. J. SOCIOLOGY 1180, 1183 (Mar. 1994). Religious standards mitigate free-rider problems, raise overall levels of commitment, increase participation, and enhance the benefits of membership. *Id.* These benefits hold "across both Christian and Jewish denominations" and "remai[n] strong even after controlling for personal beliefs." *Id.* at 1200.

In short, faith is formed and fostered through association. This is why *amici*, like thousands of religious employers across the country, insist that leaders and staff commit to and abide by religious standards of belief and conduct. As fellow believers, leaders are able to mentor staff. And all employees, regardless of position, can encourage one another in their journeys of faith and in pursuit of the mission. This deepens relationships, tightens the bond between leaders and staff, and strengthens a sense of organizational identity rooted in common faith and practice.

## III. The First Amendment and Title VII protect the right of religious organizations to build communities of the faithful.

"It is of the essence of" religious organizations that they get to decide who may "unite themselves" therein "to assist in the expression and dissemination" of the faith. *Watson v. Jones*, 80 U.S. 679, 729 (1871). Faith-based personnel standards lie at the core of religious identity and are a crucial means by which organizations "define and carry out their religious missions." *Amos*, 483 U.S. at 339; *id.* at 342 (Brennan, J. concurring).

The First Amendment right to maintain faith-based standards is not limited to employees whose duties can be categorized as "religious." This is a core teaching of *Amos*. Most religious organizations don't segregate employees based on "religious" or "secular" responsibilities; such a distinction is alien to ministry work. It would essentially cleave faith from mission, separating what an organization believes from what it does and then sifting employees accordingly. To police such a distinction would entail intrusive inquiries into religious belief and practice, requiring courts to determine whether a given ministry activity is or isn't "religious." But as *Amos* explained, "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." 483 U.S. at 336. And the Supreme Court has warned against judicial standards that would require organizations to explain in "good faith" how their personnel policies "relat[e] to the … religious mission." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979). For "[i]t is not only the conclusions that may be reached … , but also the very process of inquiry" that "impinge[s] on rights guaranteed by the Religion Clauses." *Id.*

Section 702—Title VII's religious exemption—was crafted for this purpose: to avoid burdening religious organizations in ways the First Amendment prohibits. Congress's directive that Title VII "shall not apply" to faith-based personnel decisions, 42 U.S.C. § 2000e-1(a), advances important constitutional principles. It

prevents the government from becoming entangled in "intrusive inquir[ies] into religious belief" (in accordance with the Establishment Clause), and it protects religious groups from "significant governmental interference" with their religious missions (in accordance with the Free Exercise Clause). *Amos*, 483 U.S. at 339; *cf. Catholic Bishop*, 440 U.S. at 506–07 (narrowly interpreting labor law to avoid similar entanglement problem). This is the clear teaching of *Amos*, where the Supreme Court faulted the district court for thinking that the job of a ministry's janitor was unrelated to "any conceivable religious belief or ritual." 483 U.S. at 332 (quotation omitted). That, the Court said, is "the kind of intrusive inquiry into religious belief" that § 702 "avoids." *Id.* at 339.

The point of § 702 is "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991). "[W]hen [an employment] decision is founded on religious beliefs, then all of Title VII drops out." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); *see also Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534 (7th Cir. 2023) (Brennan, J., concurring) (same); *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 335 (4th Cir. 2024) (King, J., dissenting in part and concurring in judgment) (calling this the "straightforward reading" of § 702 (quotation omitted)). Title VII's religious

exemption and the First Amendment's Religion Clauses thus advance the same goals. They ensure that religious organizations are free to set faith-based personnel standards based on their "*own* faith and mission" and decide such matters "*for themselves*, free from state interference." *Hosanna-Tabor*, 565 U.S. at 188, 186 (emphases added).

## IV. Judicial inquiries that fail to respect religious employment standards will foster personnel divisions, cripple the mission, and devastate ministry.

The lower court in this case conducted the sort of intrusive inquiry the First Amendment forbids, and which § 702 makes unnecessary. The court overlooked World Vision's religious standards, characterized McMahon's job as "secular in nature" and lacking "religious substance," and entered summary (and later final) judgment on her discrimination claims. *See* 704 F. Supp. 3d 1121, 1139, 1137 (W.D. Wash. 2023). This was legal error, and affirming it will have adverse consequences far beyond this case. It will make faith-based employment standards a source of Title VII liability, casting a pall over policies maintained by thousands of religious organizations across the country—policies essential to their missions. *See Our Lady*, 591 U.S. at 746 (church autonomy protects "internal management decisions that are essential to the institution's central mission").

Faith-based standards of belief and conduct are "of the essence" of religious organizations, *Watson*, 80 U.S. at 729, and a key element of their "internal organization," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713

13

(1976). But if applying these standards can be a basis for Title VII liability, it will have a profound chilling effect on religious exercise. Faced with the prospect of discrimination claims premised on their personnel standards, religious employers in this Circuit and elsewhere will be forced into an expensive and existential gamble: either maintain their faith-based policies and risk sizeable judgments for damages and attorney's fees, or water down their policies and forsake a crucial element of their religious identity and mission.

