No. 24-3259

# In the United States Court of Appeals for the Ninth Circuit

WORLD VISION, INC.,
*Defendant-Appellant*,

v.

AUBRY MCMAHON,
*Plaintiff-Appellee*.

Appeal from the United States District Court
for the Western District of Washington at Seattle
Honorable James L. Robart
(2:21-cv-00920-JLR)

BRIEF *AMICI CURIAE* OF CHRISTIAN LEGAL SOCIETY, ACCORD NETWORK, AMERICAN ASSOCIATION OF CHRISTIAN SCHOOLS, ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, CAMPUS CRUSADE FOR CHRIST, CRISTA MINISTRIES, CHRISTIAN MEDICAL AND DENTAL ASSOCIATION, GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, INTERVARSITY CHRISTIAN FELLOWSHIP/USA, ISLAM AND RELIGIOUS FREEDOM ACTION TEAM OF THE RELIGIOUS FREEDOM INSTITUTE, JEWISH COALITION FOR RELIGIOUS LIBERTY, THE CENTER FOR PUBLIC JUSTICE, THE INSTITUTIONAL RELIGIOUS FREEDOM ALLIANCE, AND THE NAVIGATORS SUPPORTING DEFENDANT-APPELLANT AND REVERSAL

Steven T. McFarland
 *Counsel of Record*
CHRISTIAN LEGAL SOCIETY CENTER FOR
 LAW & RELIGIOUS FREEDOM
8001 Braddock Road
Suite 302
Springfield, Virginia 22151
(703) 894-1041
smcfarland@clsnet.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(A) and 26.1, amici represent

they have no parent entities and issue no stock.

Dated: August 28, 2024       */s/ Steven T. McFarland*

CHRISTIAN LEGAL SOCIETY
   CENTER FOR LAW & RELIGIOUS
   FREEDOM
8001 Braddock Road
Suite 302
Springfield, Virginia 22151
(703) 894-1041
smcfarland@clsnet.org

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES ........................................................iv

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................1

SUMMARY OF ARGUMENT ......................................................1

ARGUMENT ...........................................................................4

I.    Strict Scrutiny Under the Free Exercise Clause Is Triggered When a Law That Substantially Burdens Religion Extends Exemptions by Individualized Assessment or Denies to Religious Persons an Exemption Extended to Comparable Secular Groups.....................4

II.    Title VII Is Not a Generally Applicable Law Under Supreme Court Free Exercise Precedent as it Involves Individualized Assessments and Extends Comparable Secular Exemptions That it Denies to Religious Employers Like Appellant. ..........................7

    A. Bona Fide Occupational Qualification Exemption (BFOQ). ............................................................8

    B. Applicant Who Is a Member of the Communist Party. ..................9

    C. Small Employers. . ....................................................11

    D. Underinclusive Silence About Other Similarly Injurious Discrimination...............................................12

    E. Exemption By Semantic Gymnastics on Identical Facts. ............15

F. Only One Secular Exemption Causing Similar Injury Is Needed. ........................................................ 17

III.   Washington State's Law Against Discrimination Is Not Generally Applicable. ...................................... 17

IV.   The Governmental Interest Underlying Title VII and WLAD Nondiscrimination Laws Is Not Sufficiently Compelling to Satisfy Strict Scrutiny. ....................... 20

V.   Employment Division v. Smith Was Wrongly Decided, and This Court Should Urge That it be Reconsidered. ................. 24

CONCLUSION ....................................................... 33

CERTIFICATE OF COMPLIANCE ........................... 34

CERTIFICATE OF SERVICE ................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023)............................................................21

*Bolden-Hardge v, Office of California State Controller,*
  63 F.4th 1215 (9th Cir. 2023)...........................................31

*Bostock v. Clayton Ctny,*
  590 U.S. 644 (2030)..............................................23-24, 29

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014)...........................................................31

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940)...........................................................26

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)................................2, 5-6, 10, 12-13, 15, 20-21, 28

*Combs v. Homer-Center Sch. Dist.,*
  540 F.3d 231 (3d Cir. 2008) ..........................................26-27

*Employment Div. v. Smith,*
  494 U.S. 872 (1990)....................................4-5, 8, 19-20, 23, 25-30, 32

*Fellowship of Christian Athletes v. San Jose Unified Sch.
Dist. Bd. Of Educ.,*
  82 F.4th 664 (9th Cir. 2023) ....................................1, 6-7, 28

*Florida Star v. B.J.F.,*
  491 U.S. 524 (1989).......................................................12-13

*Foothill Church v. Watanabe,*
  3 F.4th 1201 (9th Cir. 2021)..............................................28

iv

*Fraternal Order of Police v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) ............................................................... 17

*Frazee v. Ill. Dep't of Emp't Sec.*,
    489 U.S. 829 (1989)........................................................................... 27

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)...........................................2, 5-8, 10, 21-22, 28-29

*Garcia v. Salvation Army*,
    918 F.3d 997 (9th Cir. 2019)............................................................. 17

*Hobbie v. Unemployment Appeals Comm'n*,
    480 U.S. 136 (1987).......................................................................26-27

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012).............................................................. 18-19, 23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
    515 U.S. 557 (1995)........................................................................... 21

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)........................................................................... 28

*Little Sisters of the Poor v. Pennsylvania*,
    591 U.S. 657 (2020)........................................................................... 23

*Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*,
    584 U.S. 617 (2018)........................................................................... 29

