No. 24-3259

In the United States Court of Appeals for the Ninth Circuit

WORLD VISION, INC.,

Defendant-Appellant,

v.

AUBRY MCMAHON,

Plaintiff-Appellee.

Appeal from the United States District Court

for the Western District of Washington

Honorable James L. Robart (2:21-cv-00920-JLR)

**AMICUS BRIEF OF NATIONAL RELIGIOUS BROADCASTERS IN SUPPORT OF DEFENDANT-APPELLANT**

MICHAEL P. FARRIS
NATIONAL RELIGIOUS
BROADCASTERS
20 F. Street
Seventh Floor
Washington D.C. 20001
(202) 341-4783
*mfarris@nrb.org*
Attorney for *Amicus Curiae*

JOSHUA W. CARDEN
CARDEN LIVESAY, LTD
419 E. Juanita Ave, Ste. 103
Mesa, AZ 85204
(480) 345-9500
*joshua@cardenlivesay.com*
Attorney for *Amicus Curiae*

### Disclosure Statement

National Religious Broadcasters is a nonprofit corporation. It has no parent corporation, nor does it have any stockholders whatsoever.

### Consent to file this brief

All parties have consented to the filing of this amicus brief by National Religious Broadcasters.

## Table of Contents

Page

Disclosure Statement.................................................................A

Table of Authorities...................................................................C

Interest of Amicus ....................................................................1

Introduction .............................................................................2

Argument.................................................................................4

   I. The Freedom of Expressive Association Includes the Freedom to Not Associate. ...............................................................................4

     II. The District Court's Conclusion re Expressive Association Was Manifestly Erroneous .................................................................6

       III. The Forced Inclusion of Plaintiff Would Indeed Impair the Message of World Vision .........................................................14

Conclusion .............................................................................19

Form 8. Certificate of Compliance for Briefs...............................1

# Table of Authorities

**Page**

## Cases

*Boy Scouts of Am. v. Dale,* 530 U.S. (2000) ..................................................... passim

*Hishon v. King & Spalding*, 467 U.S. (1984) .................................................. 14, 15

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. (2012) ...........................................................................................................16

*Janus*, 138 S. Ct. .................................................................................................8

*Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. (2012) ...................8, 10, 11

*McMahon v. World Vision, Inc.*, 704 F. Supp. 3d (W.D. Wash. 2023)............. passim

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. (1958). ...................................................................7

*New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d (2d Cir. 2020). ............................10

*Norwood v. Harrison*, 413 U.S. (1973)...................................................................14

*Roberts v. U.S. Jaycees*, 468 U.S. (1984) ....................................................... 8, 9, 16

*Santopietro v. Howell*, 73 F.4th (9th Cir. 2023) .....................................................7

*Slattery v. Hochul*, 61 F.4th (2d Cir. 2023) ...................................................... 15, 16

*Sullivan v. Univ. of Washington*, 60 F.4th (9th Cir. 2023).......................................9

*Wisconsin v. Mitchell*, 508 U.S. (1993)..................................................................14

**Interest of Amicus**

National Religious Broadcasters (NRB) is a non-partisan association of Christian broadcasters united by their shared purpose of proclaiming Christian teaching and promoting biblical truths. NRB's 1,487 members reach a weekly audience of approximately 141 million American listeners, viewers, and readers through radio, television, the Internet, and other media.

Since its founding in 1944, NRB has worked to foster excellence, integrity, and accountability in its membership. NRB also works to promote its members' use of all forms of communication to ensure that they may broadcast their messages of hope through First Amendment guarantees. NRB believes that religious liberty and freedom of speech together form the cornerstone of a free society.

NRB contends that all organizations engaged in expressive association should have the freedom to hire all employees on the basis of fidelity to the vision and values of the organization. Religious organizations in particular rely on the freedom to employ only persons who share the common faith and who are willing to live that faith in their daily lives.

