No. 24-3259

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WORLD VISION, INC.,
*Defendant-Appellant.*

v.

AUBRY MCMAHON,
*Plaintiff-Appellee,*

Appeal from the United States District Court for the
Western District of Washington – Case No. 2:21-cv-00920-JLR

**Brief of *Amici Curiae* COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES; CALVARY CHAPEL FT. LAUDERDALE; CHERRY HILLS COMMUNITY CHURCH; INTERNATIONAL MISSIONS, INC. dba CHRISTAR; CHRISTIAN CAMP AND CONFERENCE ASSOCIATION; CHURCH EDUCATIONAL SYSTEM OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; COMMUNITY BIBLE STUDY; CROSS CATHOLIC OUTREACH, INC.; THE CROWELL TRUST; DIOCESE OF COLORADO SPRINGS; ETHICS AND RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; EVANGELICAL COUNCIL FOR FINANCIAL ACCOUNTABILITY; FAMILY STATIONS, INC. dba FAMILY RADIO; FOCUS ON THE FAMILY; GRACE TO YOU; GULL LAKE MINISTRIES; INTERNATIONAL CHURCH OF THE FOURSQUARE GOSPEL; THE MASTER'S UNIVERSITY & SEMINARY; O.C. INTERNATIONAL, INC.; SERVANT FOUNDATION dba THE SIGNATRY; TYNDALE HOUSE MINISTRIES; UPWARD UNLIMITED; THE CHRISTIAN COMMUNITY FOUNDATION, INC. dba WATERSTONE; and YOUNG LIFE in Support of Defendant-Appellant**

John Melcon
Taylor Huse
Stuart Lark
SHERMAN & HOWARD L.L.C.
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO  80903
(719) 475-2440
jmelcon@shermanhoward.com
thuse@shermanhoward.com
slark@shermanhoward.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that *amici* do not have any parent corporations, and no publicly-held corporation owns 10% or more of the stock of any of *amici*.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES ................................................................ iv

INTEREST OF AMICI CURIAE ......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ..................................................................................... 7

    I.    Faith communities like *amici* employ fellow believers as a form of associational religious exercise and expression protected under the First Amendment, which both Title VII and WLAD accommodate. ................................................ 7

    II.    Title VII does not apply at all to a religious organization's employment actions that are based on an employee not sharing the organization's particular religion ................................................................... 14

        A.    Section 702 is triggered when a religious organization takes an employment action because the religious belief, observance, or practice of an employee does not align with that of the organization ............................................... 14

        B.    When an employment action triggers the 702 exemption, none of Title VII applies ........................... 20

        C.    The district court's view that section 702 only exempts religious organizations from claims of religious discrimination ignores the statutory text and misreads this Court's decisions in *Pacific Press* and *Fremont Christian*. ...................................... 22

    III.    The WLAD religious nonprofit exemption protects employment actions that are based on an employee's alignment with the organization's religion. ........................ 27

        A.    The district court failed to determine if there are reasonable grounds for the exemption to apply in

this case (beyond the ministerial exception) as
required under Washington law. ................................. 29

B.   The First Amendment protections of religious
exercise, autonomy, and expression provide
reasonable grounds for the exemption to apply to
the employment by religious organizations of
individuals who align with their religion. ................... 31

CONCLUSION ....................................................................... 40

CERTIFICATE OF SERVICE ................................................. 41

# TABLE OF AUTHORITIES

## Cases

*Billard v. Charlotte Catholic High School,*
101 F.4th 316 (4th Cir. 2024)............................................................21

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ...................................................... 21, 22, 27, 39

*Boy Scouts of America v. Dale,*
*530 U.S. 640,656 (2000)* .......................................................... 11, 12, 37

*Burwell v. Hobby Lobby,*
573 U.S. 682 (2014) .............................................................................7, 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ...........................................................................33

*Corp. of the Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ................................................ 8, 9, 11, 30, 31, 34

*Curay-Cramer v. Ursuline Acad. of Wilmington,*
450 F.3d 130 (3d Cir. 2006)..............................................................19

*EEOC v. Fremont Christian School,*
781 F.2d 1362 (9th Cir. 1986) ....................................... 3, 23, 24, 26, 27

*EEOC v. Pacific Press Publishing Association,*
676 F.2d 1272 (9th Cir. 1982) ................................... 23, 24, 25, 26, 27

*Employment Division v. Smith,*
494 U.S. 872 (1990) ...........................................................................33

*Fellowship of Christian Athletes v. San Jose Unified School District,,*
82 F.4th 664 (9th Cir. 2023)..............................................................35

*Fitzgerald v. Roncalli High School,*
73 F.4th 529 (7th Cir. 2023)..............................................................20

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ...........................................................................34

*Garcia v. Salvation Army,*
918 F.3d 997 (9th Cir. 2019) ............................................................27

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006) ...........................................................................39

*Hall v. Baptist Memorial Health Care Group,*
215 F.3d 618 (6th Cir. 2000) ......................................................... 19, 21

*Hobby Lobby Stores, Inc. v. Sebelius,*
723 F.3d 1114 (10th Cir. 2013) (en banc),
*aff'd sub nom. Burwell v. Hobby Lobby*, 573 U.S. 682 ......................... 12

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
565 U.S. 171 (2012) ............................................. 10, 11, 13, 36

*Kennedy v. St Joseph's Ministries,*
657 F.3d 189 (4th Cir. 2011) ................................................. 4, 14, 20

*Korte v. Sebelius,*
735 F.3d 654 (7th Cir. 2013) ................................................. 13

