No. 24-3259

# United States Court of Appeals for the Ninth Circuit

WORLD VISION, INC.,

Defendant-Appellant,

v.

AUBRY MCMAHON,

Plaintiff-Appellee.

Appeal from the United States District Court
for the Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

## BRIEF OF THE ETHICS AND PUBLIC POLICY CENTER AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT

Rachel N. Morrison
Eric N. Kniffin
ETHICS AND PUBLIC POLICY CENTER
1730 M Street, N.W. Suite 910
Washington, DC 20036
(202) 682-1200
rmorrison@eppc.org

Michael B. Buschbacher
Austin Lipari
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
mbuschbacher@boydengray.com

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................ iii

INTEREST OF *AMICUS CURIAE* ................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................... 1

ARGUMENT .................................................................................. 4

I.    THE FIRST AMENDMENT WAS DESIGNED TO END GOVERNMENT
      INTERFERENCE WITH RELIGIOUS INSTITUTIONS. .................................. 4

II.   THE FIRST AMENDMENT PROHIBITS JUDICIAL SECOND-GUESSING OF
      WORLD VISION'S DECISION NOT TO HIRE PLAINTIFF. ......................... 8

III.  FIRST AMENDMENT PRINCIPLES ALSO SUPPORT A BROAD READING OF
      TITLE VII'S PROTECTION OF RELIGIOUS HIRING DECISIONS. ............ 14

CONCLUSION ............................................................................. 18

# TABLE OF AUTHORITIES

CASES                                               **Page(s)**

*Behrend v. S.F. Zen Ctr., Inc.,*
108 F.4th 765 (9th Cir. 2024) ........................................ 15, 16

*Bryce v. Episcopal Church in the Diocese of Colo.,*
289 F.3d 648 (10th Cir. 2002) ............................................... 10

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,*
483 U.S. 327 (1987) ............................................................... 18

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,*
450 F.3d 130 (3d Cir. 2006) ................................................... 19

*EEOC v. Mississippi Coll.,*
626 F.2d 477 (5th Cir. 1980) ................................................. 19

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
882 F.3d 655 (7th Cir. 2018) ................................................. 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 565 U.S. 171 (2012) ................................................ 11

*McMahon v. World Vision, Inc.,*
704 F. Supp. 3d 1121 (W.D. Wash. 2023) .............. 5, 12, 13, 14, 16, 17

*Our Lady of Guadalupe Sch. v. Morissey-Berru,*
591 U.S. 732 (2020) ......................................... 7, 8, 9, 10, 11, 12, 13, 14

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich,*
426 U.S. 696 (1976) ............................................................... 10

*Spencer v. World Vision, Inc.,*
570 F. Supp. 2d 1279 (W.D. Wash. 2008), *aff'd*, 619 F.3d 1109 (9th Cir. 2010), *and aff'd*, 633 F.3d 723 (9th Cir. 2011) (en banc) ...................................................................... 18

iii

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
    41 F.4th 931 (7th Cir. 2022) .................................................. 17, 19, 20

*Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981) ............................................................. 18

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) .............................................. 10

**STATUTES**

42 U.S.C. § 2000e-1(a) ............................................................. 19

42 U.S.C. § 2000e(j) ............................................................. 19, 20

Act of Toleration of 1689, 1 W. & M., ch. 18 .............................. 7

**OTHER AUTHORITIES**

EEOC, *Section 12: Religious Discrimination* (Jan. 15, 2021) ................ 17

John Locke, *A Letter Concerning Toleration* (Bennett ed.
    2010) (1689) ..................................................................... 7

Jonathan Mayhew, *Observations on the Charter and
    Conduct of the Society for the Propagation of the Gospel in
    Foreign Parts* (1763) .......................................................... 8

Kevin Pybas, *Disestablishment in the Louisiana and
    Missouri Territories*, in *Disestablishment and Religious
    Dissent: Church-State Relations in the New American
    States 1776-1833* (Esbeck & Hartog eds., 2019) ....................... 9

Letter from James Madison to John Carroll (Nov. 20, 1806) .................. 9

Michael W. McConnell, *Establishment and Disestablishment
    of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ....................... 8

St. Joseph's Abbey, *We Live by the Work of Our Hands* & *Our
    Day* ............................................................................... 14

iv

## INTEREST OF *AMICUS CURIAE*[1]

The Ethics and Public Policy Center is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics, including on matters of church autonomy and religious liberty.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Personnel, as the saying goes, is policy. And many religious organizations' policy includes far more than just worship or belief—it also involves working in the world to serve God by serving one's neighbors. We're all familiar with this. Whether it's a Mormon neighbor who helps someone move, a Catholic hospital providing low-cost medical care to the poor, or a group that works to apply Christian wisdom to contemporary politics, the world is full of religious individuals and organizations that

---

[1] Counsel for *amicus curiae* states pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amicus curiae* or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Rule 29(a)(2).

seek to improve the world not because of some vague altruism, but because they believe that this is what God requires of them. It should be unsurprising, then, that many religious organizations reserve "outward facing" positions for those who adhere to and personify the organization's beliefs and way of life.

