**Case No. 24-3108**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

AZADEH KHATIBI, *et al.*,

*Plaintiffs – Appellants,*

v.

RANDY HAWKINS, *et al.*,

*Defendants – Appellees.*

---

Appeal from the United States District Court for the
Central District of California (Almadani, J.)
2:23-cv-06195-MRA-E

---

## BRIEF OF *AMICUS CURIAE* ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Andrew L. Schlafly, Esq.
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
aschlafly@aol.com

Counsel for *Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amicus* Association of American Physicians and Surgeons (AAPS) is a nonprofit corporation having its principal place of business in Tucson, Arizona. It is not a wholly owned subsidiary of any corporation. It does not have any stock and thus no corporate or publicly held entity owns more than 10% of its stock.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ............................................................. ii

Table of Contents ................................................................................... iii

Table of Authorities ...............................................................................iv

Identity, Interest and Authority to File ................................................... 1

Summary of Argument ............................................................................2

Argument.................................................................................................5

I.     The Decision Below Must Be Reversed to Protect Academic
       Freedom ........................................................................................5

II.    Educational Indoctrination by Government Is Contrary to a
       Democratic Society........................................................................9

III.   Constitutionally Sound Alternative Approaches Exist, and the
       District Court Erroneously Held that No Level of Scrutiny
       Should Apply ...............................................................................15

Conclusion ............................................................................................20

Certificate of Compliance .....................................................................20

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                           **Pages**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..................................................................13, 14, 15

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .........................................17

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ...................................................7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................1

*Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000) ....................12, 13

*In re Amendment of Supreme Court Rule SCR 20:8.4*, No. 22-02, 2023 Wisc.
LEXIS 166 (July 11, 2023)....................................................................19

*Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ....5, 6

*Khatibi v. Hawkins*, No. 2:23-cv-06195-MRA-E, 2024 U.S. Dist. LEXIS 81485
(C.D. Cal. May 2, 2024) ......................................................................2

*Parate v. Isibor*, 868 F.2d 821 (6th Cir. 1989) ........................................8

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*,
641 F. Supp. 3d 1218 (N.D. Fla. 2022), *stay of the injunction denied
on appeal*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591
(11th Cir. Mar. 16, 2023)....................................................................18

*Rust v. Sullivan*, 500 U.S. 173 (1991)......................................................14

*Shelton v. Tucker*, 364 U.S. 479 (1960) ...................................................5

*Springer v. Henry*, 435 F.3d 268 (3d Cir. 2006).......................................1

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ....................................6

*Trump v. Anderson*, 601 U.S. 100 (2024)..........................................12, 17

*United States Term Limits v. Thornton*, 514 U.S. 779 (1995)................................17

*Valfer v. Evanston Nw. Healthcare*, 2016 IL 119220, 402 Ill. Dec. 398,
52 N.E.3d 319 (2016) .........................................................................1

**Constitution, Statutes and Rules**

U.S. CONST. amend. I ....................................... 3, 4, 5, 6, 8, 9, 12, 13, 14, 15, 16, 19

Cal. Bus. & Prof. Code § 2190.1(d)(1)................................................2, 19

Cal. Bus. & Prof. Code § 2190.1(e)...................................................2, 19

FED. R. APP. P. 29(a)(4)(E) ...............................................................1

American Bar Association Model Rule 8.4(g) .......................................18

**Other Authorities**

"China's new patriotic education law: The law is being viewed as an attempt
to solidify the Party's version of history and limit critical thinking"
(Oct. 27, 2023)
https://www.deccanherald.com/world/explained-chinas-new-
patriotic-education-law-2743573......................................................11

"Indoctrinating Youth," *Holocaust Encyclopedia*, The United States Holocaust
Memorial Museum
https://encyclopedia.ushmm.org/content/en/article/indoctrinating-youth..........10

Oral argument transcript, *Trump v. Anderson*, Sup. Ct. No. 23-719
(Feb. 8, 2024)
https://www.supremecourt.gov/oral_arguments/argument_transcripts/
2023/23-719_5he6.pdf ............................................................... 16-17

