No. 24-3259

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### WORLD VISION, INC.,

Defendant – Appellant,

v.

### AUBRY MCMAHON,

Plaintiff – Appellee.

On Appeal from the United States District Court for the
Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

### BRIEF OF APPELLEE

Michael C. Subit, WSBA No. 29189
FRANK FREED SUBIT & THOMAS LLP
Email: msubit@frankfreed.com
705 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: (206) 682-6711

Casimir Wolnowski, NYBA No. 4688826
NISAR LAW GROUP, P.C.
Email: cwolnowski@nisarlaw.com
One Grand Central Place
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (646) 889-1007

*Counsel for Appellee McMahon*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii-ix

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION .....................................................................2

STATEMENT OF THE CASE ..............................................................................2

    A. Statement of Facts .....................................................................................2

    B. Procedural History .....................................................................................7

SUMMARY OF ARGUMENT ............................................................................8

ARGUMENT........................................................................................................9

  I.    BECAUSE WV RESCINDED McMAHON'S JOB OFFER PURSUANT TO A FACIALLY DISCRIMINATORY EMPLOYMENT POLICY, THE CHURCH AUTONOMY DOCTRINE DOES NOT BAR HER CLAIMS. ...9

  II.   WV FAILED TO PROVE THAT CUSTOMER SERVICE REPRESENTATIVES FALL WITHIN THE FIRST AMENDMENT MINISTERIAL EXCEPTION ..................................................................17

    A. The *Hosanna-Tabor* Factors Show McMahon Was Not Hired to Be a Minister ...............................................................................................20

    B. McMahon Would Not Have Performed Ministerial Duties as a Customer Service Representative ..........................................................................22

        1. The Customer Service Representative Position was "at Bottom" a Secular One ......................................................................................22

        2. The Religious Requirements of the Customer Service Representative Job were the Same as for All WV Employees ..................................24

i

3.  Praying with Donors was not a Job Requirement of the Customer Service Representative Position ........................................................29

C.  Other Cases Applying the Ministerial Exception Demonstrate It is Inapposite Here .........................................................................33

D.  A Ruling in WV's Favor Would Eliminate Discrimination Law for Many Employees of Religious Organizations ...................................40

III.  NEITHER THE TITLE VII NOR THE WLAD RELIGIOUS EMPLOYER EXEMPTION BARS McMAHON'S CLAIMS .........................................42

IV.  WV CANNOT ESTABLISH A BFOQ DEFENSE UNDER TITLE VII OR THE WLAD ...............................................................................44

V.  THE RIGHTS OF EXPRESSIVE ASSOCIATION AND FREE EXERCISE OF RELIGION DO NOT IMMUNIZE WV FROM STATUTORY PROHIBITIONS ON EMPLOYMENT DISCRIMINATION ...................47

A.  There is No Expressive Association Defense to McMahon's Employment Discrimination Claims ............................................................47

B.  Title VII and the WLAD are Not Subject to Strict Scrutiny Because they are at Least Neutral with Respect to Religion and Generally Applicable ...............................................................53

CONCLUSION ..................................................................58

CERTIFICATE OF COMPLIANCE ........................................................

CERTIFICATE OF SERVICE................................................................

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023)....................................................................51

*Alcazar v. Corp. of the Catholic Archbishop of Seattle*,
627 F.3d 1288, 1292 (9th Cir. 2010) (en banc) ...........................36

*Alicea-Hernandez v. Catholic Bishop of Chicago*,
320 F.3d 698 (7th Cir. 2003) ..............................................38, 39

*American Friends Serv. Comm. Corp. v. Thornburgh*,
951 F.2d 957 (9th Cir. 1991) .......................................................53

*Aparicio v. Christian Union, Inc.*,
No. 18-cv-592 (ALC), 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019)..........11

*Bates v. UPS, Inc.*,
511 F.3d 974 (9th Cir. 2007) .......................................................30

*Bear Creek Bible Church v. EEOC*,
571 F. Supp. 3d 571 (N.D. Tex. 2021) *aff'd in part, vacated in part, and rev'd in part*, sub nom *Braidwood Mgmt. Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023)..........................................................................48

*Behrend v. San Francisco Zen Center, Inc.*,
108 F.4th 765 (9th Cir. 2024) .............................................*passim*

*Billard v. Charlotte Catholic High Sch.*,
101 F.4th 316 (4th Cir. 2024) ............................. 19, 34, 35, 42, 47

*Bostock v. Clayton Cnty., GA*,
590 U.S. 644 (2020)...............................................................12, 43

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000).............................................................51, 52

iii

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    121 F. Supp. 2d 1327 (D. Colo. 2000) ..........................................................14

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F.3d 648 (10th Cir. 2002) ....................................................................14

*Busey v. Richland Sch. Dist.*,
    172 F. Supp. 3d 1167 (E.D. Wash. 2016) ....................................................17

*Butler v. St. Stanislaus Kostka Academy*,
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) ............................ 10, 14, 15, 22, 32, 35

*Califano v. Roman Catholic Diocese of Rockville Cntr., NY*,
    No. 24-cv 0436(AMD)(JMW), 2024 WL 4276170
    (E.D.N.Y. Sept. 24, 2024) ....................................................................15, 20

*Chambers v. Omaha Girls Club, Inc.*,
    834 F.2d 697 (8th Cir 1987) ......................................................................46

*Conlon v. Intervarsity Christian Fellowship/USA*,
    777 F.3d 829 (6th Cir. 2015) ......................................................................21

*Darren v. Patterson Christian Acad. v. Roy*,
    699 F. Supp. 3d 1163 (D. Colo. 2023) ........................................................11

*DeMarco v. Holy Cross High Sch.*,
    4 F.3d 166 (2d Cir. 1993) .............................................................. 12, 13, 15

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ..................................................................................51

*Dothard v. Rawlinson*,
    433 U.S. 321 (1977) ..................................................................................44

*EEOC v. Fremont Christian Sch.*,
    781 F.2d 1362 (9th Cir. 1986) ................................................ 42, 43, 50, 57

*EEOC v. Kamehameha Schs./Bishop Est.*,
    990 F.2d 458 (9th Cir. 1993) ..............................................................45, 46, 47

iv

*EEOC v. Pac. Press Pub. Ass'n.*,
    676 F.2d 1272 (9th Cir. 1982) ....................................................42

*EEOC v. Roman Catholic Diocese of Raliegh, N.C.*,
    213 F.3d 795 (4th Cir. 2000) ......................................................37

*EEOC v. Townley Eng. & Mfg. Co.*,
    859 F.2d 610 (9th Cir. 1988) ......................................................42

*Emp. Div., Dep't of Hum. Res. v. Smith*,
    494 U.S. 872 (1990).................................................... 53, 55, 57

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*,
    82 F.4th 664 (9th Cir. 2023) (en banc)....................................55, 56

*Fitzgerald v. Roncalli High School, Inc.*,
    73 F.4th 529 (7th Cir. 2023) ..............................................*passim*

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976).................................................................51

*Frank v. United Airlines, Inc.*,
    216 F.3d 845 (9th Cir. 2000) ................................................ 10, 44

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)........................................... 53, 54, 55, 56

*Garcia v. Salvation Army*,
    918 F.3d 997 (9th Cir. 2019) ....................................................43

*Garrick v. Moody Bible Inst.*,
    412 F. Supp. 3d 859 (N.D Ill. 2019) ..........................................15

*Gordon Coll. v. DeWeese Boyd*,
    142 S. Ct. 952 (2022)................................................ 34, 35, 41

*Green v. Miss United States of Am.*,
    52 F.4th 773 (9th Cir. 2022) ....................................................48

*Groff v. DeJoy*,
    600 U.S. 447 (2023)..................................................................54

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*,
    882 F.3d 655 (7th Cir. 2018) ...............................................31, 32

*Healey v. Southwood Psychiatric Hosp.*,
    78 F.3d 128 (3d Cir. 1996) .........................................................10

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984)..............................................................48, 50

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
    565 U.S. 171 (2012)...........................................................*passim*

*Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am., UAW v.
Johnson Controls, Inc.*,
    499 U.S. 187 (1991)........................................................ 10, 44, 45

*Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*,
    591 U.S. 657 (2020)...................................................................53

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991) .......................................................11

*Loving v. Virginia*,
    388 U.S. 1 (1967)........................................................................2

*McCollum v. Cal. Dep't Corrections & Rehab.*,
    647 F.3d 870 (9th Cir. 2011)......................................................46

*McKennon v. Nashville Banner Pub. Co.*,
    513 U.S. 352 (1995)...................................................................16

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) .....................................................43

*Moore v. Hadestown Broadway LLC*,
    No. 23-CV-4837(LAP), 2024 WL 989843
    (S.D.N.Y. March 7, 2024) .........................................................51

*NLRB v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979)........................................................................13

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)........................................................................51

*Opara v. Yellen*,
    57 F.4th 709 (9th Cir. 2023) ..........................................................9

*Orr v. Christian Bros. High Sch., Inc.*,
    No. 21-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021)........................34

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020)...............................................................*passim*

*Palmer v. Liberty Univ., Inc.*,
    72 F.4th 52 (4th Cir. 2023) ...........................................19, 33, 41

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017) .........................................11, 12

*Ratliff v. Wycliffe Assocs., Inc.*,
    No. 6:22-cv-1185-PGB-RMN,2023 WL 3688082
    (M.D. Fla. May 26, 2023) ............................................20, 39, 40

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)................................................................48, 52

*Seattle Pac. Univ. v. Ferguson*,
    104 F.4th 50 (9th Cir. 2024) .......................................19, 43

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*,
    363 F.3d 299 (4th Cir. 2004) .......................................................38

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023)..........................................49, 50, 51

*Spencer v. World Vision, Inc.*,
       570 F. Supp. 2d 1279, 1288 (W.D. Wash. 2008),
       *aff'd*, 633 F.3d 723 (9th Cir. 2011) (per curiam) ...................... 25, 26, 32, 42

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
       496 F. Supp. 3d 1195 (S.D. Ind. 2020) ("Starkey I") ...........................*passim*

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
       41 F.4th 931 (7th Cir. 2022) ("Starkey II") ...........................................31, 35

*Sterlinski v. Catholic Bishop of Chicago*,
       934 F.3d 568 (7th Cir. 2019) ...............................................................37, 38

*Stormans, Inc., v. Selecky*,
       586 F.3d 1109 (9th Cir. 2009) ...................................................................54

*Sullivan v. Univ. of WA*,
       60 F.4th 574 (9th Cir. 2023) ......................................................................50

*Tandon v. Newsom*,
       593 U.S. 61 (2021) (per curiam) ...............................................................56

*Trotter v. United Lutheran Seminary*,
       20-570, 2021 WL 3271233 (E.D. Pa. July 30, 2021) ...........................19, 20

*Tucker v. Faith Bible Chapel Int'l*,
       36 F.4th 1021 (10th Cir. 2022) .................................................................41

