No. 24-3259

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WORLD VISION, INC.,

*Defendant-Appellant,*

v.

AUBRY MCMAHON,

*Plaintiff-Appellee.*

On Appeal from the
United States District Court for the Western District of Washington
Case No. 2:21-cv-00920, Hon. James L. Robart

### BRIEF OF AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE AND THE SIKH COALITION AS *AMICI CURIAE* SUPPORTING APPELLEE AND AFFIRMANCE

ALEX J. LUCHENITSER
JENNY SAMUELS
SCOTT LOWDER (Appearing under
  Ninth Cir. R. 46-4)
Americans United for Separation
  of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-3234
*luchenitser@au.org*
*samuels@au.org*
*lowder@au.org*

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amici* are nonprofit corporations. They have no parent corporations, and no publicly held corporation owns any portion of any of them.

# TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................ i

Table of Authorities ...................................................................... iii

Interests of the *Amici Curiae* ......................................................... 1

Introduction ................................................................................. 2

Argument .................................................................................... 4

I.   THE ECCLESIASTICAL-ABSTENTION DOCTRINE DOES NOT SHIELD
     WORLD VISION FROM MCMAHON'S CLAIMS ................................... 4

II.  THE MINISTERIAL EXCEPTION DOES NOT APPLY TO MCMAHON ............... 10

III. WORLD VISION'S OTHER FREE-EXERCISE ARGUMENTS HAVE NO
     MERIT ................................................................................. 17

Conclusion .................................................................................. 20

Certificate of Compliance ............................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413 (3d Cir. 2012)............................................5

*Behrend v. S.F. Zen Ctr., Inc.*,
108 F.4th 765 (9th Cir. 2024) ....................................................... 11, 13

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ....................................................................... 8

*Bollard v. Cal. Province of the Soc'y of Jesus*,
196 F.3d 940 (9th Cir. 1999)............................................................5

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002)...........................................................5

*Butler v. St. Stanislaus Kostka Cath.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022), *appeal dismissed*,
No. 22-1623 (2d Cir. Aug. 26, 2022) .............................................. 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................... 17

*Conlon v. InterVarsity Christian Fellowship*,
777 F.3d 829 (6th Cir. 2015)......................................................... 12

*Demkovich v. St. Andrew the Apostle*,
3 F.4th 968 (7th Cir. 2021) .................................................... 10, 15

*DeWeese-Boyd v. Gordon Coll.*,
163 N.E.3d 1000 (Mass. 2021)....................................................... 14

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ............................................................ 2, 7, 17

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) (en banc) ............................................ 19

*Fitzgerald v. Roncalli High Sch., Inc.*,
73 F.4th 529 (7th Cir. 2023) ......................................................... 11

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ................................................. 3, 7, 17, 18, 19

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ........................................ 9, 10, 11, 12, 16, 17

iii

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls*, 499 U.S. 187 (1991) ...................................................... 6, 18

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ............................................................. 19

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ........................................................................ 4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ........................................................................ 8

*McCarthy v. Fuller*,
714 F.3d 971 (7th Cir. 2013) ............................................................. 4

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968) ........................................................................ 8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ........................................ 2, 3, 7, 9, 10, 11, 13, 14, 16, 17

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) .................................... 2, 3, 4, 5, 6, 16

*Reynolds v. United States*,
98 U.S. 145 (1878) ........................................................................ 8

*Seattle Pac. Univ. v. Ferguson*,
104 F.4th 50 (9th Cir. 2024) ............................................................. 9

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ...................................................... 7, 18

*Tandon v. Newsom*,
593 U.S. 61 (2021) .............................................................. 4, 7, 17, 18, 19

*Tony & Susan Alamo Found. v. Sec'y of Lab.*,
471 U.S. 290 (1985) ........................................................................ 8

*United States v. Lee*,
455 U.S. 252 (1982) ........................................................................ 8

*Woods v. Seattle's Union Gospel Mission*,
481 P.3d 1060, 1072 (Wash. 2021), *cert. denied*, 142 S. Ct. 1094 (2022) ..... 14

*Youth 71Five Ministries v. Williams*,
No. 24-4101, 2024 WL 3749842 (9th Cir. Aug. 8, 2024) ................................ 19

**Statutes**

42 U.S.C. § 2000e-2(e) ............................................................ 18

Wash. Rev. Code § 49.60.180(1) ............................................ 18

**Other Authorities**

Alliance Defending Freedom, *Protecting Your Ministry* (2018),
  https://perma.cc/2KSY-KNCC ............................................. 16

