No. 24-3259

𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕹𝖎𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

WORLD VISION, INC.,
Defendant-Appellant,

v.

AUBRY MCMAHON,
Plaintiff-Appellee.

Appeal from the United States District Court
for the Western District of Washington
Honorable James L. Robart
(2:21-cv-00920-JLR)

**DEFENDANT-APPELLANT'S REPLY BRIEF**

NATHANIEL L. TAYLOR
ABIGAIL J. ST. HILAIRE
ELLIS, LI & MCKINSTRY PLLC
1700 Seventh Avenue, Suite 1810
Seattle, WA 98101
(202) 682-0565
*ntaylor@elmlaw.com*

SCOTT J. WARD
J. MATTHEW SZYMANSKI
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Tysons, Virginia 22182
(703) 761-5012
*sjw@gg-law.com*

DANIEL H. BLOMBERG
 *Counsel of Record*
LUKE W. GOODRICH
JORDAN T. VARBERG
AMANDA G. DIXON
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
 Suite 400
Washington, DC 20006
(202) 955-0095
*dblomberg@becketlaw.org*

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION ......................................................................... 1

ARGUMENT ............................................................................... 4

I. McMahon's claims are barred by church autonomy. .......................... 4

    A. Church autonomy's protection for selection of
       ministers bars McMahon's claims. ..................................... 4

        1. Representatives are entrusted with important
          religious duties................................................... 4

        2. McMahon's ministerial status is not diminished
          by other employees' religious duties. ........................ 7

        3. McMahon fails in her attempts to downplay the
          role's religious requirements. ................................. 8

        4. The ministerial exception has long covered
          diverse roles. .................................................. 10

    B. Church autonomy's protection for religious
       membership decisions bars McMahon's claims............................ 12

        1. McMahon's claims entangle courts in religion......................... 12

        2. McMahon's counterarguments lack merit. .............................. 16

        3. McMahon's position will cause severe
          church-state conflict. ......................................... 17

II. McMahon's claims are barred by Title VII and
    the WLAD. ....................................................... 18

    A. The statutory religious exemptions apply.................................. 18

B. The bona fide occupational qualification defenses apply. ....................................................... 21

III. McMahon's claims are barred by freedom of expressive association. ..................................... 22

    A. Expressive association applies to employment law. ................................................... 23

    B. McMahon's claims burden World Vision's expression.................................................... 24

    C. McMahon doesn't justify the burden on expression..................................................... 27

IV. McMahon's claims are barred by the Free Exercise Clause............ 28

CONCLUSION .................................................. 32

CERTIFICATE OF COMPLIANCE........................................ 33

CERTIFICATE OF SERVICE................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative v. Elenis*,
  600 U.S. 570 (2023)....................................................................23

*Agency for Int'l Dev. v. AOSI*,
  570 U.S. 205 (2013)....................................................................26

*Askew v. Trs. of Gen. Assembly*,
  684 F.3d 413 (3d Cir. 2012) .......................................................14

*Behrend v. S.F. Zen Ctr.*,
  108 F.4th 765 (9th Cir. 2024) ..................................... 4, 8, 10-11

*Billard v. Charlotte Catholic High Sch.*,
  101 F.4th 316 (4th Cir. 2024) .....................................................10

*Bostock v. Clayton County*,
  590 U.S. 644 (2020).......................................... 1, 18, 19, 28

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)..............................................................23, 25

*Bryce v. Episcopal Church*,
  289 F.3d 648 (10th Cir. 2002)................................................15, 16

*Calvary Chapel v. Sisolak*,
  982 F.3d 1228 (9th Cir. 2020)......................................................29

*Cannata v. Diocese of Austin*,
  700 F.3d 169 (5th Cir. 2012)..........................................................8

*Carson v. Makin*,
  596 U.S. 767 (2022)......................................................................14

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006).........................................................26

iii

*Conlon v. IVCF*,
   777 F.3d 829 (6th Cir. 2015) .......................................................... 7

*Corp. of Presiding Bishop v. Amos*,
   483 U.S. 327 (1987) ................................................................ 1, 17

*Curay-Cramer v. Ursuline Acad.*,
   450 F.3d 130 (3d Cir. 2006) .................................. 14, 17, 19

*DeMarco v. Holy Cross High Sch.*,
   4 F.3d 166 (2d Cir. 1993) .................................................. 15

*EEOC v. Diocese of Raleigh*,
   213 F.3d 795 (4th Cir. 2000) ........................................ 8, 10

*EEOC v. Fremont Christian Sch.*,
   781 F.2d 1362 (9th Cir. 1986) .......................................... 19

*EEOC v. Miss. Coll.*,
   626 F.2d 477 (5th Cir. 1980) ............................................ 19

*EEOC v. Pac. Press Publ'g Ass'n*,
   676 F.2d 1272 (9th Cir. 1982) .......................................... 19

*EEOC v. Townley Eng'g*,
   859 F.2d 610 (9th Cir. 1988) ............................................ 19

*Fellowship of Christian Athletes v. San Jose Unified Sch.
Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ................. 3, 27, 28, 29, 30, 31

*Fitzgerald v. Roncalli*,
   73 F.4th 529 (7th Cir. 2023) .......................................... 11

*Fraternal Ord. of Police v. City of Newark*,
   170 F.3d 359 (3d Cir. 1999) ............................................ 31

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021).......................................... 27, 28, 29

*Garcia v. Salvation Army*,
   918 F.3d 997 (9th Cir. 2019)............................................ 19

iv

*Green v. Miss United States of Am.,*
  52 F.4th 773 (9th Cir. 2022) ................................................................ 25, 26, 27

*Grussgott v. Milwaukee Jewish Day Sch.,*
  882 F.3d 655 (7th Cir. 2018) .......................................................................... 10

*Hishon v. King & Spalding,*
  467 U.S. 69 (1984) ............................................................................... 23, 30-31

*Hosanna-Tabor v. EEOC,*
  565 U.S. 171 (2012) .................................................. 6, 8, 9, 11, 14, 15, 24, 26

*Hunter v. U.S. Dep't of Educ.,*
  115 F.4th 955 (9th Cir. 2024) ....................................................................... 20

*Kennedy v. Bemerton Sch. Dist.,*
  597 U.S. 507 (2022) ...................................................................................... 24

*McDermott v. Ampersand Publ'g,*
  593 F.3d 950 (9th Cir. 2010) ......................................................................... 24

*New Hope Fam. Servs. v. Poole,*
  966 F.3d 145 (2d Cir. 2020) .......................................................................... 24

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) ................................................................................. 18, 28

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  591 U.S. 732 (2020) .................................................... 6, 8, 10, 11, 22

