**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AUBRY MCMAHON, | No. 24-3259 |
| Plaintiff - Appellee, | D.C. No. 2:21-cv-00920-JLR |
| v. | |
| WORLD VISION INC., | |
| Defendant - Appellant. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted May 21, 2025
Seattle, Washington

Filed August 5, 2025

Before: Ronald M. Gould, Richard C. Tallman, and
Morgan B. Christen, Circuit Judges.

Opinion by Judge Tallman

2          MCMAHON V. WORLD VISION INC.

## SUMMARY[*]

### Employment Discrimination

The panel reversed the district court's summary judgment for Aubry McMahon and remanded for entry of summary judgment in favor of World Vision, Inc., in McMahon's lawsuit against World Vision alleging discrimination based on sex, sexual orientation, and marital status under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination (WLAD).

World Vision extended a job offer to McMahon for a remote position as a customer service representative (CSR). After learning that McMahon was in a same-sex marriage, World Vision revoked its job offer.

The district court initially granted summary judgment for World Vision based on the church autonomy doctrine. Reversing itself after McMahon moved for reconsideration, the district court decided that the church autonomy doctrine did not apply because World Vision had acted under a "facially discriminatory hiring policy," so the court could resolve the case using "neutral principles of law" without becoming entangled in religion. Rejecting World Vision's ministerial exception defense and other defenses, the district court entered summary judgment for McMahon after concluding that World Vision rescinded her job offer pursuant to a policy that facially discriminated based on sex,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sexual orientation, and marital status in violation of Title VII and the WLAD.

Renewing on appeal the arguments it made before the district court, World Vision argued, *inter alia*, that CSRs fall under the ministerial exception to employment discrimination laws because CSRs serve a pivotal role in World Vision's religious mission as its public voice.

The panel held that the district court erred by rejecting World Vision's ministerial exception defense. The ministerial exception bars McMahon's employment discrimination claims because the record shows that CSRs perform key religious functions central to World Vision's mission. CSRs are responsible for effectively communicating World Vision's worldwide ministries and projects to donors and supporters. CSRs engage with donors in prayer and give them the opportunity to join World Vision's religious mission through financial contributions. Because each of these "vital religious duties," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 756 (2020), lies at the core of World Vision's religious mission of "working with the poor and oppressed to promote human transformation, seek justice and bear witness to the good news of the Kingdom of God," the ministerial exception applies to CSRs and bars McMahon's claims.

The panel accordingly reversed the district court's grant of summary judgment for McMahon and remanded for entry of summary judgment in favor of World Vision.

## COUNSEL

Michael C. Subit (argued), Frank Freed Subit & Thomas LLP, Seattle, Washington; Casimir Wolnowski, Nisar Law Group PC, New York, New York; for Plaintiff-Appellee.

Daniel H. Blomberg (argued), Luke W. Goodrich, Jordan T. Varberg, and Amanda G. Dixon, The Becket Fund for Religious Liberty, Washington, D.C.; Scott J. Ward and J. Matthew Szymanski, Gammon & Grange PC, Tysons, Virginia; Abigail J. St. Hilaire and Nathaniel L. Taylor, Ellis Li & McKinstry PLLC, Seattle, Washington; for Defendant-Appellant.

Rebecca R. Dummermuth, First Liberty Institute, Washington, D.C.; Randall W. Miller, Julie M. Christensen, and Emily C. Means, Munsch Hardt Kopf & Harr PC, Dallas, Texas; Jeffrey C. Mateer, David J. Hacker, Stephanie N. Taub, and Jeremiah G. Dys, First Liberty Institute, Plano, Texas; for Amici Curiae Billy Graham Evangelistic Association and Samaritan's Purse.

Ian S. Speir I, Covenant Law PLLC, Colorado Springs, Colorado, for Amici Curiae Colson Center for Christian Worldview, Moody Bible Institute, Summit Ministries, and Cedarville University.

Steven T. McFarland, Christian Legal Society, Center for Law & Religious Freedom, Springfield, Virginia, for Amici Curiae Christian Legal Society, Accord Network, American Association of Christian Schools, Association of Christian Schools International, Campus Crusade for Christ, Crista Ministries, Christian Medical and Dental Association, General Conference of Seventh-Day Adventists, InterVarsity Christian Fellowship/USA, Islam and Religious Freedom Action Team of the Religious Freedom Institute,

Jewish Coalition for Religious Liberty, The Center for Public Justice, The Institutional Religious Freedom Alliance, and The Navigators.

Joshua W. Carden, Carden Livesay Ltd., Mesa, Arizona; Michael P. Farris, National Religious Broadcasters, Washington, D.C.; for Amicus Curiae National Religious Broadcasters.

John T. Melcon, Taylor Huse, and Stuart Lark, Taft Stettinius & Hollister LLP, Colorado Springs, Colorado, for Amici Curiae Council for Christian Colleges & Universities, Calvary Chapel Ft. Lauderdale. Cherry Hills Community Church, International Mission Inc. dba Christar, Christian Camp and Conference Association, Church Educational System of the Church of Jesus Christ of Latter-Day Saints, Community Bible Study, Cross Catholic Outreach Inc., The Crowell Trust, Diocese of Colorado Springs, Ethics and Religious Liberty Commission of the Southern Baptist Convention, Evangelical Council for Financial Accountability, Family Stations Inc. dba Family Radio, Focus on the Family, Grace to You, Gull Lake Ministries, International Church of the Foursquare Gospel, The Master's University & Seminary, O.C. International Inc., Servant Foundation Dba The Signatry, Tyndale House Ministries, Upward Unlimited, The Christian Community Foundation Inc. dba Waterstone, and Young Life.