The lower court's decision here suggests that, unless the employee is a minister, any religious-conduct standard prohibiting same-sex conduct is *per se* unlawful. Yet religious-conduct standards often include provisions addressing same-sex conduct, and *amici*, like World Vision, maintain such standards in line with historical understandings of biblical teaching. The Supreme Court has said *amici*'s views are "decent and honorable" and entitled to "protection." *Obergefell v. Hodges*, 576 U.S. 644, 672, 679–80 (2015). But the district court's reasoning would force them to choose between asking their employees to adhere to these standards and being penalized as discriminators under Title VII. The First Amendment forbids, and § 702 avoids, putting religious employers to this choice. But it is the choice they will face if McMahon prevails.

The adverse consequences don't end there. First, to avoid liability, many religious employers will have to refashion their personnel policies to align not with

14

internal faith and mission, but with government-imposed sexual orthodoxy. The First Amendment, by contrast, envisions a separation of church from state—a "private sphere" where religious organizations are free to believe, internally organize, and "govern themselves in accordance with their own beliefs." *Hosanna-Tabor*, 565 U.S. at 199 (Alito & Kagan, JJ., concurring). This necessarily includes the freedom to make "personnel decision[s] based on religious doctrine," even as to non-ministerial employees. *Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648, 660 & n.2 (10th Cir. 2002); *Amos*, 483 U.S. at 340. Thus, when a religious institution sets a religious standard that employees must meet, courts cannot second-guess that judgment without profound incursions upon protected religious autonomy. *See Hosanna-Tabor*, 565 U.S. at 707 (First Amendment precludes "government interference with an internal church decision that affects ... faith and mission").

Second, punishing religious ministries for asking all employees (ministerial or not) to abide by their religious teachings would impose artificial personnel distinctions and foster internal divisions. Ministries will have to forsake a common set of religious commitments binding all employees and segregate their personnel into (i) "religious employees" held to standards of religious belief and moral conduct and (ii) "secular employees" of whom less or nothing is expected. This effects a sort of religious caste system that will devastate ministry. It will force organizations to predict which activities a court will consider religious, which *Amos* said is a

"significant burden." 483 U.S. at 336. It will eviscerate the shared faith commitments crucial to missional success. Worst of all, it will thrust an inconsistent double standard into the heart of ministry work, fueling employee resentment, destroying their faith-centered unity, and crippling the mission. *See Our Lady*, 591 U.S. at 746.

Punishing religious ministries for having unified religious standards will manifest in other ways, too. For example, ministry leaders such as pastoral staff will be ministerial employees under the *Hosanna-Tabor* exception and thus can be held to religious standards of conduct. Yet other staff, like IT employees, cannot be held to the same standard even though their duties are just as crucial to the religious mission. Allowing judges to police these distinctions—choosing the employees to whom religious standards do or don't apply—will divide leaders from their staff, disrupting internal processes that are the lifeblood of ministry. Ministry leaders cannot be models and mentors in faith if staff don't share their religious convictions. And how does an organization raise up leaders from within if it can't hold all employees to mission-critical religious standards?

"Religion permeates the ministerial workplace in ways it does not in other workplaces." *Demkovich*, 3 F.4th at 979. Courts cannot tinker with an essential feature of this workplace—the common faith commitments that bind employees and the ministry together—without weakening the internal cohesion and missional energy that allow ministries to thrive.

16

### Conclusion

Because the First Amendment precludes and § 702 avoids the intrusive inquiry in which the lower court engaged, *amici* ask this Court to reverse the lower court's judgment. To do so, the Court need not hold that religious organizations "enjoy a general immunity from secular laws." *Our Lady*, 140 S. Ct. at 2060. The Court need only recognize that when a religious organization sincerely determines that an applicant or employee fails to meet a faith-based employment standard, that determination cannot be a basis for Title VII liability.

Respectfully submitted,

*/s/ Ian Speir*

Ian Speir
Covenant Law PLLC
13395 Voyager Pkwy. #130-732
Colorado Springs, CO 80921
(719) 464-7357
ian@covtlaw.com

*Counsel for* Amici Curiae

**Certificate of Compliance**

This brief complies with the length limitation of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because it contains 3,794 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the requirements of Fed. R. App. P. 32(a) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2407) in 14-point Times New Roman font.

/s/*Ian Speir*
Ian Speir

**Certificate of Service**

I certify that on August 28, 2024, the foregoing brief was served on counsel for all parties by means of the Court's ECF/ACMS system.

/s/*Ian Speir*
Ian Speir

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3259

I am the attorney or self-represented party.

**This brief contains** 3,794 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Ian Speir      **Date** 08/28/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                           *Rev. 12/01/22*