*McMahon v. World Vision, Inc.*,
    704 F.Supp.3d 1121 (W.D. Wash. 2023)..............................2-4, 6-7, 32

*McMahon v. World Vision, Inc.*,
    No. C21-0920JLR (W.D. Wash. Jul. 24, 2023) ..............................31-32

*Midrash Sephardi, Inc. v. Town of Surfside*,
    366 F.3d 1214 (11th Cir. 2004)......................................................... 17

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) .................................................................... 14, 29

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ...................................................................... 18-19

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ........................................................................ 5, 12

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ................................................. 8-9, 17, 19, 25, 27

*Tandon v. Newsom*,
  593 U.S. 61 (2021) .......................................... 3, 5-8, 10, 12, 17, 21, 28

*Tandon v. Newsom*,
  992 F.3d 916 (9th Cir. 2021) ......................................................... 12-13

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981) ................................................ 8-9, 17, 19, 27, 30-31

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1942) ............................................................................ 27

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ................................................................... 5, 24, 27

*Woods v. Seattle's Union Gospel Mission*,
  481 P.3d 1060 (Wash. 2021),
  *cert denied*, 142 S. Ct. 1094 (2022) ....................................... 3-4, 18-20

## Statutes & Rules

20 U.S.C. § 4071 *et seq.*. ............................................................ 6

42 U.S.C. § 2000bb *et seq* .......................................................... 23

42 U.S.C. § 2000bb-1 ............................................................... 23-24

42 U.S.C. § 2000bb-3 ................................................................ 24

42 USC § 2000e(b) ................................................................. 11

42 USC § 2000e(j) ............................................................. 15-16

42 U.S.C. § 2000e-1(a) ........................................................... 10

42 U.S.C. § 2000e-2(e)(1) ...................................................... 7-8

42 U.S.C. § 2000e-2(f) ............................................................ 9

50 U.S.C. § 781 *et seq.* .......................................................... 9

Defense of Marriage Act, Pub. L. 104-199 (1996) ................................... 13

Respect for Marriage Act, Pub. L. 11 ............................................. 13

Wash. Rev. Code § 49.60.040(11) .............................................. 18, 20

## Other Authorities

Fed. R. App. P. 29(a)(4)(E) ....................................................... 1

Douglas Laycock, *Regulatory Exemptions of Religious
Behavior and the Original Understanding of the
Establishment Clause,*
81 Notre Dame L. Rev. 1793 (2006) ............................................ 27

Douglas Laycock, *The Remnants of Free Exercise*
1990 Sup. Ct. Rev. 1 (1991) ................................................... 26

Douglas Laycock & Steven T. Collis, *Generally
Applicable Law and the Free Exercise of Religion,*
95 Nev. L. Rev. 1 (2016) ................................................... 7, 15

Douglas Laycock & Thomas C. Berg, *Protecting
Free Exercise Under* Smith *and After* Smith,
2020-2021 Cato Sup. Ct. Rev. 33 .............................................. 30

Michael Stokes Paulsen, *Freedom for Religion,*
133 Yale L.J. Forum 403 (2023) .............................................. 26

vii

Michael W. McConnell, *Accommodation of Religion: An Update and a Response to the Critics*, 60 Geo. Wash. L. Rev. 685 (1992) ....................................................... 27

Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 Chi. L. Rev. 1109 (1990) .......................................................... 26-28

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ........................................................ 25

Stephanie H. Barclay, *Replacing* Smith, 133 Yale L.J. Forum 436 (2023) ....................................................... 30

Stephanie H. Barclay & Mark L. Rienzi, *Constitutional Anomalies or As-Applied Challenges? A Defense of Religious Exemptions*, 59 B.C. L. Rev. 1595 (2018) ........................................................... 27

Zalman Rothschild, *Free Exercise Partisanship*, 107 Cornell L. Rev. 1067 (2022) ....................................................... 30

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Amici are religious organizations representing millions of Americans from diverse faith communities. While we cherish different religious convictions, we are united in our commitment to defend religious freedom. That is what is at stake in this case: religious freedom for faith-based organizations, more specifically whether this circuit will continue to apply the Free Exercise Clause according to U.S. Supreme Court precedent, as it did in *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc). Because the district court's decision does not, it should be reversed.

## SUMMARY OF ARGUMENT

Amici address the district court's erroneous analysis of World Vision's defense under the First Amendment's Free Exercise Clause. In its Order of November 28, 2023, the district court concluded that the application of the secular exemptions in Title VII of the Civil Rights Act of

---

[1] Both parties have consented to the filing of this amicus brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part and that no person other than amici or their counsel have made any monetary contributions intended to fund the preparation or submission of this brief.

1964 and the Washington Law Against Discrimination (WLAD)

> does not depend on individualized discretion; they contain
> no mechanism to import such discretion, and they there-
> fore do not invite "the government to decide which reasons
> for not complying with the [law] are worthy of solicitude."
> *Fulton*, 141 S. Ct. at 1879. As neither Title VII nor WLAD
> *seeks to selectively burden* religiously motivated conduct,
> both are generally applicable. See *Lukumi Babalu Aye*, 508
> U.S. at 543.

*McMahon v. World Vision, Inc.*, 704 F.Supp.3d 1121, 1142 (W.D. Wash.