## Introduction

All nonprofit organizations that have an established set of values and a clear vision of their goals in society seek to hire only those individuals that are fully aligned with the beliefs, vision, and values of the organization. For example, the ACLU tells job applicants that they should "be committed to advancing the mission of the ACLU."[1] Planned Parenthood informs job applicants that they must have a "passion for Planned Parenthood mission" and, two bullet points later, a "passion for Planned Parenthood mission and strong diversity equity and inclusion lens."[2]

Similar requirements are found in a host of advocacy organizations.

- PETA (Literature Inventory Clerk position): "Commitment to the objectives of the organization."[3]

- Americans United for Separation of Church and State (Legal intern position): "Law students (any year) who are committed to advancing the public interest and the separation of religion and government are encouraged to apply."[4]

- Human Rights Watch advises all candidates: "We are looking for candidates that are passionate about human rights, who are determined to make an impact on people's lives around the world. Joining Human Rights Watch means being a part of a dedicated and diverse team committed to the protection and preservation of international human rights."[5]

---

[1] https://www.aclu.org/careers/apply?job=7485225002&type=national
[2] https://jobs.lever.co/ppfa/39fa7464-2d29-46dc-bd46-b00c0c93
[3] https://www.peta.org/about-peta/work-at-peta/search-jobs-peta/
[4] https://www.au.org/about-au/careers-fellowships-internships/
[5] https://www.hrw.org/careers

A particularly interesting example is the job listing for the National LGBTQ Task Force seeking a "Faith Work Director." [6] The need for this position rose from the employer's view that for "far too long faith and religion have been co-opted and used by some as political and cultural tools to demonize and/or denigrate a multitude of people including women, gender diverse people, people of color and other people with multiple-marginalized identities…." The goal of the position is to "disrupt" the idea that "being a person of faith, spiritual or religious is incompatible with being an LGBTQ person, that people must choose between their faith or spirituality…."

Applicants are told that they must demonstrate a "commitment to the Task Force's mission and Faith Work Purpose." Additionally, applicants must be "able to inspire spiritual engagement of people in the racial justice, LGBTQ advocacy communities and progressive movements. Sensitivity to and personal familiarity with issues facing LGBTQ religious/spiritual people including people who are atheist, agnostic, humanist, monotheist, pagan, and polytheist."[7]

There is no doubt that the National LGBTQ Task Force would reject an applicant whose Christian views aligned with those of World Vision. And it would be their right to do so.

---

[6] https://recruiting.paylocity.com/Recruiting/Jobs/Details/2543299

[7] *Id.*

3

It should be self-evident that all these organizations have the unquestionable constitutional right to define their own missions, expound their own beliefs, and to hire only those candidates who share their mission and beliefs.

The question before this Court is whether World Vision, which takes an arguably opposing view—indeed its views are expressed in a pejorative fashion and vilified in the job description posted by the National LGBTQ Taskforce—will receive the same constitutional protection to define its own mission, expound its own beliefs, and to hire only those candidates who share its mission and beliefs.

This brief deals exclusively with the issue of expressive association. While your amicus concurs with each of the arguments advanced by World Vision, we respectfully submit that the very core of the case would be best analyzed under the First Amendment's protection for expressive association.

ARGUMENT

## I. The Freedom of Expressive Association Includes the Freedom to Not Associate.

The freedom of association is not enumerated as such in the text of the First Amendment, but it is derived from "the close nexus between the freedoms of speech and assembly.*" *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). It is well settled that the "freedom to engage in association for the advancement of beliefs and ideas is an inseparable

4

aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." The Supreme Court has made it clear that "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* at 460-61.

This aspect of freedom of association has become known as "expressive association" and "it extends … only to associations engaged in expressive activity that could be impaired by government action." *Santopietro v. Howell*, 73 F.4th 1016, 1025 (9th Cir. 2023) (cleaned up). It is well-established that the freedom of expressive association also "presupposes a freedom *not* to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, (1984) (emphasis added); *accord Janus*, 138 S. Ct. at 2463 ("The right to eschew association for expressive purposes is likewise protected."). Government may not violate this protection unless it demonstrates that its policy serves a "compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 310 (2012) (cleaned up).