*Larson v. Valente,*
456 U.S. 228 (1982) ............................................................. 39

*Little v. Wuerl,*
929 F.2d 944 (3rd Cir. 1991) ................................................. 4, 13, 18

*Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.,*
475 P.3d 164 (Wash. 2020) .................................................. 29

*Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission,*
138 S. Ct. 1719 (2018) ............................................................. 35

*McMahon v. World Vision, Inc.,*
704 F. Supp. 3d 1121 (W.D. Wash. 2023) .................. 4, 5, 19, 22, 27, 28

*NLRB v. Catholic Bishop of Chicago,*
440 U.S. 490 (1979) ............................................... 23, 24, 25

*Ockletree v. Franciscan Health System,*
317 P.3d 1009 (Wash. 2014) ......................... 6, 13, 29, 31, 32

*Our Lady of Guadalupe School v. Morrissey-Berru,*
591 U.S. 732 (2020) .............................................................. 10

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) ............................................................. 39

*Seattle Pacific University v. Ferguson,*
104 F.4th 50 (9th Cir. 2024) .................................................. 28

*Sherbert v. Verner,*
374 U.S. 398 (1963) .............................................................. 39

*Spencer v. World Vision, Inc.*,
   633 F.3d 723 (9th Cir. 2011) ....................................... 13, 16, 18, 34, 36

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
   41 F.4th 931 (7th Cir. 2022) .......................................... 20, 26

*Tagore v. United States*,
   735 F.3d 324 (5th Cir. 2013) ............................................. 39

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ............................................................ 35

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ........................................................ 7, 8

*Woods v. Seattle's Union Gospel Mission*,
   481 P.3d 1060 (Wash. 2021).............................. 6, 28, 29, 30, 31, 32, 34

## Statutes

42 U.S.C. § 2000e(j) ................................................... 15, 18, 20

42 U.S.C. § 2000e-1(a)3, 4, 5, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25,
   26, 27, 34, 36

RCW 49.60.040(11).................... 5, 6, 13, 27, 28, 29, 30, 31, 32, 34, 35, 40

## Other Authorities

H.R. Rep. No. 914, 88th Cong. § 703 (1963) .......................................... 15

## INTEREST OF AMICI CURIAE[1]

*Amici* are nonprofit Christian religious organizations involved in many different activities including humanitarian relief, social services, education, evangelism, discipleship, missions, Bible teaching, broadcasting, publishing, campus outreach, camping, financial stewardship, and congregational care. *Amici* are located throughout the United States and are active in every state and in many other countries. Collectively, *amici* employ thousands of individual workers.

*Amici* conduct all their activities as an exercise of their Christian beliefs and in furtherance of their respective Christian missions. In addition, and importantly, *amici* are guided by their beliefs to carry out their activities as *communities or associations* of like-minded believers, and doing so is an expression of those beliefs. Indeed, the experience of community within religious associations often inspires and energizes their service to others. Moreover, the shared religious beliefs and practices among those carrying out *amici*'s activities ensure that these

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief, and no person other than *amici* made a monetary contribution toward the preparation or submission of this brief.

activities are conducted in a manner that distinctly expresses and exercises each organization's religious convictions.

With respect to federal and state laws limiting associational rights, *amici* have a vital interest in, and increasingly rely upon, religious exemptions such as those contained in Title VII of the Civil Rights Act of 1964 and Washington's Law Against Discrimination (WLAD). These exemptions preserve *amici*'s legal rights to exercise and express their religious beliefs not just through their activities but also through their associations as faith communities.

In this case, the district court below misinterpreted the religious exemptions in Title VII and WLAD in a flawed decision that undermines *amici*'s religious exercise and expressive rights to associate as faith communities. The present appeal provides an important opportunity for this Court to confirm both the proper meaning of these statutory religious exemptions and the protection these exemptions provide for faith communities like *amici*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case asks whether religious organizations can require their employees to agree with or live in accordance with their religious beliefs,

including their beliefs pertaining to marriage and sexuality. The First Amendment of the U.S. Constitution broadly protects the associational religious exercise and expression that are intrinsic in such an employment standard. But to resolve this appeal, this Court need look no further than the religious exemptions included in Title VII and WLAD. Accordingly, this Court should start and end with these statutory exemptions, a straightforward application of which requires reversal. *See EEOC v. Fremont Christian School,* 781 F.2d 1362, 1365 (9th Cir. 1986) ("Before reaching [a religious organization's] constitutional arguments, this court must determine whether the dispute may be resolved on statutory grounds.").

Many religious organizations like World Vision and *amici* exercise and express their religious beliefs in part by nurturing one or more communities of like-minded believers. Title VII's religious employer exemption, codified at 42 U.S.C. § 2000e-1(a) ("section 702" or the "702 exemption"), reflects this country's long tradition of recognizing such religious association as a form of protected religious exercise and expression. The 702 exemption accommodates and preserves this associational religious exercise and expression by permitting religious

3

employers to require their employees to agree with or live in accordance with their religious beliefs.

Under the exemption's plain language, Title VII's substantive provisions—including its prohibitions on religious discrimination and sex discrimination—"shall not apply" to an employment decision of a religious organization that is based on the alignment of an individual employee's religious beliefs, observance, or practice with those of the employer. As other courts of appeals have recognized, the purpose of the 702 exemption is "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices" and "to employ only persons whose beliefs and conduct are consistent with the [organizations'] religious precepts." *Kennedy v. St Joseph's Ministries*, 657 F.3d 189, 194 (4th Cir. 2011) (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3rd Cir. 1991)).