World Vision is one such organization. It is a "Christian ministry dedicated to sharing the gospel of Jesus Christ" through "humanitarian outreach to children and families around the world who are poor and underserved." 1-ER-8 (quoting 3-ER-438 ¶18). Consistent with this commitment, World Vision hires only those who adhere to its Christian beliefs and agree to live their lives in accordance with its religious standards of conduct.

This case is about a job applicant who represented—falsely—that she agreed with World Vision's beliefs and would live in accordance with those standards, including its beliefs and standards reflecting its traditional Christian understanding of marriage as a covenant between a man and a woman. World Vision relied on the applicant's representations and offered her the job, only for her to reveal that she was living in a same-sex marriage, contradicting the Christian beliefs she had just affirmed

2

during the interview process. Unsurprisingly, World Vision rescinded the employment offer. Rejection in hand, the failed applicant then brought this suit, alleging that World Vision violated Title VII and Washington state law.

This court should reverse the district court's denial of World Vision's motion for summary judgment. As World Vision aptly puts it, "The question in this case is simple but significant: May religious ministries ask their employees to comply with their core religious teachings? The answer is yes." Opening Br. at 1. As we explain below, the Constitution respects the "separate sphere" of religious authorities, and ensures that they may conduct their own affairs without state interference.

To be sure, the district court purported to acknowledge the Constitution's religious autonomy protections, but it nevertheless denied World Vision the protection of the First Amendment's "ministerial exception" because it decided that "a significant majority" of the position's responsibilities were "secular in nature," while the religious duties were "limited" to such apparently insignificant tasks as "[p]ersonify[ing] the ministry of World Vision by witnessing to Christ and ministering to others through

3

life, deed, word and sign" and "help[ing] carry out [World Vision's] mission, vision, and strategies." *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1139 (W.D. Wash. 2023).

This was wrong. The constitutional guarantee that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" protects the freedom of religious organizations to follow their faiths, including with respect to the people who will "personify" those beliefs, free from federal courts' second-guessing.

\* \* \*

World Vision's brief well explains the lower court's errors under existing case law. *Amicus curiae* offers this brief to provide additional context about the history and scope of the First Amendment's church autonomy protections in the employment context.

## ARGUMENT

## I. The First Amendment Was Designed to End Government Interference with Religious Institutions.

Today it is easy to take for granted the remarkable sea change that the First Amendment inaugurated with respect to the autonomy of religious institutions to govern religious matters without state interference.

4

But this was not always the case. Thus, as the Supreme Court demonstrated in *Hosanna-Tabor* and *Our Lady of Guadalupe*, to apply the First Amendment properly, courts must consider that amendment's text against its historic backdrop.

Western history is full of controversy and turmoil relating to who, precisely, determines religious orthodoxy. For many centuries, the answer many advanced was that it should be resolved by the state. This was particularly true in England following the Protestant Reformation, where, in response to the (actual and perceived) foreign influence of the Roman Catholic Church on English politics, Parliament passed the Act of Supremacy of 1534, 26 Hen. VIII, ch. 1, declaring the King to be the "supreme head of the Church of England."

Vesting supreme secular and religious power in the person of the monarch was designed—at least in part—to settle the disputes of the day and to achieve peace. In reality, however, it had the opposite effect, culminating in the 1642 English Civil War and its aftermath. *See Our Lady of Guadalupe Sch. v. Morissey-Berru*, 591 U.S. 732, 748–49 (2020) (quoting Act of Uniformity of 1662, 14 Cha. II, ch. 4).

5

Looking back on this bloodshed, some, like John Locke, asked if such a close union of political and religious authority might after all be corrosive to both. *See* John Locke, *A Letter Concerning Toleration* 3 (Bennett ed. 2010) (1689). But while these arguments led to some reforms, *see* Act of Toleration of 1689, 1 W. & M., ch. 18, many Protestant non-conformists and Roman Catholics in England and its colonies nevertheless remained subject to state interference with church government. It was in this context that the Pilgrims, and later the Puritans, fled England in search of religious liberty.