George Orwell, *1984* (1961) .................................................................18

Robert C. Post, "Subsidized Speech," 106 Yale L.J. 151 (1996)...........................16

Stanford Center for Continuing Medical Education
https://med.stanford.edu/cme.html ........................................................................7

University of California San Francisco, Medical Education, School of
Medicine, Continuing Education
https://meded.ucsf.edu/continuing-education .....................................................7

Eugene Volokh, "Court Strikes Down Pennsylvania Lawyer Speech Code,"
*Volokh Conspiracy* (Mar. 24, 2022)
https://reason.com/volokh/2022/03/24/court-strikes-down-pennsylvania-
lawyer-speech-code/ ..........................................................................................19

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Association of American Physicians and Surgeons ("AAPS") is a non-profit corporation founded in 1943. AAPS defends the practice of private and ethical medicine, and the U.S. Supreme Court has made use of *amicus* briefs submitted by AAPS in high-profile cases. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 704 (2008) (Breyer, J., dissenting). The U.S. Court of Appeals for the Third Circuit cited an *amicus* brief by AAPS in the first paragraph of one of its decisions. *See Springer v. Henry*, 435 F.3d 268, 271 (3d Cir. 2006). The Illinois Supreme Court also addressed an AAPS *amicus* brief. *See Valfer v. Evanston Nw. Healthcare*, 2016 IL 119220, ¶ 33, 402 Ill. Dec. 398, 408, 52 N.E.3d 319, 329 (2016) (discussing an *amicus* brief which was filed by AAPS).

Now-deceased Appellant-Plaintiff Marilyn Singleton, M.D., J.D., was a truly remarkable person, educator, physician, attorney, and podcaster, who was at the pinnacle of both the medical and legal fields. She was a past-president of AAPS. As an African American longtime resident of California, Dr. Singleton strongly opposed this California speech mandate and alerted us to this case. Dr. Singleton's

---

[1] All of the parties have consented, through their counsel, to the filing of this brief by *Amicus* AAPS. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: no counsel for a party authored this brief in any respect; and no party, party's counsel, person or entity – other than *Amicus*, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

untimely passing was mourned in both the medical and legal professions. She leaves us with a record of inspiration and achievement that will inspire many students and practitioners in these professions for years into the future.

AAPS itself provides CME-accredited conferences and seminars to physicians, and has done so in California and to physicians licensed and practicing in California. AAPS, and its member physicians, will be affected by this appeal, and AAPS thereby has direct and vital interests in the issues presented here.

## SUMMARY OF ARGUMENT

California AB 241 was enacted in 2019 to mandate that "[o]n and after January 1, 2022, all continuing medical education [CME] courses shall contain curriculum that includes the understanding of implicit bias." Cal. Bus. & Prof. Code § 2190.1(d)(1). All CME courses must thereby include:

> "[e]xamples of how implicit bias affects perceptions and treatment decisions of physicians and surgeons, leading to disparities in health outcomes," and/or "[s]trategies to address how unintended biases in decisionmaking may contribute to health care disparities by shaping behavior and producing differences in medical treatment along lines of race, ethnicity, gender identity, sexual orientation, age, socioeconomic status, or other characteristics."

*Id.* § 2190.1(e). The district court upheld these requirements based on its finding that CME courses constitute "government speech." *Khatibi v. Hawkins*, No. 2:23-cv-06195-MRA-E, 2024 U.S. Dist. LEXIS 81485, at *14 (C.D. Cal. May 2, 2024).

2

Coursework accredited for continuing medical education is akin to lectures by university professors, for whom speech compelled by government would be an unconstitutional infringement on academic freedom. General curriculum requirements for schools, particularly elementary and secondary schools, are not analogous to a mandate on higher education that an instructor include, as part of coursework for adults who are themselves professionals, statements with which that instructor disagrees. Academic freedom would be lost by allowing this mandate, and the First Amendment stands firmly against imposing control on the spoken word in higher education. *See* U.S. CONST. amend. I.