*Vigars v. Valley Christian Ctr. of Dublin, CA*,
       805 F. Supp. 802 (N.D. Cal. 1992) ...........................................................54

*Werft v. Desert Sw. Annual Conf. of United Methodist Church*,
       377 F.3d 1099 (9th Cir. 2004) ...................................................................43

*Wis. v. Mitchell*,
       508 U.S. 476 (1993) .......................................................................48, 50, 54

*Your 71FiveMinistries v. Williams*,
       24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024). ................................56

## State Cases

*DeWeese-Boyd v. Gordon Coll.*,
  487 Mass. 31, 163 N.E.3d 1000 (2021),
  *cert. denied*, 142 S. Ct. 952 (2022)......................................................40, 41

*Hegwine v. Longview Fibre Co.*,
  162 Wn.2d 340, 172 P.3d 688 (2007) ...........................................................45

*Int'l Union of Operating Eng'rs v. Port of Seattle*,
  176 Wn.2d 712, 295 P.3d 736 (2013) ...........................................................57

*Kumar v. Gate Gourmet Inc.*,
  180 Wn.2d 481, 325 P.3d 193 (2014) ...........................................................54

*State v. Arlene's Flowers, Inc.*,
  193 Wn.2d 469, 441 P.3d 1203 (2019) ..........................................................57

## Federal Statutes

28 U.S.C. § 2403............................................................................................47

Fair Labor Standards Act of 1938 ......................................................... 23, 38

42 U.S.C. § 2000e-1.................................................................................42, 54

42 U.S.C. § 2000e-2........................................................................................44

## State Statutes & Regulations

N.Y. Labor Law § 203-e ("Boss Bill") .....................................................49

Wash. Admin. Code § 162-16-240 .........................................................44

## INTRODUCTION

Appellant World Vision, Inc. ("WV"), rescinded Appellee Aubrey McMahon's job offer as a customer service representative solely because it had learned she was in a same-sex marriage. The district court ruled WV had unlawfully refused to hire McMahon pursuant to a facially discriminatory policy prohibiting employees from engaging in sexual activity outside of heterosexual marriage. The district court rejected the contention that the Constitution and federal and state law immunize WV's discriminatory employment practices. Faithfully applying U.S. Supreme Court and Ninth Circuit precedent, the district court held McMahon was not a "minister" within the meaning of the First Amendment and her claims are not barred by the Church Autonomy Doctrine, the rights to free exercise of religion, expressive association, or free speech, or any statutory affirmative defenses/exemptions.

The U.S. Supreme Court has never suggested that religious employers are immune from federal and state laws prohibiting workplace discrimination. Congress and the courts have carefully balanced the right of employees to equal treatment in the workplace against the right of religious employers to self-determination. WV and its amici ask this Court to upset that balance by giving religious employers carte blanche to discriminate. They stretch the ministerial exception beyond recognition. Their church autonomy, free exercise, expressive association, and statutory

1

exemption/affirmative defense arguments are contrary to precedent.[1] All the purported justifications for WV's alleged legal right not to employ individuals in same-sex marriages apply equally to people in mixed-race marriages:

> Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows he did not intend the races to mix.

*Loving v. Virginia*, 388 U.S. 1, 3 (1967) (quoting trial court decision). This Court should affirm the district court.

## STATEMENT OF JURISDICTION

Appellee agrees with Appellant's Jurisdictional Statement.

## STATEMENT OF THE CASE

### A.    Statement of Facts

In November 2020, McMahon saw on Indeed.com a job posting for the position of WV "Customer Service Representative." 2-ER-136. The position paid $13-$15 per hour plus benefits. 4-ER-838. Customer service representatives were part of a "call center" but worked remotely from home. *Id.* The job posting lists the following "Required Experience": "High school/GED or equivalent. Basic routine work experience. Prefer a minimum of 1 year of previous customer service/sales work experience. Must have access to a reliable, high speed internet connection." *Id.*

---

[1] WV does not challenge the district court's Free Speech Clause ruling. 1-ER-50-51.

2

The "**You bring**" section of the posting adds the following:

· The ability to multi-task in a fast pace [*sic*] environment

· Must be able to train and work 40 hours a week

· Have strong technical skills with all Microsoft Office Suite

· The ability to type 20 wpm

· Enjoys making a difference in the world!

· **Must be available to start training February 1st**

4-ER-842.

"**The Job**" section states "As a Customer Service representative, you will participate in a training program to gain a working knowledge and understanding of the position and to perform the essential functions of the job at a level that consistently meets expectations. You will learn, understand and develop the skills necessary to acquire and maintain donor relations through basic inbound and outbound calls." 4-ER-844. The posting enumerates 13 duties:

1. Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer.

2. Maintain reliable, regular attendance. Report to work on time and return from breaks and lunches on time.

3. Under supervision, learn to answer inbound customer service calls and make outbound calls, to current and potential donors in response to all media presentations and World Vision products and services. Answer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance. Recognize and respond to up-sell opportunities and actively cross-sell other WV programs when appropriate.

4. Through training and active participation, gain the skills necessary to

3

assess callers' needs and input information accurately and efficiently using data entry and ten-key skills.

5. Achieve and maintain an acceptable level of individual statistics to accomplish Call Center business goals.

6. Develop skills to utilize technology for maintaining and updating donor information as appropriate.

7. Accepts constructive feedback and welcomes instruction and direction.

8. Under supervision, research and effectively respond to inquiries utilizing a variety of resource materials and methods.

9. Learn and effectively communicate World Vision's involvement in ministries and projects around the world.

10. Work collaboratively with team members.

11. Be sensitive to Donor's needs and pray with them when appropriate.

12. Perform other duties as assigned.

13. Keep informed of organizational announcements, activities and changes via regular reading of the WVUS Intranet and other corporate communication tools.

4-ER-845.

In "**Let your work be your faith in action**," the posting states: "[W]e're looking for someone ready to place their expertise behind helping the world's most vulnerable children. Every stroke of the keyboard, shift in strategy, and innovation in our marketing of fundraising initiatives can help influence whether someone chooses to help today or not. If not you, then who?" 4-ER-841.

McMahon submitted her application and had a phone interview on December 4, 2020. 3-ER-481. During that interview WV inquired: "In this position you will be making inbound and outbound calls. Also call metrics (average handle times). Our

4

outbound calls are rapid outbound calls that you may be assigned to do all day. This is a requirement for the position. Is this something you will feel comfortable with?" 3-ER-482. She was also told: "(EXTRA BLESSINGS): In addition, there may be times when talking with a donor (i.e., depending on the type of call) where you may have to ask a donor would they like to make another donation for a specific program that we are supporting (i.e., water). That would be considered upselling and is a requirement for the position. Do you feel you are able to do this?" *Id.*

WV conveyed that "[g]reat customer service is an important part of this position." *Id.*[2] WV asked McMahon what she "would do if a customer made a request that you weren't able to accommodate" and to give an example of a time she "went above and beyond to meet/exceed a customer's expectations?" *Id.* WV also explored McMahon's computer experience and skills, her background in working with technology, her ability to learn new systems and programs, and her comfort level and experience using virtual meeting rooms. *Id.*

WV then explored McMahon's "Christian Commitment." *Id.* She was queried about her spiritual journey; God's involvement in her life; her thoughts about Jesus; and her church attendance and activities. 3-ER-483. She was asked about how she

---

[2] WV's Donor Contact Services Policies Manual refers to all employees within that department as "the **Voice, Face** and **Heart** of World Vision" because they provide customer service. 4-ER-897. The next sentence reads: "This challenge requires that each of us think of ourselves as servants; demonstrating flexibility and servicing the donor(s) with a smile." *Id.*

felt "about working in a diverse Christian environment where over 40 different Chrisitan denominations are represented." *Id.* WV described its code of employee conduct and gave as one example of unacceptable behavior "[a]ny sexual conduct outside of a marriage; (pause) WV defines marriage as between a man and woman." *Id.* McMahon was asked if she had any questions about the Standards of Conduct or WV's expectations. 3-ER-484. She replied: "No not at all." *Id.* She was asked if she was "willing and able to comply with the Standards of Conduct if employed by WV?" *Id.* She replied: "I'm aligned, yes!" *Id.*

WV made a verbal job offer to McMahon on January 4, 2021. 2-ER-336; 2-ER-352. The next day WV transmitted an offer letter signed by Talent Acquisition Partner Catherne Miolla. 3-ER-472-473. On January 5 McMahon sent Miolla the following email:

> Hey there, I just have a quick question! My wife and I are expecting our first baby in March and I wanted to see if I would qualify for any time off since I'll be a new employee? I will be the one having the baby so I just wanted to check to see if any time would be allowed off. If not, no worries, thanks so much!

3-ER-477.

WV Senior Vice-President of Human Resources Christine Talbot learned of McMahon's January 5 email. SER 4-5. Because McMahon was married to a woman, this "raised a question" for Talbot "whether or not Aubry was able to be in compliance with our required standards of conduct." SER-5. Those standards

6

"specifically name[] marriage to be a biblical covenant between a man and a woman." *Id*. Talbot concluded "if Aubry was in a same-sex marriage and unable to comply with our standards of conduct, that the job offer would, based upon our policy, need to be rescinded." SER-6. Talbot personally made the decision to retract McMahon's job offer. SER-7. The only reason WV rescinded McMahon's job offer was because she was in a same-sex marriage. 2-ER-260. When WV rescinded McMahon's job offer in January 2021, it employed approximately 60 customer service representatives out of about 900 total employees. 5-ER-1044.

**B.    Procedural History**

Appellant's Procedural History is accurate but incomplete. The district court rejected WV's argument "the court lacks jurisdiction…because this case involves a dispute regarding World Vision's understanding of the Bible and Ms. McMahon's disagreement with that understanding and such religious controversies are not the proper subject of civil court inquiry." 1-ER-85 (internal punctuation omitted).

In granting McMahon's motion for reconsideration, the district court ruled "it is undisputed that World Vision rescinded Ms. McMahon's job offer because it believed that Ms. McMahon's marriage to a woman demonstrated her inability to comply with World Vision's SOC [Standard of Conduct] prohibiting sexual conduct outside the Biblical covenant between a man and a woman." 1-ER-64 (internal punctuation omitted). The district court then concluded: "World Vision's recission

7

of Ms. McMahon's job pursuant to its Biblical marriage SOC, a facially discriminatory policy (*see supra*), constitutes unlawful sex, sexual orientation, and marital status discrimination." 1-ER-69.

## SUMMARY OF ARGUMENT

Because WV rescinded McMahon's job offer pursuant to a facially discriminatory employment policy, the district court applied neutral principles to decide this case, and the Church Autonomy Doctrine does not bar McMahon's claims. WV's assertion of a religious justification for its discriminatory employment decision does not turn this case into a dispute over religious doctrine.