Donn C. Meindertsma, *Mitigating Risk with the Ministerial
  Exception*, Conner & Winters (Mar. 2019),
  https://perma.cc/5WKN-KBC2 ........................................ 15, 16

McGuireWoods, *U.S. Supreme Court Broadens Ministerial
  Exemption to Employment Discrimination Claims* (July 10,
  2020), https://perma.cc/Q3EB-HV6S ................................. 15

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* **Americans United for Separation of Church and State** and **The Sikh Coalition** are civil-rights organizations committed both to ensuring the effective enforcement of our nation's antidiscrimination laws and protecting religious freedom under the First Amendment. *Amici* believe that religious employers' rights to select their ministers without courts' involvement need not and should not extend to exempting religious employers from complying with all workplace laws that protect employees against discrimination based on sex, race, disability, or any other protected class. *Amici* further believe that the right to exercise religion freely is precious and should never be misused to cause harm.

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

## INTRODUCTION

The First Amendment "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Although afforded dominion over matters of faith, religiously affiliated institutions are not, and have never been, above the laws that govern everyone else. Indeed, "[a]ny society adopting such a system would be courting anarchy." *Emp. Div. v. Smith*, 494 U.S. 872, 888 (1990).

Despite this, World Vision claims that it was allowed to rescind a job offer to Plaintiff Aubry McMahon because she was in a same-sex marriage —an action that constitutes unlawful discrimination in direct violation of Title VII and the Washington Law Against Discrimination (WLAD). World Vision may disagree with the result Title VII and WLAD require here, but that does not mean that the laws' applications violate the ecclesiastical-abstention doctrine[2] or the ministerial exception, or otherwise violate the Free Exercise Clause.

---

[2] World Vision calls the doctrine "church autonomy." The two terms are interchangeable. This brief follows the Ninth Circuit's convention of using "ecclesiastical abstention." *See, e.g.*, *Puri v. Khalsa*, 844 F.3d 1152, 1162–64 (9th Cir. 2017).

As the district court correctly held, ecclesiastical abstention is a narrow doctrine that simply prevents courts from intervening in religious disputes. 1-ER-69.[3] The ecclesiastical-abstention doctrine does not preclude courts from resolving disputes involving religious parties if such disputes are capable of being determined on the basis of "neutral principles of law," "without resolving underlying controversies over religious doctrine." *Puri*, 844 F.3d at 1152, 1154, 1166 (citations omitted). This Court can adjudicate McMahon's claims by reference to neutral principles, and the ecclesiastical-abstention doctrine therefore does not bar McMahon's suit.

Likewise, McMahon is not subject to the ministerial exception because, based on the record evidence, the customer-service representative position she was offered is administrative and secular. Time and again, the Supreme Court and this Court have made clear that the ministerial exception requires a fact-based and functional test. "What matters, at bottom, is what an employee *does*." *Morrissey-Berru*, 591 U.S. at 753 (emphasis added). The district court properly weighed the evidence and concluded that the position at issue—a customer-service representative—is not covered by the exception. 1-ER-38.

---

[3] All "X-ER-XXXX" citations are to World Vision's record excerpts and indicate first the volume and then the page number.

3

Finally, World Vision's argument that Title VII and WLAD are not generally applicable and that they therefore violate the Free Exercise Clause is without basis. *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and *Tandon v. Newsom*, 593 U.S. 61 (2021), on which World Vision relies, hold only that laws that contain individualized, discretionary exemptions or that impermissibly favor secular over religious conduct trigger strict scrutiny; those cases do not support the invalidation of laws like Title VII and WLAD that contain objective, categorical exemptions. Accepting World Vision's arguments would yield untenable results and open the door to challenges to all laws containing routine exemptions.[4]

## ARGUMENT

## I. THE ECCLESIASTICAL-ABSTENTION DOCTRINE DOES NOT SHIELD WORLD VISION FROM MCMAHON'S CLAIMS.

**1.** Stemming from the First Amendment's Free Exercise and Establishment Clauses, the ecclesiastical-abstention doctrine prevents courts from answering religious questions, ensuring that neither courts nor the political branches decide "matters of church government" or "those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox*

---

[4] While *amici* write only on issues raised under the Religion Clauses of the First Amendment—ecclesiastical abstention, the ministerial exception, and the Free Exercise Clause—we also agree with McMahon's arguments regarding Title VII's and WLAD's religious exemptions and the Free Speech Clause of the First Amendment.