*Pime v. Loyola Univ.,*
  803 F.2d 351 (7th Cir. 1986) ......................................................................... 21

*Puri v. Khalsa,*
  844 F.3d 1152 (9th Cir. 2017) ............................................................. 13, 14, 15

*Redgrave v. Bos. Symphony Orchestra,*
  855 F.2d 888 (1st Cir. 1988) ......................................................................... 24

*Runyon v. McCrary,*
  427 U.S. 160 (1976) ...................................................................................... 28

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ................................................................ 12

*Shaliehsabou v. Hebrew Home*,
    363 F.3d 299 (4th Cir. 2004) ............................................... 10

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ................................... 23-24, 26

*Spencer v. World Vision*,
    633 F.3d 723 (9th Cir. 2011) ........................................ 15, 19

*Starkey v. Roman Catholic Archdiocese*,
    41 F.4th 931 (7th Cir. 2022) ............................... 7, 8, 11, 20

*Sterlinski v. Catholic Bishop*,
    934 F.3d 568 (7th Cir. 2019) ............................................... 10

*Students for Fair Admissions v. President & Fellows of
    Harvard Coll.*,
    600 U.S. 181 (2023) ............................................................... 28

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ................................................. 28, 30, 31

*Teamsters v. Wash. Dep't of Corr.*,
    789 F.3d 979 (9th Cir. 2015) ............................................... 22

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) ............................................................... 15

*Turner v. U.S. Agency*,
    502 F.Supp.3d 333 (D.D.C. 2020) ..................................... 24

*Union Gospel Mission v. Ferguson*,
    2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) .............. 27, 31

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) ............................................ 17

*Werft v. Desert Sw. Ann. Conf.*,
    377 F.3d 1099 (9th Cir. 2004) ............................................ 15

**Statutes**

28 U.S.C. § 2403 ............................................................ 22

42 U.S.C. § 1981 ............................................................ 28

42 U.S.C. § 2000e ................................................... 20, 21

42 U.S.C. § 2000e-1 ....................................................... 20

42 U.S.C. § 2000e-2 ....................................................... 28

42 U.S.C. § 2000e-5 ....................................................... 30

**Other Authorities**

29 C.F.R. § 1604.2 .................................................. 27, 30

EEOC, *Compliance Manual* (Jan. 15, 2021) ......................... 20

Russell K. Robinson, *Casting and Caste-Ing*,
  95 Calif. L. Rev. 1 (2007) ....................................... 30

## INTRODUCTION

The question before this Court remains simple, but is now even more significant: May religious ministries ask their employees to comply with their core religious teachings?

The right to "condition employment" on "subscription to particular religious tenets" has long been core to the "autonomy of religious organizations." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). For many churches, synagogues, mosques, and religious groups like World Vision, those tenets include the belief that marriage is a sacred union between a man and a woman.

But now, in the eyes of not only Plaintiff Aubry McMahon but also the EEOC and nineteen states (including Washington), that is illegal. As they see it, requiring employees to follow such tenets constitutes invidious discrimination which is both banned by employment law and unprotected by the First Amendment.

Neither McMahon nor her amici identify a single federal appellate court that has accepted this argument. None have. Rather, *Bostock v. Clayton County*—the same decision that recognized McMahon's Title VII rights—emphasized that courts must "preserv[e] the promise of the free exercise of religion enshrined in our Constitution" to protect against requiring employers "to violate their religious convictions." 590 U.S. 644, 681-82 (2020).

1

Courts have repeatedly kept that promise. They've held that First Amendment rights to church autonomy, expressive association, and the free exercise of religion protect sincere beliefs like World Vision's. Breaking the promise, as McMahon asks, would be sharply inconsistent with the longstanding First Amendment doctrines of the Supreme Court and this Court, squarely split with the Second and Tenth Circuits, and spark new, intractable church-state conflict throughout this Circuit.

That's more than enough reason to reverse the district court. But McMahon supplies more.

***First***, take church autonomy. McMahon concedes that she was expected to perform numerous religious duties, including important ones unique to her role. Those concessions confirm her claim is barred by church autonomy's protection for selecting ministers. Similarly, she agrees that resolving her claims must be religion-neutral, but her own arguments show it is inescapably entangling. For instance, McMahon and her amici demand this Court not only parse different types of prayer, but also second-guess World Vision's beliefs on the substance of its religious mission, the importance of its religious standards of conduct, and the relationship between the two. All of this confirms her claim is barred by church autonomy's protection for religious membership qualifications.

***Second***, McMahon fares no better regarding the protections for religious groups found in Title VII and the Washington Law Against

Discrimination. There, she asks this Court to ignore the actual text of these protections, to treat dicta as precedent, and to reject World Vision's belief that employees who communicate its faith should not publicly undermine it. Those are not things courts may do.

**Third**, to avoid World Vision's expressive-association precedent, McMahon argues that expressive association simply doesn't apply to employment law at all. Her sole basis for that remarkable claim is a single paragraph from a Supreme Court decision which says the opposite. And accepting her claim would require squarely splitting with the Second Circuit. Moreover, she fails in her attempts to justify forcing World Vision to accept a religious dissenter as its public representative, since Title VII and the WLAD exempt the vast majority of employers from precisely the burden she seeks to impose here.

**Fourth**, that same underinclusiveness is also fatal to her arguments on the Free Exercise Clause. A law isn't "generally applicable" when it prevents World Vision from exercising the same freedom for *one* employee that the government freely grants to employers of *millions*. Nor is it sufficiently compelling to violate free-exercise rights.

Thus, McMahon's claims are barred. "Anti-discrimination laws," to be sure, serve "undeniably admirable goals." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc). But where, as here, those laws are applied in ways that "collide with the protections of the Constitution, they must yield." *Id.*

3

## ARGUMENT

## I. McMahon's claims are barred by church autonomy.

McMahon's claims violate two distinct components of the Religion Clauses' protection for church autonomy: a religious organization's (A) selection of ministers, and (B) upholding of religious moral standards for members. Br.19-43.

### A. Church autonomy's protection for selection of ministers bars McMahon's claims.

The first protection concerns selecting "ministers": employees entrusted with important religious duties. Here, the class of World Vision employees that McMahon sought to join—representatives—carry out World Vision's religious mission as its public voice and face. Br.24-29. They minister to supporters, donors, partners, and colleagues, including through personal prayer. Br.24-29. And they receive heightened training for their unique religious responsibilities. Br.29. They accordingly hold an important "role in carrying out [World Vision's] mission" and are ministers. *Behrend v. S.F. Zen Ctr.,* 108 F.4th 765, 769 (9th Cir. 2024). McMahon's contrary arguments fail.