Peter M. Torstensen Jr., Deputy Solicitor General; Christian B. Corrigan, Solicitor General; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Steve Marshall, Alabama Attorney General, Office of the Alabama, Attorney General, Montgomery, Alabama; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little

Rock, Arkansas; Ashley Moody, Florida Attorney General, Office of the Florida Attorney General, Tallahassee, Florida; Raul R. Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; Brenna Bird, Iowa Attorney General, Office of the Iowa Attorney General, Des Moines, Iowa; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew T. Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Michael T. Hilgers Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Gentner F. Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Jonathan Skrmetti, Tennessee Attorney General and Reporter, Office of the Tennessee Attorney General, Nashville, Tennessee; Ken Paxton, Texas Attorney General, Office of the Texas Attorney General, Austin, Texas; Sean D. Reyes, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; for Amici Curiae State of Montana and 16 Other States.

Michael B. Buschbacher and Austin Lipari, Boyden Gray PLLC, Washington, D.C.; Rachel N. Morrison and Eric N. Kniffin, Ethics and Public Policy Center, Washington, D.C.; for Amicus Curiae Ethics and Public Policy Center.

Vince R. Eisinger, Cranfill Sumner LLP, Raleigh, North Carolina, for Amici Curiae Professors Robert F. Cochran Jr.,

David F. Forte, Richard Garnett, Douglas Laycock, Michael W. McConnell, Michael P. Moreland, and Robert J. Pushaw.

Jenny Samuels, Alexander J. Luchenitser, and Scott Lowder, Americans United for Separation of Church and State, Washington, D.C., for Amici Curiae Americans United for Separation of Church and State and The Sikh Coalition.

Georgia C. Yeomans, Attorney; Anne N. Occhialino, Assistant General Counsel; Jennifer S. Goldstein, Associate General Counsel; Karla Gilbride, General Counsel; Equal Employment Opportunity Commission, Office of General Counsel, Appellate Services, Washington, D.C.; for Amicus Curiae Equal Employment Opportunity Commission.

Michelle Fraling, Aditi Fruitwala, and Daniel Mach, American Civil Liberties Union Foundation, Washington, D.C.; Adrien Leavitt and La Rond Baker, American Civil Liberties Union of Washington Foundation, Seattle, Washington; for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Washington.

Adam M. Cambier, Assistant Attorney General; David C. Kravitz, State Solicitor; Andrea J. Campbell, Commonwealth of Massachusetts Attorney General; Office of the Massachusetts Attorney General, Boston, Massachusetts; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver Colorado; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General,

Wilmington, Delaware; Anne E. Lopez, Hawai'i Attorney General, Office of the Hawai'i Attorney General, Honolulu, Hawai'i; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Raul Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Joshua H. Stein, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Joshua L. Kaul, Wisconsin Attorney General, Office of the Wisconsin Attorney General, Madison, Wisconsin; for Amici Curiae Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Vermont, Washington, and Wisconsin.

## OPINION

TALLMAN, Circuit Judge:

Defendant-Appellant World Vision, Inc., extended a job offer to Plaintiff-Appellee Aubry McMahon for a remote position as a customer service representative ("CSR"). After learning that McMahon was in a same-sex marriage, World Vision revoked its job offer. McMahon sued in federal district court, alleging discrimination based on sex, sexual orientation, and marital status under Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination ("WLAD").

The district court initially granted summary judgment for World Vision, finding that the church autonomy doctrine "foreclose[d] judicial inquiry into World Vision's religiously motivated personnel decision" and thus barred McMahon's claims. However, the district court reversed itself after McMahon moved for reconsideration, ultimately deciding that the church autonomy doctrine did *not* apply because World Vision had acted under a "facially discriminatory hiring policy," so the court could resolve the case using "neutral principles of law" without becoming entangled in religion.[1] The district court also rejected World Vision's remaining defenses under the ministerial exception, exemptions to Title VII and the WLAD, freedom of expressive association, and the Free Exercise Clause, and entered summary judgment for McMahon after concluding that World Vision rescinded her job offer pursuant to a policy that facially discriminated based on sex, sexual

---

[1] The district court used "church autonomy doctrine" and "ecclesiastical abstention" interchangeably.

10          MCMAHON V. WORLD VISION INC.

orientation, and marital status in violation of Title VII and the WLAD.

On appeal, World Vision renews each of the arguments it made before the district court. World Vision argues that CSRs fall under the ministerial exception to employment discrimination laws because CSRs serve a pivotal role in World Vision's religious mission as its public voice, responsible for conveying the organization's mission, discussing World Vision's projects, and praying with donors and supporters over the phone. World Vision also contends that even if the ministerial exception does not apply, McMahon's claims are barred by (a) another component of what it calls the church autonomy doctrine that protects a religious organization's membership decisions, (b) the Free Exercise Clause, (c) the freedom of expressive association under the First Amendment, and (d) exemptions to Title VII and the WLAD. We conclude that the district court erred by rejecting World Vision's ministerial exception defense, and we reverse.[2]

We now hold that the ministerial exception bars McMahon's employment discrimination claims because the record shows that CSRs perform key religious functions central to World Vision's mission. CSRs are responsible for effectively communicating World Vision's worldwide ministries and projects to donors and supporters. CSRs engage with donors in prayer and give them the opportunity to join World Vision's religious mission through financial contributions. Because each of these "vital religious duties," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 756 (2020), lies at the core of World Vision's religious

---

[2] Because McMahon's claims are barred under the ministerial exception, we do not reach the remainder of World Vision's arguments on appeal.

mission of "working with the poor and oppressed to promote human transformation, seek justice and bear witness to the good news of the Kingdom of God," the ministerial exception applies to CSRs and bars McMahon's claims. Accordingly, we reverse the district court's grant of summary judgment for McMahon and remand for entry of summary judgment in favor of World Vision.