2023) (italics supplied). But to trigger strict scrutiny of those laws under

the Free Exercise Clause, World Vision need not show that Congress or

the state legislature was motivated by a desire to selectively burden

World Vision's religious conduct. As will be discussed, it is enough that

these laws either 1) afford the government the opportunity—with malign

or benign motives—to grant exemptions in the individualized discretion

of a government official or 2) have one or more exemptions for comparable

secular activity. World Vision proved both Title VII and WLAD fail both

of these free exercise tests.

First, Title VII and WLAD only dispense their exemptions through

subjective case-by-case assessment by a government official. Second, the

district court similarly erred in applying the other Free Exercise Clause

test for whether a law is "generally applicable." The court below said:

> Unlike the COVID restrictions in *Tandon*, however, World Vision's cited exemptions do not demonstrate disparate treatment between comparable secular and religious activity.

*Id.* Yet the district court failed to mention how the several Title VII exemptions were not comparable. Instead, the court announced without reasoning that the small employer exemption was not comparable because it disfavored large secular employers the same as large religious employers. Amici will show this summary conclusion overlooks the U.S. Supreme Court's recent test for what makes a secular exemption sufficiently comparable to religious activity to trigger strict scrutiny under the Free Exercise Clause.

Even more remarkably, the district court did not address WLAD's ministerial exemption as interpreted by the Washington Supreme Court.[2] The district court, again without reasoning, concluded that the state exemption is categorically conferred and "does not depend on individualized discretion." *McMahon*, 704 F.Supp.3d at 1142. This is incorrect. The state supreme court has held that the religious exemption

_____

[2] The Washington Supreme Court rewrote that statute's religious exemption in *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021), *cert denied*, 142 S. Ct. 1094 (2022) (Alito, J., dissenting with Thomas, J., joining).

3

only applies to jobs that are proven to be "minister"-like. *Woods*, 481 P.3d at 1068-69. That standard necessarily means the state exemption is awarded only case by case in the subjective judgment of the Washington Human Rights Commission or a judge. *McMahon*, 704 F.Supp.3d at 1136.

The Free Exercise Clause requires application of strict scrutiny to both Title VII and WLAD because neither are generally applicable under either test. And neither law can satisfy strict scrutiny when denying World Vision an exemption here.

## ARGUMENT

**I. Strict Scrutiny Under the Free Exercise Clause Is Triggered When a Law That Substantially Burdens Religion Extends Exemptions by Individualized Assessment or Denies to Religious Persons an Exemption Extended to Comparable Secular Groups.**

Any law, such as Title VII or WLAD, that substantially burdens religious exercise and either 1) allocates exemptions through case-by-case discretion or 2) allows one or more comparable secular exemptions but denies it to religious persons thereby triggers strict scrutiny under the Free Exercise Clause. The first trigger is explained in a long line of Supreme Court decisions:

> [O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of

4

> individual exemptions, it may not refuse to extend that sys-
> tem to cases of "religious hardship" without compelling
> reason.

*Employment Div. v. Smith*, 494 U.S. 872, 884 (1990). The second inquiry triggering strict scrutiny under the Free Exercise Clause looks into how government exempts similar *secular* activities:

> Government regulations are not neutral and generally ap-
> plicable, and therefore trigger strict scrutiny under the
> Free Exercise Clause, whenever they treat any comparable
> secular activity more favorably than religious exercise. *Ro-
> man Catholic Diocese of Brooklyn v. Cuomo*, 592 U. S. ——,
> —— – ——, 141 S. Ct. 63, 67-68 (2020) (*per curiam*).

*Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (*per curiam*); *see also Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

If either trigger is present, strict scrutiny replaces the low bar of rational-basis review. Strict scrutiny, however, requires the government to prove that the discriminatory burden on religious exercise is the least restrictive means of furthering "only those interests of the highest order and those not otherwise served." *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972); *Tandon*, 593 U.S. at 64-65; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Fulton,* 593 U.S. at 546 ("A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests.").

5

The Supreme Court is quite clear about what makes religious and secular conduct comparable such that an exemption for the latter requires an exemption for the former: that the "nonreligious conduct . . . endangers these [state] interests in a similar or greater degree" as the burdened religious conduct. *Lukumi*, 508 U.S. at 543; *Tandon*, 593 U.S. at 62 ("whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue").

Less than a year ago, this Court issued its latest *en banc* interpretation and application of the Free Exercise Clause since *Tandon* and *Fulton*. In *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023), this Court blew away the smoke and held that a school violated the Free Exercise Clause[3] when it discriminated against a religious student club while recognizing similar student clubs that had secular purposes (e.g., Senior Women Club). *Id.* at 689. As the district court below in this case conceded:

> *Tandon* "clarif[ies] that targeting is not required for a government policy to violate the Free Exercise Clause.

---

[3] This Court also ruled that the school district violated the Free Speech Clause and the Equal Access Act, 20 USC § 4071 *et seq.*, 82 F.4th at n.8 and n.12.

Instead, favoring comparable secular activity is sufficient" to trigger strict scrutiny. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (citing *Tandon*, 141 S. Ct. at 1296 ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise."))

*McMahon*, 704 F.Supp.3d at 1142.

Respected legal experts have elaborated on what makes secular and religious activity comparable. "We must look to the reasons the state offers for regulating religious conduct and then ask whether it permits secular conduct that causes the same or similar harms." Douglas Laycock and Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 Neb. L. Rev. 1, 11 (2016). The state must identify a real difference in the harm, not just a difference in the source of the harm. *Id* at 17. In Sections II B through E, *infra*, amici show the harm from the permitted secular exemptions is the same as that alleged here.