There is no reasonable basis for questioning the fact that World Vision is the kind of organization engaged in expressive association. Through a vast program of charitable relief, World Vision seeks to communicate the love of Christ and the

truth of the Christian faith in a noble and unmistakable fashion. It would likewise seem self-evident that the *freedom not to associate* is plainly violated by the decision of the District Court.

*Boy Scouts of Am. v. Dale,* 530 U.S. 640 (2000) is the seminal and controlling case on the freedom to not associate. Like the present case, *Dale* considered the freedom of expressive association in the context of an anti-discrimination claim brought by an LGBT person. However, the district court, as we will see, effectively rejected the applicability of *Dale.* Its discussion of the issue of expressive association is riddled with problems that render its conclusion manifestly erroneous.

## II. The District Court's Conclusion re Expressive Association Was Manifestly Erroneous

The district court began well enough by outlining the proper first step for every expressive association case. The "court must determine whether World Vision engages in expressive association. *Dale*, 530 U.S. at 648." *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1143 (W.D. Wash. 2023) (cleaned up). However, the district court never actually undertook this step in the process. It simply skipped ahead to analyze whether forced inclusion of plaintiff would impair World Vision's associational rights.

This step should not be skipped over, nor should this Court hesitate to find that World Vision is exactly the kind of organization that is entitled to raise the

First Amendment's protection for expressive association. Just last year, this Court gave a full exposition of the kind of organizations that qualify to raise the right of expressive association.

> Individuals engage in expressive association when they join with others to pursue "a wide variety of political, religious, cultural, or social purposes," *Jaycees*, 468 U.S. at 630, including the advocacy of both public and private points of view, the advancement of beliefs and ideas, and the transmission of "a system of values." *Boy Scouts of Am.*, 530 U.S. at 650, 120 S. Ct. 2446. Members involved in such endeavors are generally protected in expressing the "views that brought them together."

*Sullivan v. Univ. of Washington*, 60 F.4th 574, 579 (9th Cir. 2023).

World Vision is clearly engaged in the "advocacy of points of view" and "the advancement of beliefs and ideas" and the "transmission of a system of values." Accordingly, it is entitled to raise the protection of expressive associational freedom.

After skipping the first step, the district court set out the correct legal standard for the next phase of analysis.

> "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate for public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

*McMahon v. World Vision, Inc.*, *supra* at 1143.

This second step requires an examination of whether the forced inclusion of the plaintiff impairs the ability of World Vision to deliver its message. "And the ability of like-minded individuals to associate for the purpose of expressing

7

commonly held views may not be curtailed." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012). The proper question to ask is whether "compelled association would impede [World Vision's] ability to convey its religious beliefs" that is "distinct" from the message that would be delivered if the plaintiff was able to force her way onto the team that is dedicated to the task of communicating with its donors, partner ministries, and colleagues within the organization. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 180 (2d Cir. 2020).

Even though the district court explicitly recited the correct legal standard, which requires a focus on the impact of the inclusion of the plaintiff on World Vision's message, the opinion ignored that assignment and set off in a different direction. Rather than focus on the issue of the impairment of World Vision's *message*, the district court made its own assessment of whether the forced inclusion of the plaintiff would impair World Vision's *mission.*

> World Vision's "very mission" is not to oppose or discourage same-sex marriage, but "to follow our Lord and Savior Jesus Christ in working with the poor and oppressed to promote human transformation, seek justice and bear witness to the good news of the Kingdom of God."

*McMahon v. World Vision, Inc.*, *supra* at 1145.

While consideration of mission can, to some extent, shed light on the message of the organization, ultimately the message may be much broader than the central mission of the organization. The district court focused on whether or not the

inclusion of the plaintiff on the staff of World Vision would impact its "very purpose" or its mission.