Although the district court recognized that "World Vision qualifies as a religious organization" under section 702, the court incorrectly concluded that the 702 exemption offers "immunity only from religious discrimination *claims*." *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1134 (W.D. Wash. 2023) (emphasis added). Because plaintiff Aubry

4

McMahon framed her Title VII claims as "premised on sex and sexual orientation discrimination—not religious discrimination," the court incorrectly ruled that section 702 does not apply. *Id.* at 1135.

The district court's ruling ignores the text of section 702 and misreads this Court's case law addressing the exemption. Contrary to the district court's conclusion, the application of section 702 turns not on the claims asserted but rather on whether the challenged employment action is based on the alignment of the employer's and employee's religious beliefs or conduct. Because World Vision's employment action at issue in this case is based precisely on such alignment, the 702 exemption excludes it from Title VII's coverage.

As written, the WLAD religious exemption is broader than the 702 exemption. The definition of "employer" under WLAD does not include "any religious or sectarian organization not organized for private profit." RCW 49.60.040(11). As such, nonprofit religious organizations are not subject to any of the substantive restrictions in WLAD. This exemption "accommodates the broad protections to religious freedoms afforded by Washington's article I, section 11," i.e., "the state free exercise clause." *Ockletree v. Franciscan Health System*, 317 P.3d 1009, 1017–18 (Wash.

5

2014) (lead opinion). Indeed, the religious liberty protection afforded by Washington's state constitution is "greater . . . than that of the First Amendment." *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1067 (Wash. 2021).

While the district court recognized that WLAD's religious exemption "is not limited to religious discrimination claims," the court nevertheless held—citing a recent decision of the Washington Supreme Court—that the exemption "applies only to discrimination claims brought by employees who fall under the First Amendment's ministerial exception." 704 F. Supp. 3d at 1135 (citing *Woods*, 481 P.3d at 1067–70). But the district court's holding reads the *Woods* as-applied decision too broadly and overlooks the reasonable grounds test required by *Woods* and other Washington cases. Properly weighing the broad First Amendment protections for World Vision's religious exercise and expression, including the protections found in post-*Woods* cases, there can be no doubt that there are reasonable grounds for applying the WLAD religious exemption to World Vision's challenged employment action.

Therefore, World Vision is entitled to summary judgment under both Title VII and WLAD.

6

## ARGUMENT

I. **Faith communities like *amici* employ fellow believers as a form of associational religious exercise and expression protected under the First Amendment, which both Title VII and WLAD accommodate.**

Religious exercise often includes both individual and associational (or communal) elements. In a case protecting employers' religious exercise rights, Justice Kennedy described how our country's commitment to religious liberty encompasses the individual element as exercised throughout society:

> In our constitutional tradition, freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law. For those who choose this course, free exercise is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts. Free exercise in this sense implicates more than just freedom of belief. It means, too, the right to express those beliefs and to establish one's religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community.

*Burwell v. Hobby Lobby*, 573 U.S. 682, 737 (2014) (Kennedy, J., concurring).

On this same foundation, the Supreme Court has regularly recognized that our laws also protect the communal element of religious exercise. For example, in *Wisconsin v. Yoder*, the Court held that the Free Exercise Clause protects Amish communities from mandatory school

7

attendance obligations. The Court observed that "Old Order Amish communities today are characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence." 406 U.S. 205, 210 (1972). The Court further noted that the Amish base this concept on "their literal interpretation of the Biblical injunction from the Epistle Of Paul to the Romans, 'be not conformed to this world . . . .'" *Id.* at 216.

In the Supreme Court's leading case upholding the religious employer exemption in Title VII, Justices Brennan and Marshall accurately captured the associational aspect of religious exercise when they observed that "determining that certain activities are in furtherance of an organization's religious mission, *and that only those committed to that mission should conduct them*, is . . . a means by which a religious community defines itself." *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (emphasis added) (Brennan and Marshall, JJ., concurring). They further explained:

> [R]eligious organizations have an interest in autonomy in ordering their internal affairs so that they may be free to: select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions. Religion includes important communal elements for most believers. They exercise their religion through religious

8

organizations . . . . For many individuals, religious activity derives meaning in large measure from participation in a larger religious community. *Such a community represents an ongoing tradition of shared beliefs, an organic entity not reducible to a mere aggregation of individuals.*

*Id.* at 341–43 (emphasis added) (internal quotation omitted).

Different religious organizations, even those of the same general faith tradition, will reach different conclusions regarding the associational requirements of their faith. Perhaps not many religious organizations believe the requirements apply as extensively as do the Amish. What matters is that in each case the determination is based on religious beliefs as interpreted and applied by the religious community and is therefore an instance of religious exercise and expression (and self-definition) by such community.

Religious organizations like *amici* intertwine their carrying out of activities in service to God and society with their cultivating of an association of employees committed to their beliefs and mission. Indeed, the latter often energizes the former. To this end, religious organizations commonly require employees to embrace and model the organization's religious beliefs. Such requirements help these organizations ensure that their activities—some of which may be facially similar to those of

secular organizations—maintain their distinctive religious character. For *amici*, the point is not just that services are provided, but that services are provided by individuals committed to the organization's religious beliefs as an expression and exercise of those beliefs.

The First Amendment provides additional protection, beyond the Free Exercise Clause alone, for this associational religious exercise and expression. In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020), the Supreme Court applied a so-called "ministerial exception" under which religious employers can make employment decisions in relation to certain "minister" employees based on *any criteria*.