But even the Puritans were often wary of religious freedom for Anglicans and others. Puritan minister Jonathan Mayhew, for example, vehemently protested the mere residence of an Anglican missionary in Puritan Cambridge, Massachusetts, in 1763, accusing him of a "formal design to root out Presbyterianism" and of seeking to "establish[ ] both Episcopacy and Bishops in the colonies," complete with religious tests and persecution of Puritans. Jonathan Mayhew, *Observations on the Charter and Conduct of the Society for the Propagation of the Gospel in Foreign Parts* 103 (1763), *available at* https://tinyurl.com/5n75ctzd. And, consistent with this, colonial governments routinely interfered in matters

of church doctrine, governance, and personnel. Michael W. McConnell, *Establishment and Disestablishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131 (2003).

With their experience of this history, many leaders of "the founding generation sought to prevent a repetition of these practices in our country," *Our Lady*, 591 U.S. at 748, by setting a new and firmer boundary: the First Amendment's categorical prohibition on federal laws "respecting an establishment of religion, or prohibiting the free exercise thereof," *id.* at 746 (quoting U.S. Const. amend. I). And while many during the founding era debated the merits of state (as opposed to federal) support of favored religious institutions, virtually all rejected claims of "governmental control over the character and teachings" of any church. McConnell, *supra*, at 2133; *see also* Letter from James Madison to John Carroll (Nov. 20, 1806), *available at* https://founders.archives.gov/documents/Madison/99-01-02-1094 (refusing to opine on "the selection of [religious] functionaries" on the ground that such decisions are "entirely ecclesiastical"); Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-*

*State Relations in the New American States 1776–1833*, at 273, 281 (Esbeck & Hartog eds., 2019).

\*

Unlike the decision below, early federal practice well understood the autonomy of religious organizations in their decisions about "theological controversy, church discipline, ecclesiastical government, [and] the conformity of members" to required standards. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871).

## II. The First Amendment Prohibits Judicial Second-Guessing of World Vision's Decision Not To Hire Plaintiff.

The cases that have explicated the principles of church autonomy since the time of the founding likewise establish that the First Amendment broadly safeguards religious institutions' right to govern their own internal affairs whenever their actions are "based on religious doctrine." *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–60 & n.2 (10th Cir. 2002). Thus, as the Supreme Court recently explained, the First Amendment "protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government.'" *Our Lady*, 591 U.S. at 737 (quoting *Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

8

The courts have long recognized the autonomy of Christian churches with respect to the appointment of bishops and ordination of clergy. *See Watson*, 80 U.S. (13 Wall.) at 726–29; *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 712–21, 724–25 (1976) ("[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government[.]… When this choice is exercised … the Constitution requires that civil courts accept their decisions as binding upon them."); This principle has become known as the "ministerial exception." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012).

Of course, "many religious traditions do not use the title 'minister'" for its leaders or eschew hierarchy altogether. *Our Lady*, 591 U.S. at 752; *see also Hosanna-Tabor,* 565 U.S. at 198–99 (Alito, J., concurring) ("The term 'minister' is commonly used by many Protestant denominations to refer to members of their clergy, but the term is rarely if ever used in this way by Catholics, Jews, Muslims, Hindus, or Buddhists."). Lest the adjective "ministerial" mislead, the Supreme Court held in *Our Lady* that

restricting the ministerial exception only to those "thought to be the counterparts of a 'minister,' such as priests, nuns, rabbis, and imams" did not properly reflect the scope of the First Amendment's protections. 591 U.S. at 752. Some religions, like Judaism, have "an extensive breadth of … functionaries" who perform equivalent tasks to ministers, while others, like Islam, have a theological objection to the very inquiry into the equivalency between their religious leaders and ministers. *Id.* at 752–53 (noting that "the equality of all believers" is a "central pillar of Islam" that may be violated if one compares imams to Christian ministers). Consequently, the Court emphasized that how the religious employer understood the employee to be "playing a vital part in carrying out the mission of the church" is central to the inquiry. *Id.* at 757. The court must "take all relevant circumstances into account and … determine whether each particular position implicated the fundamental purpose of the exception." *Id.* at 758.