The district court failed to address this elephant in the room, and instead erroneously dismissed this case as though it were a mere challenge to a curriculum requirement in secondary school. This case is plainly far more than that, implicating a fundamental tenet of higher education on which our freedom and prosperity are based. Professional-level instructors should not be required to teach something with which they disagree. Educators should not be forced to become puppets, in all courses, for espousing a government viewpoint against their own consciences. Not even during the troubled period of the Cold War in the 1950s in California, when loyalty oaths were imposed by California and enforced against its state university professors, was anyone actually compelled to teach something with which he or she

disagreed. Yet under the decision below, a state could compel speech by instructors on a variety of controversial topics, and in all of their CME courses.

If the decision below is upheld, then other states might accept this invitation and start requiring ideological instruction of their own on controversial topics ranging from illegal immigration to abortion to foreign policy. After all, if continuing education courses are stripped of First Amendment protection, then red states like Idaho and Montana could require that all continuing legal and medical education courses include statements about harm from illegal immigration. The issue of abortion is part of the legislative agenda in many states, and under the district court ruling there could be new requirements for all continuing education in law and medicine to teach about harm caused by abortion. Even statements about foreign policy, such as policies concerning the Middle East, could likewise be mandated by California legislators under the standard adopted by district court. An endless, disastrous slippery slope would be created by the decision below, if affirmed.

Education should not become a pawn for political struggles; freedom of speech should not be allowed to become a casualty. Totalitarian foreign regimes, past and current, have imposed mandates on their educational systems yet that is not a path allowed by controlling precedents here. Instructors, particularly at the level where the students are themselves adults, should not be forced to teach something with which they disagree.

## ARGUMENT

### I.     The Decision Below Must Be Reversed to Protect Academic Freedom.

The First Amendment fully protects academic freedom, as repeatedly held by the U.S. Supreme Court. Yet the ruling below drives a stake through the heart of this fundamental protection, by declaring that the government can coerce speech by instructors in classes provided to adults, without any application of the First Amendment. The district court did not allow for any judicial scrutiny of this compelled speech, thereby giving governments carte blanche to compel educators' speech. Reversal is essential to restore academic freedom.

As Justice William Brennan wrote on behalf of the U.S. Supreme Court:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

*Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). Justice Brennan added, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection." 385 U.S. at 603 (inner quotations omitted).

The *Keyishian* decision struck down a state law requiring university instructors to certify that they were not members of the Communist Party. While that is slightly different from compelling an instructor to teach something with which he disagrees, the rationale and force of the Court's decision left no room for doubt as to the broad scope and depth of academic freedom. Compelled speech of instructors in higher education is contrary to the First Amendment.

Similarly, as Chief Justice Earl Warren previously explained while writing for a plurality of the Supreme Court in another case:

> We believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression – areas in which government should be extremely reticent to tread.
>
> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. … Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 249-50 (1957).

The term "unquestionably" is a strong one used by Chief Justice Warren to emphasize that academic freedom is broad and robust, and not to be undermined in any way. Chief Justice Warren rejected the foregoing infringement on academic freedom, which arose in the context of a contempt ruling against a professor for

refusing to answer questions concerning his knowledge of the Progressive Party or members in that organization.

Less than a decade after Chief Justice Warren's decision, the Supreme Court rendered another ringing endorsement of the robustness of academic freedom:

> Since the ground we find dispositive immediately affects the professors and other state employees required to take the oath, and the interests of the students at the University in academic freedom are fully protected by a judgment in favor of the teaching personnel, we have no occasion to pass on the standing of the students to bring this suit.

*Baggett v. Bullitt*, 377 U.S. 360, 366 n.5 (1964).