The customer service representative position does not implicate the fundamental purpose of the ministerial exception. A holistic consideration of the duties of a WV customer service representative demonstrates the position was, at bottom, a secular one. The religious requirements of the position apply equally to all WV employees. All WV employees pray on the job; that customer service representatives may choose to pray with donors, if appropriate, does not bring them within the ministerial exception. An employee who is not a key religious figure does not shed her right to be free from workplace discrimination.

Forty years of Ninth Circuit law establishes the Title VII religious employer exemption bars only claims of religious discrimination. McMahon did not bring such claims. WV failed to prove that not being in a same-sex marriage was a "Bona Fide

Occupational Qualification" ("BFOQ") for the customer service representative position. There is no evidence WV's ban on hiring employees who engage in sex outside of heterosexual marriage is essential to the performance of that job.

The U.S. Supreme Court has explicitly held the constitutional right to expressive association does not provide a defense to a Title VII claim. Moreover, WV did not show that compliance with applicable federal and state laws preventing workplace discrimination based on sex, sexual orientation, and marital status severely burdens its right to expressive association.

The federal and state fair employment laws WV violated are generally applicable. They promote, rather than evince hostility towards, religion. The incidental burden that compliance with those laws has on WV's freedom of religion does not render them unconstitutional.

## ARGUMENT

### I. BECAUSE WV RESCINDED McMAHON'S JOB OFFER PURSUANT TO A FACIALLY DISCRIMINATORY EMPLOYMENT POLICY, THE CHURCH AUTONOMY DOCTRINE DOES NOT BAR HER CLAIMS

The district court initially granted summary judgment to WV based on the Church Autonomy Doctrine. Although McMahon never invoked the *McDonnell Douglas* burden shifting framework, the district court did based on *Opara v. Yellen*, 57 F.4th 709 (9th Cir. 2023). 1-ER-90-92. The district court concluded McMahon could not show WV's reason for rescinding her job offer was pretextual without

9

calling into "'question World Vision's explanation of religious doctrine, or to question how much that particular religious doctrine really mattered to World Vision.'" 1-ER-96 (quoting *Butler v. St. Stanislaus Kostka Academy*, 609 F. Supp. 3d 184, 203-04 (E.D.N.Y. 2022) (internal punctuation omitted)). "Accordingly, because the record before the court does not allow for the resolution of Ms. McMahon's claims on the basis of neutral principles of law, the Church Autonomy doctrine forecloses judicial inquiry into WV's religiously motivated personnel decision." 1-ER-97.

Upon reconsideration, the district court acknowledged it had erred by applying *McDonnell Douglas* to an adverse action pursuant to a facially discriminatory employment policy. 1-ER-66-69. In such a case, the plaintiff need not prove pretext or independently establish discriminatory intent. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199-200 (1991); *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000); 1-ER-67-69. That's because a "'gender-based [employment] policy is not a pretext for discrimination—it is per se intentional discrimination.'" *Frank*, 216 F.3d at 854 (quoting *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131 (3d Cir. 1996)). Below, both parties recognized "the court's conclusion that the Church Autonomy doctrine precludes review of Ms. McMahon's claims was premised on its application of a burden shifting framework to Ms. McMahon's

claims and its analysis of the pretext element of that framework." 1-ER-69. On reconsideration, the district court held "because Ms. McMahon can establish unlawful discrimination using neutral principles of law, the Church Autonomy Doctrine does not preclude review of her claims." 1-ER-70; see also 1-ER-55-56.

On appeal, WV does *not* claim *McDonnell Douglas* applies to a case involving a facially discriminatory employment policy. Nor does WV say the district court resolved McMahon's claims other than by using neutral principles of law. WV and its amici instead argue that applying federal and state anti-discrimination laws to the revocation of McMahon's job offer unconstitutionally interferes with WV's right to set religious qualifications for membership. Religious organizations have an unfettered right to make their internal membership decisions on religious grounds, but that principle has no application here. What WV revoked was an offer for a customer service representative job advertised on Indeed.com. Many of the cases upon which WV relies have nothing to do with judicial review of a religious organization's employment decisions. WV Br. at 33-38. *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991); *Darren v. Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023); and *Aparicio v. Christian Union, Inc.*, 18-cv-592 (ALC), 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019), do not involve the Church Autonomy Doctrine.

The district court correctly ruled the Church Autonomy Doctrine did not apply based on *Puri v. Khalsa*, 844 F.3d 1152, 1166-67 (9th Cir. 2017). 1-ER-69. *Puri* held

the Doctrine did not prevent civil adjudication of a dispute over management and control over two nonprofit religious entities. 844 F.3d at 1154, 1168. The plaintiffs in *Puri* did "not seek recourse to the civil courts for resolution of a controversy over religious doctrine," *id.* at 1167, and neither did McMahon. Like *Puri*, this dispute concerns a religious organization's *actions*, not its beliefs. *Id.* Therefore, the Church Autonomy Doctrine did not bar McMahon's claims. 1-ER-69-70.

WV asserts the district court "identified zero cases" supporting that conclusion where, as here, a religious organization made an employment decision on religious grounds. WV Br. at 39-40. WV ignores *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993). 1-ER-88-89. *DeMarco* held the Church Autonomy Doctrine does not bar statutory claims of discrimination where the employer "proffer[s] religious reasons for challenged employment actions" if a non-ministerial plaintiff can show a protected characteristic was a but-for cause of the employer's adverse action. 4 F.3d at 170-72. If the Church Autonomy Doctrine barred such a case, it would undermine Congress's decision to apply statutory discrimination laws to religious institutions other than religious discrimination. *Id.* at 172-73. The district court concluded McMahon's sex, sexual orientation, and marital status were but-for causes of WV's revocation of her job offer. 1-ER-65-66 (applying *Bostock v. Clayton Cnty., GA*, 590 U.S. 644 (2020)).

12

*DeMarco* carefully distinguished *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), a case upon which WV places substantial reliance. WV Br. at 42. *See* 4 F.3d at 169-70. In *Catholic Bishop*, "the Court focused upon the likelihood that resolution by the NLRB of improper labor practice complaints would 'necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission.'" 4 F.3d at 169 (quoting 440 U.S. at 502). *DeMarco* recognized the "important distinction between the ongoing government supervision of all aspects of employment required under labor relations statutes like the NLRA and the limited inquiry required in anti-discrimination disputes." *Id.*; *see also id.* at 170 (collecting cases). For that reason, the concerns that motivated *Catholic Bishop* do not apply to employment discrimination actions. *Id.* at 169.

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,* held that where, as here, a religious employer takes an adverse action pursuant to an employment policy that facially discriminates based on sexual orientation, the Church Autonomy Doctrine does not provide any greater protection than the ministerial exception. 496 F. Supp. 3d 1195, 1206-1207 (S.D. Ind. 2020) ("Starkey I"). In *Starkey I*, the religious entity terminated the employee "because her marriage to another woman was contrary to the teaching of the Catholic Church." *Id.* at 1205. The district court's final ruling on the Church Autonomy Doctrine is in accord with *Starkey I*.

13

*Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002), provides no support for WV's position. There, the plaintiff claimed that the defendants "subjected her to sexual harassment based on public statements which characterized homosexual activities in a harassing and humiliating manner." *Bryce v. Episcopal Church in the Diocese of Colo.*, 121 F. Supp. 2d 1327, 1339 (D. Colo. 2000). The Tenth Circuit's ruling that the Church Autonomy Doctrine barred the action was quite narrow in that it protected the church's *religious speech*: "The defendants' alleged statements fall squarely within the areas of church governance and doctrine protected by the First Amendment." 289 F.3d at 658. The other statements upon which Bryce based her claims "were part of an internal ecclesiastical dispute and dialogue protected by the First Amendment." *Id.* at 659.

Contrary to what WV asserts, the Tenth Circuit did not hold the Church Autonomy Doctrine barred Bryce's claims simply because the church had made "a personnel decision based on religious doctrine." WV Br. at 36 (selectively quoting 289 F.3d at 660). Furthermore, when *Bryce* was decided sexual orientation discrimination did not violate Title VII. WV's liability in this case is not based on its public statements against same-sex marriage but rather on its revocation of McMahon's job offer in violation of federal and state law.

*Butler v. St. Stanislaus* shows why the Church Autonomy Doctrine is inapplicable here. *Butler* invoked the Doctrine only because the plaintiff had relied

14

on the *McDonnell Douglas* burden shifting framework and claimed the employer's explanation for his termination—that he was planning to marry his boyfriend—was a *pretext* for sexual orientation discrimination. 609 F. Supp. 3d at 198, 200. The court ruled "the only way for the jury to find pretext would be to question the Church's explanation of religious doctrine, or to question how much that particular religious doctrine really mattered to the Church. To do so, however, would violate the church-autonomy principle." *Id.* at 203 (footnote omitted). *Cf. Califano v. Roman Catholic Diocese of Rockville Cntr., NY,* 24-cv-0436(AMD)(JMW), 2024 WL 4276170, at *9 (E.D.N.Y. Sept. 24, 2024) (noting that *Butler* applied the Church Autonomy Doctrine because the plaintiff questioned the reason for his termination).

In *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-872 (N.D. Ill. 2019), the district court held the Church Autonomy Doctrine precluded it from deciding the plaintiff's claim she was fired for advocating in favor of the inclusion of women in the ministry. "Garrick's disagreement with Moody's beliefs on the role of women in the ministry underlies the majority of Garrick's allegations." *Id.* at 872. McMahon's civil marriage to another woman was not tantamount to advocacy against WV's religious view on marriage. *Garrick* does not support the application of the Church Autonomy Doctrine here.

As *DeMarco*, *Starkey I*, and the district court all correctly recognized, a religious organization's assertion of a religious justification for a facially

discriminatory employment decision does not turn a case challenging that action into a dispute over religious doctrine. WV misleadingly attempts to manufacture a religious dispute between itself and McMahon by relying on statements it claims she made during her deposition in this case more than two years after WV rescinded her job offer. WV Br. at 12-14, 37-38. However, none of the views McMahon expressed during her February 24, 2023, deposition regarding Christianity and marriage were known to WV in January 2021.[3] An employer can defeat a claim of unlawful discrimination based only upon what it knew when it took the adverse action because "[t]he employer could not have been motivated by knowledge it did not have…." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995).

It is undisputed WV revoked McMahon's job offer as a customer service representative for only one reason: she told them she was in a same-sex marriage. Based on that, WV presumed she could not comply with its prohibition on sexual conduct outside heterosexual marriage, despite McMahon's commitment during her December 4, 2020, job interview that she could.[4] As the district court recognized, whether someone violates WV's policy "depends entirely on the employee's sex,

---

[3] McMahon did not say she sees WV's religious views on marriage as "hate," and never "publicly condemned" WV's beliefs. McMahon testified if a potential donor inquired about WV's views on marriage, she would "stick to the script" and respond that WV defines marriage to be between a man and a woman. 2-ER-152.

[4] WV never asked McMahon whether she was engaging in sexual conduct outside heterosexual marriage or planned to in the future.