*Church,* 344 U.S. 94, 116 (1952); *see also Puri*, 844 F.3d at 1162–64. Thus, for example, a court cannot question an ecclesiastical body's determination about who qualifies as a nun, *McCarthy v. Fuller*, 714 F.3d 971, 978 (7th Cir. 2013), probe the reasonableness of a church-member's excommunication, *Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 419–20 (3d Cir. 2012), or dictate internal church discussions about religious doctrine, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002).

The ecclesiastical-abstention doctrine "does not mean, however, that civil courts have no role in disputes involving religious organizations." *Puri*, 844 F.3d at 1164. Even when the parties have religious affiliations, courts may resolve disputes that can be decided by reference to neutral principles of law and without delving into religious questions. *See id.* at 1165. If "[n]othing in the character of [the case] will require . . . evalua[tion of] religious doctrine or the 'reasonableness'" of religious practices, then the ecclesiastical-abstention doctrine does not apply. *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999).

Ecclesiastical abstention does not bar McMahon's suit. This case does not entail a dispute over "religious doctrine"; nor must this Court decide whether World Vision correctly "applied ecclesiastical rules" in making its employment decision. *See Puri*, 844 F.3d at 1167. The question here is

5

whether World Vision unlawfully discriminated against McMahon on the basis of sex, sexual orientation, and marital status in violation of Title VII and WLAD. To answer that question, this Court need only look to World Vision's facially discriminatory policy of excluding from employment individuals in same-sex marriages. Though World Vision does offer a religious justification for its discrimination, "[w]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on *why* the employer discriminates but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls*, 499 U.S. 187, 199 (1991) (emphasis added). Thus, McMahon's suit "concerns the defendants' actions, not their beliefs," and there is no need to "pass[ ] judgment on questions of religious faith or doctrine." *Puri*, 844 F.3d at 1167–68 (citations omitted). The ecclesiastical-abstention doctrine is not applicable.

**2.** World Vision does not dispute the fact that its employment practices facially discriminate against individuals in same-sex marriages. Nor does it assert that resolution of McMahon's claims requires judicial interference in a religious dispute. Instead, World Vision argues that ecclesiastical abstention bars McMahon's claims because (1) World Vision had a religious justification for discriminating, and (2) Title VII and WLAD violate World Vision's right to set religious membership standards. World Vision Br. at

33. But expanding the ecclesiastical-abstention doctrine in the way World Vision advocates would require this Court to circumvent broad swaths of First Amendment law—namely, *Smith*, 494 U.S. at 872, and the ministerial-exception doctrine, *see Morrissey-Berru*, 591 U.S. at 747.

Under *Smith*, laws that are religiously neutral and generally applicable are subject only to rational-basis review, meaning that they are valid so long as they are rationally related to a legitimate governmental interest, even when they incidentally burden the exercise of religion. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015). To invoke more exacting judicial scrutiny, a religious objector must show that the challenged law is not neutral and generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" or "restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533–34; *see also Tandon*, 593 U.S. at 61 (holding that a governmental body may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying state interests at issue).

World Vision's proposed interpretation of the ecclesiastical-abstention doctrine would effectively abrogate *Smith*—something this Court cannot do. Under World Vision's view, religious entities could opt out of neutral and generally applicable employment-nondiscrimination requirements simply

7

by stating a religious justification for their actions. *See* World Vision Br. at 33.

The Supreme Court has squarely rejected that approach. To allow religious actors to opt out in every instance of conflict between the law and religious belief "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Reynolds v. United States*, 98 U.S. 145, 167 (1878). "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring).

Thus, the Supreme Court has long refused interpretations of the First Amendment that allow opting out of compliance with a law solely based on a religious objection, without more. For example, the Court has rejected bids for religious exemptions in cases challenging civil-rights laws, *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603–04 (1983), social security requirements, *United States v. Lee*, 455 U.S. 252, 254 (1982), and wage-and-hour regulations, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 305–

06 (1985). World Vision's view of ecclesiastical abstention cannot be squared with any of these cases.

World Vision's ecclesiastical-abstention argument would also make the ministerial exception a dead letter. The First Amendment's Religion Clauses shield religious employers from liability for discrimination against ministerial employees—*i.e.*, those who play an important role in preaching or teaching the faith. *Morrissey-Berru*, 591 U.S. at 747. That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 199 (2012) (Alito, J., concurring)—would encroach on a religious group's freedom to "shape its own faith and mission," *id.* at 188 (majority opinion).