### 1. Representatives are entrusted with important religious duties.

McMahon first claims representatives' roles are "overwhelmingly secular." Opp.33. Her own brief disproves that. McMahon concedes that the district court "properly determined" that "representatives perform a ***uniquely important religious function*** at World Vision by praying

4

with donors if comfortable and when appropriate." Opp.33 (emphasis added). She likewise concedes that representatives "have a 'call to ministry,'" Opp.25, and are expected to:

- "communicat[e] World Vision's Christian faith and witness … accurately and with integrity." Opp.28.

- "effectively communicate World Vision's involvement in ministries." Opp.4.

- "keep Christ central in [their] individual … lives." Opp.3.

- "carry out [World Vision's] Christian … mission." Opp.24.

- "[p]ersonify the ministry of World Vision by … ministering to others through life, deed, word and sign." Opp.24;

- "[w]itness to Jesus Christ." Opp.25.

- "call[] others to a life-changing commitment to serve the poor in the name of Christ." Opp.25.

- support the "spiritual growth" of "supporters, partners and donors" and "transformation of their values, beliefs, and behaviors." Opp.28-29.

- "enhance their colleagues' 'spiritual development.'" Opp.29.

- "[a]ttend and participate in the leadership of devotions, weekly Chapel services, and regular prayer." Opp.24.

- "pray on the job." Opp.8.

- "represent … the Gospel of Jesus Christ[] in their work as well as in their private lives." Opp.28.

In the end, the only "overwhelming" thing about representatives' duties is how thoroughly religious they are.

5

McMahon's attempt to cast her role as "secular" boils down to the long-rejected "stopwatch" method: calculating how many "minutes of each workday" are religious versus secular. *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 193-94 (2012). But even when "religious duties consume[] only 45 minutes" daily, an employee is still ministerial if those duties are important to the ministry's religious mission. *Id.* at 193; EPPC Br.12-17.

Further, the duties McMahon brands "secular" are often the means by which representatives perform their religious role. EPPC Br.11-12. Handling "inbound" and "outbound" calls, 4-ER-845, involves "communicating World Vision's Christian faith and witness" and offering prayer. Opp.28; *see* Br.24-27; 4-ER-822–23 ¶42. Similarly, "respond[ing] to up-sell opportunities and actively cross-selling other WV programs," 4-ER-845, requires being well-versed in World Vision's religious "ministries and projects," Br.9, and gives supporters "an opportunity to partner with [World Vision] in stewarding God's resources," Br.25.

Nor does McMahon's quibbling over "title" and "training" help her. Opp.20-21. Such considerations are not "important" in every case, and McMahon's arguments here mirror the unsuccessful ones of the *Our Lady* plaintiffs who didn't see "teacher" as a religious title or their training as sufficiently religious. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 752-53, 758-59 (2020); Br.32-33.[1]

---

[1]  McMahon's reference to FLSA, Opp.23, ignores that ministerial status

### 2. McMahon's ministerial status is not diminished by other employees' religious duties.

Next, McMahon claims her many religious duties don't count because some of them are also performed by others. Opp.24-29. Otherwise, McMahon suggests, every World Vision employee would be a minister. Opp.24-29. But this argument is wrong both factually and legally.

Factually, McMahon admits representatives "perform a uniquely important religious function": personal prayer with supporters. Opp.33. Indeed, *only* representatives are expected to daily pray for donors *and* have intensive daily interaction with supporters *and* daily express World Vision's Christian witness to the public. Br.24-28. And even if *some* other employees may also help to "transform[]" supporters' "values, beliefs, and behaviors," Opp.29, representatives *uniquely* carry out this crucial religious duty by personally engaging with supporters regularly. 4-ER-815 ¶¶23-24; Br.10. Thus, representatives perform many distinctive religious duties. That they also perform additional shared religious duties only further confirms their ministerial status.

Nor does this mean all employees are ministers. *Contra* Opp.27. World Vision didn't take that position below, FER-4, and doesn't here. Regardless, courts—not employers—decide ministerial status as a "pure question of law." *Conlon v. IVCF*, 777 F.3d 829, 833 (6th Cir. 2015).

---

turns on "the nature or expectations of [representatives'] employment," not statutory classifications. *Starkey v. Roman Catholic Archdiocese*, 41 F.4th 931, 941 (7th Cir. 2022) (rejecting similar comparison).

Legally, McMahon also ignores *Hosanna-Tabor*'s unanimous rejection of her focus on other employees as "err[oneous]." 565 U.S. at 192. Other courts have likewise refused to diminish ministerial status by reference to different employees. *EEOC v. Diocese of Raleigh*, 213 F.3d 795, 803 (4th Cir. 2000); *Cannata v. Diocese of Austin*, 700 F.3d 169, 179 (5th Cir. 2012). The test is, "at bottom," what McMahon—not another employee—was entrusted to do. *Our Lady*, 591 U.S. at 753; *Starkey*, 41 F.4th at 941.

McMahon's contrary rule would mandate religious discrimination. Religious communities like convents would be left unprotected, and hierarchical religious bodies—which vest religious responsibilities in one or a few leaders—would be privileged over egalitarian ones that share religious duties across a broader range of members. Br.31; EPPC Br.10.

### 3. McMahon fails in her attempts to downplay the role's religious requirements.

McMahon next demands this Court defer to *her* views on representatives' religious significance. Opp.19. That's exactly backwards. *Behrend*, 108 F.4th at 770 n.3.

***Prayer with Supporters***. McMahon disparages "[p]raying with donors" as "optional" and "marginal." Opp.30. But it is a religious "calling" to "actually pray for people all over the world," 4-ER-817 ¶31, in response to thousands of prayer requests a year, Br.11. This is why the job description *requires* prayer, why World Vision extensively trains representatives on prayer, and why representatives struggling with

8

prayer receive remedial training. Br.9, 29. McMahon's inadequate response is that donor prayer isn't "mandatory" because World Vision doesn't just fire a hesitant representative. Opp.29-30. But even then, World Vision "coache[s]" and "encourage[s]" such representatives to provide appropriate prayer, 2-ER-314–16, 320, confirming it *entrusts* and *expects* representatives to pray. Br.31-32.

***Embodiment of World Vision***. Similarly misguided is McMahon's claim that serving as World Vision's "voice, face, and heart" "has nothing to do with religious duties," Opp.28, and is akin to being a "switchboard operator," Opp.39. Far from passively redirecting calls to those authorized to speak for World Vision, representatives are themselves a "mouthpiece for [the] ministry," 4-ER-818 ¶33, serving "on the front lines" as the organization's human face and voice, 4-ER-817 ¶31. This includes "[a]cquir[ing] and maintain[ing] donor relationships," "engag[ing] … donors and supporters" with World Vision's message, and inviting churches to join religious initiatives. Br.8-11. As the "embodiment of its message" and its "voice to the faithful," representatives are ministers. *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring).