**I**

The parties do not dispute that World Vision is a religious organization. *See Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) (holding that World Vision qualified as a religious organization exempt from Title VII's general prohibition on religious discrimination). World Vision describes itself as a "Christian ministry dedicated to sharing the gospel of Jesus Christ" through "humanitarian outreach to children and families around the world who are poor and underserved." World Vision primarily serves "the world's most vulnerable . . . those living in extreme poverty or fragile contexts." Its mission is to "follow our Lord and Savior Jesus Christ in working with the poor and oppressed to promote human transformation, seek justice, and bear witness to the good news of the Kingdom of God." World Vision pursues this mission through partnership with donors, prayer supporters, and churches. It helps people of any faith or no faith. Each year, it trains more than 100,000 pastors and faith leaders from partner churches, working with them to serve millions of children worldwide.

World Vision holds itself out to the public as a Christian organization, with "its faith in Jesus . . . at the heart of all it does." World Vision's Articles of Incorporation state its religious purposes, including "perform[ing] the functions of

the Christian church" in ways that "teach and preach the Gospel" and "spread . . . the Christian religion." World Vision staff are required to (a) confess that they are committed Christians, (b) agree wholeheartedly with World Vision's core religious principles, (c) communicate World Vision's Christian faith, and (d) participate in prayer activities, devotionals, and weekly chapel services.

Every World Vision staff member is provided an employee guidebook titled the "Orange Book: Living Out Our Values," which instructs that prayer "plays a central role in World Vision's ministry." Each World Vision team is expected to spend one hour each week in team devotions, and all employees "are invited and expected" to attend a weekly "organization-wide chapel" service. World Vision believes that it and its staff's "corporate and individual behavior witnesses, reflects, and testifies about what we believe as a ministry and as individual believers." Accordingly, World Vision "seeks to honor God by requiring all staff to '[f]ollow the living Christ, individually and corporately in faith and conduct, publicly and privately, in accord with the teaching in His Word (the Bible).'"

World Vision provides Standards of Conduct ("SOC") to "clarify expectations and assist candidates/employees in deciding whether or not [World Vision] is the right place for them to serve the Lord." Because World Vision believes that the Bible confines the "express[ion of] sexuality solely within a faithful marriage between a man and a woman[,]" its SOC prohibits, among other things, "sexual conduct outside the Biblical covenant of marriage between a man and a woman." To be eligible for employment at World Vision, an individual must, among other things, be able and willing to affirm and comply with the SOC.

Aubry McMahon is a Christian, openly gay person in a same-sex marriage. McMahon and her wife are "huge advocates" for "the LGBTQ community." They attend Pride events, display Pride symbols publicly, and conduct their "day-to-day lives . . . to show that [they] are supportive of the LGBTQ community." McMahon became pregnant around June 2020 via a sperm donor and gave birth in March 2021.

In the late fall of 2020, McMahon saw a job posting for World Vision's CSR position on the website Indeed.com. The position was "remote" and offered compensation ranging from $13 to $15 per hour depending on location and cost of living, as well as a "comprehensive benefits package." The CSR position did not require any formal religious education or training. Rather, the job posting sought candidates with the following qualifications:

- High school graduate/GED or equivalent. Basic routine work experience.
- Prefer a minimum of 1 year previous customer service/sales work experience.
- Must have access to a reliable, high speed internet connection.
- The ability to multi-task in a fast pace [*sic*] environment.
- Must be able to train and work 40 hours a week.
- Have strong technical skills with all Microsoft Office Suite.
- The ability to type 20 wpm or more.
- Enjoys making a difference in the world!

- Must be available to start training on
  February 1ˢᵗ.

The job description explains in detail World Vision's
expectations for CSRs:

> As a Customer Service Representative, you
> will participate in a training program to gain
> a working knowledge and understanding of
> the position and to perform the essential
> functions of the job at a level of performance
> that consistently meets expectations. You
> will learn, understand and develop the skills
> necessary to acquire and maintain donor
> relationships through basic inbound and
> outbound calls. Serve as a liaison between
> donors and the general public as well as
> provide basic levels of customer service for
> all special programs.  Help carry out our
> Christian organization's mission, vision, and
> strategies. Personify the ministry of World
> Vision by witnessing to Christ and
> ministering to others through life, deed,
> word, and sign. You will also…
>
> 1. Keep Christ central in our individual and
>    corporate lives. Attend and participate in
>    the leadership of devotions, weekly
>    Chapel services, and regular prayer.
> 2. Maintain reliable, regular attendance.
>    Report to work on time and return from
>    breaks and lunches on time.
> 3. Under supervision, learn to answer
>    inbound customer service calls and make
>    outbound calls, to current and potential

MCMAHON V. WORLD VISION INC.                15

donors in response to all media
presentations and World Vision products
and services. Answer incoming calls
using an Automated Call Distribution
system utilizing a standard script for
guidance. Recognize and respond to up-
sell opportunities and actively cross-sell
other WV programs when appropriate.