## II. Title VII Is Not a Generally Applicable Law Under Supreme Court Free Exercise Precedent as it Involves Individualized Assessments and Extends Comparable Secular Exemptions That it Denies to Religious Employers Like Appellant.

Title VII is not generally applicable under *Tandon* and *Fulton* because it 1) exempts based on individualized assessments under Section

7

703(e)(1), 42 U.S.C. § 2000e-2(e)(1), (bona fide occupational qualification exemption) and 2) has multiple secular exemptions, each of which harms the government's interest in eliminating employment discrimination in the same or similar way as the harm alleged in this case.

## A. Bona Fide Occupational Qualification Exemption (BFOQ).

Section 703(e)(1) of Title VII allows an employer to discriminate on the grounds of religion, sex, or national origin if the employer can prove that such discrimination is "*a bona fide occupational qualification reasonably necessary to the normal operation of that particular business.*" 42 U.S.C. § 2000e-2(e)(1). This is not a categorical exemption, but one that requires the Equal Employment Opportunity Commission (EEOC) or a court to make an individualized assessment of whether the discrimination is "bona fide" and whether it is "reasonably necessary" to the business operation.

This inquiry is indistinguishable from the individualized exemptions required where "unemployment-compensation law allowed individuals to receive benefits if they refused work for 'good cause,' thus creating 'individualized exemptions' from the requirement of accepting available work." *Smith*, 494 U.S. at 884. These state laws the Supreme

Court held are invalid as to the employee unless the government can satisfy strict scrutiny. *Sherbert v. Verner* 374 U.S. 398 (1963); *Thomas v. Review Bd.*, 450 U.S. 707 (1981).

## B. Applicant Who Is a Member of the Communist Party.

Section 703(f) of Title VII, 42 USC § 2000e-2(f), carves out another secular exemption that is adverse to the government's interest in eradicating employment discrimination in the same or similar way that World Vision's employee conduct standards would. Under that exemption, any employer can discriminate in hiring against an applicant (including if she were in a same-sex marriage), as long as she is a member of the Communist Party.[4] Evidently, Congress felt its interest in keeping Communists unemployed outweighed its interest in addressing employment discrimination. But the injury to the applicant in the same-sex

---

[4] "(f) Members of Communist Party or Communist-action or Communist-front organizations. As used in this subchapter, the phrase 'unlawful employment practice' shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950 *[50 U.S.C. 781 et seq.]*." Section 703(f), 42 USC § 2000e-2(f).

marriage is the same as alleged in this case. This carveout in Title VII exempts "nonreligious conduct [that] . . . endangers these [state] interests in a similar or greater degree" as the burdened religious conduct. *Lukumi,* 508 U.S. at 543.

In sum, an employer can discriminate against a job applicant in a same-sex marriage as long as the applicant is an alien[5] or a member of the Communist Party, or the employer can prove being in a heterosexual marriage is a BFOQ.

Does the fact that employers in any of these situations are free (or obliged) to discriminate in employment on multiple bases, including sex and sexual orientation, pose the same risk of sex discrimination that is posed by World Vision's religious conduct policy on marriage? Obviously, yes. Any of these two exemptions in Title VII—for a BFOQ or Communist employees—trigger strict scrutiny under the Free Exercise Clause. *Fulton*, 593 U.S. at 544; *Tandon*, 593 U.S. at 62.

---

[5] "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, . . . ." § 42 USC 2000e-1(a).

## C. Small Employers.

Title VII does not apply to employers of fewer than 15 employees. *See* Title VII, Section 701(b), 42 USC § 2000e(b). This huge, secular carve-out permits employment discrimination on the basis of every protected characteristic (race, religion, sex, sexual orientation, or gender identity et al.) by the millions of small businesses in the U.S. Yet World Vision, because of its workforce being at least 15 employees, is denied this across-the-board exemption, even though the latter inflicts much more injury to the government's interest in eliminating employment discrimination than by permitting a religious organization to exercise its religion with a sincere religious conduct standard for all staff.

Neither should it matter that the small employer exemption extends to religious and secular employers. The fact remains that religious ministries with 15 or more employees do not enjoy the same carveout that Title VII affords millions of nonreligious small employers.

The Supreme Court in its recent Free Exercise Clause jurisprudence does not employ a "but for" causation analysis ("but for religion the small employer would be exempt"). Rather the Court simply looked at the injury to the government's interest and asked: "Does this law treat the

religious litigant less favorably than persons whose exempted activity inflicts the same or similar injury to the state interest?". It matters not that large secular employers also are treated less favorably:

> It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue.

*Tandon*., 593 U.S. at 62 (citing *Cuomo*, 592 U.S. at —— – ——, 141 S. Ct. at 66-67 (Kavanaugh, J., concurring)).

## D. Underinclusive Silence About Other Similarly Injurious Discrimination.

Both this court and the Supreme Court are clear about when a law fails the general applicability test under the Free Exercise Clause, including when the exemptions are selectively underinclusive:

> All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. . . . The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause. . . . Ordinances 87–40, 87–52, and 87–71 . . . are underinclusive . . . . They fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than Santeria sacrifice does. The underinclusion is substantial, not inconsequential. . . . The ordinances "ha[ve] every appearance of a prohibition that society is prepared to impose upon [Santeria worshippers] but not

12

upon itself." *Florida Star v. B.J.F.,* 491 U.S. 524, 542, 109 S. Ct. 2603, 2614, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring in part and concurring in judgment). This precise evil is what the requirement of general applicability is designed to prevent.