The proper task was to examine whether the plaintiff could be relied upon to deliver the correct message that World Vision wanted her to deliver when she engaged in her central daily task—talking to the donors of the organization. Impact on message is the proper form of analysis. After all, the very name of the right is *expressive association.* The right to hang out in a group is not protected. What is protected is "the ability of like-minded individuals to associate for the purpose of expressing commonly held views." *Knox, supra.*

In *Dale,* the Supreme Court analyzed expressive association with a focus on *message.* "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. at 648. "Given that the Boy Scouts engages in expressive activity, we must determine whether the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints." *Id.* at 650.

Rather than reading and following what the Supreme Court actually said in *Dale,* the district court cherry-picked phrases to fashion a completely different approach:

9

Because the very mission of the Boy Scouts was to "instill values in young people," the Supreme Court concluded that acceptance of an openly gay and outspoken "gay rights activist" as a Scout leader would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior," which the First Amendment does not tolerate.

*McMahon v. World Vision, Inc.*, *supra* at 1144.

As quoted above, the district court ultimately concluded that World Vision's "very purpose" did not involve communications about same-sex marriage. Accordingly, the right of expressive association could not be extended in this case.

The district court's focus on *mission* rather than *message* was virtually identical to the approach of the New Jersey Supreme Court in *Dale*, an approach that was explicitly rejected by the Supreme Court of the United States. The New Jersey court held that the Boy Scouts did not associate for the "purpose of disseminating the belief that homosexuality is immoral." *Id.* at 644. The Supreme Court rejected this view, saying: "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." *Id.* at 655.

Another aspect of the holding in *Dale* was overlooked by the district court. The Supreme Court followed the principle that organizations, not courts, determine their beliefs, message, and mission. "The Boy Scouts …assert that it 'does not

want to promote homosexual conduct as a legitimate form of behavior…We accept the Boy Scouts' assertion." *Dale, supra* at 651. "As we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Id* at 653. Since the district court failed to even address the question of whether employing the plaintiff would impair World Vision's message, it is not surprising that it failed to give deference to World Vision's view of the matter. But, even with the district court's mistaken view that its responsibility was to determine what the "very mission" of World Vision, deference on this question would have been appropriate and led to a different conclusion.

The district court sought to reconstruct *Dale* in its own image only to ultimately reject its authority for an additional reason. *Dale* was not an employment case, and the right of expressive association is not protected, the lower court held, in the context of employment discrimination.

> The court is persuaded that this employment discrimination action does not implicate World Vision's expressive associational rights. Indeed, the Supreme Court has previously rejected such a defense in the context of employment discrimination. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("[I]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973))); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights.").

11

*McMahon v. World Vision, Inc.*, *supra* at 1144.

This approach cannot bear scrutiny.

First, it is a stark misreading of *Hishon v. King & Spalding*, 467 U.S. 69 (1984) to claim that it announced a categorical rule that expressive association claims are never valid in employment cases. The Supreme Court simply said no such thing.

The entire discussion of the expressive association issue in *Hishon* is one paragraph long. This short discussion clearly follows the normal rules for all expressive association cases. The organization seeking to enforce its right to exclude others must demonstrate that it has a message, and that it would be impaired, if the group was forced to include the unwanted individual.

The King & Spalding firm sought to demonstrate that it was the kind of group that could claim the right of expressive association because "lawyers may make a distinctive contribution to the ideas and beliefs of our society." But the Court speedily rejected this claim by pointing out that King & Spalding failed to show "how its ability to fulfill such a function would be inhibited by a requirement that it consider petitioner for partnership." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (cleaned up).

King & Spalding did little more than claim the right to hang out with the people they desired. The right is not the right of association but the right of

12

*expressive* association. The firm did not make, and almost certainly could not make, any showing that this law firm had particular views on topics that it could not advance if Ms. Hishon became a partner in the firm.