The Court grounded this exception in a broader constitutional doctrine giving religious organizations autonomy from government intervention in its affairs. *Our Lady of Guadalupe*, 591 U.S. at 746. Tracing its precedents back to 1872, the Court recognized a long-standing principle grounded in the First Amendment that "permits hierarchical religious organizations to establish their own rules and regulations for internal discipline and government." *Hosanna-Tabor,* 565 U.S. at 187.

Based on this principle, the Court held that "[r]equiring a church to accept or retain an unwanted minister . . . interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs" in violation of both Religion Clauses. *Id.* at 188. In particular, "[b]y imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.*

This religious autonomy doctrine extends beyond the ministerial exception to encompass the right of a religious employer to make employment decisions in regard to *non-minister employees* based on the alignment of their religious beliefs or conduct with those of the employer, as defined in section 702. In their *Amos* concurrence, Justices Brennan and Marshall indicated that "[c]oncern for the autonomy of religious organizations *demands*" the "categorical exemption" for religious organizations in Title VII. 483 U.S. at 345 (emphasis added).

The First Amendment right to expressive association provides separate and additional protection for the fellow-believer employment standards of faith communities. In *Boy Scouts of America v. Dale* the

Supreme Court held that applying a state law prohibiting discrimination on the basis of sexual orientation in places of public accommodation to force the Boy Scouts to readmit a member who was a gay rights activist would "significantly affect" the organization's protected expressive association and would represent a "severe intrusion" on such rights. 530 U.S. 640, 656, 659 (2000). The Court went on to conclude that the burden was so severe that the state's interest in preventing discrimination in public places was not sufficient to justify applying the state law to the Boy Scouts. *Id.* at 659.

The expressive association interests of *amici* and World Vision are enhanced by the fact that they are religious organizations because "the Religion Clauses add to the mix when considering freedom of association." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1136 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby*, 573 U.S. 682. As Justices Alito and Kagan put it, the principle recognized in *Dale* that "forcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express . . . applies with special force with respect to religious groups, whose very existence is dedicated to the collective expression and

propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito and Kagan, JJ., concurring).

In addition to these broad constitutional protections, statutory religious exemptions—like the ones in Title VII and WLAD—provide more specific protections for the faith-based employment standards of religious organizations. *See Spencer v. World Vision, Inc.*, 633 F.3d 723, 742 (9th Cir. 2011) (Kleinfeld, J., concurring) ("[W]ithout an exemption for religious institutions, [Title VII] would have the unintended consequence of preventing the free exercise of religion."); *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) ("The religious-employer exemptions in Title VII and the ADA are legislative applications of the church-autonomy doctrine."). In particular, the 702 exemption enables religious employers to "create and maintain communities composed solely of individuals faithful to their doctrinal practices" and "employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. Similarly, WLAD's religious employer exemption "gives effect" to the state and federal constitutions' free exercise protections. *Ockletree*, 317 P.3d at 1018.

13

## II. Title VII does not apply at all to a religious organization's employment actions that are based on an employee not sharing the organization's particular religion.

In crafting the 702 exemption, Congress "painted with a broad brush" to ensure associational religious exercise and expression would remain "free from government intervention." *Kennedy*, 657 F.3d at 194. Section 702 accomplishes this by permitting religious organizations to maintain religious requirements for employees. Under the plain language of Section 702, the entirety of Title VII—including its prohibition on sex discrimination—does not apply to religious organizations like *amici* and World Vision when they make employment decisions based on the particular religion—i.e., the religious beliefs, observance, or practice—of individual employees or job applicants. World Vision's employment action triggers the 702 exemption, and is not subject to Title VII, because the action implemented World Vision's requirement that employees live in accordance with its religious beliefs regarding marriage and sexuality.

### A. Section 702 is triggered when a religious organization takes an employment action because the religious belief, observance, or practice of an employee does not align with that of the organization.

By its terms, the 702 exemption kicks in whenever a religious employer selects individuals based on whether their religious beliefs

14

and/or conduct align with those of the employer. In full, the exemption reads:

> This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).

To be sure, this language does not create a blanket exemption from Title VII for religious employers, although Congress considered such an approach. *See* H.R. Rep. No. 914, 88th Cong. § 703 (1963). Instead, the 702 exemption applies to a religious organization's "employment of individuals of a particular religion." But what is the meaning of "individuals of a particular religion"?

The answer is found in Title VII's inclusive definition of "religion," which confirms that an individual's "particular religion" is much more than his or her self-described denominational affiliation. Throughout Title VII, "religion" means "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Thus, the 702 exemption comes into play when a religious employer makes an employment

decision based on the alignment of an individual's religious belief, observance, or practice with the organization's own.

### i. *Shared beliefs*

As a starting point, the 702 exemption protects a religious organization's selection of employees who are *fellow believers*. For most *amici*, the associational requirements of their faith compel them to limit employment opportunities to individuals who share and embrace *amici*'s religious beliefs. Often, these beliefs are expressed in a "statement of faith"—a document employees must personally agree with to work for the organization. If an employee rejects the employer's doctrinal beliefs, the employer may terminate the employment relationship. *Spencer*, 633 F.3d at 725 (O'Scannlain, J., concurring) (affirming application of section 702 to World Vision's discharge of employees who "denied the deity of Jesus Christ and disavowed the doctrine of the Trinity).

In some situations, even if an employee proclaims allegiance to a certain faith tradition—e.g., Christianity—and does not disclose disagreement with any specific beliefs held by the organization (beliefs the employee is required to affirm and hold), the employee's rejection of the organization's beliefs may nevertheless be exposed by the employee's

conduct and practice. In such circumstances, a religious employer may—through careful spiritual discernment—conclude the employee does not in fact share its religious beliefs. The 702 exemption protects employment action based on such a conclusion.