The court below did not heed the Supreme Court's instruction. Instead, it treated the job description as a kind of rubric or checklist, focusing on what the *court* deemed to be the "secular" aspects of the role and concluding that the plaintiff's prayer and service "responsibilities" were

insufficient to trigger the ministerial exception's protections because "praying with donors was not a job requirement" as "the failure to do so did not subject a customer service representative to discipline or termination." *McMahon, Inc.*, 704 F. Supp. 3d at 1138. This two-dimensional assessment is indistinguishable from the approach of the two-justice dissent in *Our Lady*. That dissent likewise "treated the circumstances … found relevant in [*Hosanna-Tabor*] as checklist items to be assessed and weighed against each other in every case," "[i]nsisting" on certain requirements like "minister[ing] to the faithful" or "leadership." *Our Lady*, 591 U.S. at 757, 758 n.26. But the *Hosanna-Tabor* factors "are not inflexible requirements and may have far less significance in some cases." 591 U.S. at 753.

To be sure, the district court concluded with a purported "holistic view" of the situation, but this just repeated the same errors, providing a surface-level examination of the terms used in the job description by comparing the relative frequency of "secular" words to "religious" words. *McMahon*, 704 F. Supp. 3d at 1139. Having sorted the job description's words, the court then tallied them, concluding that "a significant majority" of the role's requirements were "secular in nature" because they were

11

described using phrases like "placing and answering" calls with church donors, "describing" activities of the church, and "maintaining attendance." *Id.*

This was a category error. What matters is not whether the actions are of a sort that, viewed in isolation, a non-religious person might do them. Rather, what matters is whether the actions are part and parcel of the organization's religious mission. And on this point the job description could hardly be clearer: World Vision's public-facing representatives must "[p]ersonify the ministry of World Vision by witnessing to Christ and ministering to others." *Id.*

Classifying certain activities as non-religious in that larger context commits the error that the court in *Our Lady* warned against. Following this logic, a Trappist monk—a religious brother who does not have leadership responsibilities and is not seeking ordination to the "ministerial" priesthood—could be deemed outside the ministerial exception because the majority of his daily work consists of ordinary labor like making fruit preserves and arranging for their sale at grocery stores. Trappist Monks of St. Joseph's Abbey, *We Live by the Work of Our Hands* & *Our Day*, https://spencerabbey.org/we-live-by-the-work-of-our-hands/ (last visited

Aug. 28, 2024). That is not what *Our Lady* requires. Indeed, the plaintiff in that case spent "the vast majority of class" teaching secular subjects and her employment duties were "almost exclusively secular." *Our Lady*, 591 U.S. at 781–82 (Sotomayor, J., dissenting).

Since the district court issued its decision, the Ninth Circuit has applied the principles set out in *Our Lady* to hold that an employee who performed mostly "maintenance, kitchen, and guest services" at a Buddhist temple fell under the ministerial exception. *Behrend v. S.F. Zen Ctr., Inc.*, 108 F.4th 765, 770 (9th Cir. 2024). Though the employee at issue "performed mostly menial work," the court barred his employment claim against the temple because labor itself was an "essential component of Zen training and is indistinguishable from other forms of practice." *Id.* at 769. Contrary to the decision below, *Behrend* makes clear that the ministerial exception sweeps broadly, encompassing a range of duties and facets of religious practice that may appear secular to unfamiliar eyes, but in reality reflects integral aspects of a religious undertaking.

It is thus irrelevant that the job at issue here bears the title of "customer service representative," *see* 3-ER-530, or that some of the work resembles what such a role might be at a secular organization. What counts

is that the position serves as the "Voice, Face, and Heart" of World Vision's Christian ministry. *See* 4-ER-897. This importance to World Vision's mission stems from the job's central task—engaging World Vision's supporters, sponsors, and donors. World Vision viewed this outreach as inviting individuals to share in its ministry and bring about the Christian "[t]ransformation of [its] donors," a task "vital to World Vision." *McMahon*, 704 F. Supp. 3d at 1138. This is enough to qualify for the ministerial exception. Because "the purpose of the exception is to ensure a religious organization's independence in matters of faith, doctrine, and government, surely it applies just as readily to those who perform vital, but not necessarily hierarchical, functions." *Behrend*, 108 F.4th at 770.