Universities are closely aligned with CME programs in California, and elsewhere. This Court can take judicial notice of the Stanford Center for Continuing Medical Education, which describes itself as "[a] global leader in the promotion of lifelong learning among professionals in healthcare."[2] Stanford represents that it has 71,119 physicians in connection with its program. Similarly, there is a UCSF Office of Continuing Medical Education (CME) at the prestigious University of California at San Francisco medical school, which "offers educational opportunities for physicians, advanced practice professionals, pharmacists, dentists, and allied health care professionals to improve their practices through a comprehensive selection of continuing education activities."[3]

---

[2] https://med.stanford.edu/cme.html (viewed Aug. 23, 2024).
[3] https://meded.ucsf.edu/continuing-education (viewed Aug. 23, 2024).

The scope of academic freedom is not limited to tenured college professors. "If the speech of a nontenured professor is compelled by a university administrator, then the professor is not without redress for this violation of her constitutional rights." *Parate v. Isibor*, 868 F.2d 821, 828 (6th Cir. 1989). Such speech is being unlawfully compelled of CME instructors here, many of whom are comparable in academic status to a nontenured or tenured college professor. Plaintiff-Appellant Azadeh Khatibi, M.D., is an ophthalmologist in Los Angeles having training and scholarly work comparable to that of college professors, and thus must be protected by academic freedom in her teachings.

The notion that government could compel these university professors to teach something in which they did not personally believe is antithetical to the fundamental liberties on which America and the First Amendment are based. Courts have long, and in a variety of ways, rejected mandates by the government as to what people must say. Yet the essence of the decision below is to allow this.

While instructors may not have a right to teach CME courses, they do have a right not to be excluded from teaching these courses based on political disagreements. The existence or extent of implicit bias is, at least in part, a political issue. Campaigns for elected political office are sometimes based on assertions and disputes about bias, and references to Diversity, Equity and Inclusion (DEI). Mandating speech about this quasi-political issue is akin to mandating that a

8

professional include in his presentation praise for a political party or a political movement. The First Amendment surely stands against such mandates.

Yet the reasoning and holding of the decision below allow for no limits on what the government could mandate in the future in CME and other presentations, because once they are categorized as "government speech" then no First Amendment protections apply. The slippery slope embraced by the district court would allow government to require, as part of this supposedly government speech, effusive praise for government itself in how it has handled a particular issue, or how it handles all issues.

Professors and other professionals at comparable levels of scholarship teach continuing education courses, in both medicine and law. Compelling them to teach material in which they do not believe, or even vehemently disagree, is an infringement on academic freedom inconsistent with the above holdings by the U.S. Supreme Court.

## II. Educational Indoctrination by Government Is Contrary to a Democratic Society.

The precedent of allowing a government to mandate ideological statements in every course is contrary to a democratic society. An appellate ruling that mandated course instruction is government speech outside the scope of the First Amendment

protections would be a very dangerous precedent that could open the door to harmful ideologically motivated mandates, as has tragically occurred in other countries.

The *Holocaust Encyclopedia* explains that:

> Education in the Third Reich served to indoctrinate students with the National Socialist world view. Nazi scholars and educators glorified Nordic and other "Aryan" races, while labeling Jews and other so-called inferior peoples as parasitic "bastard races" incapable of creating culture or civilization.

"Indoctrinating Youth," *Holocaust Encyclopedia*, The United States Holocaust Memorial Museum.[4] One of the pointed questions insightfully asked by this Museum at the end of this entry is, "Has the government of your country ever participated in a similar effort? What was the result?" *Id.* The answer for the United States to this first question should remain "no", such that societal harm queried by the second question never occurs here.

A current example of a similar speech mandate is a law that became effective this year in the People's Republic of China, which now requires teaching patriotism:

> The law's focus on instilling patriotism by incorporating the Party's ideologies into the curriculum raises concerns about the independence of educational institutions and their ability to foster critical thinking. It's seen as part of a broader effort to assert control over the education system, limiting outside influences and shaping young minds to align with the Party's agenda.

---

[4] https://encyclopedia.ushmm.org/content/en/article/indoctrinating-youth (viewed Aug. 21, 2024).