16

sexual orientation, and marital status." 1-ER-66; *accord Busey v. Richland Sch. Dist.*, 172 F. Supp. 3d 1167 (E.D. Wash. 2016) (prohibited workplace conduct inextricably linked with employee's marital status). The district court applied neutral principles of law in determining that WV's revocation of McMahon's job offer pursuant to a facially discriminatory employment policy presumptively violated both Title VII and the Washington Law Against Discrimination ("WLAD"). Accordingly, the Church Autonomy Doctrine does not bar McMahon's claims.

## II. WV FAILED TO PROVE THAT CUSTOMER SERVICE REPRESENTATIVES FALL WITHIN THE FIRST AMENDMENT MINISTERIAL EXCEPTION

"The ministerial exception exempts a church's employment relationship with its ministers from application of some employment statutes, even though the statutes by their literal terms would apply." *Behrend v. San Francisco Zen Center, Inc.*, 108 F.4th 765, 768 (9th Cir. 2024) (internal punctuation and citation omitted). It "broadly ensures that religious organizations have the freedom to choose 'who will preach their beliefs, teach their faith, and carry out their mission.'" *Id.* at 766 (quoting *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 196 (2012)). The ministerial exception is an "affirmative defense…not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at 195 n.4. Therefore, an employer who asserts the ministerial exception as a defense has the burden of proving it. *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 531 (7th Cir. 2023). As the district court correctly

ruled, WV did not meet its burden of persuasion that the customer service representative position qualifies for the ministerial exception. 1-ER-39.

The U.S. Supreme Court first recognized the ministerial exception in *Hosanna-Tabor*. 565 U.S. at 188-89. The Court held that the determination of whether a particular employee qualifies as a minister should be made on a case-by-case basis, stating "[w]e are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. In *Hosanna-Tabor*, the Supreme Court relied on the following factors to find the exception applied: "the formal title given [to the employee],…the substance reflected in that title, [the employee's] own use of that title, and the important religious functions…the employee performed for the Church." *Id.* at 192. "Ministers" have "a role distinct from that of most of [the religious organization's] members." *Id.* at 191.

The Supreme Court revisited the ministerial exception in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). In that case, the Court clarified the *Hosanna-Tabor* test and ruled the ministerial exception applied to employees with "vital religious duties." *Id.* at 757. The ministerial exception is based on the principle that the antidiscrimination laws cannot constitutionally intrude on a religious organization's "selection of the individuals who play *certain key* roles" within the organization. *Id*. at 746 (emphasis supplied). "[C]ourts are bound to stay

18

out of employment disputes involving those holding *certain important positions* with…religious institutions." *Id.* (emphasis supplied).

A religious employer "cannot show entitlement to the ministerial exception simply by asserting that everyone on its payroll is a minister or by requiring that all employees sign a ministerial contract." *Fitzgerald,* 73 F.4th at 531-32. *Hosanna-Tabor* and *Our Lady of Guadulupe* "make clear that the ministerial exception does not apply to *everyone* employed by a religious entity." *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 71 (4th Cir. 2023) (Motz, J., concurring). While the ministerial exception is "broad," *Behrend*, 108 F.4th at 766, "the ministerial exception is just that— an *exception*, applicable only to a subset of a religious entity's employees." *Palmer*, 72 F.4th at 71 (Motz, J., concurring). Only a "relatively small number of employees" fall within the ministerial exception. *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 327 (4th Cir. 2024). *See also Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024) (rejecting "sweeping interpretation of the ministerial exception").

"A religious institution's explanation of the role of…employees in the life of the religion in question is important." *Our Lady of Guadalupe*, 591 U.S. at 757. Therefore, courts give deference to the employer's view whether an employee serves in a religious role. *Behrend*, 108 F.4th at 770 n. 3; *Fitzgerald*, 73 F.4th at 531-32. However, merely having "religious responsibilities" does not make an employee a minister. *E.g.*, *Trotter v. United Lutheran Seminary*, 20-570, 2021 WL 3271233, at

19

*4 (E.D. Pa. July 30, 2021). It is for the court to determine whether the employee played "a role vital in carrying out the church's mission." *Califano*, 2024 WL 4276170, at *8 (internal quotation omitted).

Whether the ministerial exception applies "is a multi-factored, fact-specific inquiry." *Fitzgerald*, 73 F.4th at 531. Courts are to "'take all relevant circumstances into account and to determine whether each particular position implicate[s] the fundamental purpose of the exception.'" *Behrend*, 108 F.4th at 769 (citing *Hosanna-Tabor*, 565 U.S. at 190). *Our Lady of Guadulupe* instructs courts to apply the *Hosanna-Tabor* factors as appropriate, and that "[w]hat matters, at bottom, is what an employee does." 591 U.S. at 753; *see also Ratliff v. Wycliffe Assocs., Inc.*, 6:22-cv-1185-PGB-RMN, 2023 WL 3688082, at *4 (M.D. Fla. May 26, 2023) (describing this as "a holistic consideration").

### A.     The *Hosanna-Tabor* Factors Show McMahon Was Not Hired to Be a Minister

In deciding whether the employer has proven the ministerial exception applies, a court should consider, among other things: (1) the formal title given to the employee, (2) the substance reflected in that title, (3) the employee's use of that title, and (4) whether the employee performed important religious functions. *Fitzgerald*, 73 F.4th at 531. The district court rightly found the first two factors weigh against the ministerial exception and the third does not apply. 1-ER-31-33. The district court

also correctly determined, as set forth *infra*, that the religious functions McMahon would have performed did not make her a minister. 1-ER-33-36.

The employee's job title is the first "relevant circumstance[]" as to whether the ministerial exception applies. *Our Lady of Guadalupe*, 591 U.S. at 750. "Simply giving an employee the title of 'minister' is not enough to justify the exception." *Id.* at 752. An employee's job title can show whether "the recipient has been given an important position of trust" and "evidence[] the importance attached to her role." *Id.* A court should "determine whether the wording of the title conveys a religious—as opposed to secular—meaning." *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829, 834 (6th Cir. 2015) (concluding "spiritual" conveys religious meaning). The district court correctly decided the relevant job titles, "donor/customer service representative" and "customer service representative," are purely secular. 1-ER-32.

The district court also held these secular job titles reflect the position's secular substance. 1-ER-32-33. "[T]he academic requirements of a position may show that the church in question regards the position as having an important responsibility in elucidating or teaching the tenets of the faith." *Our Lady of Guadalupe*, 591 U.S. at 753. There is no requirement WV customer service representatives have any religious training. 1-ER-33; 2-ER-311-12. Customer service representatives do not receive a religious commission upon completing their training at WV. 1-ER-33; 2-

ER-312. They simply cease being trainees. 1-ER-32; 2-ER-312. The nine-to-eleven-week training customer service representatives receive upon hire by WV is not doctrinal instruction. 1-ER-33. WV does not hold customer service representatives out to the public as ministers. *Cf. Hosanna-Tabor*, 565 U.S. at 191.

### B. McMahon Would Not Have Performed Ministerial Duties as a Customer Service Representative

#### 1. The Customer Service Representative Position was "at Bottom" a Secular One

The central inquiry in determining whether an employee falls within the ministerial exception is what "at bottom" the employee "does." *Our Lady of Guadalupe*, 591 U.S. at 753. WV rescinded McMahon's offer before she performed the customer service representative job. Therefore, what McMahon would have "done" is gleaned primarily from the job description WV posted in November 2020. 4-ER-844-846.[5] *See Butler*, 609 F. Supp. 3d at 196 (where employee is terminated before performing the position, court should look to the job description for "what an employee does").

As the district court determined, the "job posting demonstrates that the thrust

---

[5] In the district court, WV argued the customer service position fell within the ministerial exception based on a job description WV created in March 2022, 4-ER-927-930. This was more than a year after it revoked McMahon's offer of employment and eight months after she filed this case. 1-ER 80-81. Although there is significant overlap between the November 2020 and March 2022 job descriptions, the terms "key liaison" and "voice of World Vision" do not appear in the November 2020 job posting.

of the customer service representative position is administrative, not ministerial." 1-ER-37. World Vision categorizes customer service representatives as "Administrative Support Workers." 4-ER-927. The position is non-exempt under the Fair Labor Standards Act of 1938 ("FLSA") and eligible for overtime pay. 4-ER-924. Eleven of the 13 enumerated customer service representative job duties are secular. 4-ER-845. The essential job functions of the customer service representative position were to "maintain donor relationships through basic inbound and outbound calls … [s]erve as a liaison between donors and the general public as well as provide basic levels of customer service for all special programs." 4-ER-844.

Customer service representatives receive inbound calls from individuals who are "potentially existing donors or may be looking to donate" and "make outbound calls to existing donors." 2-ER-314. Customer service representatives "[a]nswer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance." 4-ER-845. They learn of existing donors' identities through access to a database maintained by WV. 2-ER-314. Donors are predominantly Christian, but not exclusively. *Id*. Donors are not members of WV. *Id.*

Customer service representatives "recognize and respond to up-sell opportunities and actively cross-sell other WV programs when appropriate." 4-ER-845. They "assess callers' needs and input information accurately and effectively using data entry and ten-key skills." *Id.* They "[a]chieve and maintain an acceptable

23

level of individual statistics to accomplish Call Center business goals." *Id.* They also "[d]evelop skill to utilize technology for maintaining and updating donor information as appropriate." *Id.*

Although not dispositive, the amount of time an employee spends on secular versus religious duties is relevant to whether that employee falls within the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 194. McMahon would have spent most of her time performing secular customer service duties. 3-ER-482.

### 2. The Religious Requirements of the Customer Service Representative Job were the Same as for All WV Employees

To be sure, McMahon would have had *some* religious responsibilities as a customer service representative. But only a few duties in the position description touch upon religion:

> Help carry out our Christian organization's mission, vision, and strategies. Personify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign:
>
> Keep Christ central in our individual and corporate lives. Attend and participate in the leadership of devotions, weekly Chapel services, and regular prayer; and,
>
> Be sensitive to Donor's needs and pray with them when appropriate.

4-ER-844-45. The first two of these three religious responsibilities apply to all WV employees. 1-ER-33-35. If having religious responsibilities were the applicable constitutional test, all WV employees would fall within the ministerial exception—an outcome contrary to Supreme Court jurisprudence. *See Hosanna-Tabor*, 565 U.S.

at 191 (noting that ministers have "a role distinct from that of most of [the religious organization's] members.")

"World Vision holds itself out to the public as a religious organization." *Spencer v. World Vision, Inc.*, 570 F. Supp. 2d 1279, 1288 (W.D. Wash. 2008), *aff'd*, 633 F.3d 723 (9th Cir. 2011) (per curiam). "World Vision exists only to spread its Christian faith…." 3-ER-441; 4-ER-810. "[I]ts workforce consists only of Christians for all positions." 3-ER-441; 4-ER-810. World Vision's workforce comprises more than 40 different Christian denominations. 3-ER-483. For WV, "individual and corporate 'witness' is vital to its existence." 3-ER-445. All WV employees have a "call to ministry." 4-ER-859. All WV "staff must be committed to…calling others to a life-changing commitment to serve the poor in the name of Christ." 3-ER-582. "Witnessing to Jesus Christ" is part of every job at WV, regardless of whether an employee is "donor/partner facing," has responsibilities in "marketing/program support," or works in "Ops/Admin." 4-ER-921.