But the ministerial exception does not protect *every* decision regarding employment, and so the ecclesiastical-abstention doctrine cannot properly be interpreted to achieve the same result. If the ecclesiastical-abstention doctrine allowed religious employers to opt out of employment-nondiscrimination laws, then there would be no need to have a ministerial exception. A religious employer seeking an exemption from an employment-nondiscrimination law could simply cite interference with membership qualifications and be free of the law's requirements, regardless of whether the employees affected by the law carry out ministerial duties. The

ecclesiastical-abstention doctrine does not require this. *Cf. Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024) ("A religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike."). This Court should reject World Vision's invitation to hold otherwise.

## II. THE MINISTERIAL EXCEPTION DOES NOT APPLY TO MCMAHON.

**1.** The ministerial exception protects a religious institution's ability to select which employees will "serve[ ] as a messenger or teacher of its faith." *Morrissey-Berru*, 591 U.S. at 754 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). When the exception applies, it strips workers of the ability to succeed on certain employment claims, even if they've suffered blatant "invidious discrimination." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 989 (7th Cir. 2021) (en banc) (Hamilton, J., dissenting). Because of its potent effect, the exception applies only to "personnel who are essential to the performance" of religious functions. *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). The exception must always be "tailored to this purpose." *Id.*

There is no "rigid formula" for determining whether an employee is a minister. *Hosanna-Tabor*, 565 U.S. at 190. Instead, the fact-intensive analysis requires the reviewing court to "take all relevant circumstances into account" and determine whether an employee "performed vital

religious duties." *Morrissey-Berru*, 591 U.S. at 756, 758. The Supreme Court has identified four primary considerations, three of which are relevant here: the employee's job title, the employee's religious or secular training, and the employee's job responsibilities. *Hosanna-Tabor*, 565 U.S. at 190–92.[5] Of those, the most important is the third factor: the employee's day-to-day duties. *Morrissey-Berru*, 591 U.S. at 753–54. "What matters, at bottom, is what an employee does," *id.* at 753, and is entrusted to do, *see Behrend v. S.F. Zen Ctr., Inc.*, 108 F.4th 765, 770 (9th Cir. 2024). For example, employees may be ministers if they are teachers that regularly lead students in prayer, *Hosanna-Tabor*, 565 U.S. at 192, or live and work full-time at a temple with duties that include ceremonial religious tasks like cleaning altars, *Behrend*, 104 F.4th at 770. And evidence—not the employer's say-so—shows whether an employee actually performed or was tasked with performing religious duties*, see id.* at 770; *see also Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 531 (7th Cir. 2023) (stating that the employer bears the ultimate burden of proving that an employee is a minister under the ministerial exception).

---

[5] The fourth factor, how the employee was held out to others, is not relevant in this case because McMahon never began working at World Vision. *See* 1-ER-33.

**2.** The evidence in this case does not support World Vision's contention that McMahon's role falls into the ministerial exception. Here, all three factors, and a holistic view of what customer-service representatives do at World Vision, weigh in McMahon's favor and support the district court's conclusion that her position was not ministerial.

First, nothing about McMahon's proposed title suggests that she served in a religious role. Unlike a "Minister of Religion," *Hosanna-Tabor*, 565 U.S. at 177, or a "spiritual director," *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015), the title in the job posting McMahon applied to was "Customer Service Representative," and the title in her offer letter was "Donor/Customer Service Representative Trainee." 3-ER-530; 3-ER-472. These titles are entirely secular and weigh against the application of the ministerial exception.

Second, McMahon was not required to undergo "a significant degree of religious training" or "a formal process of commissioning" to become a customer-service representative. *Hosanna-Tabor*, 565 U.S. at 191. In *Hosanna-Tabor*, the teacher's religious training included "eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher," as well as "an oral examination by a faculty committee at a Lutheran college." *Id.* Here, the customer-service representative position required only minimal, informal religious training,

*see* 2-ER-312, not "rigorous" training that would "set [the employee] apart from laypersons," *Conlon*, 777 F.3d at 835. While this is not dispositive, it does weigh against application of the ministerial exception.