***Guided Engagement***. Nor can McMahon downplay representatives' importance by suggesting their conversations are completely scripted. Opp.39. They aren't. Instead, representatives are given wide discretion, including by "[b]e[ing] sensitive to Donor[] needs" and praying "when

appropriate." Br.9. Representatives routinely exercise judgment when discussing sensitive topics and crises. 4-ER-817–18 ¶¶30, 32; 5-ER-1062; Br.27 n.3. Regardless, courts have repeatedly rejected the argument that the authority to ad lib is mandatory for ministerial status. *Our Lady*, 591 U.S. at 758 n.26; *Grussgott v. Milwaukee Jewish Day Sch.*, 882 F.3d 655, 660 (7th Cir. 2018); *Diocese of Raleigh*, 213 F.3d at 803.

### 4. The ministerial exception has long covered diverse roles.

McMahon fails to distinguish the caselaw against her. Br.23, 29-30. She plunges into each case's weeds, as if all she needs is to prove she wasn't a drama teacher (*Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 330-31 (4th Cir. 2024)), organist (*Sterlinski v. Catholic Bishop*, 934 F.3d 568, 569-72 (7th Cir. 2019)), or food inspector (*Shaliehsabou v. Hebrew Home*, 363 F.3d 299, 301 (4th Cir. 2004)). *See* Opp.33-39. But of course, not all ministers look alike. A contrary rule would mandate conformity as the price to obtain a protection meant to ensure "religious diversity." *Our Lady*, 591 U.S. at 757.

Casting about for authority, McMahon primarily relies on out-of-circuit district and state court decisions about software developers, math teachers, student-services administrators, and social-work professors— none of whom had anything approaching representatives' religious responsibilities. Opp.19-20, 39-41. In any event, *Behrend* resolves this case. There, this Court applied the ministerial exception to an apprentice even though he "mostly" performed "menial work" such as "maintenance,

10

kitchen, and guest services." 108 F.4th at 767, 769-70. *Behrend*'s reasoning is not limited to employees "who are training to become 'ministers,'" Opp.36, but includes those with "a role in carrying out the [ministry's] mission." 108 F.4th at 769 (cleaned up). That's McMahon.

Finally, McMahon and her amici retreat to policy concerns. They claim applying *Behrend* here would "eliminate 'civil law protection against discrimination' within religious entities." Opp.41; Massachusetts Br.23 ("near-total" loss). But these "dire" "predict[ions]" have been made ever since the ministerial exception was recognized a half-century ago, *Hosanna-Tabor*, 565 U.S. at 196, including in *Fitzgerald* and *Starkey*, which McMahon now describes as "easy cases." Opp.35.[2] Representatives just as easily fit the exception given their "key roles" in expressing, embodying, and effectuating World Vision's religious mission. *Our Lady*, 591 U.S. at 746. And they fit far more easily than the "IT technician" and "operations assistant" that the Washington attorney general recently conceded are ministers. *See* Appellees' Letter, *Union Gospel Mission v. Ferguson*, 2024 WL 3755954 (9th Cir. Aug. 12, 2024), https://perma.cc/9WBX-ZMKY.

---

[2] *See* Appellant Br. at 2, *Fitzgerald v. Roncalli*, 73 F.4th 529 (7th Cir. 2023) (No. 22-2954), 2023 WL 1468634 ("[m]illions … would lose all protections of the fundamental civil-rights laws"); Americans United Br. at 16, *Starkey*, 41 F.4th 931 (No. 21-2524), 2021 WL 5344713 (Fitzgerald's counsel arguing applying exception would "strip hundreds of thousands … of fundamental civil-rights protections").

## B. Church autonomy's protection for religious membership decisions bars McMahon's claims.

In addition to the ministerial exception, the Religion Clauses also bar employment claims contesting religious qualifications for members of a religious ministry, regardless of their ministerial status. Br.33. Because McMahon undisputedly did not meet the "standard of morals" necessary to serve in World Vision's ministry, and because that was World Vision's undisputed reason for withdrawing her offer, her claims are barred. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976).

### 1. McMahon's claims entangle courts in religion.

McMahon's response narrows the dispute before this Court by conceding several key points. She agrees World Vision is a religious organization that exists "only" to "spread" its faith. Opp.25. She agrees World Vision requires all employees to be members of its faith and follow its core religious beliefs. Opp.25. She agrees that she rejects those standards, and that World Vision's withdrawal of the offer to become a member of its ministry "was motivated by a sincerely held religious objection to same-sex marriage." Opp.42. She agrees that church autonomy guarantees religious groups "an unfettered right to make their internal membership decisions on religious grounds." Opp.11. And she doesn't dispute that church autonomy can bar employment discrimination claims, including sex discrimination claims similar to hers, *if* the claims rely on an assertion of pretext. Opp.9-10, 14-15.

Indeed, like the district court, her primary *dis*agreement is ultimately that she thinks employment claims are barred *only* if they raise pretext. Br.39. But even there, her reasoning gets her almost to the right place. McMahon agrees that church autonomy bars claims requiring "inquiry into the good faith of the position" asserted by religious defendants, including regarding the "relationship" of that position to the defendant's "religious mission." Opp.12-13. And she agrees civil courts cannot "question how much [a] particular religious doctrine really mattered to the Church." Opp.15. She just thinks that only employment claims asserting pretext require that kind of entangling analysis.

Not so. Entanglement is inescapable here. There's no "neutral principle[]" for controverting World Vision's sincere determination that McMahon lacks the "religious eligibility requirements" necessary to speak for its ministry. *Puri v. Khalsa*, 844 F.3d 1152, 1168 (9th Cir. 2017). And McMahon's own arguments prove it.

McMahon asks this Court to hold—as a matter of civil law—that openly violating World Vision's religious standards of conduct would not "undermine[]" the "essence of [World Vision's] operation" as a religious ministry, and would have "no impact" on the "essential … purposes" of representatives. Opp.45-46. Similarly, she asks the Court to define the "very mission" of World Vision, and then decide whether World Vision's religious standards bear a sufficiently close expressive relationship to that mission. Opp.49-50; EEOC Br.18-20 (questioning "substantial basis"

13

for religious judgment that religious dissenter lacks the "religious qualification" to join World Vision's ministry and advance its "mission"). And McMahon invites the Court to join her in questioning World Vision's religious judgment that there is a meaningful spiritual difference between same-sex *attraction* and same-sex *activity*. *Compare* Opp.45-46 *with* 3-ER-549, 2-ER-272; EEOC Br.21 (same).