4. Through training and active participation,
gain the skills necessary to assess callers'
needs and input information accurately
and efficiently using data entry and ten-
key skills.

5. Achieve and maintain an acceptable level
of individual statistics to accomplish Call
Center business goals.

6. Develop skills to utilize technology for
maintaining and updating donor
information as appropriate.

7. Accepts constructive feedback and
welcomes instruction and direction.

8. Under supervision, research and
effectively respond to inquiries utilizing a
variety of resource materials and
methods.

9. Learn and effectively communicate
World Vision's involvement in ministries
and projects around the world.

10. Work collaboratively with team
members.

11. Be sensitive to Donor's needs and pray
with them when appropriate.

12. Perform other duties as assigned.

> 13. Keep informed of organizational
> announcements, activities and changes
> via regular reading of the WVUS Intranet
> and other corporate communication tools.

CSRs fall under World Vision's Donor Contact Services ("DCS") department. DCS describes its employees as "the Voice, Face and Heart of World Vision" because they "interact all day with the ministry's donors, its lifeblood." "This challenge requires that each of us think of ourselves as servants; demonstrating flexibility and servicing the donor(s) with a smile." More specifically, unlike most of World Vision's employees, CSRs engage with World Vision's donors, supporters, and partners on a daily basis to provide information and answer questions about World Vision's work, ministry, and beliefs. For this reason, CSRs play a crucial role in fundraising, which World Vision views as "a form of ministry in itself." When appropriate, CSRs are expected to "pray[] for and with the persons with whom they talk" because spiritual "[t]ransformation of donors is just as vital to World Vision as that of the children they sponsor." World Vision states that prayer is an "essential function of the role." However, praying with donors is not a requirement of the CSR role, and the failure to do so does not result in discipline or termination.

CSRs are required to attend "devotions"—religious meetings where teams come together "for reading of Scripture and prayer for the daily work." All World Vision employees, including CSRs, are expected to lead devotions at some point. CSRs may also lead World Vision's weekly organization-wide chapel services, but they are not required to do so. Upon joining World Vision, representatives receive nine to eleven weeks of formal training, which is

more "advanced training" than that required of any other
World Vision employee. This training covers religious
topics such as "who we are in Christ," "how to pray with
donors," "attending chapel," and "leading and participating
in devotions."

Shortly after McMahon applied for the CSR position, she
conducted a phone screening interview with a World Vision
talent acquisition partner. McMahon was asked questions
about her background and interest in World Vision and her
comfort level with job "requirement[s]" like "making
inbound and outbound calls" and "upselling" World Vision
programs. World Vision asked about McMahon's computer
experience and skills, her background in working with
technology, and her comfort level and experience using
virtual meeting rooms. World Vision described its
"Christian commitment" and asked McMahon to describe
her personal faith. McMahon was asked if she was "willing
and able to comply with the Standards of Conduct" and
McMahon responded, "I'm aligned, yes!"

World Vision extended McMahon a verbal offer of
employment on January 4, 2021, followed by a formal
written offer the next day for the "full-time position of
Donor/Customer Service Representative Trainee (DSR
Trainee)." That same day, McMahon sent the following
email to World Vision:

> Hey there, I just have a quick question! My
> wife and I are expecting our first baby in
> March and I wanted to see if I would qualify
> for any time off since I'll be a new employee?
> I will be the one having the baby so I just
> wanted to check to see if any time would be

> allowed off. If not, no worries, thanks so
> much!

After receiving McMahon's email, World Vision engaged in internal discussions about the "application of its Biblical marriage policy . . . to Ms. McMahon's situation." World Vision decided to rescind McMahon's offer because of her "inability" to comply with the SOC prohibiting sexual conduct outside the Biblical covenant of marriage between a man and a woman. World Vision rescinded McMahon's job offer on January 8, 2021.

## II

McMahon sued World Vision in federal district court for sex, sexual orientation, and marital status discrimination under Title VII and the WLAD. After discovery, the parties cross-moved for summary judgment. The district court initially granted summary judgment to World Vision under the church autonomy doctrine because World Vision had rescinded McMahon's job offer due to her inability to comply with World Vision's SOC. McMahon successfully moved for reconsideration, arguing that because World Vision had acted under a "facially discriminatory hiring policy," the court could resolve the case under "neutral principles of law" without becoming entangled in religion, and thus the church autonomy doctrine did not bar her claims. The district court reconsidered and reversed its initial decision, granting summary judgment for McMahon and finding that World Vision engaged in "unlawful sex, sexual orientation, and marital status discrimination" by rescinding McMahon's job offer pursuant to its "Biblical marriage [SOC]," which the court deemed a "facially discriminatory policy."

MCMAHON V. WORLD VISION INC. 19

The district court then rejected World Vision's remaining defenses under the ministerial exception, exemptions under Title VII and the WLAD, freedom of expressive association, and the Free Exercise Clause, and granted summary judgment to McMahon. In lieu of a jury trial on damages, the parties stipulated to damages of $120,000, and the district court entered final judgment for McMahon.

## III

The district court had jurisdiction under 18 U.S.C. §§ 1331 and 1367, and 42 U.S.C. § 2000e-5(f)(3). We have jurisdiction under 28 U.S.C. § 1291. We review grants of summary judgment "de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Behrend v. S.F. Zen Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024) (citation and internal quotation marks omitted).