*Lukumi*, 508 U.S. at 542-546; *see also Tandon v. Newsom*, 992 F.3d 916, 923 (9th Cir. 2021).

Title VII is silent about employers discriminating on the basis of an applicant's politics or ideology (other than members of the Communist Party), so Plaintiff-Appellee would have no Title VII claim had World Vision's interviewer rephrased the question about same-sex marriage. Rather than forthrightly telling Ms. McMahon what World Vision believes as a matter of creed and conduct, the interview could have asked whether she agrees with the political view that the Defense of Marriage Act was right, and the Respect for Marriage Act was wrong.[6] Or whether she agrees with the Supreme Court's decision in favor of same-

---

[6] The Defense of Marriage Act, Pub. L 104-199 (1996) (DOMA), declared that no state shall be required to recognize a same-gender marriage performed in another state. DOMA also defined marriage as only between a man and a woman for purposes of federal law. The Respect for Marriage Act, Pub. L. 117-228 (2022), repealed DOMA and recognized any marriage between two individuals that is valid under state law.

sex marriage?[7] Or the psycho-social question whether same-sex marriage advances or diminishes the stability of the family unit or is unhealthy for childrearing? These would be questions about political or psycho-social policy, and they would not have provided grounds for a facial sex discrimination claim under Title VII. This is not a generally applicable law against all employment discrimination that is based on protected characteristics.

People for the Ethical Treatment of Animals (PETA) can ask about an applicant's position on hunting and pet breeding. Similarly, NARAL Pro-Choice America can turn down an applicant who, on her Saturdays off, counsels pregnant women entering an abortion clinic. And the Democratic National Committee (DNC) can fire an employee who changes her mind about with which political party she aligns. Title VII, by omission or silence, permits PETA, NARAL and the DNC to discriminate based on an employee's belief about carnivorous consumption, abortion rights, and political ideology, respectively. This silent exemption does great harm to Congress' interest in eradicating all employment discrimination. Yet

---

[7] *Obergefell v. Hodges*, 576 U.S. 644 (2015).

World Vision cannot prefer a job applicant who will abide by sincerely held religious conduct standards that align with its religious beliefs.

Unequal treatment of religious and secular conduct requires strict scrutiny, whether or not that inequality is explicitly stated in the text of the challenged law or simply allowed by omission. In *Lukumi*, the Supreme Court expressly rejected the city's contention that judicial "inquiry must end with the text of the law at issue." 508 U.S. at 534. In addition to evaluating the text of the city's ordinances, the Court reviewed an array of other sources to find analogous secular conduct left unregulated. Laycock and Collis, *supra*, at 17. As in *Lukumi*, here the "nonreligious conduct [by PETA, NARAL and the DNC] . . . endangers these [state] interests in a similar or greater degree" as the burdened religious conduct. *Lukumi*, 508 at 543. Therefore, in this case, as in *Lukumi*, the Free Exercise Clause demands strict scrutiny of that omission and its discriminatory burdening of religious employers.

## E. Exemption By Semantic Gymnastics on Identical Facts.

In Title VII, Congress defined "religion" for every purpose under the statute, including the religious organization employer exemptions in Sections 702 and 703e(2), in the broadest possible terms: "(j) The term

"religion" includes all aspects of religious observance and practice, as well as belief . . . ." 42 U.S.C. § 2000e(j). Unquestionably, World Vision's employee conduct standard falls squarely within this law's definition of religion. And Plaintiff-Appellee does not contest that World Vision's conduct policy about same-sex marriage is based upon a *sincere* religious belief.

One need not change a single fact in the record of this case to logically, reasonably, and accurately describe this as discrimination on the basis of Ms. McMahon's *religion*. That her religious belief extends to her beliefs about marriage and God's intention for sexual expression is not surprising. Neither is it remarkable that World Vision shares a religious belief on the same topic—a position that has been taught by orthodox Christianity for two millennia. The sole reason why the Title VII claim survives here is because the court below labelled it "sex" discrimination rather than religious discrimination. Same parties, same facts, yet the result solely turns on whether one labels it "sex" rather than "religious" discrimination. There are constitutional and statutory rights at stake, and they should not rise or fall simply on how the facts are labelled or

into which simplistic bucket the case is dropped. *Garcia v. Salvation Army*, 918 F.3d 997, 1005 (9th Cir. 2019).

### F. Only One Secular Exemption Causing Similar Injury Is Needed.

Even one secular exemption, written or unwritten, is sufficient to render the laws in question (Title VII and WLAD) not generally applicable and to trigger strict scrutiny. *Tandon*, 593 U.S. at 62; *Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) (holding of then Judge Alito); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004); *see also Sherbert,* 374 U.S. 398; *Thomas*, 450 U.S. 707.

Amici respectfully offer any of the exemptions outlined above as reasons why Title VII is not generally applicable here. Therefore, because World Vision's free exercise rights are substantially burdened, and the laws being applied are not neutral or generally applicable, its free exercise interests must receive strict scrutiny analysis.

### III. Washington State's Law Against Discrimination Is Not Generally Applicable.

Washington State's Law Against Discrimination (WLAD) is not generally applicable under *Tandon* for the same reasons as Title VII,

17

namely: 1) WLAD allows for individualized discretion in conferring a religious exemption since the Washington State Supreme Court rewrote it in *Woods* and 2) it carves out a generous nonreligious exemption for small employers. Wash. Rev. Code § 49.60.040(11).