The district court relies on this blatant misreading of *Hishon* to reject the ultimate applicability of *Dale* and the cases that follow *Dale.* The district court rejected the applicability of the Second Circuit's recent decision of *Slattery v. Hochul*, 61 F.4th 278, 291 (2d Cir. 2023), which upheld an employer's claim to the right of expressive association in a nondiscrimination context. The rationale for this rejection, the district court opined, was that *Slattery* "fails to address the Supreme Court's holding in *Hishon* and is distinguishable from the present case." *McMahon v. World Vision, Inc.*, *supra* at 1145.

Anyone reading *Hishon* correctly would see no necessity to explain why it and not *Dale* controls in a case like the one at bar. Accordingly, the Second Circuit cannot be expected to explain away a holding that simply does not exist. *Hishon* created no categorical rule rejecting expressive association in employment cases; it simply applied the normal rule to reject the law firm's claim based on the facts. The Second Circuit need not catalog every Supreme Court case discussing expressive association since there is no disparity that needs to be explained. There is no rule that employment discrimination cases, including those brought under Title VII, are exempt from expressive association claims. In fact, both the EEOC

13

and the Supreme Court have made this plain. "According to the EEOC and Perich,

religious organizations could successfully defend against employment

discrimination claims in those circumstances by invoking the constitutional right to

freedom of association—a right "implicit" in the First Amendment. *Roberts v.*

*United States Jaycees,* 468 U.S. 609, 622 (1984)." *Hosanna-Tabor Evangelical*

*Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012).

In addition, the district court rejected the applicability of *Slattery* on the

ground that "the very mission" of the prolife organization was at issue whereas

here, World Vision does not exist for the purpose of advancing its views on same-

sex marriage. *McMahon, supra* at 1145. *Slattery* did not purport to reinstate the

approach of the New Jersey Supreme Court in *Dale.* The United States Supreme

Court has established a binding precedent that makes this clear no matter how

many times the district court seeks to replay this refrain. Organizations "do not

have to associate for the 'purpose' of disseminating a certain message in order to

be entitled to the protections of the First Amendment." *Dale,* 530 U.S. at 655.

## III. The Forced Inclusion of Plaintiff Would Indeed Impair the Message of World Vision

We now turn to the issue the district court never considered. Would the

inclusion of the plaintiff in the position where she would talk to the World Vision's

14

donors, ministry partners, and others impair its ability to deliver its desired message?

An old radio preacher once said that there are three kinds of people—believers, non-believers, and make-believers. The facts in this case lead to the inescapable conclusion that the plaintiff fits neatly within the category of make-believers who cannot be trusted to reliably deliver World Vision's desired message.

In her interview for the position of Customer Service Representative for World Vision, the plaintiff was asked questions about her spiritual faith to ensure that she was spiritually aligned with the beliefs of the organization. 3-ER-482–84; 2-ER-329–31, 333. She was specifically informed that World Vision expects its employees to "be in alignment with behaviors described in our standards of conduct, which are biblically based." 3-ER-483. She was advised that any sexual conduct outside of marriage was in violation of those standards, and that only a marriage between a man and a woman is in alignment with World Vision's Christian beliefs. World Vision Opening Brief at 13-14.

The plaintiff said she had no questions about the standards, and when asked if she was willing and able to comply, she replied, "I'm aligned, yes!" 3-ER-484; 2-ER-150.

But on the day after she received and accepted her offer of employment, plaintiff sent World Vision an email, under the guise of asking about maternity

benefits that revealed that she was in a same-sex marriage. "My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee? I will be the one having the baby so I just wanted to check to see if any time would be allowed off." 3-ER-436 ¶9; 3-ER-477.

It is easy to infer that the plaintiff was not looking for a job but for an opportunity to engage in a philosophical battle with World Vision over its views concerning marriage.

But the plaintiff's lack of alignment with World Vision went much further than disagreement over the biblical standards for marriage and sexuality. She denies that belief in the resurrection and deity of Jesus Christ are essential to Christianity. 2-ER-143–44. These two beliefs are the very heart of orthodox Christianity.