### ii. Belief-based conduct

Some *amici* and other religious organizations may—for religious and mission-based reasons—not require certain employees to agree with certain of their beliefs. Yet these organizations still require these employees to *respect* and *live in accordance with* such beliefs. For example, *amici* and other religious organizations may determine that employees who do not provide formal teaching or instruction still play a role in exercising and expressing the organization's beliefs, both internally and to the public. Employees engaged in conduct contrary to *amici*'s religious beliefs would undermine the ability of *amici* to maintain spiritual unity within their faith communities and effectively carry out their religious missions.

To accommodate this form of religious exercise and expression, the 702 exemption expressly applies when a religious organization requires employees to live in accordance with its religious beliefs. As Title VII's

17

definition of "religion" confirms, the exemption is triggered when a religious employer selects individuals because of their "religious observance and practice," not just "belief." 42 U.S.C. § 2000e(j). In other words, when the 702 exemption authorizes religious employers to select individuals because of their "particular religion," this includes belief-based conduct. A religious employer is permitted to select individuals who conform to and respect its religious beliefs and expectations and to reject others who do not.

### iii. Supporting caselaw

The caselaw confirms this plain-text interpretation of section 702. In the seminal case *Little v. Wuerl*, the Third Circuit upheld a Catholic school's decision not to renew the contract of a *non-Catholic* teacher who had remarried in violation of Catholic teaching on marriage. 929 F.3d 944. Noting Title VII's "broad" definition of religion, the Third Circuit held that "the permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Id.* at 951. *Accord Spencer*, 633 F.3d at 742 (Kleinfeld, J., concurring) (recognizing that "[i]f the government coerced staffing of religious institutions by persons who

18

rejected or even were hostile to the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions."); *Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 141 (3d Cir. 2006) (holding section 702 barred a sex discrimination claim brought by a teacher dismissed for engaging in pro-choice advocacy in violation of Catholic teaching); *Hall v. Baptist Memorial Health Care Group*, 215 F.3d 618, 623 (6th Cir. 2000) (holding 702 protected a Baptist college when it fired a Student Services Specialist after she—a lesbian—became ordained in church known for supporting "homosexual lifestyles").

Here, there is no dispute that Ms. McMahon's job offer was rescinded because her self-disclosed conduct—her marriage to another woman—conflicted with World Vision's employment standard exercising its "sincerely held religious beliefs that (1) marriage is a Biblical covenant between a man and a woman" and (2) sexual conduct outside such a marriage constitutes "open, ongoing, and unrepentant' sin." 704 F. Supp. 3d at 1124, 1126. Section 702 is therefore triggered.

**B.   When an employment action triggers the 702 exemption, none of Title VII applies.**

When, as in this case, a religious employer makes an employment decision because of an individual's religious beliefs, observance, or practice under section 702, "then all of Title VII drops out." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring).

The 702 exemption provides that "with respect to the employment of individuals of a particular religion" at a religious organization, "[t]his subchapter shall not apply." 42 U.S.C. § 2000e-1(a). In context, "[t]his subchapter" refers to Title 42, Chapter 21, Subchapter VI, i.e., all of Title VII. *See Kennedy*, 657 F.3d at 194. Thus, where a covered religious organization makes an employment decision on the grounds of any "aspect" of an employee's "religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), then none of Title VII's other substantive provisions apply. *Fitzgerald v. Roncalli High School*, 73 F.4th 529, 536 (7th Cir. 2023) (Brennan, J., concurring) ("I see no principled way to limit the all-encompassing scope of 'This subchapter' when the religious employer exemption applies.").

This is true regardless of how the aggrieved individual frames his or her Title VII claims. This means Title VII permits a religious employer to maintain religious standards even if the prohibited conduct or advocacy might be said to implicate matters of sex, such as where a religious employer prohibits employees from engaging in same-sex intimate conduct or from promoting such conduct.

The cases discussed in Section II.A, *supra*, confirm this point. In *Hall*, for example, the Sixth Circuit held that the 702 exemption allowed a Baptist school to terminate an employee for "assum[ing] a leadership position in an organization that publicly supported homosexual lifestyles," that is, for displaying public support for conduct in violation of the religious employer's requirements for employees. 215 F.3d at 627. *See also Billard v. Charlotte Catholic High School*, 101 F.4th 316, 335 (4th Cir. 2024) (King, J., concurring) (asserting that "a 'straightforward reading' of § 702 of Title VII bars [plaintiff]'s discrimination claim" challenging his Catholic employer's decision to discharge him after announcing plans to marry his same-sex partner).

These cases align with the Supreme Court's guidance in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). In *Bostock*, the Court ruled that

discrimination because of a person's sexual orientation or gender identity is a form of sex discrimination prohibited under section 703(a) of Title VII. To address concerns about implications of that ruling raised by religious organizations espousing traditional views of marriage, the Court expressly highlighted the 702 exemption, acknowledging its role in protecting religious employers from being forced to "violate their religious convictions." *Id.* at 1753–54.

In sum, because section 702 applies to World Vision's employment action, Title VII does not apply.

## C. The district court's view that section 702 only exempts religious organizations from claims of religious discrimination ignores the statutory text and misreads this Court's decisions in *Pacific Press* and *Fremont Christian*.

Disregarding the plain text of the 702 exemption, the court below erroneously held that Title VII prohibits religious organizations from requiring employees to live in accordance with their religious beliefs about marriage and sexuality. Instead, relying on a misreading of this Court's prior cases, the district court incorrectly concluded that the 702 exemption does not apply to "claims . . . premised on sex and sexual orientation discrimination." 704 F. Supp. 3d at 1135.