## III. First Amendment Principles Also Support a Broad Reading of Title VII's Protection of Religious Hiring Decisions.

The constitutional principles discussed above are sufficient to decide this case, but they also underscore why the district court's reading of Title VII is wrong. In the decision below, the district court applied Ninth Circuit case law holding that "Title VII's religious employer exemption offers qualifying employers immunity only from religious discrimination claims." *McMahon*, 704 F. Supp. 3d at 1134 (citing *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366) (9th Cir. 1986)). Even

14

though the district court recognized that World Vision rescinded the plaintiff's employment offer because of "its sincerely held religious belief that marriage is a Biblical covenant between a man and a woman," *id.* at 1124, the court nevertheless concluded that the plaintiff's claims "are premised on sex and sexual orientation discrimination—not religious discrimination," as if decisions related to sex and sexual orientation somehow cannot be religious, *id.* at 1135; *cf.* EEOC, *Section 12: Religious Discrimination* (Jan. 15, 2021) ("However, sections 702(a) and 703(e)(2) allow a qualifying religious organization to assert as a defense to a Title VII claim of discrimination or retaliation that it made the challenged employment decision on the basis of religion." (footnote omitted)), *available at* https://tinyurl.com/3kztk27t. The district court's internally inconsistent discussion shows the wisdom of the church autonomy doctrine and the ministerial exception that flows from it. Given the facts of this case, "how could one distinguish religious discrimination from sex discrimination"? *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J., concurring). "Firing people who have same-sex partners is sex discrimination.… But it is also religious

discrimination." *Id.* That World Vision's "adherence" to its religious beliefs about marriage "produces a form of sex discrimination does not make the action less religiously based." *Id.*

As other circuits have recognized, drawing a secular-religious line in this context is both "incredibly difficult" and "impermissibl[e]" because it "entangles the government with religion." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018). As the Supreme Court has often recognized, the "determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task." *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). Because "[t]he line is hardly a bright one," a religious organization "might understandably be concerned that a judge would not understand its religious tenets and sense of mission." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987). Asking a religious organization "to predict which of its activities a secular court will consider religious" therefore places "a significant burden on" it. *Id.* And because "determining whether an activity is religious

or secular requires a searching case-by-case analysis," the result is "considerable ongoing government entanglement in religious affairs." *Id.* at 343 (Brennan, J., concurring in the judgment).

Title VII's religious exemption, however, was meant "to prevent excessive government entanglement." *Spencer v. World Vision, Inc.*, 570 F. Supp. 2d 1279, 1283 (W.D. Wash. 2008), *aff'd*, 619 F.3d 1109 (9th Cir. 2010), *and aff'd*, 633 F.3d 723 (9th Cir. 2011) (en banc). And this Court should read it through that lens. Several of this Court's sister circuits interpret Title VII as Judge Easterbrook does in his *Starkey* concurrence, holding that religious organizations' employment decisions based on an individual's religious belief, observance, or practice is exempt from Title VII. *See, e.g.*, *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485–86 (5th Cir. 1980) (barring a sex-discrimination investigation under Title VII where a religious employer "applied its policy of preferring Baptists over non-Baptists"); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006) (religious exemption bars sex-discrimination claims). Such an approach eliminates the constitutionally suspect approach the lower court employed when it classified the recission of the

17

plaintiff's job offer as sex discrimination rather than religious discrimination.

This approach would more faithfully apply the text of Title VII. Title VII does not apply to "a religious corporation … [or] educational institution … with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). And "[a]ny temptation to limit this exception to authorizing the employment of co-religionists … is squelched by the definitional clause in § 2000e(j)," providing that "religion" includes "'*all* aspects of religious observance and practice, as well as belief.'" *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) (quoting 42 U.S.C. § 2000e(j)) (emphasis added). Thus, no matter what Title VII may require in secular contexts, it ensures that World Vision "is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word." *Id.*

Properly interpreting the religious employer exemption would avoid the constitutionally prohibited step of reclassifying World Vision's action as sex discrimination rather than religious discrimination.

## CONCLUSION

The Court should reverse the judgment below.

18

August 28, 2024                    Respectfully submitted,

_Michael B. Buschbacher_
Michael B. Buschbacher
Austin Lipari
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
mbuschbacher@boydengray.com

Rachel N. Morrison
Eric N. Kniffin
ETHICS AND PUBLIC POLICY CENTER
1730 M Street, N.W. Suite 910
Washington, DC 20036
(202) 682-1200
rmorrison@eppc.org


*Counsel for Amicus Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*Michael B. Buschbacher*
Michael B. Buschbacher

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief of *amicus curiae* complies with Federal Rule of Appellate Procedure 29(a)(5) because it has 3,468 words, excluding those parts of the brief exempted by Rule 32(f).

*Michael B. Buschbacher*
Michael B. Buschbacher