"China's new patriotic education law: The law is being viewed as an attempt to solidify the Party's version of history and limit critical thinking" (Oct. 27, 2023).[5] Widespread criticism of this law refers to it as "historical nihilism." *Id.*

To be fair, California has not imposed any ideology similar to the above heinous propaganda that was imposed in Germany, or what China has recently done. But the Rule of Law at issue in this appeal is whether this Court should adopt a standard of "government speech" that forces instructors to kowtow to an ideology despite their disagreement with it. No one is objecting here to California granting accreditation to specific courses that teach implicit bias. The objection here is to a judicial standard of review that allows California to require that *every* CME course contain certain ideological material, contrary to the beliefs and views of some instructors.

Balkanization could easily result from adoption of the standard used below, such that so-called red states within the Ninth Circuit such as Idaho and Montana could retaliate with offsetting speech mandates of their own. They could also enact laws prohibiting adherence to California's CME mandate, and then it would be impossible to have multi-state CME-accredited courses as are commonly available now for the convenience of all. As discussed further in Point III below, under the

---

[5] https://www.deccanherald.com/world/explained-chinas-new-patriotic-education-law-2743573 (viewed Aug. 24, 2024).

district court standard many states could impose, with impunity, all sorts of ideological requirements for *all* CME courses accredited in their states. This would push states further apart from each other, at a time when divisiveness among states is already an enormous, growing problem. *See, e.g.*, *Trump v. Anderson*, 601 U.S. 100, 116-17 (2024) (discussed *infra*).

Government should never be allowed to become a puppeteer that can force citizens to repeat, teach, or be taught, an ideology or point-of-view. It may begin innocuously, but an ill-advised legal rule would then remain in effect as the mandates turn from innocent to harmful and divisive. If government is allowed to compel speech by educators, or to compel listening to California's favored speech, particularly if judicial review is erased, then this would allow erasure of fundamental First Amendment rights.

This case is nothing like a dispute between a teacher and a public high school as to recognition of Gay and Lesbian Awareness Month. *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000). The *Downs* decision was unrelated to academic freedom or what is taught in a classroom. Instead, it concerned whether a teacher in a public high school had a constitutional right to outspokenly object, within the school and on its property, to its recognition of Gay and Lesbian Awareness Month. This Court held that the school could prevent a cacophony of statements on its own bulletin boards:

We hold that when the school district speaks through bulletin boards that are not "free speech zones," but instead are vehicles for conveying a message from the school district, the school district may formulate that message without the constraint of viewpoint neutrality. Here, LAUSD, an arm of local government, is firmly policing the boundaries of its own message. As such, LAUSD did not violate Downs's First Amendment free speech rights. Because we determine that Downs has no First Amendment right to speak for the government, his equal protection claim based upon the deprivation of this asserted right also fails to withstand summary judgment.

*Id.* at 1016-17.

The Appellants-Plaintiffs and private universities in California that offer CME-accredited courses, such as Stanford, are not "an arm of … government." Moreover, no one compelled the teacher who was plaintiff in *Downs* to teach something with which he disagreed, as California is mandating CME instructors do now. Neither *Downs* nor any other precedent genuinely supports California's CME mandate at issue here.

The decision below conflicts with a Supreme Court precedent on the related issue of impermissible government-compelled speech. An ostensibly reasonable requirement of a government program to combat HIV/AIDS included a condition that "no funds may be used by an organization 'that does not have a policy explicitly opposing prostitution and sex trafficking.'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208 (2013) (quoting 22 U.S.C. §7631(f)). Like the issue of California compelling the teaching of implicit bias in all CME courses, the federal government's requirement that recipient organizations explicitly oppose

13

prostitution and sex trafficking seems uncontroversial and a salutary position to require.

Yet the U.S. Supreme Court struck down this requirement under the First Amendment. As with the teaching of a CME course, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev.*, 570 U.S. at 214. But that option does not salvage a condition on participation when there is a requirement "that funding recipients adopt—as their own—the Government's view on an issue of public concern," such that the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id.* at 218 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Where, as here, the government "[r]equirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program," then it violates the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 221.