WV views "Fund-raising as a form of Witness," 5-ER-950, and marketing/fund-raising as "a form of ministry." 5-ER-978-979; WV Br. at 10. In arguing customers service representatives' fund-raising uniquely brings them within the ministerial exception, WV ignores that *all* its "Job Postings require witnessing to Christ and ministering to others through life, deed, word, and sign." 3-ER-445 (internal punctuation omitted). The inclusion of "ministry" and "witnessing" in the

customer service representative job description does not distinguish that position from any other at WV. Just as "giving an employee the title of 'minister' is not enough to justify the [ministerial] exception," *Our Lady of Guadalupe*, 591 U.S. at 752, labeling what an employee does as "ministry" is also not enough to justify the exception, especially where the same religious calling applies to every employee.

The requirements that customer service representatives "[a]ttend and participate in the leadership of devotions, weekly Chapel services, and regular prayer" also do not differentiate them from any other WV employee. "In its activities, [WV] regularly includes prayers and other forms of worship such as chapel services, devotionals led by department leaders, prayer chains, an annual day of prayer and Scriptural themes." *Spencer*, 570 F. Supp. 2d at 1288. "All World Vision staff… participat[e] regularly in prayer activities, devotionals, and weekly chapel services." 3-ER-441 (internal punctuation omitted); 4-ER-811 (internal punction omitted).

"Leadership of Devotions" is "part of every WVUS job description," and is rotated among the staff. 4-ER-705.[6] Although some customer service representatives

---

[6] WV incorrectly claims the district court did not agree customer service representatives are required to lead team devotions. WV Br. at 32 n.4. As the district court noted, one of WV's witnesses gave contradictory testimony. 1-ER-16-17. Despite this contradiction, the court assumed in deciding the renewed cross motions for summary judgment that "to the extent customer service representatives are required to lead team devotions, the same is required of all other World Vision employees." *Id.*

lead chapels, leading chapel is *not* "an expectation" of the customer service representative position. 2-ER-247. Whether a customer service representative chooses to lead chapels depends entirely on their own "interest and desire to lead." *Id*. Thus, customer service representatives play no greater role in leading chapels than other WV employees.

"Prayer plays a central role in World Vision's mission…." 4-ER-812 (internal punctuation omitted). "A core job responsibility of all staff is prayer, which is a component of World Vision's work." 3-ER-441 (internal punctuation omitted); 4-ER-811 (internal punction omitted). "Prayer is critical to World Vision's ministry. All World Vision staff…are responsible for participating in and helping to foster a 'Prayer-Centered Work Environment'…." 4-ER-812. WV staff "pray, pray again, and pray some more." *Id.* (internal punctuation omitted). WV "encourage[s] employees to begin and end each work or project meeting in prayer." 4-ER-863.

In the district court, WV argued that as a "general" matter, all its employees qualify for the ministerial exception because "all staff are responsible for 'important religious functions.'" SER 12-13 (quoting *Hosanna-Tabor*, 565 U.S. at 192). WV relied on the fact that "**all** World Vision staff are responsible for…participating regularly in prayer activities, daily devotionals, and weekly chapel services." SER 13. (internal punctuation omitted). WV particularly emphasized "the core element of *prayer*." *Id.* As WV originally asserted in this case, its customer service

27

representatives perform the same "important religious functions" as every employee. This strongly weighs against applying the ministerial exception to customer service representatives.

In arguing for the exception, WV relies heavily on a single sentence in its "Donor Contact Services: DCS Policies" that says "[b]eing part of DCS means you are the **Voice**, **Face**, and **Heart** of World Vision," 4-ER-897. This sentence has nothing to do with religious duties.[7] The next sentence reads: "This challenge requires that each of us think of ourselves as servants; demonstrating flexibility, and servicing the donor(s) with a smile." *Id.* Furthermore, "all staff represent WVUS and, more importantly, the Gospel of Jesus Christ, in their work as well as in their private lives." 3-ER-553. "All World Vision staff…are responsible for…communicating World Vision's Christian faith and witness, which is integrated into everything it does, accurately and with integrity…." 3-ER-441 (internal punctuation omitted); 4-ER-811 (internal punction omitted). That customer service representatives do so in phone calls with donors is a distinction without a difference for purposes of the ministerial exception.

No WV document says that "the 'spiritual growth' of supporters, partners and

_____

[7] In January 2021, approximately 20% of DCS employees worked in positions other than customer service representative. 5-ER-1044. The other DCS employees do not typically handle inbound or outbound donor calls. *Id.* Accordingly, WV considers DCS staff who do not make calls to or receive calls from donors to be just as much "the **Voice**, **Face**, and **Heart** of World Vision" as customer service representatives.

28

donors is a 'primary concern of'" customer service representatives. *Cf.* WV Br. at 9. The document WV purportedly quotes, 5-ER-1001, describes "every Christian fundraiser!" The requirement "to engage with donors and supporters in a way that contributes to the transformation of their values, beliefs, and behaviors…," WV Br. at 9, applies to all WV employees. 4-ER-712. Likewise, all WV employees are required to enhance their colleagues' "spiritual development," 3-ER-637, contrary to WV's claim it is a responsibility unique to customer service representatives. WV Br. at 9. All WV employees are trained regarding WV's "mission, vision, core values, and standards of Christian witness," 3-ER-452-453, and trained on prayer, attending chapel, and leading and participating in devotions. 2-ER-312 (describing the "training surrounding our organization, which is a religious organization").

As the district court determined, every religious job requirement of the customer service representative position was also a requirement of every other position at WV. 1-ER-33-35.

### 3. Praying with Donors was not a Job Requirement of the Customer Service Representative Position

The only arguably unique religious responsibility of WV customer service representatives was to pray with donors "when appropriate." 4-ER-845. However, praying with donors is "not a requirement" of the customer service representative position and "isn't mandatory." 2-ER-314-15; 1-ER-36. While praying with donors "is encouraged as an expression of [WV's] Christian identity," no disciplinary action

29

is taken against a customer service representative who chooses not to pray with donors. 2-ER-314-15; 1-ER-36. During McMahon's December 4, 2020, phone interview, nothing was said to her about praying with donors and she was not asked whether she would be comfortable doing so. 3-ER-480-484. "That World Vision declined to even raise the subject of donor prayer in Ms. McMahon's screening interview negates the stated importance of that job function." 1-ER-36. Praying with donors was an optional, marginal function of the customer service representative job.[8] As the district court found, "it is impossible to know whether or how often Ms. McMahon would have performed this job function." 1-ER-36.

None of the cases WV cites suggests an employer can prove a position qualifies for the ministerial exception by relying upon optional religious functions the employee *did not* actually perform. *Cf.* WV Br. at 31-32. Neither *Hosanna-Tabor* nor *Our Lady of Guadalupe School* considered optional religious functions in concluding the religious-school teachers in those cases were ministers. In the latter, all the employer "expectations" upon which the majority relied were requirements set forth in Morrisey-Berru's written employment agreement. 591 U.S. at 739-41.

---

[8] A job's "'essential functions' are [the] fundamental job duties of the employment position…." *Bates v. UPS, Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (internal punctuation and citation omitted). "Essential functions" contrast with the "marginal functions of the position." *Id.* (internal citation omitted).

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 941 (7th Cir. 2022) ("*Starkey II*"), looked to the employer-mandated "job duties and responsibilities" of the position. The court rejected Starkey's argument that she did not qualify as a minister because she failed to perform some of the religious requirements of her position: "Under Starkey's theory, an individual placed in a ministerial role could immunize themself from the ministerial exception by failing to perform certain job duties and responsibilities….But an employee is still a minister if she fails to adequately perform the religious duties she was hired and entrusted to do." *Id.* (citing *Hosanna-Tabor*, 565 U.S. at 192). *Fitzgerald* examined the mandatory religious duties of the same Director of Guidance position and the religious duties the plaintiff had performed. 73 F.4th at 533-34. None were optional.

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018), was the reverse of *Starkey II*. In *Grussgott*, the plaintiff admitted she had "performed religious functions" but claimed she "remained a secular employee" because she voluntarily "taught her students about prayer, Torah portions, and Jewish holidays…." 882 F.3d at 660. The court rejected her contention. Even though she "had discretion in planning her lessons," the school expected her to teach a curriculum "designed to develop Jewish knowledge and identity in its learners." *Id.* (internal punctuation omitted). Moreover, in *Grussgott* the plaintiff was hired because of her Judaic teaching experience. *Id.* at 661. This confirmed "the school

31

expected her to play an important role in transmitting the Jewish faith to the next generation." *Id.* (internal punctuation and citation omitted).

In *Butler*, the court focused on what the plaintiff was "obligated" to do, *i.e.*, "the specific ministerial duties that it is undisputed [the plaintiff] *would have performed.*" 609 F. Supp. 3d at 194-96 (emphasis supplied).

WV's contention that all customer service representatives qualify for the ministerial exception because some customer service representatives choose to pray with donors proves too much. All WV employees must pray on the job. All WV employees must foster a "Prayer-Centered Work Environment." World Vision hires only "Christians." When WV employees pray together, it is the prayer of co-religionists. That is not true with respect to donors. Not all WV donors are Christians. 2-ER-314. "World Vision does not proselytize. Its services are made available to people of all faiths or of no faith." *Spencer*, 633 F.3d at 737 (O'Scannlain, J., concurring); 3-ER-444; 3-ER-582 ("WVUS offers our programs to people in need, regardless of their religious beliefs and without proselytism"). When a WV customer service representative prays with a donor, they are not engaging in religious indoctrination or proselytizing. WV views prayer with donors as an expression of its Christian identity and "showing empathy." 2-ER-315; SER-9-10 ("*Ask the donor how we can specifically be praying. If comfortable, offer to pray with donor over the phone*"); 1-ER-15.

Praying with another person does not automatically make someone a minister under the First Amendment. An employee does not qualify for the ministerial exception "simply because she believes in God, prays at work, and is employed by a religious entity." *Palmer*, 72 F.4th at 75 (Motz, J., concurring). If the option to pray on the job with donors who are not necessarily co-religionists makes customer service representatives ministers, then surely WV's requirement that all staff pray at work with their co-religionists makes all WV employees ministers. The district court properly determined that although "customer service representatives perform a uniquely important religious function at World Vision by praying with donors if comfortable and when appropriate," 1-ER-36, this function does not uniquely qualify them for the ministerial exception. 1-ER-38.

A "holistic view" of the job duties of the customer service representative position shows they were overwhelmingly secular. 1-ER-36-38. The religious aspects of the position were either equally applicable to all WV employees or optional. 1-ER-33-36. Therefore, the district court correctly determined "the customer service representative role does not implicate the fundamental purpose of the ministerial exception." 1-ER-38.