Third, the responsibilities of customer-service representatives at World Vision do not serve important and distinctly religious functions. In *Morrissey-Berru*, the teachers "were entrusted most directly" with the responsibility of "guid[ing] their students . . . toward the goal of living their lives in accordance with the faith." 591 U.S. at 757. They were "required to participate in '[s]chool liturgical activities,'" "provide[] religious instruction every day," "locate, read and understand stories from the Bible," prepare "students for participation in" mass, communion, and confession, "take [students] to confession and to pray the Stations of the Cross," and "beg[i]n or end[] every day with a Hail Mary." *Id.* at 740–41. Similarly, in *Behrend v. S.F. Zen Center, Inc.*, this Court found the ministerial exception applicable to an apprentice at a Zen Buddhist temple where his day-to-day work was "an essential component of Zen training and is indistinguishable from other forms of practice." 108 F.4th at 767. The apprentice lived at the temple full-time as a monk, engaged in twice-daily meditations and services, cleaned the temple, attended dharma talks, went to classes, and performed doan ryo ceremonial tasks to support the formal practice of the temple. *Id.* at 767, 770.

Here, by contrast, the duties of a customer-service representative—which include "[a]nswer[ing] incoming calls" and "[a]chieve[ing] and maintain[ing] an acceptable level of individual statistics to accomplish Call Center business goals"—are predominately secular. 3-ER-531. And although two of the thirteen duties listed on the job description have religious components, *see id.*, that does not transform the customer-service representative position into a distinctly religious role. *See Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1072 (Wash. 2021) (Yu, J., concurring) ("[T]o the extent ODLS staff attorneys are tasked with furthering SUGM's religious mission, the same is true of every Mission employee." (internal quotation marks omitted)), *cert. denied*, 142 S. Ct. 1094 (2022).[6] Indeed, "[t]he integration of religious faith and belief with daily life and work is a common requirement in many, if not all, religious institutions," but if that were dispositive it would mean the ministerial exception covers "everyone in the community, whether they be coaches, food service workers, or transportation providers"—"a significant expansion of

---

[6] Because World Vision rescinded McMahon's employment offer before she began work, World Vision's job posting is an appropriate source of authority. *See Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 193–94, 196 (E.D.N.Y. 2022) (relying on public job listing in determining whether the ministerial exception applied to a Catholic school teacher where the teacher was terminated before the school year began), *appeal dismissed*, No. 22-1623 (2d Cir. Aug. 26, 2022).

14

the ministerial exception well beyond 'individuals who play certain key roles' in a religious institution." *DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1017 (Mass. 2021) (quoting *Morrissey-Berru*, 591 U.S. at 746).

**3.** If this Court accepts that the limited religious components of McMahon's job qualify her as a minister, millions of employees at religious organizations could be stripped of fundamental civil rights and basic workplace protections. Employers could do an end-run around employment laws simply by writing some religious duties into otherwise secular job descriptions, turning into ministers employees who tangentially further the mission of their employers by performing only minimal religious duties.

This concern is not hypothetical: "[M]any employers with religious affiliations, such as hospitals and schools, are trying to expand the reach of the ministerial exception to cover a much broader range of their employees, such as teachers, nurses, and other health-care workers." *Demkovich*, 3 F.4th at 995 (Hamilton, J., dissenting). Law firms and advocacy groups are already advising religiously affiliated employers on how to "squeeze into the cleft" of the ministerial exception to avoid Title VII's requirements. McGuireWoods, *U.S. Supreme Court Broadens Ministerial Exemption to Employment Discrimination Claims* (July 10, 2020), https://perma.cc/Q3EB-HV6S. One law firm, for example, suggests that religious employers "distribut[e] religious duties to as many staff members

15

as is reasonably appropriate," so that the employer "can increase the *perception* that employees who have those duties are ministers." Donn C. Meindertsma, *Mitigating Risk with the Ministerial Exception*, Conner & Winters (Mar. 2019), https://perma.cc/5WKN-KBC2 (emphasis added). The advocacy organization Alliance Defending Freedom recommends that, "for legal purposes," religious employers should "detail how the receptionist is required to answer basic questions about the church's faith, provide religious resources, or pray with callers." Alliance Defending Freedom, *Protecting Your Ministry* 13 (2018), https://perma.cc/2KSY-KNCC.

If endorsed by the courts, this kind of gamesmanship could leave millions of workers without basic legal protections at work. Consider receptionists, help-line employees, and call-center workers—all individuals in customer-service positions with public-facing jobs that may be directed to communicate the religious mission of their employer to callers. If World Vision had its way, these employees would no longer receive protection from discriminatory hiring and firing decisions. By simply requiring all employees to attend weekly chapel, occasionally lead team devotionals, or answer questions about the organization on the phone, religious employers could defeat employment-discrimination claims.