Whether under pretext analysis or otherwise, such "complex balancing of spiritual and pragmatic considerations" is "not [for] civil courts." *Askew v. Trs. of Gen. Assembly*, 684 F.3d 413, 420 (3d Cir. 2012). Courts cannot gainsay World Vision's sincere "religious justification" for its employment decisions, or its determination that "religious eligibility requirements" are reasonably related to who represents it. *Puri*, 844 F.3d at 1167-68. They cannot "scrutiniz[e] … how a religious [group] pursues its [religious] mission" without plunging into "state entanglement with religion." *Carson v. Makin*, 596 U.S. 767, 787 (2022). And they cannot "compare the relative severity of violations of religious doctrine." *Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 142 (3d Cir. 2006).

But that's what McMahon's arguments above do. Every one of them ultimately devolves into second-guessing World Vision's sincere understanding of "how important" its religious standards are to its "overall mission"—which would "dangerously undermine … religious autonomy." *Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., joined by Kagan, J., concurring).

14

Of course, the situation would be different were the defendant not a "religious organization," *Hosanna-Tabor*, 565 U.S. at 189, or were the disputed "personnel decision" not "based on religious doctrine," *Bryce v. Episcopal Church*, 289 F.3d 648, 660 (10th Cir. 2002), or were the asserted religious basis pretextual, *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171-72 (2d Cir. 1993). But here, in this "pervasively religious" context where World Vision's religious identity and motivation are expressly conceded and inextricable from the contested employment decision, it is "impossible" to rule for McMahon without offending the First Amendment. *Id.* Church autonomy thus bars McMahon's attempt to override World Vision's sincere "religious justification for a personnel decision." *Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1102 (9th Cir. 2004); *accord Puri*, 844 F.3d at 1167-68; Scholars Br.17-21.[3]

---

[3] To be clear, these are just *some* of McMahon's entanglement problems. She also insists that World Vision's training on spiritual formation, praying with donors, and leading devotions, Br.9, does not—by law—constitute "doctrinal instruction," Opp.22. She asks the Court to hold that her violation of World Vision's religious standards cannot inform its assessment of her beliefs "regarding Christianity and marriage." Opp.16. And she requests this Court distinguish between the meaning of the "prayer of coreligionists" (which, in her view, involves "religious indoctrination or proselytizing") and prayer with supporters (which, in her view, is "an expression of [World Vision's] Christian identity and 'showing empathy'"). Opp.32-33. Such "sifting" of prayers, *Town of Greece v. Galloway*, 572 U.S. 565, 581-82 (2014), and "litigating" over "religious meaning" is barred as "touch[ing] the very core of the constitutional guarantee against religious establishment," *Spencer v. World Vision*, 633 F.3d 723, 731 (9th Cir. 2011) (O'Scannlain, J., concurring).

### 2. McMahon's counterarguments lack merit.

McMahon's attempts to avoid this conclusion are unsuccessful. For instance, she argues that squarely applicable cases applying church autonomy to employment claims are distinguishable because they concern only pretext inquiries (*Butler*) or speech (*Bryce* and *Garrick*). But as shown above, her claims implicate the same church autonomy problems as pretext analysis. And she has likewise engaged in speech against World Vision's beliefs. Br.37; *infra* at 26.

Nor are the rules announced in those cases so limited. Take, for example, *Bryce*. There, the Tenth Circuit barred a Title VII claim arising after a religious organization terminated an employee. She alleged that she'd been sexually harassed by statements at work over "church doctrine on homosexuality and how it related to [her] employment within the church." 289 F.3d at 659. The court explained that "employment decisions may be subject to Title VII scrutiny" *if* they are "purely secular." *Id.* at 657. But it held that "[w]hen a church makes a personnel decision based on religious doctrine, and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it, the courts will not intervene." *Id.* at 660. That holding applies here: World Vision is a religious organization, its asserted violation of Title VII is undisputedly based on religious doctrine and is not "purely secular," and thus its challenged personnel decision is protected from further Title VII scrutiny.

16

Massachusetts—and not McMahon or EEOC—suggests that church autonomy does not apply to religious employment disputes. Massachusetts Br.27-28; EEOC Br.1 n.1. But religious organizations have long had the right to ensure non-ministerial employees are "member[s] of the Church" who "observe the Church's standards." *Amos*, 483 U.S. at 330 & n.4. It is of "defin[ing]" importance to "the autonomy of religious organizations" to be able to "condition employment … on subscription to particular religious tenets." *Id.* at 342 (Brennan, J., concurring). And the Supreme Court, this Court, and many others have recognized that church autonomy principles apply to non-ministerial personnel disputes, including in the Title VII context. Br.34-37 (collecting cases); *accord Curay-Cramer*, 450 F.3d at 142.[4]

### 3. McMahon's position will cause severe church-state conflict.

McMahon's position has sweeping consequences. Personnel is policy, and so forbidding religious groups from ensuring that "only those committed to th[eir] mission" should represent them is a poison pill for their "ongoing tradition of shared belief[]." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). Opening the doors of "secular courts" to claims like McMahon's thus "lead[s] to the total subversion" of religious bodies. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1872).

---

[4]  The same cases also dispose of Massachusetts' contention (at 27-28) that church autonomy is coextensive with the ministerial exception.

McMahon's amici drive the point home. The nation's largest employment regulation agency, joined by Washington and 18 other states, compares World Vision's beliefs to invidious racism. *E.g.*, EEOC Br.15-16; Opp.2; Massachusetts Br. 16, 19. They do not—and cannot—dispute that thousands of houses of worship, religious schools, and religious ministries have employment policies just like World Vision's; that these organizations have relied since the founding of the country on the constitutional guarantee that they can ask employees to share their religious beliefs and practices; and that adopting her position would unleash a flood of lawsuits against these organizations and undermine their autonomy on matters central to their faith. Colson Ctr. Br.4-7. Nor do they dispute that *Obergefell* and *Bostock* warned against precisely this result, promising that religious organizations would receive "proper protection as they seek to teach" and "advocate with utmost, sincere conviction" their views on same-sex marriage. *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). But they seem content to exchange our "pluralistic society" for one in which their views are law. *Bostock*, 590 U.S. at 644, 681-82. The Constitution does not permit that outcome.

## II. McMahon's claims are barred by Title VII and the WLAD.

### A. The statutory religious exemptions apply.

McMahon agrees that resolution of the ministerial exception also resolves her WLAD claim, Opp.43, and she doesn't even try to rebut the textual case for applying Title VII's religious exemption. Br.44-45.

Instead, she says this Court's precedents foreclose it. Opp.42. EEOC, in turn, denies that the religious exemption applies even if World Vision's interpretation is correct. EEOC Br.10-15. Both are wrong.