## IV

### A

The Religion Clauses of the First Amendment protect the "principle of church autonomy," which guarantees religious groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747. But the church autonomy doctrine is not absolute; churches and other religious organizations must abide by neutral and generally applicable state and federal employment laws. *See id.* at 746 (explaining that religious institutions do not enjoy a general immunity from secular laws). However, an exception to this requirement exists for certain employees within religious organizations who perform "important religious functions." *Hosanna-Tabor*

*Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190–92 (2012); *see also Our Lady*, 591 U.S. at 746 (explaining that religious organizations are afforded "autonomy with respect to internal management decisions that are essential to the institution's central mission. And a component of this autonomy is the selection of the individuals who play certain key roles.").

The ministerial exception "broadly ensures that religious organizations have the freedom to choose 'who will preach their beliefs, teach their faith, and carry out their mission.'" *Behrend*, 108 F.4th at 766 (quoting *Hosanna-Tabor*, 565 U.S. at 196). But we have recognized that "[a] religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike . . . First Amendment protections serve as a sieve, not a lid." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024). "[T]he ministerial exception is just that, an *exception*, applicable only to a subset of a religious entity's employees." *Palmer v. Liberty Univ., Inc*., 72 F.4th 52, 71 (4th Cir. 2023) (Motz, J., concurring); *see also Seattle Pac. Univ.*, 104 F.4th at 58 (rejecting defendant's "sweeping interpretation [that] the ministerial exception" prohibits *any* inquiry into a religious organization's employment practices).

Although the Supreme Court has declined "to adopt a rigid formula for deciding when an employee qualifies as a minister," it has provided some guidance on circumstances that might qualify an employee as a minister within the meaning of the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 190–92. Though they are not "inflexible requirements," *Our Lady*, 591 U.S. at 753, courts should consider: (1) the employee's formal title; (2) the "substance reflected in that title," such as "a significant degree of

religious training followed by a formal process of commissioning"; (3) the employee's use of that title; and (4) whether the employee performed important religious functions. *Hosanna-Tabor*, 565 U.S. at 191–92.

Importantly, courts must not "treat[] the circumstances that [the Court] found relevant in [*Hosanna-Tabor*] as checklist items to be assessed and weighed against each other in every case" because "[t]hat approach is contrary to our admonition that [the Court was] not imposing any 'rigid formula.'" [3] *Our Lady*, 591 U.S. at 757–58 (quoting *Hosanna-Tabor*, 565 U.S. at 190). Rather, to determine whether an employee falls within the ministerial exception, we are to "take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception." *Behrend*, 108 F.4th at 769 (quoting *Our Lady*, 591 U.S. at 758). The Supreme Court has emphasized that "what matters, at bottom, is what an employee does" and whether they perform "vital religious duties." *Our Lady*, 591 U.S. at 753, 756. To determine this, the "religious institution's explanation of the role of . . . employees in the life of the religion in question is important." *Id.* at 757. The employee need not be a "co-religionist," a practicing member of the religion with which the employer is associated, for the ministerial exception to apply. *Id.* at 761. We have also rejected the argument that the ministerial exception applies only to teachers and leaders of the faith. *Behrend*, 108 F.4th at 769–70.

The ministerial exception is an "affirmative defense . . . not a jurisdictional bar." *Hosanna-Tabor*, 565

---

[3] Relatedly, courts should refrain from overemphasizing the lack of a clerical title or the amount of formal religious training required. *Our Lady*, 591 U.S. at 758–59.

U.S. at 195 n.4.  Therefore, an employer who asserts the ministerial exception as a defense has the burden of proving it.  *Fitzgerald v. Roncalli High School, Inc.*, 73 F.4th 529, 531 (7th Cir. 2023).

**B**

We begin by discussing the various contexts in which courts have found the ministerial exception applies.  The Supreme Court has found the ministerial exception applies to teachers at religious schools because "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."  *Our Lady*, 591 U.S. at 753–54, 757–58 (finding that religious schoolteachers responsible for educating students in the Catholic faith—the core mission of their schools—were ministers for purposes of the exception); *see also Hosanna-Tabor*, 565 U.S. at 190–92 ("called" religious schoolteacher qualified under ministerial exception).  Lower courts have followed suit.[4]

But the exception is not exclusive to Catholic school teachers.  We have applied the ministerial exception outside the religious schoolteacher context on a few occasions, including recently to a "work practice apprentice" at the San Francisco Zen Center ("Center").  *See Behrend*, 108 F.4th at

---

[4] *See, e.g.*, *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 331–33 (4th Cir. 2024) (substitute English and drama teacher was a "minister" because he was required to teach in a way "agreeable with Catholic thought," and to pray and attend Mass with his students); *Butler v. Saint Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 193–98 (E.D.N.Y. 2022) (same); *Orr v. Christian Bros. High Sch., Inc.*, 21-15109, 2021 WL 5493416, *1 (9th Cir. Nov. 23, 2021) (finding the ministerial exception applied to a religious-school principal).

766–67, 769–71.  The Center is the largest Zen Buddhist
temple in North America and was formed to "encourage the
practice of Zen Buddhism by operating one or more religious
practice facilities and educating the public about Zen
Buddhism." *Id.* at 766.  It offers three residential programs
designed to be sequential: a two-to-six-week in-residence
guest student program, a two-to-three-year in-residence
work practice apprenticeship, and, for those who complete
an apprenticeship, full-time staff positions.  *Id.* at 766–67.
As a work practice apprentice, Behrend was required to
follow a "strict practice schedule of formal and work
practice" including twice daily meditations and services,
temple cleanings, dharma talks, ceremonial tasks to support
the formal practice, and menial tasks like cooking,
dishwashing, and cleaning.  *Id.* at 767.