In *Woods,* the state supreme court held that the state constitution's privileges and immunities clause would not permit the total exemption the legislature gave to "any religious or sectarian organization not organized for private profit." *Woods*, 481 P.3d at 1064 (quoting Wash. Rev. Code § 49.60.040(11)). So, the state supreme court said that, notwithstanding the text, the exemption would only apply where the job at issue was for a "minister." *Id*. at 1069. Building off the U.S. Supreme Court's "ministerial exemption" under the First Amendment, the Washington Supreme Court said that a court must only award the religious exemption after a case-by-case examination of "the totality of the circumstances" as done by the U.S. Supreme Court in *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, (2020), and *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity*

18

*Comm'n*, 565 U.S. 171 (2012).[8] Specifically, the *Woods* court said that the exemption would depend on the weighing of many facts in each case: the job title; religious training prerequisites; congregational commissioning; leading in prayer and religious observance. "What matters, at bottom, is what an employee does." *Woods*, 481 P.3d at 1072 (citing *Our Lady of Guadalupe*, 140 S. Ct at 2064).

Therefore, after the statutory interpretation in *Woods*, WLAD's religious exemption is definitely not "generally applicable," but rather is available only after individualized assessments of many factors. This is reminiscent of the unemployment compensation cases[9] that the U.S. Supreme Court described in *Smith* as the epitome of laws not generally applicable because they conferred benefits case by case based on many factors, thus triggering strict scrutiny as required by the Free Exercise Clause. *Smith*, 494 U.S. at 883.

---

[8] "In order to balance Woods' fundamental rights with the religious protections guaranteed to [*Seattle's Union Gospel Mission*], we hold that article I, section 12 is not offended if WLAD's exception for religious organizations is applied concerning the claims of a "minister" as defined by [the Supreme Court of the U.S.'s decisions in] *Our Lady of Guadalupe* and *Hosanna-Tabor.*" *Woods*, 481 P.3d at 1069.

[9] *Sherbert,* 374 U.S. 398; *Thomas,* 450 U.S. 707.

In the alternative, WLAD is not generally applicable for another of the same reasons that Title VII is not generally applicable. *See* Section II C, *infra.* WLAD § 49.60.040(11) exempts the thousands of employers with under eight employees. For the reasons discussed above, this secular exemption, which the state supreme court did not address in *Woods*, is not afforded to all religious employers.[10] Therefore, strict scrutiny is triggered under the Free Exercise Clause as interpreted in *Smith* and *Lukumi*—a level of scrutiny that neither WLAD nor Title VII can survive in this case, as will be shown in Section IV, *infra.*

## IV. The Governmental Interest Underlying Title VII and WLAD Nondiscrimination Laws Is Not Sufficiently Compelling to Satisfy Strict Scrutiny.

When the First Amendment requires strict scrutiny of a government law or action, the latter rarely survives. Antidiscrimination laws generally do not survive when the government must prove that the law's burdening of religious exercise, free speech, or free association is the least restrictive means of furthering a compelling interest.

---

[10] Indeed, in *Woods,* the Washington Supreme Court did not address this First Amendment issue. *Woods* was decided at the trial court on statutory, not constitutional, grounds, and the appeal was about the *state* constitution's privileges and immunities clause.

As the Supreme Court reiterated:

> And historically, strict scrutiny requires the State to further "interests of the highest order" by means "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546, 113 S. Ct. 2217, 124 L.Ed.2d 472 (1993) (internal quotation marks omitted). That standard "is not watered down"; it "really means what it says." *Ibid.* (quotation altered).

*Tandon*, 593 U.S. at 64-65.

The nondiscrimination law of the City of Philadelphia failed against Free Exercise Clause rights. *Fulton,* 593 U.S. 522. Colorado's Anti-Discrimination Act failed to outweigh religiously informed creative speech. *303 Creative LLP v. Elenis*, 600 U.S. 570 (2023). A state court's application of the Massachusetts public accommodations law failed against the First Amendment's guaranty of free association. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) (unanimous).

Is whatever interest the government has in prohibiting sexual orientation discrimination through Title VII "compelling"? Specifically, in applying it against a religious ministry with a sincerely held religious

creed about how serious followers of Jesus conduct themselves?[11] There are many factors that bear on the answer to that question, and they all point to the same answer: "No." That the government's interest falls well short of compelling is evidenced by many exemptions:[12]

- Title VII is pockmarked with exemptions as discussed above; given the existence of such exceptions, the government or employee claimant is required to demonstrate that denial of such secular exemptions to the religious claimant is 1) in furtherance of a compelling governmental interest and 2) the least restrictive means of furthering that compelling governmental interest.

- Congress also provided multiple exemptions [Sections 702 and 703(e)(2) of Title VII] for religious corporations, associations, educational institutions and societies, despite how those exemptions compromise the government interest in employment nondiscrimination.

---

[11] "[C]ourts must "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants" when analyzing a free-exercise claim. *Fulton*, 593 U.S. at 541.

[12] "The creation of a system of exceptions … undermines the ... contention that ... non-discrimination policies can brook no departures." *Id.* at 542.