The plaintiff rejected the very notion that it was any of World Vision's business to ensure that their employees "keep Christ central in [their] individual lives." 2-ER-144–45. She forthrightly acknowledges that World Vision has a different view of Christianity than she does, and that she rejects the organization's views. 2-ER-142–43.

The plaintiff is an advocate for her viewpoint, and she contends that the viewpoint of World Vision is "hate" and "very wrong." 2-ER-120, 147. Her open public advocacy of her support for same-sex marriage and her antipathy for the

16

contrary view, including prior to her interview with World Vision, have been fully catalogued in World Vision's opening brief. Opening Brief at 13. She came to World Vision pretending to be someone holding views she despised.

Would the ACLU allow someone who thoroughly rejects its core views to work in a position where his or her main responsibility was to talk to the donors of the ACLU? Would Planned Parenthood allow a pro-life advocate who believed that the organization was involved in the immoral taking of human life to work for the organization in a similar position?

It is obvious that someone who holds World's Vision's view of Christianity and same-sex marriage would not be hired to be the Faith Work Director for the National LGBTQ Task Force.

Every organization that engages in expressive communications wants every employee whose job it is to communicate with others to share their viewpoints on all relevant issues. And each organization gets to decide for itself what issues it believes to be relevant. All of this is especially true when it comes to a position where the core job function is to talk with the organization's donors.

Donors are the *sine qua non* of every nonprofit organization. Employees who interact with donors are expected to build relationships with donors. This necessarily involves asking questions about the donor's life and, at times, sharing information about one's own life. Customer-service representatives at World Vision

are expected to make outbound calls to donors and are instructed to ask for prayer requests. And most importantly, the donor-representative must be able to communicate a sincere and enthusiastic commitment to the beliefs and values of the organization.

If the plaintiff would have revealed to the donors of World Vision that she rejects the necessity of the resurrection of Jesus Christ, she would cause serious problems for the organization. It is also quite true that World Vision would face serious repercussions with its donors if the plaintiff revealed that she and her wife were expecting a baby in March. Donors give because they are in true alignment with the beliefs, values, and mission of the organization.

Planned Parenthood leadership could expect a firestorm among its donor-base if it was revealed that a customer-service representative had publicly declared her support for the pro-life cause on her own social media accounts. Moreover, Planned Parenthood would have good reason to worry that she might share these contrary views with its supporters. Either way, it changes Planned Parenthood's message.

No organization should be required to put up with this kind of bait-and-switch tactic. Upon finding out the truth of the views of a new employee, every single nonprofit advocacy organization in this country would dismiss an employee who rejects the views of the organization. They would do so because a mixed

18

message about their views and mission are simply far too serious to be tolerated. And it would be their unquestionable constitutional right to do so.

It is obvious that allowing the plaintiff to communicate with World Vision's donors and ministry partners would change the message it wished to communicate. There is little wonder that the district court failed to squarely address the issue. To pose the question is to answer it. The plaintiff rejects and despises the views of World Vision. To allow her to talk to World Vision's donors would severely damage its ability to communicate its desired messages.

## Conclusion

The decision below should be reversed, and this lawsuit should be dismissed with prejudice.

Respectfully submitted,

MICHAEL P. FARRIS                           *s/Joshua W. Carden*
NATIONAL RELIGIOUS                          JOSHUA W. CARDEN
BROADCASTERS                                CARDEN LIVESAY, LTD
20 F. Street                                419 E. Juanita Ave, Ste. 103
Seventh Floor                               Mesa, AZ 85204
Washington D.C. 20001                       (480) 345-9500
(202) 341-4783                              *joshua@cardenlivesay.com*
*mfarris@nrb.org*                           Attorney for *Amicus Curiae*
Attorney for *Amicus Curiae*

19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** No. 24-3259

I am the attorney or self-represented party.

**This brief contains 4,650 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one):*

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joshua W. Carden **Date** 8-28-2024

20