22

The district court purported to follow two of this Court's past 702 cases: *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272 (9th Cir. 1982), and *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986). These cases do not support the district court's interpretation of Title VII.

In *Pacific Press*, Lorna Tobler, a Seventh Day Adventist in "good standing" with her church, filed charges against her employer, an Adventist publishing house, for sex discrimination on account of its written wage scale that specified higher salaries and additional financial allowances for males (especially married males) compared to females. *Id.* at 1274–75. Relying on *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979), in which the Supreme Court held that the National Labor Relations Board's assertion of jurisdiction over religious institutions would "implicate the guarantees of the Religion Clauses" and "present[] a significant risk that the First Amendment will be infringed," the publishing house primarily contended that its employment practices were entirely insulated from the reach of Title VII and the EEOC. The publishing house did not invoke the 702 exemption or assert any religious justification for its unequal pay scale.

To assess the publishing house's *Catholic Bishop* argument, this Court turned to section 702 and its legislative history to conclude "Congress specifically . . . rejected proposals that provided religious employers a complete exemption from [Title VII]." *Pacific Press*, 676 F.2d at 1276. The Court reasoned that Congress's decision to adopt a partial rather than complete exemption for religious employers revealed an intent for the statute to apply generally to religious organizations, notwithstanding the resulting "serious constitutional questions." *Id*. Having rejected the publishing house's *Catholic Bishop* argument, the Court affirmed that the publishing house violated Title VII's prohibition on sex discrimination.

*Pacific Press* simply stands for the proposition that the 702 exemption does not provide a complete exemption from Title VII, and that the EEOC's jurisdiction over religious institutions is not limited in the same way as the NLRB's.

In *Fremont Christian*, decided just four years after *Pacific Press*, the EEOC brought a Title VII sex discrimination action against an Assemblies of God school based on the school's provision of health insurance benefits only for "head of household" employees, which the

24

school defined as "single persons and married men." 781 F.2d at 1364. As in *Pacific Press*, this Court began its analysis by examining the applicability of Title VII in light of *Catholic Bishop*. The Court again held that section 702 demonstrated Congress's intent to exempt religious employers from Title VII "only to a narrow extent," not "altogether." *Id.* at 1366. The Court explained that "[w]hile the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, religious employers are not immune from liability under Title VII for discrimination based on sex." *Id.* (cleaned up).

This Court proceeded to evaluate the case as one that implicated *only* sex discrimination, not religious doctrines or preferences. Relying on a statement from a pastor associated with the school—who said the school "could not, without sin, treat women according to unfair distinctions"— the Court concluded that "preventing the sex discrimination involved in this case should have no significant impact on Fremont Christian's religious beliefs or doctrines" and "would not interfere with religious

25

belief." *Id.* at 1368–69.[2] On these assumptions, the Court concluded that the school's health insurance policy violated Title VII.

*Pacific Press* and *Fremont Christian* do not address situations where, as here, a religious institution's employment action is based on the lack of alignment between an individual's religious beliefs or conduct and the religion of the institution. More specifically, these cases do not consider at all the question of whether the 702 exemption protects employment actions implementing a religious employer's requirement that employees live in accordance with its religious beliefs regarding marriage and sexuality. Instead, these cases merely stand for the unobjectionable proposition that "§ 702(a) does not exempt all employment decisions by religious organizations." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). It does not follow from this proposition that religious organizations cannot make religion-based employment decisions described in section 702 that also produce what might be viewed as "a form of sex discrimination." *Id.* at 947.

---

[2] To be sure, the school at one point argued its policy was "grounded in religious belief." 781 F.2d at 1367. But on *de novo* review of the record, this Court determined that the school's asserted religious justification was merely pretextual. *Id.* at 1367 n.1.

Indeed, the mere fact that a Title VII claim against a religious employer is characterized as a sex discrimination claim does not bring it within the ambit of *Pacific Press* and *Fremont Christian*. As this Court has explained, what matters under section 702 is whether the employment action ultimately "centers around religious discrimination," not how the cause of action is styled. *Garcia v. Salvation Army*, 918 F.3d 997, 1005 (9th Cir. 2019). Moreover, the district court's conclusion that section 702 cannot apply to "claims . . . premised on sex and sexual orientation discrimination," 704 F. Supp. 3d at 1135, would preclude the exemption from applying to any sex discrimination claim arising under *Bostock,* notwithstanding the Supreme Court's assurance to the contrary.

In short, the district court's interpretation of section 702, which contradicts the exemption's plain text, finds no support in *Pacific Press* or *Fremont Christian.*

### III. The WLAD religious nonprofit exemption protects employment actions that are based on an employee's alignment with the organization's religion.

The plain text of the WLAD religious nonprofit exemption clearly and expressly exempts nonprofit religious organizations like World Vision entirely from WLAD's scope. RCW 49.60.040(11). But the district court

adopted a much narrower interpretation, holding the exemption "applies only to discrimination claims brought by employees who fall under the First Amendment's ministerial exception." 704 F. Supp. 3d at 1135.[3] This interpretation misreads the Washington Supreme Court's decision in *Woods* and fails to apply the overarching reasonable grounds test required by *Woods* (and other Washington cases) when determining the scope of the exemption in particular circumstances. Faithfully applying the required test, it is clear that the First Amendment provides more than sufficient reasonable grounds for applying the exemption to World Vision and other religious nonprofits that require religious alignment on the part of their employees. Accordingly, this Court should reverse the district court's narrow interpretation of the WLAD exemption and, in so doing, provide clarity about how the First Amendment informs the statutory exemption's application. *See Seattle Pacific University v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024) ("[W]e have the authority to

---

[3] *Amici* agree with World Vision that the position Ms. McMahon sought is covered by the ministerial exception, but WLAD's religious nonprofit exemption applies to World Vision's employment action regardless of whether the ministerial exception applies.

address the constitutionality of [WLAD] as applied to [religious employers].").