The California CME requirement has the same constitutional infirmity. *Amicus* AAPS commonly posts its CME-accredited lectures for viewing by the public online, as do some other CME-accredited providers. By its nature statements by CME instructors cannot be confined within the CME program, but extend to the far corners of the internet as soundbites and video clips. The statements can be used

14

against CME instructors by political opponents, legislators in judicial confirmation hearings, and millions of internet trolls. Compelling someone to make a statement with which he does not agree, or which is irrelevant to the presentation being made by him, runs afoul of the First Amendment protections established in *Agency for Int'l Dev.*

### III. Constitutionally Sound Alternative Approaches Exist, and the District Court Erroneously Held that No Level of Scrutiny Should Apply.

The district court erroneously held that *no* level of scrutiny of any type should apply, because as government speech its mandate is beyond the reach of the First Amendment. This standard of non-scrutiny adopted by the district court is particularly inappropriate in light of how constitutionally sound alternative approaches to mandate training in implicit bias are available.

The result from the standard adopted below is for government to have a new power to compel speech by people, without a rational or compelling justification. It is as though government mandated that people salute whenever they enter a particular government building, and a court upheld that as government speech immune from First Amendment challenge.

As explained by Professor Robert C. Post of the School of Law, University of California, Berkeley:

> The First Amendment is surely implicated whenever the state seeks to proscribe the flow of information qua information. Although there is at

15

present no well-developed doctrine setting forth the exact test to be used to evaluate viewpoint discriminatory regulations of this type in the context of professional speech, it would be fair to say that the First Amendment should at a minimum require that any such restriction *have a substantial justification*.

Robert C. Post, "Subsidized Speech," 106 Yale L.J. 151, 175 (1996) (emphasis added).

The district court did not merely uphold coursework mandated by the government, and did not merely uphold compelled speech in the sensitive context of education. The district court went further than that: it adopted a standard of review that prevents any meaningful judicial scrutiny of this type of mandate. This is the equivalent of giving a blank check to the government to impose ideologies through education.

Chief Justice John Roberts is one of many who are increasingly concerned about a fracturing or tit-for-tat battle erupting among the States on hot-button issues. After the Colorado Supreme Court excluded Trump from its ballot, on its appeal to the Supreme Court, Chief Justice Roberts expressed grave concern at oral argument that Republican-dominated states would retaliate if this were allowed. *Trump v. Anderson* (Sup. Ct. No. 23-719, Tr. 84:9-14) (Chief Justice Roberts: "Counsel, what do you do with the … plain consequences of your position? …

16

[S]urely, there will be disqualification proceedings on the other side, and some of those will succeed.").[6]

Chief Justice Roberts then assigned to himself the writing of the majority opinion, where he emphasized:

> The "patchwork" that would likely result from state enforcement [of ballot access for federal offices] would "sever the direct link that the Framers found so critical between the National Government and the people of the United States" as a whole. *U. S. Term Limits*, 514 U. S., at 822 …. But in a Presidential election "the impact of the votes cast in each State is affected by the votes cast"—or, in this case, the votes not allowed to be cast—"for the various candidates in other States." *Anderson*, 460 U. S., at 795 …. An evolving electoral map could dramatically change the behavior of voters, parties, and States across the country, in different ways and at different times. ***The disruption would be all the more acute***—and could nullify the votes of millions and change the election result—if Section 3 enforcement were attempted after the Nation has voted. ***Nothing in the Constitution requires that we endure such chaos***—arriving at any time or different times, up to and perhaps beyond the Inauguration.

*Trump v. Anderson*, 601 U.S. 100, 116-17 (2024) (emphasis added, additional string citations omitted). Chief Justice Roberts then pointedly and unusually added, "All nine Members of the Court agree with that result." *Id.*

Indeed, Florida has already gone in the direction opposite to California, and a district court there expressed dismay while quoting *1984*:

> "It was a bright cold day in April, and the clocks were striking thirteen," and the powers in charge of Florida's public university system have declared the State has unfettered authority to muzzle its professors in the name of

---

[6] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-719_5he6.pdf (viewed Aug. 27, 2024).