### C.     Other Cases Applying the Ministerial Exception Demonstrate It is Inapposite Here

The job responsibilities of a WV customer service representative are distinctly different from those of the religious-school teachers who were the subjects of the

33

U.S. Supreme Court's decisions on the ministerial exceptions. *Cf. Hosanna-Tabor*, 565 U.S. at 191-92; *Our Lady of Guadalupe*, 591 U.S. at 739-41. Underlying both these decisions was the Supreme Court's recognition that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 591 U.S. at 753-54.

In *Orr v. Christian Bros. High Sch., Inc.*, this Court recognized that "many teachers at religious schools qualified as 'ministers' for the purposes of the exception, even though they were not considered formal ministers." 21-15109, 2021 WL 5493416, *1 (9th Cir. Nov. 23, 2021). This Court had no trouble concluding the exception barred the discrimination claims of an employee who "played an important role in the religious education and formation of the students…." *Id.*

In *Billard*, a teacher at a religious school was fired for planning to marry his same-sex partner. 101 F. 4th at 320. The Fourth Circuit determined "Billard falls in precisely the category of people whose ministerial status *Our Lady of Guadalupe* seems most likely to affect: educators in religious schools who primarily teach secular subjects." *Id.* at 327. For this reason, the court recognized "we break no new ground in applying" the ministerial exception to Billard. *Id.* at 328. *Billard* noted that in *Gordon Coll. v. DeWeese Boyd*, four Justices made clear that the ministerial exception applied to the "faith-infused instruction of secular subjects" in religious

34

schools. *Id.* at 332 (internal punctuation omitted) (citing 142 S. Ct. 952, 954-956 (2022) (Alito, J, respecting denial of certiorari)). Also pertinent was that on rare occasions Billard filled in for teachers of religion classes. *Id.* Critically, *Billard* identified "administrative personnel" as one example of employees that "all agree fall outside the ministerial exception." 101 F.4th at 328. WV classifies its customer service representatives as "Administrative Support Workers." 4-ER-927.

*Starkey II* and *Fitzgerald* were easy cases after *Our Lady of Guadalupe*.[9] Starkey and Fitzgerald were co-Directors of Guidance at the same Catholic school. 41 F.4th at 940; 73 F.4th at 532. Starkey was a member of the school's Administrative Council and was "entrusted with communicating the Catholic faith to children, supervising guidance counselors, and advising the principal on matters related to the school's religious mission." 41 F.4th at 940. She also had the responsibility of "guiding the religious mission of the school." *Id.* Starkey was also "one of the school leaders responsible for the vast majority of [its] daily ministry, education and operations." *Id.* (internal quotation omitted). Fitzgerald was "one of a handful of key, visible leaders of the school." 73 F.4th at 532 (internal punctuation omitted). Both Starkey and Fitzgerald held themselves out as ministers. *Id.* at 532-33.

The employee in *Behrend* was "a live-in monk" at the largest Soto Zen

---

[9] *Butler* involved a Catholic school teacher and was also a straightforward application of *Our Lady of Guadalupe.* 609 F. Supp. 3d at 198.

Buddhist temple in North America. 108 F.4th at 766, 770. He was in a program that was "the launch and the foundation for the apprentice's Zen training." *Id.* at 767 (internal punctuation omitted). This Court rejected his claim that only teachers and leaders of the faith qualify for the ministerial exception and held it also covers "those who perform vital, but not necessarily hierarchical, functions." *Id.* at 769-70. Critical to this Court's determination Behrend fell within the ministerial exception was that "he lived and worked full time at the temple as a monk." *Id.* at 770. McMahon would have worked for WV remotely from her home.

*Behrend* analogized the position at issue to the one in *Alcazar v. Corp. of the Catholic Bishop of Seattle*. *Id*. at 769 (citing 627 F.3d 1288, 1292 (9th Cir. 2010) (en banc)). Alcazar was a Catholic seminarian studying to become a priest. *Alcazar*, 627 F.3d at 1292. He performed "maintenance of the church and assisted with Mass." *Id.* This Court applied the ministerial exception to his position "because he did this work as part of his seminary training even though he was not yet a teacher or a leader in that church." *Behrend*, 108 F.4th at 769 (internal punctuation and citation omitted).

*Behrend* and *Alcazar* hold that the ministerial exception covers employees of religious organizations who are training to become "ministers." Behrend and Alcazar had "vital religious duties" in "key" and "important" roles that were "distinct" from that of most of the religious organization's members. *See Our Lady of Guadalupe*, 591 U.S. at 746, 756, 757; *Hosanna-Tabor*, 565 U.S. at 191. WV customer service

36

representatives are not ministers in training. To the extent customer service representatives have required religious duties, those job duties are indistinguishable from those of other WV employees.

The other cases upon which WV relies also involved individuals in key religious positions distinct from other employees. *EEOC v. Roman Catholic Diocese of Raliegh, N.C.,* concerned the Director of Music Ministry of a cathedral who worked as a part-time music teacher at a Catholic school. 213 F.3d 795, 797 (4th Cir. 2000). The court ruled the ministerial exception barred the employee's claims for sex discrimination because her "primary duties at the Cathedral consisted of the selection, presentation, and teaching of music, which is integral to the spiritual and pastoral mission of the Catholic Church…." *Id.* The employee "was clearly a pivotal figure in most, if not all, aspects of the musical life of the Cathedral and school." *Id.* at 803. That position has no resemblance to McMahon's job as one of approximately five dozen WV customer service representatives.

*Sterlinski v. Catholic Bishop of Chicago* also recognized that "music is vitally important to the services of the Roman Catholic Church." 934 F.3d 568, 569 (7th Cir. 2019). The court held that a Catholic church organist falls within the ministerial exception because "an organist is, if not as important to services as a priest or a cantor, a part of religious exercise…." *Id.* A church organist's role in religious

37

exercise is different from the other members of the church. *Sterlinski* provides no support for the ministerial exception here.

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, involved an employee who worked as a kosher food supervisor appointed by a board of Orthodox rabbis to guard against any violation of Jewish dietary laws. 363 F.3d 299, 301 (4th Cir. 2004). The court held the ministerial exception applied to his claims for overtime pay under the FLSA because the position was "intrinsically religious" and had "no secular purpose." *Id.* at 308. The employee also held himself out as "clergy" on his federal tax returns. *Id.* The position of customer service representative is not "intrinsically religious." WV does not consider customer service representatives to be exempt from FLSA's overtime pay requirements. 4-ER-924.

*Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003), shows that merely interfacing with the public does not bring an employee within the ministerial exception. Alicea-Hernandez was the Archdiocese Hispanic Communications Manager. Her duties included composing media releases, correspondence for the Cardinal, and articles for Church publications. 320 F.2d at 700. She also served as Archdiocese press secretary. *Id.* at 703-04. Given "Alicea-Hernandez's unique responsibilities at the Church," *Id.* at 700, the ministerial exception applied. "[A] press secretary is responsible for conveying the message of an organization to the public as a whole" and "Alicea-Hernandez was integral in

38

shaping the message that the Church presented to the Hispanic community." *Id.* at 704.

McMahon would not have had "unique responsibilities" at WV. She would have been one of about 60 customer service representatives. She would not have crafted WV's public messages. A prepared script governed her communication with incoming callers. The WV customer service representative job was no more the equivalent of the position in *Alicea-Hernandez* than a White House switchboard operator would be the equivalent of the White House Press Secretary. The *Alicea-Hernandez* court did not conclude the plaintiff "served a ministerial function for the Church" just because she interacted with the public on behalf of her religious employer. Rather, the court focused on the fact that the plaintiff *personally* was the Church's "primary communications link to the *public as a whole*." 320 F.3d at 704 (emphasis supplied). *Alicea-Hernandez* demonstrates the type of public-facing position within a religious organization that qualifies for the ministerial exception. McMahon's role at WV would have been the antithesis of such a position.

McMahon's situation is much more like *Ratliff*, where the court held that a software developer for a Bible translation company did not fall within the ministerial exception. 2023 WL 3688082, at *1. The plaintiff's job title there was "Software Developer II," and his primary duty was to develop software for Bible translation. *Id*. The employer terminated the plaintiff when it learned he was in a same-sex

marriage. *Id.* at *2. The employer argued the plaintiff qualified "as a *minister* of Defendant's religious mission" because the express conditions of his employment required him to "'sense a call from God to ministry' and meet Defendant's 'high standards for spirituality and the Christian faith.'" *Id.* at *5 (internal punctuation omitted). The plaintiff's job description included "having 'a personal relationship with Jesus Christ' and sensing 'a call from God to ministry.'" *Id.* at *5 n. 8. The court held that this was "a far cry from accepting a job akin to a minister." *Id.* at *5. "Defendant did not bestow Plaintiff with a ministerial title nor anything even remotely similar…." *Id.* The plaintiff in *Ratliff* did not hold himself out as a minister. *Id.* "[N]either the Plaintiff's title nor the fundamental nature of his position persuades the Court that he was anything but a secular employee." *Id.*

### D.     A Ruling in WV's Favor Would Eliminate Discrimination Law for Many Employees of Religious Organizations

Case law demonstrates it is not enough that an employee of a religious organization has some role in carrying out the organization's mission for the ministerial exception to apply. All employees have some role in carrying out their employer's mission. "The integration of religious faith and belief with daily life and work is a common requirement in many, if not all, religious institutions." *DeWeese-Boyd v. Gordon Coll.*, 487 Mass. 31, 54, 163 N.E.3d 1000 (2021), *cert. denied*, 142 S. Ct. 952 (2022). WV's arguments why customer service representatives should qualify for the ministerial exception overlap substantially with the reasons why WV

qualifies as a "religious organization" in the first place. The ministerial exception requires proof that the employer is a religious organization *and* that the employee is a minister. *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1027 n. 2 (10th Cir. 2022). WV's arguments collapse the important distinction between a religious employer and a ministerial employee. They have no logical stopping point.

Expanding the ministerial exception beyond "individuals who play certain key roles" would eliminate "civil law protection against discrimination" within religious entities. *DeWeese-Boyd*, 487 Mass. at 54 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746).[10] A ruling in WV's favor would cause many employees of religious organizations to lose those protections. An employee who is not a key religious figure "does not shed her right to be free from workplace discrimination…." *Palmer*, 72 F.4th at 74-75 (Motz, J., concurring). The district court here recognized that "[a]pplying the ministerial exception to the principally administrative customer service representative position would expand the exception beyond its intended scope, erasing any distinction between roles with mere religious components and those with 'key' ministerial responsibilities." 1-ER-38. The district court did not err.

---

[10] Concurring in the denial of certiorari in *DeWeese-Boyd*, four Justices questioned the Massachusetts Supreme Judicial Court's "understanding of religious education" but did not disagree with the state court's general pronouncements regarding the ministerial exception. *Gordon College*, 142 S. Ct. at 954-55 (statement of Alito, J). Indeed, those four Justices re-emphasized that the ministerial exception is limited to "the selection of the employees who play 'certain key roles'" in the religious institution. *Id.* at 954 (internal citation omitted).