That is not what the First Amendment requires: the exception protects religious institutions against governmental intrusion into their internal

decisions about who will "minister to the faithful" to fulfill their religious purpose. *Puri*, 844 F.3d at 1162. In both *Hosanna-Tabor* and *Morrissey-Berru*, the Supreme Court declined to adopt a ministerial-exception test that would "defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial.'" *Morrissey-Berru*, 591 U.S. at 762–63 (Thomas, J., concurring); *see also Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring). The exception does not and should not allow employers to opt out of antidiscrimination laws merely by declaring anyone and everyone a minister.

## III. WORLD VISION'S OTHER FREE-EXERCISE ARGUMENTS HAVE NO MERIT.

The Supreme Court held in *Smith* that laws that apply generally and are neutral with respect to religion do not trigger heightened scrutiny. 494 U.S. at 879. General applicability is the requirement that the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). Government thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying governmental interests. *See Tandon*, 593 U.S. at 62. Nor may the government utilize a "formal system of entirely discretionary" and "individualized" exemptions to favor requests for secular exceptions over

17

religious ones. *See Fulton*, 593 U.S. at 533, 536 (quoting *Smith*, 494 U.S. at 884). World Vision's arguments that Title VII and WLAD are not generally applicable, and therefore subject to strict scrutiny, are unavailing and should be rejected.

First, World Vision argues (Br. at 59–60) that Title VII and WLAD trigger strict scrutiny because the statutes provide a BFOQ defense, which allows employers to make decisions based on otherwise protected characteristics if they are "reasonably necessary to the normal operation of that particular business." 42 U.S.C. § 2000e-2(e); *see also* Wash. Rev. Code § 49.60.180(1). But the BFOQ defense entails "objective, verifiable requirements," *Johnson Controls*, 499 U.S. at 201, and therefore bears no resemblance to the unfettered discretion that the Supreme Court has held triggers strict scrutiny. *See Fulton*, 593 U.S. at 533–34; *see also, e.g.*, *Stormans*, 794 F.3d at 1081–82 (finding that the challenged "rules do not afford unfettered discretion that could lead to religious discrimination because the provisions are tied to particularized, objective criteria").

Next, World Vision argues that Title VII and WLAD treat "comparable secular activity more favorably than religious exercise" by including certain objective exemptions. World Vision Br. at 60 (citing *Tandon*, 593 U.S. at 62). But unlike the Covid restrictions in *Tandon*, 593 U.S. at 63, which disfavored religiously motivated conduct, Title VII and WLAD's exemptions

18

do not disfavor religion. For example, the small-business exemption allows all businesses under fifteen employees to discriminate based on otherwise protected characteristics, without any consideration whatsoever of religious or secular justifications.

The cases World Vision cites involve selective enforcement of antidiscrimination policies that allowed secular, but not religious, groups to discriminate on protected grounds. *See, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc) (finding that school district allowed secular, but not religious, student groups to discriminate on protected grounds that included race and gender); *Youth 71Five Ministries v. Williams*, No. 24-4101, 2024 WL 3749842, at *3 (9th Cir. Aug. 8, 2024) (finding that state allowed secular, but not religious, groups that discriminated based on race and gender to receive grants). No such selective enforcement disfavoring religious groups is present here.

Put together, World Vision's interpretation of *Fulton* and *Tandon* would yield untenable results. Even post-*Fulton*, "neither the Supreme Court . . . nor any other court of which we are aware has ever hinted that a law must apply to all people, everywhere, at all times, to be 'generally applicable.'" *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021). Yet this is precisely

what World Vision's view would require, resulting in uncountable statutes being struck down simply because they do not apply to everyone in all cases.

## CONCLUSION

For these reasons, the Court should reject World Vision's arguments and affirm the judgment of the district court.

Respectfully submitted,

s/*Alex J. Luchenitser*
ALEX J. LUCHENITSER
JENNY SAMUELS
SCOTT LOWDER (Appearing under
   Ninth Cir. R. 46-4)
Americans United for Separation of
   Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-3234
*luchenitser@au.org*
*samuels@au.org*
*lowder@au.org*

*Counsel for* Amici Curiae

Date: October 28, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: 24-3259

I am the attorney or self-represented party.

**This brief contains 4,082 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: s/*Alex J. Luchenitser*    **Date:** October 28, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*