*First*, McMahon does not respond to the point that this Court's decisions in *EEOC v. Fremont Christian School*, 781 F.2d 1362, 1365-66 (9th Cir. 1986), and *EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272, 1276 (9th Cir. 1982), were nonbinding dicta that have subsequently been "undermined." Br.46-48.[5]

In fact, this Court's precedent *supports* World Vision's analysis. As *Garcia v. Salvation Army* recognized, "Congress 'painted with a broad[] brush, exempting religious organizations from the *entire subchapter* of Title VII with respect to the *employment* of persons of a particular religion.'" 918 F.3d 997, 1004-05 (9th Cir. 2019). In *Garcia*, this meant that claims beyond hiring and firing are exempted. *See id.* The same textual analysis applies to claims beyond religious discrimination.

Other precedents support this reading. Br.45-46 (citing *Curay-Cramer*, 450 F.3d at 132, and *EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir. 1980)). Likewise, *Bostock* recognizes the religious exemption plays a role in sex-discrimination cases, 590 U.S. at 682—a point to which McMahon has no response. Opp.43.

---

[5] *EEOC v. Townley Engineering* and *Spencer* are also dicta. *Townley*, 859 F.2d 610, 617-19 (9th Cir. 1988) (employer was "primarily secular"); *Spencer*, 633 F.3d at 724 (addressing religious-discrimination claim).

19

This doesn't mean "religious organizations" are "[e]ntirely exempt[]" from complying with Title VII. Opp.43. Title VII "drops out" only when a *particular* employment "decision is founded on religious beliefs." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); EPPC Br.15-16; *see also Hunter v. U.S. Dep't of Educ.*, 115 F.4th 955, 968 (9th Cir. 2024) (applying Title IX's religious exemption "does not give a free pass to discriminate on the basis of sex" because it applies "only" to "a direct conflict" with "religion"). Here, McMahon concedes World Vision was "motivated by a sincerely held religious objection to same-sex marriage." Opp.42. That concession resolves this case under Title VII's text.

*Second*, EEOC is wrong to suggest that World Vision's interpretation "would require the court" to analyze whether McMahon understood her same-sex marriage to be "a *religious* practice." EEOC Br.12-15 (emphasis added). As EEOC's own guidance explains, the exemption "allows religious organizations to prefer to employ individuals who *share their religion*, defined not by the self-identified religious affiliation of *the employee*, but broadly by *the employer's* religious observances, practices, and beliefs." EEOC, *Compliance Manual* § 12-I.C.1 (Jan. 15, 2021) (emphasis added); BGEA Br.9-10. And, as the text of the statute puts it, the exemption protects a religious organization's decision to employ individuals "of" (*i.e.*, belonging to or sharing) a "particular religion" (*i.e.*, the employer's religion), defined to include "all aspects" of "belief," "observance," and "practice." 42 U.S.C. §§ 2000e-1(a), 2000e(j).

Here, World Vision rescinded McMahon's offer because her "practice" of being in a same-sex marriage confirms that she does not share World Vision's religious practices about the nature of marriage. 42 U.S.C. § 2000e(j). That triggers the religious exemption.

## B. The bona fide occupational qualification defenses apply.

World Vision's BFOQ arguments show that following its beliefs is related both to its religious mission and to a representative's role. Br.48-49. McMahon challenges mission- and role-relatedness in two main ways.

First, she speculates "[d]onors would have had no way of knowing whether [she] was in a … same-sex marriage." Opp.46. That's untrue. Br.12-13; *infra* at 26. It's also beside the point. World Vision has decided that to be a member of its ministry, an employee must agree to abide by its religious expectations. Br.34-38. Those in active opposition to those religious expectations cannot, World Vision believes, effectively personify its ministry and witness to Christ and thus cannot meet requirements for the role. Br.33-35; *cf. Pime v. Loyola Univ.*, 803 F.2d 351, 353 (7th Cir. 1986) (recognizing defense to religious-discrimination claim where "[t]he BFOQ … is membership in a religious order of a particular faith").

Second, McMahon (now) asserts she would've "defend[ed]" World Vision's "religious views regarding marriage." Opp.46. But her conduct undermines them. Moreover, she testified that she *wouldn't* "be comfortable saying much about" World Vision's "view on marriage" and "hope[d]" that the topic "wouldn't come up" because she saw the issue as

21

"political." 2-ER-152. She would "respond" only "with the[] exact words [that] World Vision defines marriage between a man and a woman" and could not "answer" any "questions" or "pushback" except to "seek direction" from bosses. *Id.* McMahon's inability to meet the requirement of "wholeheartedly" defending World Vision's beliefs on marriage is plain. Br.12-14, 37.

In the end, McMahon merely repeats the district court's central error: "second-guess[ing]" World Vision's sincere religious judgment that representatives who openly contradict its faith commitments cannot personify and communicate its faith. *Our Lady*, 591 U.S. at 751; 1-ER-38–40; *see also Teamsters v. Wash. Dep't of Corr.*, 789 F.3d 979, 988 (9th Cir. 2015) ("defer[ring]" to employer's "professional judgment").

## III. McMahon's claims are barred by freedom of expressive association.

The First Amendment prevents forcing an expressive association to associate with individuals who significantly burden its expression. Br.52. McMahon argues that (A) there's an employment-law exception to expressive-association doctrine, (B) forced association with a public religious dissenter wouldn't burden World Vision's expression, and (C) generalized interests defeat First-Amendment rights. She's mistaken.[6]

---

[6] Certifying the associational and free-exercise defenses under 28 U.S.C. § 2403, *see* Opp.47, is unnecessary (they're as-applied defenses) and superfluous (EEOC and Washington have addressed both defenses).

### A. Expressive association applies to employment law.

McMahon starts with the sweeping proposition that "the right to expressive association provides no defense" to Title VII claims—citing *Hishon v. King & Spalding*, 467 U.S. 69 (1984). Opp.48. But *Hishon* doesn't exempt Title VII claims from the First Amendment. Quite the opposite. *Hishon* expressly *applies* standard expressive association analysis to a Title VII sex-discrimination claim, finding that the law-firm defendant had "not shown" how its expression "would be inhibited" by associating with a female partner who was already a successful associate. 467 U.S. at 78. And the Supreme Court later explained that a misreading of *Hishon* like McMahon's "disregards" precedent that government cannot force expressive associations to accept members who disagree on "matters of significance." *303 Creative v. Elenis*, 600 U.S. 570, 600 n.6 (2023) (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648-53 (2000)). This is why multiple courts, including the Second Circuit in *Slattery v. Hochul*, have repeatedly applied expressive-association doctrine to bar employment discrimination claims. Br.58-59 (citing 61 F.4th 278, 286-91 (2d Cir. 2023)). Thus, adopting McMahon's argument would not only contradict *Hishon* and *303 Creative*, but also create a circuit split.