We found that the ministerial exception applied to
Behrend because, although he performed mostly menial
work, that work was itself "an essential component of Zen
training." *Id.* at 769.  We reasoned:

> Behrend was tasked with performing
> maintenance, kitchen, and guest services.
> But he was also responsible for assisting with
> rituals, participating in meditations and
> services, cleaning the temple, attending talks
> and classes, and performing doan ryo
> ceremonial tasks like ringing bells and
> cleaning altars.  He lived and worked full
> time at the temple as a monk.  While Behrend
> may not have taught and was not a part of the
> hierarchical leadership structure, he
> "performed vital religious duties" as part of

24          MCMAHON V. WORLD VISION INC.

> the Center's [work practice apprentice]
> program.

*Id.* at 770 (quoting *Our Lady*, 591 U.S. at 756).  Importantly,
we rejected Behrend's argument that only those in key roles
in preaching and teaching the faith to others could be subject
to the exception because that would mean "'interfering with
the freedom of religious groups to select' who may or may
not serve as a live-in monk."  *Id.* (quoting *Hosanna-Tabor*,
565 U.S. at 184).

We have also found that the ministerial exception
applied to an Orthodox Jewish man employed by the Union
of Orthodox Jewish Congregations of America ("Union") as
a mashgiach—"an inspector appointed by a board of
Orthodox rabbis to guard against any violation of the Jewish
dietary laws" (*i.e.*, "keeping kosher").  *Markel v. Union of
Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 801
(9th Cir. 2024) *cert. denied sub nom. Markel v. Union of
Orthodox Jewish*, No. 24-1204, 2025 WL 1727421 (June 23,
2025).   The Union ran the largest kosher certification
program in the United States and used those revenues to
further its core religious mission of serving the Orthodox
Jewish Community.  *Id.*  Markel served on the Union's
kosher team and was responsible for grape products, which
are unique in Jewish dietary law because, to be kosher, only
Orthodox Jews can handle them until they are sufficiently
cooked or boiled.  *Id.* at 802.  Thus, "[t]o qualify to serve as
a mashgiach, Markel needed to submit a letter from an
Orthodox rabbi certifying that he was Sabbath observant,
knowledgeable about kosher law, and compliant with the
same."  *Id.*  We held that because (1) only observant
Orthodox Jews can serve as a mashgiach for the Union, and
(2) a mashgiach is necessary to the Union's mission of

MCMAHON V. WORLD VISION INC.                    25

"ensuring the wide availability of kosher food," a mashgiach is "essential to the institution's central mission" and thus qualifies as a minister for purposes of the ministerial exception.[5] *Id.* at 807 (quoting *Our Lady*, 591 U.S. at 746).

The common thread between these cases is that the Catholic schoolteacher in *Our Lady*, the work practice apprentice in *Behrend*, and the mashgiach in *Markel* all performed "vital religious duties" in light of the core missions of their respective organizations. *Our Lady*, 591 U.S. at 756, 758; *see Behrend*, 108 F.4th at 769; *Markel*, 124 F.4th at 807. We apply that analysis here to determine whether World Vision's CSR position falls under the ministerial exception.

**C**

World Vision, like any employer, is generally prohibited under Title VII and the WLAD from taking adverse employment actions based on protected characteristics, including sexual orientation.[6] *Bostock v. Clayton County*, 590 U.S. 644, 661–62 (2020). Because we agree with the district court's determination that World Vision's Biblical marriage SOC facially discriminates based on sex, sexual orientation, and marital status, World Vision is liable under Title VII and the WLAD unless it can establish an exemption or a defense, including by showing that the CSR position

---

[5] The district court did not have the benefit of our most recent decisions applying the ministerial exception, *Behrend* and *Markel*, because its order granting summary judgment to McMahon was issued before either case was published.

[6] The parties agree that World Vision rescinded McMahon's job offer because she is in a same-sex marriage.

qualifies for the ministerial exception.[7]  For the reasons below, we hold that World Vision has met its burden of showing that the CSR position qualifies for the ministerial exception, barring McMahon's claims.

Whether World Vision's CSRs qualify as "ministers" for purposes of the exception is the central issue in this appeal and requires a lengthy analysis.  The district court concluded that World Vision's CSR position was not entitled to the ministerial exception affirmative defense.  The district court found that the CSR position was secular and lacked ministerial or religious substance given that CSRs do not receive significant doctrinal instruction or a religious commissioning, are not required to perform any unique, important religious functions, and perform primarily secular job responsibilities such as placing donor calls, describing World Vision's work, data entry, and maintaining statistics. Though it "considered donor prayer and credited this job function in World Vision's favor," the district court ultimately concluded that the CSR's job duties—answering calls, up-selling, data entry, sales work, typing proficiency— "demonstrate[d] that the thrust of the customer service representative position is administrative, not ministerial."

We respectfully disagree with the district court's conclusion.  When viewing CSRs' religious functions within the context of World Vision's mission, we hold that World Vision's CSRs qualify for the ministerial exception because they perform "vital religious duties" at the heart of World Vision's mission.  *Our Lady*, 591 U.S. at 753–54, 756

---

[7] It follows that World Vision generally remains bound by state and federal laws prohibiting employment discrimination based on race, color, sex, national origin, or other protected grounds for all *non*-ministerial positions.

("What matters, at bottom, is what an employee does" and
whether those responsibilities "lie at the very core of [World
Vision's] mission.").