22

• Congress has never passed a general sexual orientation or gender identity nondiscrimination statute.[13]

• The First Amendment protects some employment discrimination by religious employers whenever the job has ministerial duties.[14]

• In response to the *Smith* decision, Congress passed (near unanimously), in 1993, the Religious Freedom Restoration Act (RFRA), the nation's most significant religious freedom statute. RFRA remains unamended, a law that the Supreme Court recently described as a "super statute," supreme over any federal statute or regulation unless Congress explicitly says otherwise by naming it. *Bostock*, 590 U.S. at 682. As the Supreme Court wrote in 2020:

> And Congress has gone a step further yet in the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, codified at 42 U. S. C. §2000bb *et seq.* That statute prohibits

---

[13] *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 697 (2020) (Alito, J., concurring) ("if Congress thought that there was a compelling need" at issue, "why didn't Congress mandate that [provision] in [the law] itself?").

[14] "This Court has also recognized that the First Amendment can bar the application of employment discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U. S. 171, 188 (2012)." *Bostock v. Clayton Cnty.,* 590 U.S. 644, 682 (2020).

23

the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest. §2000bb–1. Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases. See §2000bb–3.

*Id.*

Therefore, the government's interest here is not compelling. Whatever interest in advancing employment nondiscrimination Congress had in 1964 and the Washington State Legislature had in 1949 cannot fairly be said to be compelling, rising to an interest of the "highest order," *Yoder*, 406 U.S. at 215, at least not when it would force religious nonprofit employers to jettison sincere religious conduct standards for their staff.

## V. *Employment Division v. Smith* Was Wrongly Decided, and This Court Should Urge That it be Reconsidered.

The district court inaccurately frames World Vision's purpose for and intent behind its Standards of Conduct. This case is not about a right to exclude someone based on their sexual orientation (the facial discrimination that the district court claimed to find). Rather, it is about a religious organization's right to observe its religious beliefs and faithfully

24

pursue its religious mission. This is about the central promise of consti-tutional free exercise and the broad carveout in Title VII that protects the observance and practice, as well as belief, of religious adherents.

Unfortunately, *Smith*, by focusing courts primarily on whether a law is neutral and generally applicable, has caused free exercise analysis to often miss the forest for the trees, ignoring that First Amendment promise.

We urge this Court to 1) acknowledge the obvious fact that *Smith* hinders and sometimes even undermines the purpose of the Free Exer-cise Clause and 2) urge the U.S. Supreme Court to reconsider whether *Smith* was wrongly decided.

The Free Exercise Clause's history has been well documented. Mi-chael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990). "Government may neither compel affirmation of a repugnant belief, nor penalize or discrim-inate against individuals or groups because they hold religious views abhorrent to the authorities." *Sherbert*, 374 U.S. at 402 (citations omit-ted). The *Sherbert* case involved specific pressure on the plaintiff to abandon the precepts of her religion in order to keep her job. *Id.* at 410.

Free exercise is not limited to beliefs but protects the twin guaranties of "freedom to believe and freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The text of the first freedom in the First Amendment is "free *exercise*."

These strong statements clarify that the promise of free exercise is more than protection from direct discrimination; it is a freedom to live faithfully. *Smith*, however, has functionally prevented courts from directly implementing that purpose, instead requiring them—after noting a significant burden on religious exercise—to ask if the law involved is neutral and generally applicable rather than consider whether the law is the least intrusive means of advancing a government interest that is compelling. *Smith* did not have strong reasoning for this change; significant scholarship has documented how *Smith* mischaracterized prior holdings. *See* Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109 (1990); Douglas Laycock, *The Remnants of Free Exercise*, 1990 Sup. Ct. Rev. 1 (1991); Michael Stokes Paulsen, *Freedom for Religion*, 133 Yale L.J. Forum 403 (2023).

Lower courts have not been able to consistently apply aspects of its holding like the "hybrid rights" theory. *Combs v. Homer-Center Sch.*

26

*Dist.*, 540 F.3d 231, 244–247 (3d Cir. 2008) (describing differing approaches by the circuits). Prior to *Smith,* the government had consistently done an individualized assessment and provided accommodations for religious reasons, and the Court had mandated exemptions for free exercise when warranted. *See, e.g., Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989); *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987); *Thomas*, 450 U.S. 707; *Yoder*, 406 U.S. 205; *Sherbert*, 374 U.S. 398; *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). Scholars have clarified that exemptions are historically grounded, common ways to prevent violations of fundamental rights. *See, e.g.*, Michael W. McConnell, *Accommodation of Religion: An Update and A Response to the Critics*, 60 Geo. Wash. L. Rev. 685, 692 (1992); Stephanie H. Barclay & Mark L. Rienzi, *Constitutional Anomalies or As-Applied Challenges? A Defense of Religious Exemptions*, 59 B.C. L. Rev. 1595, 1611 (2018); Douglas Laycock, *Regulatory Exemptions of Religious Behavior and the Original Understanding of the Establishment Clause*, 81 Notre Dame L. Rev. 1793 (2006).