## A. The district court failed to determine if there are reasonable grounds for the exemption to apply in this case (beyond the ministerial exception) as required under Washington law.

In *Woods*, the Washington Supreme Court framed the issue presented as whether the Washington legislature had a "reasonable basis" for providing an exemption from WLAD for religious nonprofit employers such that its application would not violate the privileges and immunities clause in Washington's state constitution. 481 P.3d at 1062. The reasonable grounds test was first recognized in 2002 and has been applied by the Washington Supreme Court in privileges-and-immunities cases since that time. *See, e.g.*, *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 475 P.3d 164 (Wash. 2020); *Ockletree*, 317 P.3d at 1014. In holding that "reasonable grounds exist" to support the *facial* constitutionality of the religious exemption, the *Woods* court noted that the Washington constitution affords "greater protection" for the religious liberty rights of religious organizations than the First Amendment does. *Id.* at 1066–67.

It is true that when the court turned to Mr. Woods' *as-applied* challenge, the court limited its reasonable grounds analysis to the

29

ministerial exception. But this was just because the ministerial exception was the reasonable grounds offered by the employer in defense of its employment action. *Id.* at 1063 ("SUGM now argues that [the religious] exemption applies to its hiring decisions because its employees are expected to minister to their clients.").

Importantly, the court declined to hold that the ministerial exception provides "a fair and useful approach" for balancing the relevant competing interests in all cases, *id.* at 1070, and "d[id] not opine on the effect of this decision on *every* prospective employee seeking work with any religious nonprofit." *Id.* at 1065 n.2. Indeed, the majority even cited the U.S. Supreme Court's opinion in *Amos*, a non-ministerial-exception case, as supporting the reasonable grounds for upholding WLAD's religious exemption against a facial challenge. *Id.* at 1067.

As the *Woods* court recognized, the gravamen is determining "whether reasonable grounds exist to support a constitutional application" of the religious nonprofit organization exemption to a particular employment action. *Id.* at 1067. The district court erred in purporting to apply *Woods* without independently conducting this reasonable grounds analysis.

B.    **The First Amendment protections of religious exercise, autonomy, and expression provide reasonable grounds for the exemption to apply to the employment by religious organizations of individuals who align with their religion.**

In addition to the fact that *Woods* expressly did not engraft a ministerial exception limitation into the WLAD religious nonprofit exemption in every case, both Washington Supreme Court precedent and recent developments in First Amendment jurisprudence dictate that such a limitation is inappropriate here. To the extent *Woods* held that the application of the exemption would be reasonable *only if* the ministerial exception applied, the case is an anomaly.

For example, in *Ockletree*, a case involving an employee who was part of a protected class but whose role did not involve religious practice, the lead opinion held that the religious exemption "satisfies the reasonable ground test because it . . . accommodates the broad protections to religious freedom afforded by" Washington's free exercise clause and the federal First Amendment. 317 P.3d at 1018 (citing *Amos*, 483 U.S. at 336). The controlling concurrence held that application of the exemption was unreasonable only on the assumption that "there is *no relationship* between [the employee's] duties and religion or religious practices." *Id.* at 1028 (emphasis added). Because of the way religious organizations like

*amici* view their work and structure their communities (see Section I, *supra*), there will be very few situations where their employees' duties have "no relationship" with religion or religious practices. In other words, a majority of the justices in *Ockletree* recognized that reasonable grounds exist to support the exemption's application beyond the ministerial exception. The *Woods* court's as-applied holding did not disturb this consensus.

Recent cases recognizing the expansive religious liberty protections for religious organizations further undermine the notion that only the ministerial exception can provide reasonable grounds for applying WLAD's religious organization exemption to employment actions based on the employee's alignment with the organization's religion. The broad First Amendment protections for religious exercise, religious autonomy, and expressive association discussed in Section I and below each provide reasonable grounds for applying the exemption in such cases—including this one.

 *i.* *Free exercise*

First, there is a strong basis for the position that failing to exempt from WLAD World Vision's employment action in this case would violate

the Free Exercise Clause. In applying the Free Exercise Clause, the Supreme Court has adopted a general rule that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Employment Division v. Smith*, 494 U.S. 872 (1990)). However, "[a] law *failing to satisfy these requirements* must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531–32 (emphasis added).

Applying this framework, there is no doubt WLAD's restrictions would burden the religious exercise of World Vision and similar religious organizations. The very existence of the religious organization exemption evinces such burden, since alleviating the burden is the reason for the exemption. Requiring a religious organization like World Vision to employ individuals who reject the organization's religious beliefs substantially burdens such organization's religious exercise as a faith community. As Judge Kleinfeld put it: "If the government coerced staffing of religious institutions by persons who rejected or even were hostile to

33

the religions the institutions were intended to advance, then the shield against discrimination would destroy the freedom of Americans to practice their religions." *Spencer*, 633 F.3d at 742.