"freedom." To confront certain viewpoints that offend the powers that be, the State of Florida passed the so-called "Stop W.O.K.E." Act in 2022—redubbed (in line with the State's doublespeak) the "Individual Freedom Act." The law officially bans professors from expressing disfavored viewpoints in university classrooms while permitting unfettered expression of the opposite viewpoints. Defendants argue that, under this Act, professors enjoy "academic freedom" so long as they express only those viewpoints of which the State approves. This is positively dystopian.

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.,* 641 F. Supp. 3d 1218, 1229-30 (N.D. Fla. 2022) (the first quotation is from George Orwell, *1984* at 1 (1961), footnotes omitted), *stay of the injunction denied on appeal*, Nos. 22-13992-J, 22-13994-J, 2023 U.S. App. LEXIS 6591 (11th Cir. Mar. 16, 2023).

But the Florida statute merely prohibited certain speech in classrooms, without compelling teachers to instruct contrary to their beliefs as the California CME mandate does. Instructors are not vassals of any government, and never should be forced to become mouthpieces of an ideology favored by a particular government. Compelling political statements by teachers of any kind is inconsistent with a free society. As part of their training and often throughout their careers, physicians are sometimes taking care all night of people of every conceivable kind, to the very best of their abilities, and forcing them to hear about implicit bias in every CME course is unjustified as well as being unconstitutional.

The Wisconsin Supreme Court rejected a proposal to incorporate into the Wisconsin professional rules American Bar Association Model Rule 8.4(g):

It is professional misconduct for a lawyer to ... (g) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law. …

In concurrence, Justice Rebecca Grassl Bradley explained her view of why this rule should be rejected, which was objected to by commentators as a "lawyer speech code." *In re Amendment of Supreme Court Rule SCR 20:8.4*, No. 22-02, 2023 Wisc. LEXIS 166, at *2 (July 11, 2023) (Bradley, J., concurring) (quoting Eugene Volokh, *Court Strikes Down Pennsylvania Lawyer Speech Code*, Volokh Conspiracy (Mar. 24, 2022)).[7] Justice Bradley pointed that the harmful effect could be, *inter alia*, to "chill protected speech, and weaponize the rules of professional conduct. Prudence counsels caution in the face of these possibly unavoidable but perhaps unintended consequences." *Id.* at *3 (Bradley, J., concurring).

The "unintended consequences" are severe of California compelling all CME instructors to include a certain ideology in all of their courses. Based on the First Amendment, this Court should invalidate Cal. Bus. & Prof. Code § 2190.1(d)(1) & (e).

---

[7] https://reason.com/volokh/2022/03/24/court-strikes-down-pennsylvania-lawyer-speech-code/ (viewed Aug. 29, 2024).

19

## CONCLUSION

For the foregoing reasons and those set forth by Appellants-Plaintiffs,

*Amicus* AAPS respectfully requests that the decision below be entirely reversed.

Dated:  August 29, 2024        Respectfully submitted,

        /s/ Andrew L. Schlafly

        Andrew L. Schlafly
        Attorney at Law
        939 Old Chester Rd.
        Far Hills, NJ 07931
        Phone:  (908) 719-8608
        Fax:  (908) 934-9207
        Email: aschlafly@aol.com

        *Counsel for Amicus Curiae Association of*
        *American Physicians and Surgeons*

## CERTIFICATE OF COMPLIANCE

1. This brief has been prepared using Times New Roman 14-point,

proportionately spaced, serif typeface, in Microsoft Word.

2. This brief complies with FED. R. APP. P. 29(a)(5) and Ninth Circuit Rule

32-1 because it contains a total of 4,574 words, excluding material not counted

under Rule 32(f).

Dated:  August 29, 2024

        /s/ Andrew L. Schlafly
        Andrew L. Schlafly