### III. NEITHER THE TITLE VII NOR THE WLAD RELIGIOUS EMPLOYER EXEMPTION BARS McMAHON'S CLAIMS

The district court properly rejected WV's erroneous assertion that McMahon's claims are barred by Title VII's or the WLAD's religious employer exemptions. 1-ER-26-29. The Title VII religious exemption provides:

> [42 U.S.C. §§ 2000e *et seq.*] shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a). "No federal appellate court in the country has embraced the…argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard*, 101 F.4th at 328.

It is settled law in this Circuit the religious employer exemption bars only *religious* discrimination claims. *E.g.*, *Spencer*, 633 F.3d at 724; *EEOC v. Townley Eng. & Mfg. Co.*, 859 F.2d 610, 616 (9th Cir. 1988); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986); *EEOC v. Pac. Press Pub. Ass'n.*, 676 F.2d 1272, 1276 (9th Cir. 1982). Under Ninth Circuit law, that WV's discrimination was motivated by a sincerely held religious objection to same-sex marriage does not bring McMahon's claims within the Title VII religious employer exemption. *See, e.g., Fremont Christian Sch.*, 781 F.2d at 1364-65, 1366 (religious school paid men but not women health benefits because of sincerely held religious belief that men are

the "heads of the household"). A panel may not overrule prior decisions of this Court absent superseding U.S. Supreme Court authority. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003). *Bostock* does not suggest Title VII's religious employer exemption applies to sex discrimination claims. *See* 590 U.S. at 682.

WV misleadingly asserts *Garcia v. Salvation Army*, 918 F.3d 997, 1004 (9th Cir. 2019), holds that 42 U.S.C. § 2000e-1(a) "exempts qualifying entities 'from the *entire subchapter* of Title VII.'" WV Br. at 44. What *Garcia* says is that Congress "exempt[ed] religious organizations *from the entire subchapter* of Title VII with respect to the *employment* of persons of a particular religion." 997 F.3d at 1004 (internal punctuation and citation omitted). The issue *Garcia* considered was whether the religious employer exemption "went beyond hiring and firing," not whether it went beyond religious discrimination claims. *Id.* at 1004-06. Consistent with prior Ninth Circuit law, *Garcia* recognized that the religious employer exemption "permits religious organizations to discriminate based on religion…." *Id.* at 1006. *See* 1-ER-28-29. Entirely "exempting religious organizations would impede the Title VII objective of eliminating workplace discrimination." *Werft v. Desert Sw. Annual Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004).

Although the WLAD religious employer exemption is not limited to religious discrimination claims, it applies only to employees who fall within the ministerial exception. *Seattle Pac. Univ.*, 104 F.4th at 55-56; 1-ER-29.

43

## IV.   WV CANNOT ESTABLISH A BFOQ DEFENSE UNDER TITLE VII OR THE WLAD

The district court also correctly held that WV failed to establish its decision to rescind McMahon's job offer based on her being in a same-sex marriage fell within the BFOQ defenses of Title VII, 42 U.S.C. § 2000e-2(e)(1), or the WLAD, Washington Administrative Code 162-16-240. 1-ER-38-40.

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Johnson Controls*, 499 U.S. at 201. It is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). Title VII "limits the situations in which discrimination is permissible to 'certain instances' where sex discrimination is 'reasonably necessary' to the 'normal operation' of the 'particular' business." *Johnson Controls*, 499 U.S. at 201. "Each one of these terms…prevents the use of general subjective standards and favors an objective, verifiable requirement." *Id.* "But the most telling term is 'occupational'; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes." *Id.* "By modifying 'qualification' with 'occupational,' Congress narrowed the term to qualifications that affect an employee's ability to do the job." *Id.*

To prove a Title VII BFOQ, WV had to show (1) its facially discriminatory policy is reasonably necessary to the normal operation of its particular business, and (2) the policy concerns job-related skills and aptitudes. *Frank,* 216 F.3d at 855. The

"employer must show 'a high correlation' between a qualification and ability to perform job functions." *EEOC v. Kamehameha Schs./Bishop Est.*, 990 F.2d 458, 466 (9th Cir. 1993) (quoting *Johnson Controls*, 499 U.S. at 202).

To establish a WLAD BFOQ, WV had to show "excluding members of a particular protected status group is essential to the purposes of the job." *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 358, 172 P.3d 688 (2007) (internal quotation marks omitted). The employer must also "establish that all or substantially all persons in the excluded class would be unable to efficiently perform the duties of the position at issue, and the essence of the operation would be undermined by hiring anyone in that excluded class." *Id.* (internal punctuation and citation omitted).

As the district court held, WV's Title VII and WLAD BFOQ defenses both fail as a matter of law. WV has a facially discriminatory hiring policy that precludes the employment of individuals in same-sex marriages. That policy does not constitute an "occupational qualification" within the meaning of Title VII because it does not pertain to the "job-related skills and aptitudes" of the customer service representative position. Nor did WV show that its ban on hiring customer service representatives in same-sex-marriages is essential to the purposes of the job; that people in same-sex marriages would be unable to efficiently perform the duties of the position; and that the essence of WV's operation would be undermined by hiring anyone in a same-sex marriage as a customer service representative. Whether

McMahon was in a same-sex or heterosexual marriage would have had no impact on her ability to do the customer service representative job. Donors would have had no way of knowing whether McMahon was in a heterosexual marriage, a same-sex marriage, divorced, or single. WV's "role model" argument based on *Chambers v. Omaha Girls Club, Inc.*, 834 F.2d 697 (8th Cir 1987), fails.

There is no support in the record for WV's claim McMahon would have refused to defend its religious views regarding marriage in performing her customer service representative duties. WV Br. at 49. After receiving McMahon's email of January 5, WV never asked her what she would say to donors regarding marriage. WV hires employees regardless of their sexual orientation. 3-ER-449, 3-ER-592. If WV's concern with hiring people in same-sex marriages as customer service representatives is that they might "go off-script" with respect to discussions about same-sex marriage with donors, then that concern equally applies to hiring LGBTQ employees generally. That further undermines WV's BFOQ defense here.

This case has no resemblance to *McCollum v. Cal. Dep't Corrections & Rehab.*, 647 F.3d. 870, 881 (9th Cir. 2011), where this Court had no trouble concluding that, with respect to a program that paid the salaries of inmate chaplains for five specific faiths, being a member of one of those five faiths was a BFOQ for a paid chaplain position. Instead, as in *Kamehameha Schools/Bishop Est.*, there is no evidence here that WV's ban on hiring employees who engage in sex outside of

heterosexual marriage "is essential to the performance of this job." 990 F.2d at 466.

WV's BFOQ defense fails *a fortiori* under the stricter requirements of the WLAD.

1-ER-40. This Court should affirm the district court's BFOQ rulings.

## V.    THE RIGHTS OF EXPRESSIVE ASSOCIATION AND FREE EXERCISE OF RELIGION DO NOT IMMUNIZE WV FROM STATUTORY PROHIBITIONS ON EMPLOYMENT DISCRIMINATION

WV claims Title VII and the WLAD unconstitutionally abridge its freedoms of expressive association and religion. Congress included religious organizations within Title VII's prohibition on sex discrimination and religious organizations are subject to the WLAD. WV asks this Court to declare those legislative determinations unconstitutional. If the Court were to give serious consideration to WV's argument that McMahon's Title VII and WLAD claims are unconstitutional then this Court *must*, under 28 U.S.C. § 2403, certify to the Attorney General of the United States that there is a constitutional challenge to a federal statute, and to certify to the Washington Attorney General there is a constitutional challenge to a state statute.

### A.    There is No Expressive Association Defense to McMahon's Employment Discrimination Claims

There is no precedent for privileging expressive association over anti-discrimination law in the commercial employment context. If there were, application of Title VII would be justified by the compelling interest in protecting employees from discrimination. *Billard*, 101 F.4th at 324 (citing lower court opinion).

47

The U.S. Supreme Court has explicitly held the right to expressive association provides no defense to a Title VII violation. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). "In *Hishon*, we rejected the argument that Title VII infringed employers' First Amendment rights." *Wis. v. Mitchell*, 508 U.S. 476, 487 (1993). In *Hishon*, a law firm argued its First Amendment right to expressive association precluded application of Title VII's prohibition on sex discrimination to its partnership decisions. 467 U.S. at 78. However, the law firm had "not shown how its ability to fulfill protected functions would be inhibited by a requirement that it consider a woman lawyer for partnership on her merits." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984) (quoting *Hishon*, 467 U.S. at 78; internal punctuation omitted). "Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Hishon*, 467 U.S. at 78 (internal punctuation and citation omitted)." As the district court held, *Hishon* and *Mitchell* control this case.[11] 1-ER-48.

---

[11] *Green v. Miss United States of Am*., 52 F.4th 773, 781-82, (9th Cir. 2022), doesn't mention *Hishon* or *Mitchell* and, contrary to what WV asserts, WV Br. at 58-59, does not undermine the district court's reliance on those cases. *Bear Creek Bible Church v. EEOC*'s refusal to find that *Hishon* forecloses an expressive association defense in a Title VII action, 571 F. Supp. 3d 571, 616 (N.D. Tex. 2021), *aff'd in part, vacated in part, and rev'd in part*, *sub nom Braidwood Mgmt. Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023), cannot be squared with *Mitchell*. The Fifth Circuit did not affirm *Bear Creek Church*'s expressive association rulings.

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), does not aid WV's argument. New York had adopted a law (the "Boss Bill") prohibiting adverse actions against employees because of "their reproductive health decisions." *Id.* at 283 (internal punctuation omitted). "Unlike other antidiscrimination statutes, the Boss Bill contains no express exemption for religious employers or for small employers with objections to abortion." *Id.* Nor did the law allow a BFOQ defense. N.Y. Labor Law § 203-e. Evergreen, an anti-abortion organization that "hires only employees who oppose abortion," argued the law was unconstitutional on several grounds including expressive association. 61 F.4th at 284.