McMahon's argument also makes no sense. She concedes public accommodation laws are governed by expressive-association law under cases like *Dale*. But "[c]ompelled hiring" is even more obviously a "way in which a government mandate can affect in a significant way a group's

23

ability to advocate public or private viewpoints." *Slattery*, 61 F.4th at 288 (quoting *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 179 (2d Cir. 2020)). And courts have long found that expressive interests serve as a check on employment regulation. *See McDermott v. Ampersand Publ'g*, 593 F.3d 950, 962 (9th Cir. 2010) (enjoining NLRB order "[t]elling the newspaper that it must hire specified persons" who harmed "the expressive content of its newspaper"); *accord Redgrave v. Bos. Symphony Orchestra*, 855 F.2d 888, 906 (1st Cir. 1988) (en banc); *Turner v. U.S. Agency*, 502 F.Supp.3d 333, 378 (D.D.C. 2020). Indeed, until recently, EEOC likewise agreed "religious organizations could successfully defend against employment [sex-]discrimination claims" "by invoking" "freedom of association." *Hosanna-Tabor*, 565 U.S. at 189.[7]

### B. McMahon's claims burden World Vision's expression.

McMahon next claims that forced association with public religious dissenters on sensitive matters of religious importance would not burden World Vision's religious expression. Opp.50. She argues that only expression going to the "very mission" of an association is protected, and that because World Vision's mission isn't "outlawing or opposing same-sex marriage," there's no expressive burden. Opp.49-50.

---

[7] *Contra* McMahon (at 53), the ministerial exception doesn't leave religious groups uniquely bereft of associational rights. Religious groups receive heightened First Amendment *solicitude*, not special disfavor. *Hosanna-Tabor*, 565 U.S. at 189; *Kennedy v. Bemerton Sch. Dist.*, 597 U.S. 507, 523 (2022).

*Boy Scouts of America v. Dale* squarely rejected exactly this argument. *Dale* held "associations do not have to associate for the 'purpose' of disseminating a certain message," but "must merely engage in expressive activity that could be impaired." 530 U.S. at 654-55. This Court reached much the same conclusion in *Green v. Miss United States of America*, finding that the "First Amendment's protection for non-particularized messages" applied to bar the "forced inclusion" of transgender individuals in a beauty pageant. 52 F.4th 773, 785 (9th Cir. 2022).

McMahon also fails to "give deference" to World Vision's views on its expression and on what significantly burdens that expression. *Dale*, 530 U.S. at 653. Deference is particularly appropriate here, where "the sincerity of the professed beliefs" is unquestioned. *Id.* at 651. World Vision's message is "sharing the gospel of Jesus Christ." 3-ER-438 ¶18; 3-ER-537. It believes "faithfulness in biblical … conduct" is an "indispensable element[] of being a credible witness" to that message. 3-ER-549. This is because "individual behavior witnesses, reflects, and testifies about what we believe as a ministry," 3-ER-446–47 ¶¶33, 37, and "verif[ies] the integrity of our words about Jesus Christ," 3-ER-588. Thus, McMahon's rejection of World Vision's religious standards burdens its message.

McMahon suggests World Vision's message wouldn't suffer if her rejection of the standards were secret. Opp.46; EEOC Br.33. But it wouldn't be secret within World Vision, or from the supporters who often

know representatives by name, 4-ER-817–18 ¶¶30-32, 2-ER-152, as McMahon's name has long been publicly attached to her same-sex marriage and advocacy. *See* Br.12-13.[8]

Regardless, it is no answer to say World Vision "can express [its] beliefs only at the price of evident hypocrisy." *Agency for Int'l Dev. v. AOSI*, 570 U.S. 205, 219 (2013). That loss of integrity undermines the "shared faith commitments" which both "advance the mission outwardly" and "form the community inwardly." Colson Ctr. Br.8-9. Courts thus have "no difficulty" finding that compelled inclusion of dissenters undermines religious "express[ion]" and "identi[ty]," *Christian Legal Society v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006)— which is precisely McMahon's objective. Br.53; *Green,* 52 F.4th at 785 (inclusion "alter[s]" message even if dissent kept "completely" secret).

World Vision "cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., joined by Kagan, J., concurring). Thus, the "right to expressive association allows [World Vision] to determine that its message will be effectively conveyed only by employees who sincerely share its views." *Slattery*, 61 F.4th at 288.

---

[8]  *See also* David Sentendrey, *Lesbian couple says SC wedding venue turned them away*, Queen City News (Mar. 6, 2019), https://perma.cc/VJN5-YLMU.

### C. McMahon doesn't justify the burden on expression.

McMahon's claims thus trigger strict scrutiny. Br.53-57. But McMahon barely addresses strict scrutiny and fails to even cite record evidence supporting her argument, much less prove that she meets the most demanding test known to constitutional law. Opp.47, 50. That alone dooms her claims. *FCA*, 82 F.4th at 694.

McMahon's defense of employment law in the abstract (at 50) also fails. She cannot "rely on 'broadly formulated interests'" supporting "non-discrimination policies generally," but must instead prove that there is "a compelling interest in … denying an exception to" World Vision *specifically*. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

Under the appropriately "precise analysis" that the "First Amendment demands," *id.*, McMahon's claims don't pass muster. *See* Br.53-57. This should come as no surprise, since Title VII and WLAD undisputedly exempt most employers from their mandates. That includes exemptions for small businesses, private clubs, and for all businesses under BFOQs. Br.45, 48-49, 55-56. Indeed, to advance "authenticity or genuineness," EEOC has entirely exempted the entertainment industry's well-known sex discrimination. *See* 29 C.F.R. § 1604.2(a)(2); *Green*, 52 F.4th at 781-82. That's hardly the stuff of an interest that can "brook no departures." *Fulton*, 593 U.S. at 542; *Union Gospel Mission v. Ferguson*, 2024 WL 4660918, at *4 (E.D. Wash. Nov. 1, 2024) (WLAD fails strict scrutiny because it is "impermissibly underinclusive"); CLS Br.7-11.

27

Nor does protecting World Vision's widely shared religious expression mean opening the floodgates to racism. Opp.2. While the law sees "[r]acial discrimination [a]s invidious in all contexts," *Students for Fair Admissions v. President & Fellows of Harvard College*, 600 U.S. 181, 214 (2023), it treats sex distinctions differently. Title VII permits BFOQ defenses for sex-based classifications, but not race-based classifications. 42 U.S.C. § 2000e-2(e). Section 1981 independently bans racial discrimination in employment without exemptions. *See* 42 U.S.C. § 1981. Title IX's ban on sex discrimination includes a religious exemption; Title VI's ban on race discrimination doesn't. And while courts have rightly recognized the unique harm of race discrimination given this country's deplorable history of racism, *Runyon v. McCrary*, 427 U.S. 160, 167 (1976), they have also repeatedly rejected the offensive assertion that sincere religious objections to same-sex marriage are the equivalent of racism. *Obergefell*, 576 U.S. at 679; *Bostock*, 590 U.S. at 682.