    The Supreme Court has made it clear that an employee's
job duties cannot be viewed in isolation from the religious
organization's mission. *Id.* at 751–52 ("The circumstances
that informed our decision in *Hosanna-Tabor* were relevant
because of their relationship to Perich's 'role in conveying
the Church's message and carrying out its mission.'"
(quoting *Hosanna-Tabor*, 565 U.S. at 192)).   Thus, the
ministerial exception applies to individuals who perform
"vital religious duties" that are "essential to the institution's
central [religious] mission." *Markel*, 124 F.4th at 806
(quoting *Our Lady*, 591 U.S. at 746).  For instance, because
the "very reason for the existence" of a religious school is
the "religious education and formation of students," the
"selection and supervision of the teachers upon whom the
schools rely to do this work lie at the core of their mission."[8]
*Our Lady*, 591 U.S. at 738.

    On this critical step, the district court erred by viewing
the CSR's responsibilities in the abstract, isolated from
World Vision's central mission.   *See id.* at 753–54
(explaining that courts should consider what an employee
does in the context of the "core of the [employer's]
mission").   When viewed within the context of World

---

[8] Similarly, the Court found the ministerial exception applied to a
religious school teacher because her "job duties reflected a role in
conveying the Church's message and carrying out its mission"—she
taught religion four days a week, led prayer three times a day, took
students to a weekly school-wide chapel service, led the chapel service
twice per year, performed devotional exercises every morning with
fourth graders, and thereby played an "important role in transmitting the
Lutheran faith to the next generation." *Hosanna-Tabor*, 565 U.S. at 192.

Vision's central mission, as we must, it is evident to us that CSRs serve "vital religious duties" at the core of World Vision's mission. *Id.* at 756.

World Vision describes its mission as to "follow our Lord and Savior Jesus Christ in working with the poor and oppressed to promote human transformation, seek justice and bear witness to the good news of the Kingdom of God." World Vision pursues its mission through: (1) "[t]ansformational [d]evelopment that is community-based and sustainable, focused especially on the needs of children"; (2) "[e]mergency [r]elief that assists people afflicted by conflict or disaster"; (3) [p]romotion of [j]ustice that seeks to change unjust structures affecting the poor among whom we work"; (4) "[p]artnerships with churches to contribute to spiritual and social transformation"; (5) "[p]ublic awareness that leads to informed understanding, giving, involvement and prayer"; and (6) "[w]itness to Jesus Christ by life, deed, word and sign that encourages people to respond to the Gospel."

According to World Vision, CSRs play a unique and vital role in each aspect of the organization's mission. World Vision describes its CSRs as the organization's "lifeblood" because they are the sole employees interfacing with donors and soliciting donations, which World Vision views as a form of ministry or religious practice. CSRs minister to donors through prayer and routinely pray with donors about their needs and the needs of the children they sponsor. In this way, World Vision considers CSRs its "voice."

World Vision emphasizes that CSRs are at the frontline of one of its primary goals: promoting the "child sponsorship program," which pairs donors with children. Some of World

Vision's donors may wish to "learn about the Christian faith," and the CSRs are responsible for teaching curious donors about World Vision's Christian faith and mission. Thus, World Vision views the CSR position as crucial not only because CSRs solicit donations and complete administrative tasks, but also because they support donors' religious transformation by "inspiring those donors who share World Vision's faith and by sharing that faith with those who don't."

True, the CSR job posting primarily lists secular and administrative duties: "[r]eport to work on time"; "learn to answer inbound customer service calls and make outbound calls"; "[a]nswer incoming calls using an Automated Call Distribution system utilizing a standard script for guidance"; "[r]ecognize and respond to up-sell opportunities"; and "[a]chieve and maintain an acceptable level of individual statistics to accomplish Call Center business goals," among others.  But the job posting also states that a CSR must "[l]earn and effectively communicate World Vision's involvement in ministries and projects around the world," "[h]elp carry out our Christian organization's mission, vision, and strategies," and "[p]ersonify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign."  In so doing, CSRs are required to "[k]eep Christ central in [their] individual and corporate lives," "[a]ttend and participate in leadership of devotions, weekly Chapel services, and regular prayer," and "[b]e sensitive to Donor's needs and pray with them when appropriate."

But that is not all.  In addition to the job posting, "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady*, 591 U.S. at 757.  According to World

Vision, "Being a part of DCS means you *are the Voice, Face and Heart of* World Vision." World Vision's Senior Director of Talent Management, Melanie Freiberg, testified that "ministering to people is an essential function of the [CSR] job" that requires "being a representative of Christ and teaching about the witness of Jesus Christ."

Recordings of real-world calls between CSRs and donors also demonstrate that the CSR role is not merely an employee at a call center cold-calling for donations. In one call, a CSR and a current donor discuss how COVID-19 has impacted a 15-year-old in Zimbabwe that the donor has sponsored for the past nine years before praying together for the donor's family during the pandemic. In another call, after a donor asks about how his sponsored child is doing, the CSR thanks the donor for providing clean water to the child and provides methods for the donor to find out how the COVID-19 pandemic is impacting the child. The donor then asks the CSR to pray for his brother, who is "close to meeting God," and the donor puts the call on speakerphone so his wife can pray with the donor and the CSR.