*Smith* is inconsistent with the history of free exercise of religion. Renowned free exercise scholar Michael W. McConnell concludes that it

"is contrary to the deep logic of the First Amendment." McConnell, *Free Exercise Revisionism*, at 1111. Justice O'Connor's concurrence in *Smith* noted that the "sweeping result" drastically altered free exercise doctrine and that it would likely fail to protect minority religions with less favored views and practices. 494 U.S. at 892, 902. This has proved prescient as the exceptions outlined in *Smith* have had to grow in order to provide protection for religious practice. *See, e.g.*, *Lukumi*, 508 U.S. 520; *Fulton*, 593 U.S. 522; *Tandon,* 593 U.S. 61; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022); *FCA*, 82 F.4th 664; *Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir 2021). Such efforts feel like a game, trying to find an exception to actually get to the logic of treating religious individuals and organizations in a manner that takes seriously their need for protection of religious exercise. Justice Gorsuch, in his *Fulton* concurrence, takes note of this very practice when he describes the complex "circumnavigation of *Smith*" in the majority's analysis. 593 U.S. at 621.

The Supreme Court continues to point to the promise of religious freedom protections grounded in the First Amendment. Since *Smith*, the Court has repeatedly used reassuring statements that *Smith* should not

be construed to diminish religious freedom, including specifically in relation to beliefs about sexuality and marriage that clash with nondiscrimination interests in that area. In *Obergefell v. Hodges*, the Court stated:

> The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

576 U.S. 644, 679-80 (2015).

In *Bostock*, the majority stated: "We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." 590 U.S. at 681. The Court, in *Fulton,* acknowledged that religious exercise had clearly been burdened and indicated that the government interests had to be "properly narrowed" to rightly consider the impact of exemptions for particular religious claimants. 593 U.S. at 541. In *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n,* the Court identified the hostility to Phillips as likely "showing lack of due consideration for Phillips' free exercise rights and the dilemma he faced." 584 U.S. 617, 635 (2018).

These stated values matter *in principle*. Yet the ambiguity of the law because of *Smith*'s uncertain application has eroded the promises of protection *in practice*, allowing lower courts to be susceptible to partisanship in how cases are argued. *See, e.g.,* Zalman Rothschild, *Free Exercise Partisanship*, 107 Cornell L. Rev. 1067, 1126-1132 (2022) (noting "doctrinal confusion" in lower court decisions and describing the need for clarity about how to analyze religious discrimination in the free exercise context). Courts must focus on whether an exception to *Smith*'s rule applies rather than on how to faithfully apply the first freedom of the Bill of Rights. *Smith* requires a serpentine analysis. We urge this Court to ask the U.S. Supreme Court to reconsider *Smith* and to create a clear path forward.[15]

Here, the district court misapplied the Free Exercise Clause analysis. A religious organization (World Vision) has laid out its theological beliefs and corresponding religious practices clearly, consistently stating that every employee must agree with its religion and beliefs, so that its

---

[15] Scholars have described options if *Smith* is overruled. *See, e.g.,* Stephanie H. Barclay, *Replacing* Smith, 133 Yale L.J. Forum 436 (2023); Douglas Laycock & Thomas C. Berg, *Protecting Free Exercise Under* Smith *and After* Smith, 2020-2021 Cato Sup. Ct. Rev. 33.

mission and messages are consistently communicated, lived out, and up-held in every aspect of its ministry and work. This belief that employee conduct matters for its mission is itself a theologically and religiously de-fined matter that a judge should not seek to evaluate for reasonableness. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014); *Thomas,* 450 U.S. at 715; *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023). Yet that is exactly what the district court has done here. The district court dismissed this clearly religious requirement. It rejected religious employer statutory exemp-tions by reframing the religious requirement as "sex discrimination," concluded that the church autonomy doctrine does not apply, and then prevented any serious examination of the significant free exercise burden by finding the laws generally applicable.

In its July 2023 ruling, the district court purported to apply "neu-tral principles of law" and claimed that it was not calling into question "the reasonableness, validity, or truth of a religious doctrine or practice." *McMahon v. World Vision, Inc.,* No. C21-0920JLR, 2023 WL 4704711, at *2 (W.D. Wash. Jul. 24, 2023). Yet it surveyed the religious beliefs and practices outlined in the "standards of conduct" document and called

31

them "facially discriminatory under controlling precedent." *Id*. at *3. Then, in the ruling on November 28, 2023, the district court rejected all protections related to religious identity and practice. Concluding that the Title VII religious employer exemption did not apply and that First Amendment-based protections did not apply, the district court summarily used rational basis review based on *Smith*. *McMahon*, 704 F.Supp.3d at 1142.

This judicial determination that a sincere religious conviction about what it means to follow God-given principles for living is just sex discrimination and therefore not worthy of any protection is shocking and contrary to the promise of the First Amendment. It evidences that *Smith* has caused confusion and undermined the promise of free exercise.

## CONCLUSION

For all these reasons, the Court should reverse the district court's

decision.

August 28, 2024                              Respectfully submitted,

                                             */s/ Steven T. McFarland*
                                             CHRISTIAN LEGAL SOCIETY
                                                CENTER FOR LAW & RELIGIOUS
                                                FREEDOM
                                             8001 Braddock Road
                                             Suite 302
                                             Springfield, Virginia 22151
                                             (703) 894-1041
                                             smcfarland@clsnet.org

                                             *Counsel for Amici Curiae*

33

## CERTIFICATE OF COMPLAINCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 6,437 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: August 28, 2024      _/s/ Steven T. McFarland_
Steven T. McFarland

_Counsel for Amici Curiae_

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, the foregoing brief *amici curiae* was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's AMCS system. I certify that all participants in the case who are registered AMCS users will be served by the appellate AMCS system.

*/s/ Steven T. McFarland*
Steven T. McFarland

*Counsel for Amici Curiae*