Relatedly, limiting WLAD's exemption to positions that are sufficiently religious (e.g., "ministerial") would impose an additional burden on religious exercise. In *Amos*, the Court noted that "Congress' purpose in [extending the 702 exemption beyond religious activities] was to minimize governmental interference with the decision-making process in religions." 483 U.S. at 336 (cleaned up). The Court further observed that "[t]he line [between religious and secular activities] is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." *Id*. Thus, the Court concluded that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Id*.

In post-*Woods* cases, courts have emphasized the strict and comprehensive requirements for general applicability and religious neutrality. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Fellowship of Christian Athletes v. San Jose Unified School*

*District*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (collecting cases). *Accord Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1731 (2018) ("The Free Exercise Clause bars even subtle departures from neutrality on matters of religion.") (internal quotation omitted). For example, in *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), the Supreme Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." The Court further stated that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

Absent a robust religious exemption that protects all religion-based employment practices, WLAD would fail *Tandon*'s general applicability standard because, among other reasons, it includes a blanket exemption for employers with less than eight employees. RCW 49.60.040(11). As a result of this broad exemption, small secular employers in Washington can discriminate *on any basis* when making *any employment decisions* under WLAD. A law that asserts a greater interest in eliminating

discrimination in employment decisions of religious organizations than in those of small employers is not generally applicable.

### ii. Religious autonomy

Laws that substantially burden a religious organization's free exercise rights often also violate the religious autonomy doctrine. For example, the Court has applied the doctrine to a law that "interferes with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. WLAD's employment restrictions constitute exactly this type of interference. Similarly, this Court previously rejected an interpretation of the 702 exemption that would have required examination of the religiosity of World Vision's own activities on the grounds that "[t]he Supreme Court . . . has repeatedly cautioned courts against venturing into this constitutional minefield." *Spencer*, 633 F.3d at 730 (O'Scannlain, J., concurring). The religious autonomy rights recognized in *Hosanna-Tabor* (and discussed in Section I, *supra*) are not subject to any competing governmental interests. *Hosanna-Tabor*, 565 U.S. at 190.

### iii. Expressive association

Finally, as *Dale* demonstrates, the First Amendment's protection of expressive association provides independent reasonable grounds for applying the WLAD religious organization exemption in this case. The district court's attempts at distinguishing *Dale* are inapposite. The "[m]ost critical[]" distinction drawn by the district court is that the plaintiff in *Dale* was a volunteer, not an employee. 704 F. Supp. 3d at 1144. But this is a distinction without a difference. Nowhere in *Dale* did the Supreme Court rely on the fact that Mr. Dale was a volunteer. Contrary to the district court's assertion, the reasoning in *Dale* makes it apparent that an organization's expressive association interests are generally stronger in the case of an employee versus a volunteer. It was the "forced inclusion" and "presence" of the gay rights activist as a member that the Court highlighted as creating the significant burden on the Boy Scouts. 530 U.S. at 648. An employee is almost always going to be included to a much greater degree and present at a much higher frequency and for a longer duration than a volunteer, making the burden only more severe.

*iv.*     *Strict scrutiny of governmental interests*

Laws subject to strict scrutiny under the First Amendment are unlikely to survive. The Court has emphasized that the Free Exercise strict scrutiny test must be rigorous:

> A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "interests of the highest order" and must be narrowly tailored in pursuit of those interests.

*Lukumi*, 508 U.S. at 546 (citations omitted).

Those seeking to apply state statutes in a manner that burdens religious exercise may argue that any applicable legislative interest is compelling, and that exempting persons whose religious exercise is burdened will materially impair such interest. But the two parts of the strict scrutiny test push against each other, such that it is difficult to maintain that a law is narrowly tailored where the asserted interest is stated broadly. Accordingly, courts must "look beyond broadly formulated interests to scrutinize the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing the law" in the particular case. *Burwell v. Hobby Lobby*, 573 U.S. at 726–27 (cleaned up). As a result, many broadly-

38

asserted important interests have had to yield to religious liberty rights under strict scrutiny, including protecting public health during a pandemic (*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)), enforcing federal drug laws (*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006)), and protecting personnel in federal buildings (*Tagore v. United States*, 735 F.3d 324, 330–31 (5th Cir. 2013)). In addition, the strict scrutiny burden cannot be satisfied with mere speculation, but instead must be supported by evidence. *Larson v. Valente*, 456 U.S. 228, 249 (1982).

Although it might be argued that Washington's broad interests in reducing employment discrimination are compelling, there is no reason to think the state's marginal interest in applying WLAD to World Vision's religious employment standards is also compelling. Such a position is even less tenable when taking into account the Supreme Court's assurance in *Bostock*—the case expanding Title VII's protection in the context of human sexuality—that the case would not force religious employers to "violate their religious convictions." 140 S. Ct. at 1753–54.

In sum, the First Amendment's protections for religious exercise, autonomy, and expression—individually and collectively—provide

straightforward reasonable grounds for applying WLAD's religious exemption to organizations like World Vision and *amici* with respect to their employment of individuals who align with their religion, regardless of whether the ministerial exception also applies.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court reverse the district court's flawed summary judgment order.

Respectfully submitted,

/s/ John Melcon
John Melcon
Taylor Huse
Stuart Lark
SHERMAN & HOWARD L.L.C.
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO 80903
(719) 475-2440
jmelcon@shermanhoward.com
thuse@shermanhoward.com
slark@shermanhoward.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2024, the foregoing document was filed electronically through the Court's AMCS system. I certify that all participants in the case who are registered AMCS users will be served by the appellate AMCS system.

Date: August 28, 2024

/s/ John Melcon
John Melcon
*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3259

I am the attorney or self-represented party.

**This brief contains** 7,453 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/John T. Melcon **Date** 08/28/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*