*Slattery* recognized strict scrutiny applies only if the group engaging in expressive association shows that the law "imposes severe burdens on associational rights." *Id.* at 287 (internal punctuation omitted). Evergreen proved a severe burden: "The statute forces Evergreen to employ individuals who act or have acted against *the very mission* of its organization." *Id.* at 288 (emphasis supplied). The state's alleged compelling interest in *Slattery* was "one's choice to engage in certain legally authorized conduct." *Id.* at 289. "[T]hat interest cannot overcome the expressive rights of an association *dedicated to outlawing or opposing that specific conduct*." *Id.* (emphasis supplied). "Evergreen's beliefs about the morality of abortion are its defining values…." *Id.* at 290 (internal punctuation omitted). For that reason, "the balancing of interests" in *Slattery* came out in favor of Evergreen. *Id.*

49

The district court recognized *Slattery* has little resemblance to this case. 1-ER-48-49. *Slattery* did not involve Title VII and did not mention *Hishon* or *Mitchell*. Unlike WV, Evergreen proved compliance with the law would "severely burden" its expressive activities. In *Slattery*, opposition to abortion was "the very mission" of the organization. WV opposes same-sex marriage but opposition to same-sex marriage is not its "very mission." 1-ER-49. WV is not *dedicated to* outlawing or opposing same-sex marriage specifically. *Cf. Slattery*, 61 F.4th at 289. The district court rightly held that "[e]nforcing Title VII and the WLAD in this instance would not require World Vision to employ someone who acts against its 'very mission.'" 1-ER-49 (distinguishing *Slattery*). Having "an official policy or official stance on a subject" is a prerequisite for a claim of expressive association. *Sullivan v. Univ. of WA*, 60 F.4th 574, 580 (9th Cir. 2023) (internal punctation omitted). It does not give an organization blanket immunity from federal or state laws that may incidentally burden the right to expressive association.

As *Starkey I* concluded in an analogous situation, 496 F. Supp. 3d at 1208, WV's having to comply with the laws prohibiting sexual orientation discrimination in employment would have only an incidental impact on WV's right to expressive association. Therefore, strict scrutiny does not apply here. Even if strict scrutiny did apply, Title VII and the WLAD satisfy that standard. *See Fremont Christian Sch.*, 781 F.2d at 1368-69. Title VII is an exercise of Congress's power under section 5 of

the Fourteenth Amendment to guarantee equal protection of the laws. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447-48 (1976). The right to engage in same-sex marriage is a fundamental constitutional right. *Obergefell v. Hodges*, 576 U.S. 644, 675-76 (2015). By contrast, *Slattery* involved the right to abortion, which the Constitution does not protect. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022).

The district court correctly rejected the contention that *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000), gives WV an expressive association defense to McMahon's claims. The constitutional violation in *Dale* was that the state had "tried to require the group to propound a point of view contrary to its beliefs by directing its membership choices." *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023) (internal quotations omitted). "The legal issues here and in *Dale* are distinct…." 1-ER-47.[12] *Dale* held that New Jersey's prohibition on sexual orientation discrimination in public accommodation did not require the Boy Scouts to admit a gay assistant scoutmaster. 530 U.S. at 644. The majority reasoned that the presence of an openly gay scoutmaster "would significantly burden the Boy Scouts' desire to not promote homosexual conduct as a legitimate form of behavior," and because Dale was "a gay rights activist" having him as scoutmaster would send a message

---

[12] Other than *Slattery* and *Hosanna-Tabor*, none of the cases WV relies upon to support its expressive association argument involve employment. *Moore v. Hadestown Broadway LLC*, 23-CV-4837(LAP), 2024 WL 989843, at *17-20 (S.D.N.Y. March 7, 2024), is a Free Speech Clause case. WV did not appeal the district court's adverse Free Speech Clause ruling. 1-ER-50-51.

"both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as legitimate form of behavior." *Id.* at 653 (internal quotations omitted).

*Dale* made clear that its holding was "not to say an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* "The forced inclusion of an unwanted person in a group infringes the group's freedom of expression if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. That was true in *Dale* because he was a leader in the gay Scouts community. *Id.* at 653. It was untrue in *Roberts*, which rejected an expressive association challenge to enforcement of a state law prohibiting sex discrimination in public accommodations. "We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." 468 U.S. at 623. It is untrue here.

Like the district court, *Starkey I* rejected the assertion that freedom of expressive association precludes a claim of sexual orientation discrimination against a religious organization that opposes homosexuality on religious grounds. 496 F. Supp. 3d at 1209. "*Dale* does not require anti-discrimination laws to give way automatically in the face of a freedom of association defense asserted by an expressive organization." *Id.* at 1208. "[I]f World Vision could raise an expressive

association defense to defeat any Title VII claim, it is difficult to conceive why the Supreme Court would have carved out a specific constitutional exception to liability under Title VII for only ministerial employees." 1-ER-48 (citing *Starkey I*, 496 F. Supp. 3d at 1209). This Court should affirm the district court's rejection of WV's expressive association defense.

### B. Title VII and the WLAD are Not Subject to Strict Scrutiny Because they are at Least Neutral with Respect to Religion and Generally Applicable

The district court also properly dismissed WV's Free Exercise Clause challenge to McMahon's claims. 1-ER-40-45. "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring in the judgment). Free exercise claims "must fail if prohibiting the exercise of religion...is not the *object* of the law but merely the incidental effect of a generally applicable and otherwise valid provision...." *American Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991) (quoting *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 878 (1990)) (internal punctation omitted).

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citation

omitted). Where, as here, "a law is neutral and generally applicable, the rational basis test applies," which asks whether the government action is "rationally related to a legitimate governmental purpose." *Stormans, Inc., v. Selecky*, 586 F.3d 1109, 1137 (9th Cir. 2009). "To invalidate a law reviewed under this standard, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal punctuation and citation omitted).

A law is not neutral with respect to religion "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. That cannot be said of either Title VII or the WLAD. Both statutes require the accommodation of religious beliefs and practices and thereby treat religious exercise more favorably than comparable secular activity. *E.g.*, *Groff v. DeJoy*, 600 U.S. 447, 461-62 (2023); *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 500-01, 325 P.3d 193 (2014). Moreover, Title VII permits religious but not secular employers to discriminate based on religion. 42 U.S.C. § 2000e-1(a). "Title VII neither regulates religious beliefs, nor burdens religious acts, *because* of their religious motivation. On the contrary, it is clear that Title VII is a secular, neutral statute.…" *Vigars v. Valley Christian Ctr. of Dublin, CA*, 805 F. Supp. 802, 809 (N.D. Cal. 1992). Title VII is "a permissible content neutral regulation of conduct." *Mitchell*, 508 U.S. at 487.

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton,* 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884) (internal punctuation omitted). In *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Ed.*, this Court held the policy at issue was not "generally applicable" within the meaning of *Fulton* because the policy had "a *discretionary* mechanism to grant exemptions…." 82 F.4th 664, 687-88 (9th Cir. 2023) (en banc) (emphasis supplied). The school district had no fixed criteria for granting exemptions; "rather, these exemptions are sanctioned based on the District Officials' use of 'common sense' on a case-by-basis." *Id.* at 688.

The district court correctly concluded that neither Title VII nor the WLAD provides individualized exemptions based on the defendant's particular reasons for committing unlawful discrimination, thereby making them not "generally applicable." 1-ER-43-44. Title VII's categorical exceptions for small employers, private clubs, and family businesses; inapplicability to employees in foreign countries where compliance would violate the law of that country; preference for Native Americans on or near reservations; and hostility towards Communists, WV Br. at 55-56, are not discretionary "individualized exemptions." Likewise, whether a defendant can establish a BFOQ defense for an otherwise unlawful employment practice does not depend on "the particular reasons" why the defendant

discriminated. Neither *Fulton* nor *Fellowship of Christian Athletes* suggests that if a statute contains an affirmative defense that *ipso facto* renders the law not "generally applicable." Few statutes would be "generally applicable" under WV's test.

"A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. Government regulations are not neutral with respect to religion "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).[13] Having fewer than 15 or eight employees is not a "secular activity" and is not comparable for First Amendment purposes to having a religious objection to same-sex marriage. As the district court recognized, if Title VII and the WLAD exempted only small secular employers but not small religious ones, then those statutes would not be neutral to religion. 1-ER-44. It is WV who would destroy the statutes' general applicability by carving out a special constitutional exemption for employers who engage in unlawful discrimination for religious reasons.

This Court has already rejected the contention that the First Amendment prohibits application of Title VII to facially discriminatory conduct that is religiously

---

[13] Contrary to what WV suggests, Br. at 60, in *Your 71FiveMinistries v. Williams*, this Court found a violation of the principle based on "selective enforcement" against a religious organization. 24-4101, 2024 WL 3749842, at *2-3 (9th Cir. Aug. 8, 2024).

motivated. In *Fremont Christian School*—which was decided before *Smith* adopted rational basis review for generally applicable laws that are neutral with respect to religion—the employer argued that applying Title VII to its policy of supplying health insurance only to male heads of household would violate the First Amendment because that policy was "grounded in religious belief." 781 F.2d at 1367. Invoking strict scrutiny, this Court disagreed. *Id.* at 1368. "By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a highest priority. Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions." *Id.* at 1368-69 (internal punctuation omitted). *Fremont Christian School*'s conclusion applies *a fortiori* under rational basis review.

The WLAD is a "neutral, generally applicable law subject to rational basis review." *State v. Arlene's Flowers, Inc.*, 193 Wn.2d 469, 523, 441 P.3d 1203 (2019). "And the WLAD clearly meets that standard[.]" *Id.* Moreover, the laws against workplace discrimination in Washington are "an explicit, well-defined, and dominant public policy." *Int'l Union of Operating Eng'rs v. Port of Seattle*, 176 Wn.2d 712, 721, 295 P.3d 736 (2013).

The district court correctly held that *Fremont Christian School* and *Arlene's Flowers* dispose of WV's Free Exercise challenge to the constitutionality of

57

McMahon's sex, sexual orientation, and marital status discrimination claims. 1-ER-44-45. This Court should uphold the district court's decision.

## CONCLUSION

In multiple, thorough opinions faithfully applying U.S. Supreme Court and Ninth Circuit precedent, the district court rejected all of WV's affirmative defenses to McMahon's federal and state employment discrimination claims. This Court is also bound by those precedents and should affirm in all respects.

RESPECTFULLY SUBMITTED this 21st day of October 2024.

FRANK FREED SUBIT & THOMAS LLP

By:  *s/ Michael C. Subit*
    Michael C. Subit, WSBA No. 29189
    Email: msubit@frankfreed.com
    705 Second Avenue, Suite 1200
    Seattle, WA 98104
    P: 206-682-6711
    F: 206-682-0401

NISAR LAW GROUP, P.C.

By:  *s/Casimir Wolnowski*
    Casimir Wolnowski, NYBA No. 4688826
    Email: cwolnowski@nisarlaw.com
    60 East 42nd Street, Suite 4600
    New York, NY 10165
    P: (646) 889-1007

*Attorneys for Appellee*

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number** <u>24-3259</u>

I am the attorney or self-represented party.

**This brief contains 13,723 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>s/Michael C. Subit</u>    **Date** <u>10/21/2024</u>

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be electronically filed the foregoing

document with the Clerk of the Court for the United States Court of Appeals for

the Ninth Circuit by using the appellate ACMS system on October 21, 2024.

Participants in the case who are registered ACMS users will be served by the

appellate ACMS system.

By: *s/Michael C. Subit*
Michael C. Subit, WSBA #29189
705 Second Avenue, Suite 1200
Seattle, Washington 98104
P: 206-682-6711
F: 206-682-0401
msubit@frankfreed.com


Dated: October 21, 2024