## IV. McMahon's claims are barred by the Free Exercise Clause.

Under "bedrock" free-exercise doctrine, a law is not generally applicable where it allows "for individualized exemptions" or "'treat[s] … secular activity more favorably than religious exercise.'" *FCA*, 82 F.4th at 686 (quoting *Fulton*, 593 U.S. at 533, and *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). McMahon's claims flunk that test. Br.59-62.

McMahon tries to avoid *Fulton* and *Tandon* by appealing to older lower-court decisions. That fails. Courts cannot ignore the recent "seismic shift in Free Exercise law." *Calvary Chapel v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020); *FCA*, 82 F.4th at 686 (overruling caselaw contrary to *Fulton* and *Tandon*).

***Individualized exemptions***. The BFOQ exceptions to Title VII and WLAD sex-discrimination claims require individualized determinations of an employer's particular reasons for sex-based distinctions. Br.59-60. McMahon's arguments that they don't (at 55) can't be squared with statutory text or precedent requiring "justifi[cation] under the circumstances" of each situation. Br.60. The proof is in McMahon's own individualized arguments against BFOQ application here, Opp.45-46, demanding precisely the kind of "case-by-case analysis [that] is antithetical to a generally applicable policy." *FCA*, 82 F.4th at 688.

McMahon maintains that this discretion doesn't matter because BFOQ exceptions use "fixed criteria." Opp.55; EEOC Br.25. But *Fulton* wasn't "only concerned with 'unfettered' discretion," *FCA*, 82 F.4th at 687; it concerned any rule that "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up). And, just like the "good cause" standard in *Sherbert v. Verner*, BFOQs "permit[] the government to grant exemptions based on the circumstances underlying each application." *Id.* at 534

Nor is it any answer that courts (may) assess BFOQs, Opp.56; EEOC Br.25, which was also true in *Sherbert* and *Fulton*. The problem isn't the decider, it's the mechanism of decision. Here, that mechanism first vests discretion in private employers, most of whom will never be challenged. Then it gives agencies like EEOC a gatekeeper and enforcement role, including bringing charges, investigating charges, and choosing to enforce through litigation. 42 U.S.C. § 2000e-5(b); Russell K. Robinson, *Casting and Caste-Ing*, 95 Calif. L. Rev. 1, 31 (2007) (describing EEOC's broad judgment that sex is a BFOQ for entertainment casting, 29 C.F.R. § 1604.2(2), courts' deference to that determination, and evidence that as many as 94% of casting calls discriminated based on sex). And even if a BFOQ reaches the courts, the statutory mechanisms still require judges to individually assess which forms of sex discrimination deserve solicitude—exactly what *Fulton* says triggers strict scrutiny.

**Categorical exemptions.** Categorical exemptions likewise trigger scrutiny where they treat burdened religious activities worse than comparable exempted activities. Br.59-62. And "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted interest," and the "risks" they pose to that interest. *FCA*, 82 F.4th at 689 (quoting *Tandon*, 593 U.S. at 62).

Everyone agrees the asserted interest here is eliminating sex-based discrimination. Br.61; Opp.57; EEOC Br.28-29. But Title VII "grant[s]" most employers "*complete immunity*" from that interest, including by

30

"expressly exempt[ing] … small businesses and bona fide private membership clubs." *Hishon*, 467 U.S. at 78 & n.11 (emphasis added); *see also* Br.55 (WLAD small-employer exemption). This leaves them "free to discriminate based on sex." EEOC Br.26. That kind of categorical preference for secular reasons triggers scrutiny.

McMahon argues that the Free Exercise concern with categorical exemptions arises only if they permit individualized discretion. Opp.55-56; EEOC Br.24. That conflates *Fulton* and *Tandon*. And, "[i]f anything," the secular-favoritism problem is "only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection." *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.). So too here.

McMahon and EEOC also repeat the district court's error, asserting the exceptions are irrelevant because, for instance, "comparable secular employer[s]" to World Vision aren't small enough to use them. EEOC Br.25; Opp.56. As World Vision explained, this kind of argument was raised and rejected in *Tandon*. Br.61; *Union Gospel Mission*, 2024 WL 4660918, at *4. The relevant comparison isn't to similar *employers* but to similar "activities." *FCA*, 82 F.4th at 689 (quoting *Tandon*, 593 U.S. at 62). Here, the activity is alleged sex discrimination. That activity is permitted in the workplaces of millions of employees nationwide, Br.55, but not for one World Vision employee. That is not generally applicable.

Thus, McMahon's claims must pass strict scrutiny, which they cannot. *Supra* at 27-28; Br.53-57.

## CONCLUSION

This Court should reverse and direct entry of summary judgment for World Vision.

Respectfully submitted,

/s/ *Daniel H. Blomberg*

|  |  |
|---|---|
| NATHANIEL L. TAYLOR | DANIEL H. BLOMBERG |
| ABIGAIL J. ST. HILAIRE | *Counsel of Record* |
| ELLIS, LI & MCKINSTRY PLLC | LUKE W. GOODRICH |
| 1700 Seventh Avenue, Suite 1810 | JORDAN T. VARBERG |
| Seattle, WA 98101 | AMANDA G. DIXON |
| (202) 682-0565 | THE BECKET FUND FOR |
| *ntaylor@elmlaw.com* | RELIGIOUS LIBERTY |
|  | 1919 Pennsylvania Ave. NW |
| SCOTT J. WARD | Suite 400 |
| J. MATTHEW SZYMANSKI | Washington, DC 20006 |
| GAMMON & GRANGE, P.C. | (202) 955-0095 |
| 1945 Old Gallows Road, Suite 650 | *dblomberg@becketlaw.org* |
| Tysons, Virginia 22182 |  |
| (703) 761-5012 |  |
| *sjw@gg-law.com* |  |

*Counsel for Defendant-Appellant*

December 12, 2024

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3259

I am the attorney or self-represented party.

**This brief contains** 6,997 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Daniel H. Blomberg     **Date** 12/12/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                    33                    *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2024, the foregoing reply brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the Court's ACMS system. I certify that all participants in the case who are registered ACMS users will be served by the appellate ACMS system.

/s/ *Daniel H. Blomberg*
Daniel H. Blomberg