In sum, we hold that the ministerial exception applies to World Vision's CSR position because CSRs perform "vital religious duties" that "lie at the very core of [World Vision's] mission." *See Our Lady*, 591 U.S. at 754, 756–57. World Vision's "core mission" is to bear witness to Jesus Christ through acts of service, including support for children, those afflicted by conflict, and the poor, by partnering with churches, donors, and other members of the public through prayer and ministry. The CSRs' responsibilities "lie at the very core of [World Vision's] mission" because CSRs are the organization's "voice, face, and heart"—without the CSRs, World Vision would be severely hindered in pursuing its central religious mission. Although the execution of

those responsibilities requires administrative and customer service tasks that are ubiquitous in a secular setting, CSRs also perform "vital religious duties" crucial to World Vision's mission by explaining World Vision's ministry, programs, and by "giv[ing] people an opportunity to join [World Vision] in the mission of God" through donations and sponsorships. *See Our Lady*, 591 U.S. at 756–57.

McMahon argues that a holistic view of a CSR's job duties shows that the position is overwhelmingly secular, and any religious aspects of the position were either equally applicable to all World Vision employees or optional. We reject these arguments. For one, that a position has primarily administrative or secular job duties does not foreclose the possibility that the position qualifies under the ministerial exception. The Supreme Court has imposed no requirement that the "thrust" of the position be ministerial, or that a particular quantum of the position's job duties be religious in nature. *See Hosanna-Tabor*, 565 U.S. at 193 (indicating that the Sixth Circuit erred by "plac[ing] too much emphasis on Perich's performance of secular duties," which occupied most of each school day).

We also reject McMahon's argument and the district court's conclusion that religious job duties that are equally applicable to all World Vision employees carry diminished or no relevance in the ministerial exception analysis. True, all World Vision employees are expected to "bear witness to Jesus Christ" through life, deed, word, and sign. Similarly, all employees, not just CSRs, are "invited and expected" to attend a weekly "organization-wide chapel" service. But the district court did not cite any authority for the proposition that a position is less likely to be central to a religious organization's core mission if its religious duties are shared with general members of that organization. In fact, in

*Hosanna-Tabor*, the Supreme Court explained that the Sixth Circuit "gave too much weight to the fact that lay teachers at the school performed the same religious duties as Perich." 565 U.S. at 193.

At the same time, we recognize that the touchstone of the ministerial exception analysis is "whether each particular position implicate[s] the fundamental purpose of the [ministerial] exception," because the exception protects only "certain key roles" or "certain important positions." *Our Lady*, 591 U.S. at 746, 758. But while the ministerial exception requires at least some characteristics that distinguish a "minister" from other general employees, we have no reason to believe that any religious job duties shared between the "minister" position and other employees are irrelevant. For example, in *Markel*, the mashgiach was required to be an observant Jew, keep the Sabbath, and follow kosher laws—religious obligations that would apply to all Orthodox Jews. 124 F.4th at 807. Beyond those shared job requirements, the mashgiach's "certain important" role was ensuring the kosher integrity at the two wineries to which he was assigned, which carried out the Union's mission of ensuring the wide availability of kosher food. *Id.* at 803 (quoting *Our Lady*, 591 U.S. at 746).

Here, while the CSR's obligation to attend chapel and to bear witness to Jesus Christ are shared with all World Vision employees, the "certain important" and unique role of a CSR is to "give people an opportunity to join [World Vision] in the mission of God" through monetary donations underwriting the organization's mission. Secretaries, accountants, and custodians at World Vision, despite having the same religious obligations to attend chapel and bear witness to Jesus Christ, would not qualify for the ministerial exception because, unlike CSRs, they are not charged with

conveying the organization's message to its donors—a role "vital" to World Vision's central mission. *See Our Lady*, 591 U.S. at 756–57.

We emphasize that although universal, generic job requirements can be considered in the ministerial analysis, they are alone insufficient to establish that a position qualifies for the ministerial exception. Otherwise, every employee of a religious organization would qualify as a "minister." *See Palmer*, 72 F.4th at 71 (Motz, J., concurring) ("[T]he ministerial exception is just that—an *exception*[.]"). An employee does not necessarily qualify for the ministerial exception because they are required to pray or participate in religious services with their colleagues. Likewise, a religious employer's universal requirement that its employees help carry out the organization's religious mission or live consistently with the organization's religious values cannot be enough to qualify for the ministerial exception.

Here, every World Vision employee is required to "[p]ersonify the ministry of World Vision by witnessing to Christ and ministering to others through life, deed, word and sign" and to "keep Christ central in [their] individual and corporate lives." Though we may consider those duties in our ministerial exception analysis, they would not be sufficient standing on their own. A religious organization must show more: that the position it claims is ministerial performs "vital religious duties" *at the core of the organization's mission*. *Our Lady*, 591 U.S. at 756–57. World Vision has done so on the record before us.

We hold that the ministerial exception applies to a CSR not merely because they interface with the public, pray with their colleagues, or abide by World Vision's requirements to

embody Christian values. Rather, CSRs qualify for the exception because (1) they are World Vision's "voice," responsible for "effectively communicat[ing] World Vision's involvement in ministries and projects around the world"; (2) their engagement with donors is a form of ministry itself; and (3) they "give people an opportunity to join [World Vision] in the mission of God." Each of these religious responsibilities is "vital" to World Vision's particular religious mission. *See id.* at 756.

\* \* \*

Considering that CSRs perform "vital religious functions" that "lie at the very core of [World Vision's] mission," we conclude that CSRs qualify for the ministerial exception. Because World Vision has carried its burden of showing that there is no genuine issue of material fact as to whether a CSR qualifies for the ministerial exception, World Vision is entitled to summary judgment.

Each party shall bear its own fees and costs.

**REVERSED AND REMANDED**.